UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HOVENSA L.L.C., | § § § | |
| VS. | § § | JUDGE BUCHWALD |
| TECHNIP ITALY S.P.A. and TECHNIP S.A. | § § § § | CIVIL ACTION NO. 08-CV-12211 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO
JOIN AN INDISPENSABLE PARTY, FAILURE TO STATE
A CLAIM AND LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

I.    Introduction ................................................................................................1

II.   Factual and Procedural Background .........................................................1

    A.    Technip Italy successfully bids on an engineering, procurement,
        and construction contract for the LSG unit. ...............................................1

    B.    A few days before formal execution of the contract,
        Technip Italy decides to create a new entity to sign the
        Construction Agreement on its behalf. .....................................................2

    C.    Technip agrees to terms of the Parent Guaranty Agreement. ..................4

    D.    The project is delayed and over budget. ...................................................5

    E.    Technip unsuccessfully tries to avoid liability relating to the
        Construction Agreement. ..........................................................................6

    F.    Pursuant to the exclusive forum selection clauses in the
        Agreements and the Parent Guaranty, HOVENSA files
        this lawsuit. ...............................................................................................7

III.  Argument and Authorities .........................................................................8

    A.    Technip's Rule 12(b)(7) motion to dismiss should be denied
        because the absence of a nominal, likely insolvent, Technip-related
        entity does not preclude just resolution of the dispute. ............................8

        1.    TPVI, an agent and nominal party to a contract, is not a
            necessary party to this suit. ............................................................9

        2.    The "equity and good conscience" standard of Rule 19(b)
            does not compel dismissal of this suit; rather, it warrants proceeding in
            accordance with the real parties' exclusive
            forum selection clause .................................................................12

            a.    There is no realistic prejudice presented by the absence
                of TPVI. ..............................................................................13

            b.    Not only will dismissal nullify the parties' exclusive
                forum selection clause, it likely will leave HOVENSA
                without an adequate forum in which all real parties in
                interest are subject to jurisdiction. ........................................15

B.  Technip's Rule 12(b)(6) motion to dismiss should be denied
    because HOVENSA has pled viable claims against Technip
    Italy and Technip S.A. .............................................................16

    1.  Based on HOVENSA's well-founded allegations,
        Technip Italy is liable for breaches of both the E&P
        and the Construction Agreements. .................................17

    2.  HOVENSA had pled a viable claim against Technip S.A.
        pursuant to the Parent Guaranty. ...................................18

        a.  The Parent Guaranty is a part of the executed
            Construction Agreement and satisfies the Statue of Frauds. ...18

        b.  Other signed writings from Technip evidencing its
            agreement also operate to satisfy the Statute of Frauds. ..........21

C.  Technip S.A.'s Rule 12(b)(2) motion to dismiss should be denied because, at a
    minimum, there is prima facie evidence of
    Technip S.A.'s consent to jurisdiction. ..................................................23

    1.  HOVENSA has made a prima facie showing that
        Technip S.A has consented to jurisdiction. ...................................23

    2.  Alternatively, HOVENSA should be permitted to conduct discovery
        relating to jurisdictional issues. ..................................................25

IV.  Conclusion .................................................................................................25

TABLE OF AUTHORITIES

**Cases:**

*AETNA Cas. & Sur. Co. v. Namrod Dev. Corp.*, 140 B.R. 56
    (S.D.N.Y. 1992) ...................................................................................11

*Alpi USA, Inc. v. D&F Fashion Int'l Gemeli*, 2007 WL 942096
    (S.D.N.Y. Mar. 29, 2007) ..................................................................24

*Arol Dev. Corp. v. Whitman & Ransom*, 626 N.Y.S.2d 118
    (App. Div. 1995) ................................................................................19

*Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377
    (S.D.N.Y. 2005) ...........................................................................21, 22

*Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ...........................................16

*Bitúmenes Orinoco, S.A. v. N.B. Power Holding Corp.*,
    2007 WL 485617 (S.D.N.Y. Feb. 13, 2007)......................................24

*Coastal Aviation, Inc. v. Commander Aircraft Co.*, 903 F. Supp. 591
    (S.D.N.Y. 1995) .................................................................................22

*Cohen v. Heussinger*, 1994 WL 240378 (S.D.N.Y. May 26, 1994) ...................14

*Dennis v. Wachovia Sec., LLC*, 429 F. Supp. 2d 281 (D. Mass. 2006) .............13

*Direct Inv. Partners AG v. Cerberus Global Invs., LLC*, 2008 WL 355467
    (S.D.N.Y. Feb. 7, 2008) ...................................................16, 17, 18, 22

*DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81 (2d Cir. 2001) .........................23

*Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 942 F. Supp. 201
    (S.D.N.Y. 1996) .................................................................................11

*Fid. & Cas. Co. of N.Y. v. Tillman Corp.*, 112 F.3d 302 (7th Cir. 1997) .........14

*Gerald Syndicate, Inc. v. Negev Home Made Foods, Inc.*,
    603 N.Y.S.2d 843 (App. Div. 1993) .................................................19

*Giaguara S.p.A. v. Amiglio*, 257 F. Supp. 2d 529 (E.D.N.Y. 2003) ..................11

*Glyfada Seafaring Corp. v. Fillmore Shipping Ltd.*,
    685 F. Supp. 40 (S.D.N.Y. 1987) .....................................................20

*Great White Bear, L.L.C. v. Mervyns, LLC*, 2007 WL 1295747,
    (S.D.N.Y. Apr. 26, 2007).................................................................22

*Gruppo, Levey & Co. v. ICOM Info. & Commc'ns, Inc.*,
   2003 WL 22283812 (S.D.N.Y. Oct. 2, 2003)
   *aff'd*, 126 Fed. Appx. 45 (2d Cir. 2005) ..................................................22

*Hall v. Nat'l Serv. Indus., Inc.*, 172 F.R.D. 157 (E.D. Pa. 1997) ......................................13

*Hawley Fuel Coalmart, Inc. v. Steag Handel GmbH*,
   796 F.2d 29 (2d Cir. 1986)..............................................................20, 21

*In re Manhattan Woods Golf Club, Inc.*, 192 B.R. 80 (S.D.N.Y. 1996)...........................23

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399
   (3d Cir. 1993)..............................................................................9

*Jaser v. N.Y. Ins. Underwriting Ass'n*, 815 F.2d 240 (2d Cir. 1987)..............................8

*Kane v. Rodgers*, 250 N.Y.S.2d 674 (App. Div.),
   *aff'd*, 15 N.Y.2d 544 (1964)..............................................................17

*Kunica v. St. Jean Fin., Inc.*, 63 F. Supp. 2d 342 (S.D.N.Y. 1999).....................8, 12, 13

*Lone Star Indus., Inc. v. Nelstad Material Corp.*, 811 F. Supp. 147
   (S.D.N.Y. 1993) ..........................................................................19

*Martin Roofing, Inc. v. Goldstein*, 60 N.Y.2d 262 (1983)................................................23

*Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70 (S.D.N.Y. 2006)....................10

*Michael Kors Co. v. Compagnia Internazionale Abbigliamento S.p.A.*,
   1996 WL 509725 (S.D.N.Y. Sept. 9, 1996)..............................................20

*Montalvo v. Air Dock Sys.*, 830 N.Y.S.2d 255 (App. Div. 2007) ......................................12

*Nanopierce Techs., Inc. v. Southridge Cap. Mgmt., LLC*, 2003 WL 22882137
   (S.D.N.Y. Dec. 4, 2003)..................................................................24

*Oy Noresin AB v. ICC Indus., Inc.*, 1991 WL 161367,
   (S.D.N.Y. Aug. 16, 1991) ..............................................................17

*Parma Tile Mosaic & Marble Co. v. Short*, 87 N.Y.2d 524 (1996) ................................23

*Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102 (1968)..................12

*Matcon, Inc. v. Canron Constr. Corp.*, 1998 WL 28068
   (S.D.N.Y. Jan. 26, 1998)..............................................................18, 20

*Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114
   (D.C. Cir. 1991) ..........................................................................15

*Ricoh Corp. v. M/V "Ming Plenty"*, 2002 WL 109576 (S.D.N.Y. Jan. 25, 2002) ............15

*Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993) .....................................................15

*Rockwood Nat'l Corp. v. Peat, Marwick, Mitchell & Co.*, 406 N.Y.S.2d 106
    (App. Div. 1978) ............................................................................................................12

*Rosewood Apartments Corp. v. Perpignano*, 200 F. Supp. 2d 269 (S.D.N.Y. 2002) ........11

*Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407 (S.D.N.Y. 1996) ..............9, 13 17

*RUS, Inc. v. Bay Indus., Inc.*, 2004 WL 1240578 (S.D.N.Y. May 25, 2004),
    *aff'd sub nom.*, *Recital Foam Corp. v. Bay Indus., Inc.*, 128 Fed.
    Appx. 798 (2d Cir. 2005) ..............................................................................................17

*St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 664 F. Supp. 824
    (S.D.N.Y. 1987) .......................................................................................................9, 13

*Stevens v. Publicis, S.A.*, ____ N.Y.S.2d ____, 2008 WL 851411
    (App. Div. Apr. 1, 2008)................................................................................................21

*Teevee Toons, Inc. v. Gerhard Schubert GmbH*, 2002 WL 498627
    (S.D.N.Y. Mar. 29, 2002) .................................................................................9, 13, 17

*WPP Group USA, Inc. v. Interpublic Group of Cos., Inc.*,
    644 N.Y.S.2d 205 (App. Div. 1996) ..............................................................................25

*ZPC 2000, Inc. v. SCA Group, Inc.*, 86 F. Supp. 2d 274 (S.D.N.Y. 2000) ........................24

*Zucker v. Katz*, 708 F. Supp. 525 (S.D.N.Y. 1989) ...........................................................21

## **Federal Rules:**

FED. R. CIV. P. 19 ..................................................................................................................8

FED. R. CIV. P. 19(a)(1)(A) ...................................................................................................9

FED. R. CIV. P. 19(a)(1)(B) .................................................................................................10

FED. R. CIV. P. 19(a)(B)(ii) .................................................................................................11

FED. R. CIV. P. 19(b)(4)........................................................................................................16

## **Statutes:**

N.Y. GEN OBLIG. LAW § 5-701 .........................................................................................18

**<u>Treatises:</u>**

7 Charles Allen Wright, Arthur R. Miller & Mary K. Kane,
    *Federal Practice and Procedure* § 1608 (3d ed.) .................................................14

RESTATEMENT (SECOND) OF THE LAW OF AGENCY §149 (1958) ......................................17

## I. Introduction

HOVENSA awarded Defendant Technip Italy S.p.A. ("Technip Italy") a $127 million contract for the delivery of a Low Sulfur Gasoline ("LSG") Hydrotreater Unit. In order to induce HOVENSA to award it this lucrative contract, Technip Italy, and its parent company, Technip S.A., agreed that Technip S.A. would guarantee the contractual performance and obligations of Technip Italy. Despite HOVENSA's grants of schedule relief and additional payments, Technip Italy failed to mechanically complete the LSG unit until almost one year after the promised date, forced HOVENSA to pay over $30 million above the agreed-upon lump sum price, and delivered a facility with significant defects in critical components that, to date, have prevented the successful operation of the Unit.

HOVENSA filed suit in this Court, the agreed-upon exclusive forum for resolving disputes relating to the project. On April 18, 2008, over two months after this suit was filed, Technip Italy and Technip S.A. (collectively "Technip") filed various motions to dismiss on April 18, 2008––one day after filing a duplicative lawsuit in New York state court, a forum to which HOVENSA, and possibly Technip S.A., are not subject to jurisdiction. Technip's motions find no basis in law or equity and should be denied in their entirety.

## II. Factual and Procedural Background

**A.    Technip Italy successfully bids on an engineering, procurement, and construction contract for the LSG unit.**

HOVENSA owns and operates an oil refinery in St. Croix, U.S.V.I.. In June 2004, HOVENSA invited contractors to bid on a lump-sum basis to provide the engineering, procurement, and construction services for an LSG unit at the refinery. While HOVENSA's invitations to bid contemplated one contractor to perform all aspects of the LSG project, the invitation packages contained two draft agreements—one for engineering and procurement ("E&P") and one for construction—in order to distinguish, for local tax purposes, between the

E&P work performed outside of the U.S.V.I. and the construction work performed within the U.S.V.I. (First Am. Compl. ¶¶ 6-7.)

Responding to the invitation to bid, Technip Italy provided HOVENSA with several documents regarding its purported expertise and financial stability, and the parties executed a confidentiality agreement in July 2004 to discuss the LSG project. Shortly thereafter, however, Technip notified HOVENSA that it needed to "propose [its] Paris operating center, Technip France, as potential bidder, instead of Technip Italy," explaining that "Technip France [would] be more adapted to this project particularly for assuming construction risk." (First Am. Compl. ¶¶ 10-11.)[1]

HOVENSA decided to award the project to Technip and, in January and February 2005, the parties continued to negotiate the terms of the contracts. Meanwhile, Technip Italy notified HOVENSA that it would resume control of the project. After the parties agreed on the material terms, including the terms of the Parent Guaranty Agreement, *see infra* Part II.C, the parties signed Letters of Intent on or about February 10, 2005. The Letters of Intent were addressed to Technip S.A. and signed by representatives on behalf of "Technip Corporation." (First Am. Compl. ¶¶ 13-14 .)

**B.    A few days before formal execution of the contract, Technip Italy decides to create a new entity to sign the Construction Agreement on its behalf.**

A project kick-off meeting was scheduled for March 9-11, 2005 in Rome for the formal execution of the contract, which was divided into an Engineering and Procurement

---

[1]    Technip Italy and Technip France purport to be "major operating centers" of the multinational engineering and construction group of companies known as the Technip Group and headed by the parent company, Technip S.A. According to public filings, Technip S.A. is the parent to over 200 wholly-owned or other subsidiaries and its primary business purpose is to hold interests in these entities and provide various financial support, including parent guaranties for the contractual performance of its affiliates. (Ex. A at 77; Ex. B at 45; *see also id.* at 25 ("As the contractor of a turnkey project, we are responsible for all aspects of the project. We start with the design of the facility, then procure all the equipment and oversee all stages of construction.")

Agreement ("E&P Agreement") and a Construction Agreement (collectively "the Agreements"). Each Agreement contains over 25 virtually identical Appendices setting out the scope of work, project schedule, coordination procedures, and other obligations of the parties. The total lump-sum price for the project was $127 million; Technip Italy allocated $77 million for the E&P Agreement and $50 million for the Construction Agreement. (*See* First Am. Compl. ¶¶ 15, 25; Exs. 1-2 to Technip's Memorandum of Law (hereafter "Technip's Mem.").)

Over the course of the meetings in Rome, Technip Italy conducted a PowerPoint presentation outlining its plans and contractual responsibilities, including those for the construction phase of the project. (*See* Ex. C at 21; First Am. Compl. ¶ 16.) While in Rome, Technip Italy informed HOVENSA that an entity registered to conduct business in the U.S.V.I.––which Technip Italy referred to as "T.P.I.V." during its PowerPoint presentation—would actually sign the Construction Agreement in compliance with local tax and other regulations. (First Am. Compl. ¶ 18; Ex. C at 113.)[2]

Accordingly, on or about March 10, 2005, the same Technip representatives who had signed the Letters of Intent signed the executed Agreements. The E&P Agreement was signed by Nicola Greco, CEO of Technip Italy. (First Am. Compl. ¶ 21; Ex. 2 to Technip's Mem.) The Construction Agreement was signed by Etienne Gory, CEO of Latin America for Technip Italy and "President" of TPVI. (First Am. Compl. ¶ 21; Ex. 1 to Technip's Mem.)

---

[2]     Upon information and belief, Technip Italy created this entity, actually named "TPVI Ltd.," on or about March 2, 2005. (First Am. Compl. ¶ 19.) During the contract negotiations, HOVENSA had informed Technip Italy that a U.S.V.I. business license was required to perform construction work on the island. Technip Italy, however, decided not to obtain a U.S.V.I. business license; instead, it decided to create an entity to hold the business license and act as signatory for the Construction Agreement. (First Am. Compl. ¶ 17.) According to public filings by Technip S.A., TPVI was "created to support" the contract with HOVENSA, and both Technip Italy and TPVI are wholly-owned by Technip S.A. (Ex. A at 17, 59, 61.)

Notably, while "TPVI" is listed in the introductory paragraph as the nominal party, the various Appendices to the Construction Agreement, and Technip's public representations, refer only to Technip Italy as the party responsible for performing all obligations under the Agreements, including answering all technical and commercial questions relating to the project and providing the personnel for all phases of the project. (First Am. Compl. ¶¶ 23-24, 26)  Moreover, based on information and belief, the entire project team, including the construction management team, consisted of Technip Italy employees, including the Project Director Vincenzo Lagana. (First Am. Compl. ¶¶ 23-24.)

**C.      Technip agrees to terms of the Parent Guaranty Agreement.**

Attached as Appendix Q to, and expressly made a part of, the executed Agreements is a "Parent Guaranty Agreement" ("Parent Guaranty").  The parties had reached agreement on the terms of the Parent Guaranty in January.  (First Am. Compl. ¶¶ 47-52; Exs. E, F.)   On January 21, 2005, Etienne Gory submitted Technip's proposed draft of various aspects of the transaction, including the Parent Guaranty, to be attached to the Agreements as Appendix Q.  (Ex. E.)  With the exception of the forum selection clause, the material terms of this draft of the Parent Guaranty proposed by Technip on January 21, 2005 are *identical* to the one ultimately attached to and incorporated into the executed E&P and Construction Agreements. (First Am. Compl. ¶¶ 49-52; Exs. D, E.)

In an e-mail dated January 24, 2005, HOVENSA responded by agreeing to the proposed guaranty with one material modification: the adoption of the exclusive forum selection clause contained in the Agreements instead of an arbitration agreement.  (Ex. F.)  On that same date, Stéphane Mespoulhes, on behalf of Technip, responded by e-mail to HOVENSA that Technip agreed to the modifications.   (Ex. F.)  As a result, the final version of Appendix Q was made a part of the executed E&P and Construction Agreements.  (*See* Ex. D ¶ 7 ("Any dispute

4

arising out of or in connection with this Guaranty will be settled in the same manner as in Article 24 [EP]/27[C] of the [EP/C] Agreement."); First Am. Compl. ¶¶ 47-52.)[3]

**D.      The project is delayed and over budget.**

As set forth in Technip Italy's "Overall Project Schedule" in the Agreements, "Mechanical Completion" of the LSG project was to be achieved no later than November 10, 2006. As compensation for damages resulting from Technip Italy's failure to deliver Mechanical Completion by that date, the parties agreed to a set amount of liquidated damages ("Schedule Liquidated Damages"), and Technip Italy contracted with an Italian bank to provide two Letters of Credit ("LOCs") to insure payment of any Scheduled Liquidated Damages, among other financial obligations. (First Am. Compl. ¶¶ 27-28.)

Unfortunately, problems with Technip Italy's performance under the Agreements began early in the project with its engineering and procurement deliverables and extended to its construction management. (*See* First Am. Compl. ¶¶ 29-46) As set forth in more detail in HOVENSA's First Amended Complaint, Technip Italy claimed *force majeure* on the project, which ultimately resulted in a March 2006 Settlement Agreement. In exchange for an additional payment of $3 million and deferring the commencement of Scheduled Liquidated Damages by 28 days, Technip Italy released HOVENSA from any claims under the Agreement, including claims relating to "force majeure events, that have occurred, issues that have arisen or for Work that has been performed as of the date of this Settlement Agreement, including any 'impacts' or 'ripple' effects." (First Am. Compl. ¶¶ 34-36.)

Even after the Settlement Agreement, however, Technip Italy proved unable to manage the costs of construction. As a result, shortly after execution of the Settlement

---

[3]      According to Technip S.A., "[p]arent guarantees are given in the normal course of the Group's businesses by Technip S.A. [and affiliates] to customers to cover the good performance of a contract awarded to one of our subsidiaries." (Ex. B at 68; *see also id.* at F-67.)

Agreement, Technip Italy shifted $7 million from the price allocated to the E&P Agreement to the price allocated to the Construction Agreement. Along with the escalating project costs, Technip Italy failed to manage the project schedule and Mechanical Completion was not achieved until late fall of 2007, almost one year after the promised November 2006 date. As set forth in the First Amended Complaint, the project delays and cost overruns resulted from Technip Italy's performance in all phases of the project. (First Am. Compl. ¶¶ 37-46.)

**E.   Technip unsuccessfully tries to avoid liability relating to the Construction Agreement.**

By the end of May 2007––with Mechanical Completion still ultimately several months away––the Scheduled Liquidated Damages owed to HOVENSA alone exceeded $13 million. Accordingly, HOVENSA exercised its right to draw on the LOCs provided by Technip Italy through an Italian bank. As with the Agreements, the LOCs had been divided into one corresponding to the E & P Agreement (approximately $7 million) and one corresponding to the Construction Agreement (approximately $6 million). In response, Technip Italy filed suit in Rome to enjoin its bank from paying on the LOCs. (Ex. G.)

In addition to arguing that HOVENSA caused all of the project delays and cost overruns, Technip Italy repeatedly argued that HOVENSA's claim related to delays caused by construction activities and, thus, only TPVI, the signatory of the Construction Agreement, could be liable for any damages. In an argument similar to the one advanced in this Court, Technip Italy argued to the Italian court that the E&P and Construction Agreements were completely independent and autonomous, and further, that HOVENSA could draw only on the LOC that Technip Italy had posted in the name of TPVI for the Construction Agreement. (See Ex. G at p. 2, 10-11.) Rejecting Technip's fanciful separation of the two Agreements, the Italian court recognized the indisputable "unitary nature" of the Agreements as follows:

> Once again it must be held that the arguments put forward by [Technip Italy], according to which the two aforementioned contracts are autonomous and distinct and that, therefore the draw down of the guarantees should be limited only to the "Construction Agreement"[] are also unfounded. The *unitary nature of the relationship in question* has been reiterated by the respondent Hovensa *and confirmed by various documentary elements*, not validly refuted by the formal aspect relied on by the petitioners . . .

(Ex. H at 3-4).  Accordingly, the Italian court refused to enjoin payment on the LOCs.

**F.**     **Pursuant to the exclusive forum selection clauses in the Agreements and the Parent Guaranty, HOVENSA files this lawsuit.**

Despite overcoming Technip Italy's interference with the LOCs, HOVENSA's damages from Technip Italy's failure to perform under the Agreements still exceed $31 million, a number that will continue to increase in light of apparent defects in the design and/or fabrication of critical component parts of the LSG unit.   In July 2007, pursuant to the dispute resolution procedures in the Agreements, HOVENSA met in St. Croix with Technip's representative Etienne Gory but were unable to resolve the disputes.  Moreover, during other conversations with Technip Italy, HOVENSA was informed that Technip's headquarters in France had unequivocally refused to provide additional money to the project.

On February 6, 2008, in accordance with the parties' agreement to litigate all contractual disputes exclusively in the United States District Court for the Southern District of New York, (Ex. 1 to Technip's Mem. ¶ 24.2; Ex. 2 to Technip's Mem. ¶ 27.2), HOVENSA filed this suit against Technip Italy and Technip S.A.  Two and one-half months later, Technip Italy filed a duplicative lawsuit in New York state court.   One day later, in this action, Technip filed various motions to dismiss this suit on the following grounds: (1) TPVI, a non-diverse nonparty, is indispensable to the resolution of HOVENSA's claims; (2) TPVI, not Technip Italy, is liable for damages arising from any breach of the Construction Agreement; and (3) the Parent Guaranty is unenforceable as a matter of law, and thus, Technip S.A. is neither subject to the jurisdiction of this Court nor liable for breaches of the E&P and Construction Agreements.

As set forth below, these motions are based both on mischaracterizations of HOVENSA's claims, a disregard of the terms of the E&P and Construction Agreements and the undisputed circumstances surrounding their negotiation and execution, and recitation of general legal principles that have no connection to the facts and claims in this case. According, the motions should be denied in their entirety.

### III. ARGUMENT AND AUTHORITIES

**A.    Technip's Rule 12(b)(7) motion to dismiss should be denied because the absence of a nominal, likely insolvent, Technip-related entity does not preclude just resolution of the dispute.**

Technip seeks dismissal of this suit—and nullification of the parties' agreement that the U.S. District Court for the Southern District of New York would be the exclusive forum for resolution of all contractual disputes—based on the absence of TPVI, a nondiverse, nominal party to the Construction Agreement. To warrant such extraordinary relief, Technip must show that (1) TPVI is a person "required to be joined if feasible" (i.e. a "necessary" party under previous nomenclature), and (2) "in equity and good conscience," the action should not proceed without TPVI's participation. FED. R. CIV. P. 19.

As the Second Circuit has explained, dismissal for failure to join a nondiverse person is disfavored. "[V]ery few cases should be terminated due to the absence of nondiverse parties unless there has been a reasoned determination that their nonjoinder makes just resolution of the action impossible." *Jaser v. N.Y. Props. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987). This determination requires a fact-intensive and pragmatic inquiry into the parties and the nature of the dispute. *See Kunica v. St. Jean Fin., Inc.*, 63 F. Supp. 2d 342, 350 (S.D.N.Y. 1999). Here, that inquiry shows that Technip's motion is a groundless attempt to use a completely dispensable entity to avoid liability for breaching its contractual obligations and undo its explicit agreement to litigate the contractual dispute in the U.S. District Court for the Southern District of New York. The motion should be denied.

1.    **TPVI, an agent and nominal party to a contract, is not a necessary party to this suit.**

The first prong of Rule 19(a) requires a determination that, without the absent person's participation, "the court cannot accord complete relief among existing parties." FED. R. CIV. P. 19(a)(1)(A); *see also Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993) (explaining that this inquiry "is limited to whether the district court can grant complete relief to the persons already parties to the action"). HOVENSA's allegation—amply supported by the Agreements themselves and the circumstances surrounding their negotiation and execution—is that TPVI was created at the last minute by Technip Italy to sign the Construction Agreement on its behalf. (*See* First Am. Compl. ¶¶ 16-26, 56.)

As a result, to the extent TPVI "acted" at all, it did so as the agent of Technip Italy, who bid on the project, negotiated the Agreements, planned and managed the project, and provided all materials and personnel for execution of the project. (Ex. C; First Am. Compl. ¶¶ 8-16, 23-24.)    If HOVENSA prevails on its claim, Technip Italy—not its agent, TPVI—is liable for any breach of the Construction Agreement and complete relief can be granted to HOVENSA.  In this situation, courts repeatedly have refused to find the defendant's purported agent to be a necessary, much less indispensable, party to the action.  *See, e.g., Teevee Toons, Inc.*, 2002 WL 498627, at *5 ("[C]omplete relief can be accorded to the present parties because TVT claims no independent wrongdoing on the part of Rodico; rather, the Complaint alleges that Rodico merely executed the contract as Schubert's agent and that Schubert breached its own contractual obligations by producing a flawed Biobox system"); *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 415 (S.D.N.Y. 1996) ("[I]f plaintiff establishes an agency relationship and ultimately prevails at trial, it can obtain complete relief whether or not Suchard is a party defendant."); *see also St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 664 F. Supp. 824, 830 (S.D.N.Y. 1987).

The second prong of Rule 19(a) is equally inapplicable under the facts of this case.  This requires Technip to show that TPVI claims an interest in the subject matter of the

lawsuit *and* is so situated that proceeding without it may (i) "as a practical matter impair or impede [TPVI's] ability to protect the interest" or (ii) "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." FED. R. CIV. P. 19(a)(1)(B).  Characteristic of most of Technip's arguments, the "interest" that Technip advocates on behalf of TPVI resides in the realm of theory, rather than in the realities of the parties' dispute and the practical considerations of Rule 19.

Technip never identifies what practical or realistic interest that TPVI––a last-minute creation used to enable Technip Italy to perform its construction and related services in the U.S.V.I.––has in this suit, much less how such an interest will be "impaired or impeded" unless the parties' agreement to resolve disputes is negated and this suit is dismissed.  *See Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 74 (S.D.N.Y. 2006) (explaining that movant bears burden of producing evidence showing the nature of the interest and how such interest will be impaired).  HOVENSA is aware of no evidence that TPVI is a lasting, financially viable business, or that TPVI has any significant assets, business activities, or employees distinct from those of Technip Italy.   In contrast, what is evident is that Technip Italy controlled the entire project, unilaterally "shifting" $7 million from the price of its E&P Agreement to the Construction Agreement as construction-related costs continued to escalate.  Indeed, in the Italian proceeding, Technip Italy itself dismissed the significance of TPVI to the dispute, urging the court to apply Italian legal principles to enjoining payment of the two LOCs as they "have both been issued in Italy upon request of the ordering party, *that in both cases is the same company, Technip Italy* – incorporated under the laws of Italy." (Ex. G at 15 (emphasis added).)

Moreover, even if TPVI's theoretical interest in the suit as the signatory on the Construction Agreement requires protection, this interest is consistent with, if not identical to, the interests of Technip Italy and Technip S.A. in defending the execution of the LSG project.  As this Court and other courts have explained, a non-party is not necessary under Rule 19

when its interests are closely aligned with an existing party who can adequately protect those interests. *See Rosewood Apartments Corp. v. Perpignano*, 200 F. Supp. 2d 269, 277 (S.D.N.Y. 2002); *accord Aetna Cas. & Sur. Co. v. Namrod Dev. Corp.*, 140 B.R. 56, 61 (S.D.N.Y. 1992) (holding that corporation was not a necessary party where it was doubtful that joinder of corporation "will result in any arguments being raised in the defense that have not already been raised by the present parties"); *cf. Giaguara S.p.A. v. Amiglio*, 257 F. Supp. 2d 529, 541 (E.D.N.Y. 2003) ("[A] party is not necessary even if the defendant would have to defend the absent party's actions at trial.").

As for the remaining consideration under Rule 19(a), there is no plausible, much less significant, threat of "inconsistent obligations" being imposed upon any "existing party" to this action. FED. R. CIV. P. 19(a)(B)(ii). In an effort to manufacture a potential threat, Technip Italy—one day before it was required to respond to HOVENSA's complaint in this suit, and in complete disregard of its agreement to the exclusive jurisdiction of the United States District Court for the Southern District of New York—sued HOVENSA in New York state court. Even putting aside the inequity of rewarding Technip's gamesmanship by dismissing this suit, the potential for inconsistent adjudications in parallel proceedings does render a non-party "necessary" under Rule 19(a). *See Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 942 F. Supp. 201, 206 (S.D.N.Y. 1996) ("If this litigation proceeds concurrently with the litigation in Antwerp, there is a possibility that the two tribunals could come to opposite conclusions concerning Welgrow's liability for the disputed detention charges. However, Rule 19 does not protect a party from logically inconsistent results, only inconsistent obligations. Here, an inconsistency in holdings will not impose multiple damage awards or inconsistent equitable obligations, such as would result from the issuance of conflicting injunctions."); *accord Giaguara S.p.A.*, 257 F. Supp. 2d at 541 ("[A] party is not necessary to an action merely because a parallel action is being brought against an absent party that may result in different outcomes.")

Further, the state court suit, which has yet to be served upon HOVENSA, presents no significant risk of imposing inconsistent obligations on either Technip Italy or Technip S.A. (who, notably, did not join in the state court suit). First, HOVENSA—a Virgin Islands LLC that does not conduct business in the State of New York—has not consented, nor is it otherwise subject, to the personal jurisdiction of New York state courts.[4] Second, even if the state court suit somehow proceeds, reaches trial before this action, *and* results in a finding that Technip Italy (or TPVI) did not breach the Agreements, then Technip Italy may defensively assert the collateral estoppel effect of that judgment in this suit.

Because Technip has not made the preliminary showing under Rule 19(a) that TPVI is even a "necessary" party, its motion to dismiss under Rule 12(b)(7) should be denied.

> **2.    The "equity and good conscience" standard of Rule 19(b) does not compel dismissal of this suit; rather, it warrants proceeding in accordance with the real parties' exclusive forum selection clause.**

Even if TPVI were a "necessary" party under Rule 19(a), its joinder—and the resulting dismissal of this suit for lack of diversity jurisdiction—is not proper because TPVI is not an "indispensable" party in light of the issues and the largely undisputed facts of this case. *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19 (1968) (explaining that determination of indispensability "can only be determined in the context of particular litigation" and "must be based on factors varying with the different cases, some such factors being substantive, some procedural, some compelling by themselves, and some subject to balancing against opposing interests"). In determining whether a party is indispensable, a district court considers the following non-exclusive list of factors: "(1) to what extent a judgment

---

[4]    In the state court suit, Technip has alleged that HOVENSA is subject to jurisdiction pursuant to CPLR 303, which provides that a person who files suit in New York thereby consents to jurisdiction of the state courts with respect to a related suit brought against the person by a party to the first suit. In *Rockwood Nat'l Corp. v. Peat, Marwick, Mitchell & Co.*, however, the court properly held that this statute "is inapplicable where the pending action is commenced in Federal court." 406 N.Y.S.2d 106, 107 (App. Div. 1978) (acknowledging, but not addressing, the potential for constitutional problems with expansively reading the statute to apply to federal actions). Notably, even if the state court suit somehow is not dismissed on jurisdictional grounds, there will be a compelling argument for abatement in favor of this action. *See generally Montalvo v. Air Dock Sys.*, 830 N.Y.S.2d 255, 256 (App. Div. 2007).

rendered in the person's absence might be prejudicial to him or those already parties, (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided, (3) whether a judgment rendered in the person's absence will be adequate, and (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." *See Kunica*, 63 F.Supp.2d at 350 ("The phrase 'good conscience' implies a careful and constructive consideration of those parties that are necessary to the litigation.") (citation and internal marks omitted).

> **a.    There is no realistic prejudice presented by the absence of TPVI.**

Trying to conjure a need for TPVI to be named in the suit, Technip dispenses with the fact-intensive, pragmatic analysis of likely prejudice required by Rule 19(b) and suggests a *per se* rule that any entity named in a contract is an indispensable party to a dispute relating to that contract. (*See* Technip's Mem. at 11-12.) In contrast to inapposite authorities cited by Technip, federal courts repeatedly have refused to treat a corporate affiliate of the defendant as a necessary, much less indispensable, party to a breach of contract action based on the affiliate's acts as the alleged agent of the defendant. *See Teevee Toons, Inc.*, 2002 WL 498627 at *5; *Royal Indus. Ltd.,* 926 F. Supp. at 415; *St. Charles Cable TV, Inc.*, 664 F. Supp. at 830.[5]

Moreover, it is the alleged wrongdoing of Technip Italy––not TPVI––that is "at the heart of this case." (Technip's Mem. at 11.) Not only is it HOVENSA's allegation that TPVI served as an agent of Technip Italy, many of the events contributing to the project delays and cost overruns occurred *before TPVI even existed*, including Technip Italy's creation of a misleading and inadequate project schedule, its designation of construction and project

---

[5]    *See generally Dennis v. Wachovia Sec. LLC*, 429 F. Supp. 2d 281, 290 (D. Mass. 2006) ("Courts have consistently concluded that Rule 19 does not require joinder of principal and agent.") (citation and internal marks omitted); *Hall v. Nat'l Serv. Indus., Inc.*, 172 F.R.D. 157, 159 (E.D. Pa. 1997) ("It is well established that Rule 19 does not require the joinder of principal and agent.").

management personnel, and its selection of the mechanical contractor, whose performance Technip now contends was the cause of most of the project delays and cost overruns. Moreover, the technical absence of TPVI as a party will not hamper Technip's defense in any manner. Even assuming *arguendo* that TPVI ever employed persons or created documents independent of Technip Italy, Technip wholly owns and controls TPVI and would have ready access to all relevant evidence.

With respect to the threat of multiple litigation resulting from TPVI not being named in this suit, Technip again proffers an argument more appealing in theory than in the undisputed facts surrounding this dispute. *See generally* 7 Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1608 (3d ed.) ("[C]ourts must look to the practical likelihood of prejudice and subsequent litigation, rather than the theoretical possibility that they may occur."). Technip contends that, should HOVENSA not prevail on its claims against Technip, HOVENSA might subsequently pursue the same claims against TPVI. (*See* Technip's Mem. at 12.) Given TPVI's apparent status as a limited-purpose entity without significant assets or ongoing business activities, HOVENSA has no incentive to pursue claims against TPVI. *See, e.g., Cohen v. Heussinger*, 1994 WL 240378, at *2 (S.D.N.Y. May 26, 1994) (explaining that a "defunct and assetless" entity "can not be deemed an indispensable party to this litigation, since for practical purposes, it is not a real party in interest to this dispute").[6]

In addition, the collateral estoppel risk associated with this suit is borne by HOVENSA, not TPVI. If HOVENSA does not prevail on the merits of its claims—*i.e.*, Technip Italy breached the Construction Agreement—it will be collaterally estopped from relitigating those claims against TPVI. Moreover, Technip Italy will be held liable in this action only if it is found—in accordance with the largely undisputed facts surrounding the

---

[6]    *Accord Fid. & Cas. Co. of N.Y. v. Tillman Corp.*, 112 F.3d 302, 304 (7th Cir. 1997) (holding that nondiverse non-party was not an indispensable party due to threat of subsequent litigation against

negotiation and execution of the Agreements—that Technip Italy is the real party in interest to the Construction Agreement, as well as the E&P Agreement.   Consequently, there is no plausible risk of prejudice to any party from proceeding with this suit involving the real parties in interest.    *See generally Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1120-21 (D.C. Cir. 1991).

> **b.    Not only will dismissal nullify the parties' exclusive forum selection clause, it likely will leave HOVENSA without an adequate forum in which all real parties in interest are subject to jurisdiction.**

The Agreements governing this dispute—the E&P Agreement, Construction Agreement, and Parent Guaranty—all provide for resolution of disputes *exclusively* in the United States District Court for the Southern District of New York.   (Ex. 1 to Technip's Mem. ¶ 24.2; Ex. 2 to Technip's Mem. ¶ 27.2; Exs. D, F.)  Such exclusive forum selection clauses are a common and critical component of international business contracts and, accordingly, federal policy warrants their strict enforcement.   *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993) ("[T]he [Supreme] Court has noted that contracts entered into freely generally should be enforced because the financial effect of forum selection and choice of law clauses likely will be reflected in the value of the contract as a whole."); *Ricoh Corp. v. M/V "Ming Plenty"*, 2002 WL 109576, at *2 (S.D.N.Y. Jan. 25, 2002) (denying motion to transfer, explaining that "while the potential for duplicative litigation is a real one, the fact does not outweigh the strong policy favoring enforcement of forum selection clauses"). Indeed, even after the contractual disputes arose in this case, Technip Italy (and TPVI) acknowledged in the Italian court proceeding that the proper forum for resolution of the underlying contractual disputes was the "US District Court, Southern District of New York." (Ex. G at 19.)[7]

---

him, explaining that the non-party "lacks the assets to pay a judgment and is not apt to acquire them later . . . so as a practical matter no one is going to sue him").

[7]    Technip's request that the forum selection clause be nullified in favor of a mandated arbitration is both legally and factually disingenuous.   Technip proposed arbitration during contract negotiations but the parties could not agree on the terms, and thus, they agreed on litigation in the U.S. District

Perhaps even more importantly, this Court is the only forum to which all of the real parties in interest are subject to jurisdiction. *See* FED. R. CIV. P. 19(b)(4). HOVENSA is not subject to the jurisdiction of the state courts of New York. Also, while there is at least an issue of fact as to whether Technip S.A. has consented to the jurisdiction of this Court, *see infra* Part III.C, Technip S.A. will certainly argue that it cannot be subject to the jurisdiction of the *state courts* in New York based on its consent to the forum selection clause in the Parent Guaranty. Moreover, Technip's complaint about the lack of jurisdiction over TPVI in the parties' agreed-upon forum is a problem of its own making, having unilaterally created a nondiverse entity at the last minute to sign the Construction Agreement on its behalf.[8]

In sum, considerations of both policy and equity warrant enforcement of the real parties' explicit agreement to resolve disputes exclusively in this forum and rejection of Technip's continued attempt to escape that agreement through unrealistic and untenable claims of prejudice on the part of the clearly dispensable TPVI. Technip's Rule 12(b)(7) motion to dismiss should be denied.

**B.    Technip's Rule 12(b)(6) motion to dismiss should be denied because HOVENSA has pled viable claims against Technip Italy and Technip S.A.**

To avoid dismissal for failure to state a claim under Rule 12(b)(6), plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). In applying this standard, the plaintiff's factual allegations are accepted as true and all reasonable inferences are drawn in

---

Court for the Southern District of New York instead. What Technip could not obtain through negotiation, it now tries to obtain by manipulation of Rule 19.

In addition, Technip's reliance on the "strong federal policy favoring arbitration" is wholly misplaced. This federal policy favors full enforcement of the parties' *agreements* to arbitrate, not imposing arbitration on parties. Here, the parties have never agreed to arbitrate but, instead, explicitly agreed to resolve disputes by litigation in a particular forum.

[8]    Indeed, the fact that TPVI could not be brought into the exclusive forum chosen after extensive negotiations by sophisticated corporate parties indicates that no one considered TPVI as a necessary or real party to any contractual dispute.

favor of the plaintiff. *See Direct Inv. Partners AG v. Cerberus Global Invs., LLC*, 2008 WL 355467, at *3 (S.D.N.Y. Feb. 7, 2008).

    **1.**      **Based on HOVENSA's well-founded and plausible allegations, Technip Italy is liable for breaches of both the E&P and the Construction Agreements.**

        Technip Italy mischaracterizes or, at a minimum, misunderstands the allegations forming the basis of HOVENSA's claims under the Construction Agreement. HOVENSA does not allege that Technip Italy entered oral agreements, separate and apart from the Agreements, to provide construction services to HOVENSA. Instead, HOVENSA alleges that Technip Italy *is the* party to the Construction Agreement and that TPVI as signatory acted on behalf of Technip Italy. (Orig. Compl. ¶¶ 28, 47, 52). To the extent that the basis for HOVENSA's claim was unclear, HOVENSA has filed a First Amended Complaint clarifying these allegations. (First Am. Compl. ¶¶ 16-26, 56.)

        Under well established New York law, a corporation may bind another corporation to a contract under the traditional principles of agency. *See Kane v. Rodgers*, 250 N.Y.S.2d 674, 674 (App. Div.) (holding that a principal may be bound by its agent's execution of a written agreement even though the principal is not named in the agreement), *aff'd*, 15 N.Y.2d 544 (1964); *Teevee Toons, Inc.*, 2002 WL 498627 at *5; *Royal Indus. Ltd.*, 926 F. Supp. at 413; *accord* RESTATEMENT (SECOND) OF THE LAW OF AGENCY § 149 (1958) ("A disclosed or partially disclosed principal is subject to liability upon an authorized contract in writing . . . although it purports to be the contract of the agent, unless the principal is excluded as a party by the terms of the instrument or by the agreement of the parties.")[9] As set forth in HOVENSA's

---

[9]    *See also Oy Noresin AB v. ICC Indus., Inc.*, 1991 WL 161367, at *1-2 (S.D.N.Y. Aug. 16, 1991) (denying Rule 12(b)(6) motion to dismiss breach of contract claim against non-signatory defendant, explaining that "a parent corporation may become a party to its subsidiary's contract under an agency theory if the parent's conduct manifests an intent to be bound by the contract"); *RUS, Inc. v. Bay Indus., Inc.*, 2004 WL 1240578, at *12-14, 20-21 (S.D.N.Y. May 25, 2004) (entering judgment based on jury verdict under similar agency theory), *aff'd sub nom., Recticel Foam Corp. v. Bay Indus., Inc.*, 128 Fed. Appx. 798 (2d Cir. 2005) (summary order).

pleadings—and amply supported by the undisputed facts and documentation—TPVI signed the Construction Agreement as agent of Technip Italy; thus, Technip Italy's motion to dismiss HOVENSA's breach of contract claim relating to overpayments on construction services must be denied.[10]

### 2.    HOVENSA had pled a viable claim against Technip S.A. pursuant to the Parent Guaranty.

Technip's Rule 12(b)(6) motion is premised solely upon the characterization of the Parent Guaranty as an "unsigned draft" agreement unenforceable as a matter of law under the Statute of Frauds. (*See* Technip's Mem. at 14.)  A promise to guarantee the obligations of another clears the hurdle of the Statute of the Frauds so long as the promise "or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent." *See* N.Y. GEN. OBLIG. LAW § 5-701; *accord Matcon, Inc. v. Canron Constr. Corp.*, 1998 WL 28068, at *5 (S.D.N.Y. Jan. 26, 1998) ("General Obligations Law Section 5-701 requires nothing more than that the existence of an agreement be evidenced by a writing subscribed by the party to be charged.")  The writings alleged—and proven by—HOVENSA readily satisfy this evidentiary hurdle.[11]

### a.    The Parent Guaranty is a part of the executed E&P Agreement and Construction Agreement and satisfies the Statute of Frauds.

The parties attached the Parent Guaranty and explicitly made it part of the E&P and Construction Agreements signed by the parties' representatives.   Instead of trying to

---

[10]    Technip Italy has not moved for dismissal of HOVENSA's claims arising from the defective design and/or fabrication of compressors in the LSG unit (Count Two in both the Original Complaint and First Amended Complaint).  Further, HOVENSA has withdrawn its affirmative claims for relief against Defendants based on the quasi-contractual grounds of promissory estoppel and unjust enrichment (Counts Three and Four in Original Complaint), thereby mooting that portion of Technip's motion.

[11]    "The Statute of Frauds was not enacted to afford persons a means of evading just obligations; nor was it intended to supply a cloak of immunity to hedging litigants lacking integrity . . . ." *Direct Inv. Partners AG*, 2008 WL 355467, at *8 (quoting 4 Williston, Contracts [3d ed.], § 567A, pp. 19-20).)

explain why these sophisticated parties would include a Parent Guaranty that no one intended to enforce as part of their Agreements, Technip repeatedly refers to the Parent Guaranty as being "unsigned," never acknowledging the fact that the final Parent Guaranty, like the parties' previous drafts, contains no signature block separate from that in the main body of the Agreements. (Exs. D, E.)  A reasonable inference from the parties' knowing omission of any signature block is that they understood that Appendix Q—like all other obligations contained in the Appendices—became binding when their representatives signed the E&P and Construction Agreements. *See Lone Star Indus., Inc. v. Nelstad Material Corp.*, 811 F. Supp. 147, 149-50 (S.D.N.Y. 1993) (denying motion to dismiss on Statute of Frauds based on unfilled blank in guaranty agreement regarding maximum amount of guarantor's liability, explaining as follows: "The interpretation urged by [the guarantor]–that the intention of the parties might have been that the guarantee was nugatory–does not make sense in view of the background against which this contention must be judged.  This is a business, not a consumer transaction.  There is no contention that this is a contract of adhesion between unmatched parties or that a take-it-or-leave-it provision was foisted on a less sophisticated trading partner." (footnote omitted).)

What is more, an apparent representative of either Technip S.A. or Technip Italy initialed each Appendix to the Construction Agreement, including the Parent Guaranty, (Ex. D), thereby further evidencing assent to its terms.  *See, e.g., Gerald Syndicate, Inc. v. Negev Home Made Foods, Inc.*, 603 N.Y.S.2d 843, 843 (App. Div. 1993) (holding that defendant's initialing of rider pages, including page naming him as guarantor, raised fact issue of whether he intended to personally guaranty the contractual obligations even though he did not sign the signature blank on the page containing the guaranty).  While Technip likely will deny that the representatives who e-mailed their agreement to the Parent Guaranty, signed the Agreements, and/or initialed the final Parent Guaranty had authority to bind Technip S.A., such a denial presents an issue of fact to be resolved after discovery is conducted.  *See generally Arol Dev. Corp. v. Whitman & Ransom*, 626 N.Y.S.2d 118, 120 (App. Div. 1995) ("The issue of apparent authority presents what is inherently a fact determination."); *see also*

19

*Glyfada Seafaring Corp. v. Fillmore Shipping Ltd.*, 685 F. Supp. 40, 43 (S.D.N.Y. 1987) (concluding that corporate treasurer had either actual or apparent authority to execute guaranty on behalf of another corporation).

Moreover, Technip S.A. cannot use the fact that it is not identified by name in the Parent Guaranty—due to Technip's intentional or neglectful disregard of its ministerial task to fill in the appropriate blank—to render it unenforceable. To satisfy the statute, a writing or writings must supply the material terms of an agreement "expressly or by reasonable implication." *Hawley Fuel Coalmart, Inc. v. Steag Handel GmbH*, 796 F.2d 29, 33 (2d Cir. 1986). Simply put, as would be expected, the Parent Guaranty explicitly and reasonably identifies the Guarantor as "the parent company" of the "Contractor" identified in the body of the E&P Agreement (i.e. Technip Italy) and Construction Agreement (i.e. TPVI). (Ex. D.) Moreover, the parties clearly viewed Technip S.A.--the party to the Letters of Intent and the *only* "parent company" of Technip Italy--as the guarantor. Indeed, this is the only reasonable interpretation of the identification of the "Guarantor" given that, when the parties agreed to the terms of the Parent Guaranty in January of 2005, see *supra* Part II.C., TPVI did not even exist. Accordingly, there could only have been one parent company: Technip S.A. *See Matcon, Inc.*, 1998 WL 28068, at *5 (citing decision from Justice Cardozo explaining that "the sufficiency of the writing or writings must be determined with reference to the surrounding circumstances and facts"); *see also Michael Kors Co. v. Compagnia Internazionale Abbigliamento S.p.A.*, 1996 WL 509725, at *5-6 (S.D.N.Y. Sept. 9, 1996) (denying the defendant-guarantor's motion for summary judgment, holding that the scope of the obligations guaranteed could be reasonably inferred from handwritten notation).[12]

---

[12]    Contrary to Technip Italy's implication in its motions, HOVENSA has not alleged that Technip Italy is the "parent" of TPVI. HOVENSA alleged only that, upon information and belief, Technip Italy had TPVI created to facilitate execution of the Construction Agreement. HOVENSA does not know which Technip entity technically "owns" TPVI, although Technip S.A. has represented publicly that both Technip Italy and TPVI are wholly-owned by Technip S.A. (Ex. A at 59-61.)

In sum, the Parent Guaranty is not unenforceable as a matter of law, and thus, Technip S.A.'s Rule 12(b)(6) motion should be denied.

> **b.**    **Other signed writings from Technip evidencing its agreement also operate to satisfy the Statute of Frauds.**

"Under New York law the writing necessary to satisfy the statute of frauds may be embodied in several documents, only one of which need be signed by the party to be charged." *Hawley Fuel Coalmart, Inc.*. 796 F.2d at 33; *accord Zucker v. Katz*, 708 F. Supp. 525, 531 (S.D.N.Y. 1989) ("The statute of frauds may be satisfied by several incomplete writings if the agreement can be pieced together out of these separate writings—not all of which need to be signed—as long as one writing is signed by the party to be charged.") Even if the Parent Guaranty in the executed E&P and Construction Agreements itself did not satisfy the Statute of Frauds, Technip's previous unequivocal written agreement to its terms clearly does.

The parties' written communications from January 2005 demonstrate their agreement on the terms of the Parent Guaranty. Specifically, Technip submitted its version of the Parent Guaranty to HOVENSA on January 21, 2005. (Ex. E.) Significantly, the *only* material difference between Technip's January 21, 2005 proposal and the final Parent Guaranty explicitly made a part of the E&P and Construction Agreements was the dispute resolution procedure. (Exs. D, E.) On January 24, 2005, the parties agreed in writing on that provision. As evidenced by the January 24, 2005 the e-mail "signed" by Stéphane Mespoulhes, (Ex. F), the parties agreed that the Parent Guaranty would adopt the exclusive forum selection clause from the Agreements, which designated the United States Court for the Southern District of New York.[13] This exchange evidences the parties' agreement on the Parent Guaranty, particularly for

---

[13]    *See Stevens v. Publicis, S.A.*, ___ N.Y.S.2d ___, 2008 WL 851411, at * 2 (App. Div. Apr. 1, 2008) ("The e-mails from plaintiff constitute 'signed writings' within the meaning of the statute of frauds, since plaintiff's name at the end of his e-mail signified his intent to authenticate the contents."); *see also*

purposes of the Rule 12(b)(6) standard.  *See Direct Inv. Partners AG*, 2008 WL 355467, at *7

(denying motion to dismiss, holding that e-mail exchange, unsigned contracts, and letter "taken

together, contain the material terms of the agreement and satisfy the Statute of Frauds");  *Great*

*White Bear, LLC v. Mervyns, LLC*, 2007 WL 1295747, at *3 (S.D.N.Y. Apr. 26, 2007) (denying

motion to dismiss on Statute of Frauds, explaining that the defendant's "[e]-mail 'afford[s] a

basis for believing that [it] reflects a real transaction between the parties' at this stage of the

case").[14]

Finally, noting that HOVENSA did not make a separate demand on Technip S.A.

once Technip Italy refused to fulfill its contractual obligations, Technip suggests that

HOVENSA's claim to enforce its rights under the Parent Guaranty in this suit is a

"fabricated" claim.   (Technip's Mem. at 15.)   This suggestion is both irrelevant and

disingenuous.  The unsuccessful dispute resolution meeting between the parties in July 2007 was

attended by Etienne Gory, the Technip Italy executive who signed the Letters of Intent on behalf

of Technip S.A.  Further, during other discussions with Technip Italy, HOVENSA was informed

that the issues had been escalated to Technip's headquarters in France and that Technip Italy had

been told unequivocally that Technip S.A. would not commit any additional money to insure

---

*Bazak Int'l Corp. v. Tarrant Apparel Group*, 378 F. Supp. 2d 377, 386 (S.D.N.Y. 2005) (holding in a case under the Uniform Commercial Code that an e-mail was a "writing" under the Statute of Frauds and that the defendant's typed signature on attached letter satisfied the signature requirement).

[14]   *See also Gruppo, Levey & Co. v. ICOM Info. & Commc'ns*, 2003 WL 22283812, at *2 (S.D.N.Y. Oct. 2, 2003) ("Although there is some dispute between the parties as to the meaning and purpose of the memorandum calculating fees, if the memorandum has the meaning and purpose suggested by [the plaintiff], it would satisfy the statute of frauds when combined with [the defendant's e-mail] response. Whether or not the memorandum has the meaning proposed by [the plaintiff] is a question of fact for the jury to decide."), *aff'd*, 126 Fed. Appx. 45 (2d Cir. 2005) (summary order);  *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 903 F. Supp. 591, 594 (S.D.N.Y. 1995) (holding that the defendant's response letter satisfied the Statute of Frauds under the Uniform Commercial Code, explaining

performance of the project. Thus, HOVENSA understood that any demand on Technip S.A. was futile, an understanding confirmed by Technip S.A.'s position in this lawsuit. [15]

In sum, if anything has been "fabricated" for litigation, it is Technip's post-lawsuit implication that––contrary to its written representations to HOVENSA, its execution of the Agreements containing the Parent Guaranty, and its customary business practice––it never agreed to or intended to be bound by the Parent Guaranty. HOVENSA has properly alleged, and even proven, the existence of writings that evidence Technip S.A.'s assent to the Parent Guaranty, and thus, Technip's Rule 12(b)(6) motion should be denied.

**C.    Technip S.A.'s Rule 12(b)(2) motion to dismiss should be denied because, at a minimum, there is prima facie evidence of Technip S.A.'s consent to jurisdiction.**

When responding to a pre-discovery Rule 12(b)(2) motion on the basis of the pleadings and documents submitted by the parties, rather than a complete evidentiary hearing, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

**1.    HOVENSA has made a prima facie showing that Technip S.A has consented to jurisdiction.**

The sole basis for Technip S.A.'s pre-discovery challenge to personal jurisdiction is its contention that blanks in the Parent Guaranty render it—and Technip S.A.'s

___

that the defendant's "agreement to change only one aspect of the Dealership Agreement evidences his intent to be bound by other terms of that agreement").

[15]     Equally disingenuous is Technip's reliance on *Martin Roofing, Inc. v. Goldstein*, 60 N.Y.2d 262, 265-66 (1983) to criticize the lack of a separate demand on Technip S.A. In that case, the plaintiff obtained a default judgment against its obligor and, afterwards, sued the defendant as alleged guarantor based on a verbal promise. *See id.* at 264. The court did not suggest that the plaintiff's failure to previously assert a claim against the defendant undermined its guaranty claim but, instead, that it contravened the plaintiff's argument on appeal that the defendant was actually a primary obligor to the plaintiff, and thus, that the Statute of Frauds was inapplicable. *See id.* at 265-66. The other authorities cited by HOVENSA are also wholly inapposite to the facts of this case. *Parma Tile Mosaic & Marble Co. v. Short*, 87 N.Y.2d 524, 526-27 (1996) (holding that the automated imprint of a corporate name on a facsimile header did not qualify as a "signature" for the Statute of Frauds); *In re Manhattan Woods Golf*

corresponding consent to jurisdiction through the exclusive forum selection clause—
unenforceable as a matter of law.  As set forth *supra* Part III.B.2, this contention is foreclosed
by multiple writings, signed by persons with actual or apparent authority to bind Technip
S.A., that evidence its assent to the terms of the Parent Guaranty.  Moreover, to the extent
that Technip contends that it did not intend to be bound by the Parent Guaranty despite its
written representations to the contrary, this contention both raises an issue of fact and likely
entitles HOVENSA to amend its pleadings to assert a claim for fraudulent inducement.

What is more, the Court need not resolve the issue of the enforceability of the
Parent Guaranty in order to properly exercise jurisdiction over Technip.  First, Technip's
January 24, 2005 e-mail alone shows that Technip S.A. agreed to resolve disputes over the
guaranty in accordance with the exclusive forum selection clause designating the U.S. District
Court for the Southern District of New York.  (Ex. F); *cf. Bitúmenes Orinoco, S.A. v. N.B.
Power Holding Corp.*, 2007 WL 485617, at *11 n.10 (S.D.N.Y. Feb. 13, 2007) (addressing
similar e-mail exchange involving arbitration clause and holding that it constituted a sufficient
written agreement to arbitrate).  Second, even without this explicit agreement, Technip S.A.
should be bound by the forum selection clauses of the E&P and Construction Agreements
because it is so "closely related" to the dispute that it was readily foreseeable to Technip S.A.
that it would be bound by its subsidiary's agreed-upon forum.  *See, e.g., Nanopierce Techs.,
Inc. v. Southridge Cap. Mgmt., LLC*, 2003 WL 22882137, at *5-6 (S.D.N.Y. Dec. 4, 2003).

Finally, unlike the two cases cited by Technip that involved actual "unsigned"
contracts, this case involves far more than a plaintiff's "bald allegation that defendants
consented to this forum selection provision." *Alpi USA, Inc. v. D&F Fashion Int'l Gemeli*,
2007 WL 942096, at *3 (S.D.N.Y. Mar. 29, 2007); *cf. ZPC 2000, Inc. v. SCA Group, Inc.*, 86
F. Supp. 2d 274, 277 (S.D.N.Y. 2000).  Instead, there is (1) an explicit, written agreement to
the forum selection clause by a representative of Technip; (2) inclusion of the Parent Guaranty

---

*Club, Inc.*, 192 B.R. 80, 82-83 (S.D.N.Y. 1996) (involving an alleged long-term management agreement

Agreement in both the E&P and Construction Agreements executed by the same Technip representatives who had executed the Letters of Intent on behalf of Technip S.A. and/or ("Technip Corporation"); (3) initialing of the Parent Guaranty Agreement to the Construction Agreement by an apparent representative of Technip; and (4) Technip S.A.'s unequivocal admission that it routinely provides such parent company guarantees in the "normal course of the Group's business." Technip S.A.'s Rule 12(b)(2) motion should be denied.

> **2.    Alternatively, HOVENSA should be permitted to conduct discovery relating to jurisdictional issues.**

In the alternative, given the intertwining nature of the ultimate issue against Technip S.A. and the existence of jurisdiction––whether the Parent Guaranty Agreement is enforceable against Technip S.A.––resolution of the Rule 12(b)(2) motion should be deferred until discovery is conducted. At a minimum, the current evidence provides a credible basis to believe that Technip S.A. entered into an enforceable contract to guarantee the performance and obligations of the E&P and Construction Agreements. HOVENSA should be permitted to conduct discovery on the jurisdictional issues, including whether any internal Technip memoranda satisfy the Statute of Frauds, *see, e.g., WPP Group USA, Inc. v. Interpublic Group of Cos., Inc.*, 644 N.Y.S.2d 205, 206 (App. Div. 1996), and the authority of Technip representatives such as Etienne Gory, Nicola Greco, and Stéphane Mespoulhes.

### IV. CONCLUSION

For the foregoing reasons, HOVENSA respectfully requests that Technip's motions to dismiss pursuant to Rule 12(b)(7), 12(b)(6), and 12(b)(2) be denied. HOVENSA respectfully requests such further relief to which it may be entitled.

---

where no document evidencing the agreement was signed by the debtor).

Dated:     New York, New York                    Respectfully submitted,
           May 5, 2008

                                                 By:    _Gabriel Del Virginia / by permission_ JBS
                                                        Gabriel Del Virginia
                                                        LAW OFFICES OF GABRIEL DEL VIRGINIA
                                                        641 Lexington Avenue, 21st Floor
                                                        New York, NY 10022
                                                        Telephone: (212) 371-5478
                                                        Facsimile (212) 371-0460

                                                 ATTORNEYS FOR PLAINTIFF
                                                 HOVENSA L.L.C.

OF COUNSEL:

George T. Shipley
Texas Bar No. 18267100
Federal I.D. No. 2118
Jonathan B. Smith
Texas Bar No. 24013528
SHIPLEY SNELL MONTGOMERY LLP
4600 First City Tower
1001 Fannin
Houston, TX 77002
Telephone:  (713) 652-5920
Facsimile:   (713) 652-3057


To:     Christopher Paparella
        John Fellas
        Hagit Elul
        HUGHES HUBBARD & REED LLP
        One Battery Park Plaza
        New York, NY 10004-1482
        (212) 837-6000

        *Attorneys for Defendants*
        *Technip Italy S.p.A. and Technip S.A.*

# EXHIBIT A

# Annual and Sustainable Development Report 2005



*Technip*

# 2005 in Review

## January

■ Technip is awarded the Ticonderoga subsea flowline installation contract by Kerr-McGee Oil & Gas Corp., a wholly-owned affiliate of Kerr-McGee Corp. The Ticonderoga production will be tied back to the Constitution Spar.

■ Technip, leader in a joint venture with Zachry Construction Corporation and Saipem, is awarded by Freeport LNG Development an engineering, procurement and construction (EPC) contract for a new Liquefied Natural Gas receiving terminal to be located in Quintana Island near Freeport, Texas (USA).

## February

■ Technip is awarded an engineering, procurement, installation and commissioning (EPCI) contract by Caledonia E.U. Limited for the development of the Johnston field in the Southern part of the North Sea. The contract, valued at around £7 million (€10 million) requires the J4 production well to be tied back to the existing Johnston subsea manifold, which is located 400km South East of Aberdeen.

■ Technip is awarded a contract by Murphy Oil Corporation, for the engineering, construction and installation of a Spar floating production platform complete with topsides facilities, hull, mooring system and riser/wellhead systems for the Kikeh Area Development located in 1,330m water depth offshore Sabah, Malaysia. Kikeh will be the first deepwater development in Malaysia.

■ Technip is awarded by Canadian Natural Resources Limited (Canadian Natural) two contracts worth approximately CAD 1,070 million (€700 million) for upgrading facilities and a hydrogen unit for the Horizon Oil Sands Project located 75km northwest of Fort McMurray, in Northern Alberta, Canada.

## March

■ Technip is awarded by NAFTEC, Algeria's National Oil Refining Company, an engineering consultancy contract worth approximately €14 million for the revamping and expansion of their refinery in Arzew (Algeria). Refinery modernization covers the overall instrumentation and electrical systems. The expansion aims at improving fuel specification in line with 2009 European regulations.

■ Technip, in association with Subsea 7, is awarded by Petroleo Brasileiro SA (Petrobras) an engineering, procurement, installation and construction contract worth around US $500 million (Technip share: approximately US $350 million). The contract is for the deepwater Roncador subsea field development offshore Brazil.

■ Saudi Aramco awards a contract to the consortium of Technip and Bechtel for a grassroots gas plant as part of the Khursaniyah, Fadhli and Abu Hadiyah hydrocarbon field development program located in Saudi Arabia.

■ Technip is awarded, by Hovensa, a lump sum turnkey contract for a new hydrotreating unit to be located at its refinery in St. Croix, US Virgin Islands.

## April

■ Technip is awarded by Norsk Hydro two engineering, procurement, installation and commissioning (EPIC) contracts worth around €147 million (NOK 1.2 billion) combined, for tie-ins from Fram East field to Troll C and from Vilje to Alvheim, on the Norwegian Continental Shelf. The contracts include engineering, fabrication, installation and pre-commissioning of subsea umbilicals, risers and flowlines, tie-ins, manifold installation and subsea equipment protection work.

### Note 2 – Changes in Scope of Consolidation

*Year Ended December 31, 2005*
In 2005, no significant change in scope of consolidation has occurred. Only three entities entered the consolidation scope, Technip South Africa (subsidiary controlled at 51%), Technip Marine Sdn. Bhd (subsidiary controlled at 90%) and Technipetrol Hellas (subsidiary controlled at 99%). 2005 has also been characterized by the closure of pharmaceutical activities in U.S.A. through the liquidation in progress of Technip BioPharm at the end of July 2005, the disposal of Technip Engineering Brunei on September 30, 2005 and the sale of Technip Portugal to its management at the end of December 2005, without any significant impact on net income from continuing operations.

Over the year 2005, new legal entities have been created to support contracts in joint ventures: CTJV and CTEP (Qatargas 2) in Qatar, CTJV and CTEP (Rasgas 3) also in Qatar, Yemgas FZCO in Yemen, Technip Consortium (Dung Quat) in Vietnam, HT JV (Koniambo) in New Caledonia and TPVI (Hovensa) in the U.S. Virgin Islands.

*Year Ended December 31, 2004*
The following events occurred in 2004:
• The disposals of EHR and IG Spa. The German company, EHR, was sold on April 7, 2004 for €12.2 million. The net consolidated gain on EHR disposal was of €2.3 million. The Italian company, IG Spa, was sold on April 3, 2004 for €2.0 million. The net consolidated gain on IG Spa disposal was of €0.7 million. As per each disposal agreement, the companies EHR and IG Spa have been considered as sold as of January 1, 2004.
• The disposal of 75% of KTI Spa shares to KTI employees in November 2004, with a retrospective effect as of January 1, 2004. No gain has been generated by this transaction. Following this part disposal, the remaining 25% still under Company control is consolidated using the equity method for the year ended December 31, 2004.
• As the Group transferred its unstrategic operations, it also sold assets of Technip Offshore Moorings Inc. Company at their book value, at the end of the year 2004.

### Note 3 – Segment Information

The primary segment-reporting format of the Group Technip is determined to be business segment. Secondary information is reported geographically.

*(a) Information by Business Segment*
Business Segments
In order to improve the follow-up of its operating performances, the Group organized the reporting of its operations into five segments:
• The SURF segment (Subsea Umbilicals, Risers and Flowlines), which includes the manufacturing, the supply and the installation of sub-marine equipments.
• The Facilities segment, which includes the fabrication of floaters, fixed platforms and topsides.
• The Onshore Downstream segment, which comprises all business units in charge of engineering and construction of petrochemical and refining units as well as upstream facilities, including gas treatment units LNG facilities and onshore pipelines.
• The Industries segment, which is devoted to engineering and construction of non-oil related facilities, such as pharmaceutical or chemical units, power plants, cement factories, industrial buildings and infrastructures.
• The Corporate segment, which comprises the Holding activities, the reinvoicing of group services, management fees, EDP services and reinsurance activities.
The segment result disclosed by Technip in its business segment information is the "Income / (Loss) from Operations".

Consequently, the segment result does not include financial income and expenses (except financial result on contracts), income tax expense and the share of income / (loss) of associates accounted for using the equity method. Segment assets do not include asset items related to the latter, such as income tax assets. Similarly, segment liabilities do not include liability items that are not connected to segment result, such as current and deferred income tax liabilities.

**Note 35 – Main Consolidated Companies and Equity Associates**

Consolidated affiliates close their accounts as of December 31, excepting the following entities: Technip KT India, Technip India, and Nargan with a closing date on March 31 and Technip South Africa on June 30. These previous subsidiaries perform a complete and audited closing on December 31.

The following tables summarize the main consolidated companies included in the consolidation scope of Technip as of December 31, 2005, their location and their percentage of control:

| Fully Consolidated Companies | Country | December 31, 2005 % Control |
|---|---|---|
| Technip | France | Consolidating company |
| Technip France | France | 100% |
| Technip Eurocash | France | 100% |
| Technip Italy | Italy | 100% |
| TPL-Tecnologie Progetti Lavori Spa | Italy | 100% |
| TPG U.K. | United Kingdom | 100% |
| Technip TPS | France | 100% |
| Technip Iberia | Spain | 100% |
| S.C.I. CB3 Défense | France | 100% |
| Technip Overseas | Panama | 100% |
| Technip Benelux NV | Belgium | 100% |
| Technip Capital | Belgium | 100% |
| ABAY Engineering | Belgium | 100% |
| Technip Far East | Malaysia | 100% |
| Technip International AG | Switzerland | 100% |
| TTIL SNC (MIDOR) | France | 100% |
| Technip KT India | India | 100% |
| Technip Upstream Management Inc. / Technip Upstream Services Inc. / Technip Upstream Houston Inc. | U.S.A. | 100% |
| Technip U.S.A. | U.S.A. | 100% |
| Technip Benelux BV | Netherlands | 100% |
| Technip Americas | U.S.A. | 100% |
| Technip Holding Benelux BV | Netherlands | 100% |
| Technip Germany | Germany | 100% |
| Technip Seiffert | Germany | 100% |
| Technip Singapore | Singapore | 100% |
| Technip Middle East | United Arab Emirates | 100% |
| Technip Engenharia | Brazil | 100% |
| Citex | France | 100% |
| Eurobatch | France | 100% |
| SNPE Ingénierie Défense | France | 100% |
| Seal Engineering | France | 100% |
| Cofri | France | 100% |
| Clecel | France | 100% |
| Technipnet BV | Netherlands | 100% |
| Technip Nouvelle-Calédonie | New Caledonia | 100% |
| Engineering Re | Switzerland | 100% |
| Technip Bolivar | Venezuela | 100% |
| Technip Oil & Gas BV | Netherlands | 100% |



| Fully Consolidated Companies | Country | December 31, 2005 % Control |
|---|---|---|
| Technip-Coflexip Engineering Consultant (Shanghaï) | China | 100% |
| Technipetrol Hellas S.A. | Greece | 99% |
| Technip Marine (M) Sdn. Bhd. | Malaysia | 90.40% |
| PT Technip Indonesia | Indonesia | 90% |
| Technip BioPharm | U.S.A. | 85% |
| Technip CIS | Russia | 70% |
| Technip Tianchen | China | 60% |
| Technip Engineering (Thailand) | Thailand | 49% |
| TPG (M) | Malaysia | 44.10% |
| Technip Angola | Angola | 60% |
| Technip Saudi Arabia | Saudi Arabia | 40% |
| Inversiones Dinsa / DITECH | Venezuela | 20% |
| Technip Offshore International | France | 100% |
| Flexi France | France | 100% |
| Middle East Projects International (Technip MEPI ex-Cofleximmo) | France | 100% |
| Technip Marine | France | 100% |
| Angoflex | France | 100% |
| Coflexip Développement | France | 100% |
| Technip Offshore N.V. | Netherlands | 100% |
| Technip Offshore Contracting BV | Netherlands | 100% |
| Technip Offshore Holdings Ltd. | United Kingdom | 100% |
| Technip Offshore U.K. Ltd. | United Kingdom | 100% |
| Technip Ships One Ltd. | United Kingdom | 100% |
| Technip Ships Three Ltd. | United Kingdom | 100% |
| Technip-Coflexip U.K. Holdings Ltd. | United Kingdom | 100% |
| Coflexip U.K. Ltd. | United Kingdom | 100% |
| Perry Slingsby Systems Ltd. | United Kingdom | 100% |
| DUCO Ltd. | United Kingdom | 100% |
| Genesis Oil and Gas Consultants Ltd. | United Kingdom | 100% |
| Technip Offshore Norge AS | Norway | 100% |
| Technip-Coflexip Norge AS | Norway | 100% |
| Coflexip Stena Offshore AS | Norway | 100% |
| Technip-Coflexip U.S.A. Holdings Inc. | U.S.A. | 100% |
| R.J. Brown Deepwater Inc. | U.S.A. | 100% |
| DUCO Inc. | U.S.A. | 100% |
| Coflexip Maritime Inc. | U.S.A. | 100% |
| Technip Offshore Inc. | U.S.A. | 100% |
| Technip Offshore Moorings Inc. | U.S.A. | 100% |
| Genesis Oil and Gas Consultants Inc. | U.S.A. | 100% |
| Gulf Marine Fabricators Inc. | U.S.A. | 100% |
| Perry Slingsby Systems Inc. | U.S.A. | 100% |
| Technip Offshore Canada Limited | Canada | 100% |
| Stena Offshore Jersey Ltd. | Jersey | 100% |
| Coflexip Stena Offshore Mauritius Ltd. | Mauritius | 100% |
| Technip Offshore Nigeria Ltd. | Nigeria | 100% |
| Angoflex Ltda | Angola | 70% |
| Technip Maritime Overseas Ltd. (TMOL) | Bahamas | 100% |
| Flexservice N.V. | Dutch Antilles | 100% |

| Fully Consolidated Companies | Country | December 31, 2005 % Control |
|---|---|---|
| Sunflex Offshore N.V. | Dutch Antilles | 100% |
| Brasflex Tubos Flexiveis Ltda | Brazil | 100% |
| Brasflex Overseas Inc. | Virgin Islands | 100% |
| TPVI Ltd. (Hovensa) | Virgin Islands, U.S.A. | 100% |
| Sea Oil Marine Services Inc. | Cayman Islands, British Antilles | 100% |
| Flexibras Tubos Flexiveis Ltda | Brazil | 100% |
| Technip Oceania Pty Ltd. | Australia | 100% |
| Technip CSO Australia Pty Ltd. | Australia | 100% |
| Technip CSO Oceania Pty Ltd. | Australia | 100% |
| Technip CSO Oil and Gas Pty Ltd. | Australia | 100% |
| Genesis Oil and Gas Consultants Pty Ltd. | Australia | 100% |
| South East Asia Marine Engineering & Construction Ltd. | India | 78.20% |
| Technip Offshore Finland OY | Finland | 100% |
| Coflexip Singapore Pte Ltd. | Singapore | 100% |

| Consolidated Companies Under Proportionate Method | Country | December 31, 2005 % Control |
|---|---|---|
| TSS Dalia SNC | France | 55% |
| Technip South Africa (Pty) Ltd. | South Africa | 51% |
| Bechtel Technip Goro LLC | U.S.A. | 50% |
| BRI-Technip (Q-CHEM) | Qatar | 50% |
| CTME FZCO (Qatargaz) | United Arab Emirates | 50% |
| SPF-TKP Ornifpro SNC / SP-TKP Fertilizer | France / Italy | 50% |
| ProTek Germany GmbH (ex Technip Anlagenbau) | Germany | 50% |
| Technip India | India | 50% |
| UCI FZC (Amenam) | United Arab Emirates | 50% |
| Dalia Floater Angola | France | 55% |
| Tipiel | Colombia | 44.10% |
| Technip Zachry Saipem LNG LP (Freeport) | U.S.A. | 43% |
| CTEP FZCO (Qatargaz II) | United Arab Emirates | 40% |
| Consorcio Contrina SNC/CC(S)V | France / Venezuela | 34.40% |
| Saibos Akogep SNC | France | 30% |
| TSKJ / TSKJ II / LNG (Madecos) | Portugal | 25% |
| FSTP PTE Ltd. (P51/P52) | Singapore | 25% |
| FSTP Brasil Ltda (P51/P52) | Brazil | 25% |
| Yemgas FZCO | United Arab Emirates | 33.33% |
| Yemen Coordination Services | France | 33.33% |
| CTEP FZCO (Rasgaz III) | United Arab Emirates | 40% |
| Deep Oil Technology Inc. | U.S.A. | 50% |
| Spars International Inc. | U.S.A. | 50% |
| PI Rauma OY | Finland | 50% |

| Consolidated Companies Under Equity Method | Country | December 31, 2005 % Control |
|---|---|---|
| Technip KTI SpA | Italy | 25% |
| Nargan | Iran | 20% |

Part II

# PARENT COMPANY FINANCIAL STATEMENTS AS OF DECEMBER 31, 2005

## 1. PRELIMINARY NOTE

The statutory financial statements of the parent company Technip hereafter summarized disclose the main points of the financial statement and the operating results.

The main activity of Technip consists in holding interests in affiliates, receiving dividends, centralizing and reinvoicing both management fees and other organizational costs, such as insurance, information systems costs and financing costs and guarantees.

Following are the key events in 2005:
- The 4-for-1 share split and consequently, the multiplication by 4 of the number of shares on the decision of the Combined Shareholders' Meeting of April 29, 2005.
- The reclassification of a part of the special reserve on long-term profits in ordinary reserve for €200 million, with an additional tax expense amounting to 2.5% of the total transfer.
- The disposal of the affiliate Technip Portugal for €1.8 million, resulting in a €3.7 million net loss before reversal of the investment depreciation for €2.9 million accrued over the previous years.

- Technip has maintained its repurchasing program on OCEANE convertible bonds issued in January 2002. The total nominal amount repurchased on this bond loan decreased from €632.2 million as of January 1, 2005 to €612.2 million as of December 31, 2005. The redemption premium standed at €72.3 million as of December 31, 2005, versus €74.7 million as of December 31, 2004.

The complete version of the parent company financial statements is available at the Company's headquarters.

# EXHIBIT B

As filed with the Securities and Exchange Commission on June 20, 2007

# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 20-F

☐ REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF
THE SECURITIES EXCHANGE ACT OF 1934

OR

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from                to

☐ SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

Date of event requiring this shell company report _____

**Commission file number: 1-15234**

# TECHNIP

*(Exact name of registrant as specified in its charter)*

**Not Applicable**                                          **France**
*(Translation of registrant's*                   *(Jurisdiction of incorporation*
*name into English)*                                   *or organization)*

**6-8 allée de l'Arche,
Faubourg de l'Arche — ZAC Danton, 92400 Courbevoie
(telephone: +33-1-4778-2121)**
*(Address of principal executive offices)*

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class: | Name of each exchange on which registered: |
|---|---|
| **American Depositary Shares, each representing one Ordinary Share[(1)(2)]** | **New York Stock Exchange** |
| **Ordinary Shares[(1)(2)]** | **New York Stock Exchange** |

(1) Listed, not for trading or quotation purposes, but only in connection with the registration of the American Depositary Shares pursuant to the requirements of the Securities and Exchange Commission.

(2) On April 29, 2005, Technip's extraordinary meeting of shareholders approved a one-for-four share split with the corresponding division of the nominal share value, effective May 13, 2005. As of May 13, 2005, the number of outstanding shares was 96,522,328 with a nominal value of €0.7625. Simultaneously with the share split, our ADS-to-share ratio changed from four-to-one to one-to-one.

Securities registered or to be registered pursuant to Section 12(g) of the Act:
**None**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
**None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

**Ordinary Shares, nominal value €0.7625 per share: 106,117,174[(2)]**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
**Yes ☑       No ☐**

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.
**Yes ☐       No ☑**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:
**Yes ☑       No ☐**

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):
Large accelerated filer ☑        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark which financial statement item the registrant has elected to follow:
Item 17 ☐        **Item 18 ☑**

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ☐       No ☑

## Description of Our Operations

### Contract Project Management

Our project contractor activities expose us contractually to significant construction and cash flow risks. To mitigate these risks, we have developed stringent risk controls, including selectivity as to the projects we bid on, and implemented a disciplined management of cash flows, both on a contract-by-contract and on a global basis. We believe that our past ability to manage these risks has been a key factor in our ability to successfully provide turnkey solutions for our clients.

### Turnkey Projects

Our clients are generally not specialized in construction and are primarily interested in obtaining the timely delivery of a completed and operational industrial complex without significant involvement on their part. Turnkey projects allow our clients to achieve this result by delegating to the turnkey contractor the responsibility for designing and executing major facilities of an industrial complex within an agreed budget and timetable. An increasing number of companies offering turnkey services competing for one project have become involved in the offshore production area where the unit size of contracts has grown significantly. The 1995 N'Kossa field development project in Congo's territorial waters, for example, generated 50 separate turnkey contracts. In recent calls to bid, it has become commonplace for Offshore developments to divide a project into drastically fewer contracts, such as in the case of the Yemen LNG project, awarded to our Yemgas JV with KBR and JGC in 2005, or even to award the project in its entirety to only one contractor or joint venture.

As the contractor of a turnkey project, we are responsible for all aspects of the project. We start with the design of the facility, then procure all equipment and oversee all stages of construction. We complete our engagement by delivery of the facility to our client in a "ready to use" state. We usually guarantee completion by a scheduled acceptance date and/or achievement of some acceptance and performance testing levels. The client usually retains responsibility for obtaining all necessary construction and operating permits and for operating the facility after delivery.

Substantially all of our turnkey projects are under "lump-sum" contracts that fix an all inclusive lump-sum price for the project. Lump-sum contracts have several advantages for our clients: the delivery price is known in advance and in most cases cost overruns are absorbed by the project contractors and the typical penalty structure encourages timely delivery. From our point of view, while lump-sum contracts entail business and financial risks, notably by requiring us to absorb some of the cost overruns, they also allow us to appropriate any of the three types of cost savings that we generate during the life of the project: technical studies, the procurement of equipment and the management of worksites. Because of these business and financial risks, generally, we cannot estimate the margins of our lump-sum turnkey contracts accurately until a substantial portion of the work has been completed.

### Progressive Lump-Sum Turnkey Contract

In today's volatile raw material cost environment, we are introducing innovative contractual methods designed to reduce risk and costs both for ourselves and our clients. The progressive lump-sum turnkey contract ("LSTK") is a case in point: during the engineering and procurement phases of a project, we work on an open book basis with our clients and apply pre-agreed mark-ups to the costs incurred. This allows us to mitigate price rise risks associated with these project phases and reduce cost contingencies which our client would have to bear. Promptly after the completion of these phases, we close our books and promise to complete the project at a fixed cost at a specified time.

### "Cost Plus Fee" Contracting

Another type of contractual arrangement common in our industry is "cost plus fee" contracting, or service contracting. Under cost plus fee contracts, the project contractor passes the design, equipment and construction costs on to the customer after adding a predetermined percentage profit margin. Contrary to turnkey projects, the equipment, materials and construction are not paid for through a lump-sum fee. While cost plus fee contracts often contain performance bonuses and penalties, much of the bid negotiation is focused on the percentage profit margin, with relatively little reward to the contractor for efficient project management and relatively little guarantee for its client

25

such as the risk of equipment failure, work accidents, fire or explosion. These hazards can cause personal injury and loss of life, business interruptions, property and equipment damage, pollution and environmental damage. We may be subject to claims as a result of these hazards. We may also be subject to claims resulting from the subsequent operations of facilities we have designed and/or delivered. Our policy of covering these risks through contractual limitations of liability and indemnities and through insurance may not always be effective. In some of the jurisdictions in which we operate, environmental and workers' compensation liability may be assigned to us as a matter of law. Clients and subcontractors may not have adequate financial resources to meet their indemnity obligations to us. Losses may derive from risks not addressed in our indemnity agreements or insurance policies, or it may no longer be possible to obtain adequate insurance against some risks on commercially reasonable terms. Failure to effectively cover ourselves against engineering and construction industry risks for any of these reasons could expose us to substantial costs and potentially lead to material losses. Additionally, the occurrence of any of these risks could damage our reputation.

We operate in a number of different jurisdictions that have various types of governmental laws and regulations relating to the holding, the discharge and the release of oil, wastes or hazardous substances and to the protection of the environment. Pursuant to these laws and regulations, we could be held liable for remediation of some types of pollution, including the release of oil, hazardous substances and debris or wastes from production, refining or industrial facilities, as well as other assets we own or operate or which are owned or operated by either our customers or our subcontractors. Environmental remediation costs could be significant and cause us to incur a substantial loss.

We could potentially be held liable for releases of fuel oil, hazardous materials and wastes from offshore oil platforms, pipelines, storage tanks and other installations that we have engineered, constructed or installed, or are in the process of so doing.

For all projects, we seek to negotiate our contracts to include a cap for potential environmental damages and we require indemnity agreements from our customers and subcontractors above.

In 2003, we joined the Global Compact program launched by the United Nations, in which businesses commit to respect a set of core values regarding human rights, labor standards, the environment and anti-corruption. At the same time, and within the framework of our business segments, we underscored our determination to contribute to the quest for concrete answers to today's pressing issues of sustainable development, corporate social and civic responsibility, and globalization.

The Group's commitment to sustainable development is an integral part of its strategic orientation and a cornerstone of its corporate mission for the years to come. It expresses itself in our values, giving them substance with the aim of promoting them within our sphere of influence.

### Corporate History

We were incorporated under French law in 1958 by IFP to develop expertise in engineering and construction services. In 1994, we became a publicly traded company in France when our shareholders conducted a French public and international institutional offering of our shares. In 1999, we carried out a corporate restructuring which transformed us into a pure holding company through the transfer of all of our engineering and construction operations to Technip France, a wholly owned subsidiary. In October 2001, we acquired directly and indirectly 98.36% of the share capital of the offshore engineering and construction group, Coflexip. At the same time, we listed American Depositary Shares on the New York Stock Exchange under the symbol TKP. In July 2003, within the context of the reorganization of the French subsidiaries of the Group, the shareholders of Technip and Coflexip approved the merger of Coflexip into Technip which already held more than 98% of Coflexip's capital following the public offerings launched in July 2001. The shareholders of Coflexip received nine Technip shares for eight Coflexip shares.

The Technip Group is made up of 111 wholly owned subsidiaries and 93 other subsidiaries and affiliates in some 48 countries. Our registered and executive offices are located at 6-8 Allée de l'Arche, Faubourg de l'Arche — ZAC Danton, 92400 Courbevoie, France (telephone: (011-33-1) 4778 2121). For purposes of receiving process in the United States solely with respect to our obligations under the United States Securities Exchange Act of 1934, as

amended, our agent is CT Corporation System, 111 Eighth Avenue, New York, NY, 10011, and the telephone number is (+1-212) 894-8500.

We are organized as a *société anonyme* under French law. Under our articles of association *(statuts)*, our corporate existence expires on April 20, 2057. The duration of our corporate existence may, however, be extended by our shareholders at an extraordinary shareholders' meeting.

We are a multinational group of companies. We own, directly or indirectly, 100% of most of our significant operating subsidiaries' shares and voting rights, which have their own organization and management bodies, and are operated independently in compliance with the laws of their country of incorporation. For a list of our main consolidated subsidiaries, see Note 35 to our Consolidated Financial Statements.

As of December 31, 2006, our organizational chart was as follows:



Following the Board Meeting of April 27, 2007, our organizational chart is as follows:



**Item 4A.    Unresolved Staff Comments**

Not applicable.

**Off-Balance Sheet Financing Arrangements**

In addition to the above-referenced contractual obligations, we have additional contractual and other commitments not necessarily reflected on our consolidated balance sheet, which are summarized in the table below as of December 31, 2006.

| | Total as of year end 2006 | Maturity | | | |
| | | 2007 | 2008-2009 | 2010-2011 | Thereafter |
|---|---|---|---|---|---|
| | | (in millions of Euros) | | | |
| Parent company guarantees . . . . . . . . . . . | 25,766.7 | 5,844.3 | 9,728.8 | 9,312.4 | 881.2 |
| Others commitments given . . . . . . . . . . . | 2,904.4 | 1,131.7 | 856.4 | 901.4 | 14.9 |
| Total commitments given. . . . . . . . . . . . . | 28,671.1 | 6,976.0 | 10,585.2 | 10,213.8 | 896.1 |
| Total commitments received . . . . . . . . . . | 945.8 | 457.4 | 202.4 | 264.8 | 21.2 |

**Guarantees Related to Contracts**

Guarantees related to contracts are mainly made up of bonds which are related to the contract execution issued to the benefit of clients and which are usually not for the full amount of the maximum theoretical contractual liability but are subject to individual negotiation. Bonds issued to the benefit of clients would usually be released partially upon contract payment and delivery of the contract (provisional acceptance by the customer), the remainder being released at the final acceptance by the customer.

When circumstances arise that result in the threat of calling a bond, then we seek to negotiate acceptable alternative arrangements. Bonds are typically called when there is no other remedy acceptable to our customer. Our experience to date has been that bonds are very rarely called. In general, we establish provisions to cover any anticipated loss that could arise from our contractual obligations.

**Parent Guarantees to Clients**

Parent guarantees are given in the normal course of the Group's businesses by Technip SA, Technip Offshore International, Technip Offshore Holdings Ltd. or Technip USA Holdings Inc. to customers to cover the good performance of a contract awarded to one of our subsidiaries. They are generally released at the end of the contract. To date, no parent company guarantee has ever been called. The amount includes the contract part allocated to the Group's joint venture partners and is not reduced according to the project's percentage-of-completion. They are not substracted from the amount of parent company guarantees received from Technip's partners within these joint ventures, whereas Technip issues parent company guarantees in their favor.

**Other Material Financial Elements**

Policies of the Organization of Petroleum Exporting Countries ("OPEC") could affect the investments by our shareholders, and as a consequence some of our operations. Petroleum industry operations and profitability are influenced by many factors some of which our clients cannot control. Prices for crude oil and natural gas, petroleum products and petrochemicals are determined by supply and demand for these commodities. OPEC member countries are typically the world's swing producers of crude oil, and their production levels are a major factor in determining worldwide supply. For example, OPEC's implementation of production cutbacks to eliminate excess supply of crude oil for world markets results in price increases of crude oil.

For information on how ISA may affect our operations or the investments by our shareholders, please see "Item 4. Information on Technip — Segment and Geographical Breakdown of Revenues and Backlog — Special Geographic Considerations".

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

*B. Bank and Commercial Guarantees*

Commitments given and received are summarized hereafter:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
|  | In millions of Euros | | |
| Parent Company Guarantees | 25,766.7 | 23,234.9 | 13,789.9 |
| Other Commitments Given | 2,904.4 | 2,817.0 | 1,418.6 |
| **Total Commitments Given** | **28,671.1** | **26,051.9** | **15,208.5** |
| **Total Commitments Received** | **945.8** | **675.1** | **539.4** |

Parent company guarantees given by Technip SA or its affiliates to clients cover the due and proper performance of the specified construction contracts for which the average expiration period until the release of the commitment guarantees is about five years. The amounts disclosed in the parent company guarantees, which stand at €25.767 billion, also include the contract part allocated to the Group's partners in joint venture and are not reduced according to the projects' percentage of completion. They are not subtracted from the amount of parent company guarantees received from Technip's partners within these joint ventures, whereas Technip issues parent company guarantees in their favor.

The parent company guarantees issued by Technip for contracts outside of a joint-venture framework amount to €9.595 billion as of December 31, 2006.

The following table illustrates the breakdown of these €16.171 billion of parent company guarantees issued by Technip within joint ventures' contracts, according to the Group's percentage of ownership in these joint ventures, as of December 31, 2006.

| | Allocation as per % of Technip's Ownership in Joint Ventures | | | |
|---|---|---|---|---|
| **TOTAL** | Less or equal to 25% | Greater than 25% and less or equal to 40% | Greater than 40% and less or equal to 75% | Greater than 75% and less than 100% |
| | In millions of Euros | | | |
| **16,171.3** | 2,490.3 | 12,236.8 | 1,444.2 | — |

Other commitments given mainly relate to guarantees or counter-guarantees given by banks and insurance companies to various customers in connection with ongoing contracts, in order to secure due and proper performance of the contracts or following the payment of retention guarantees and advance billings.

Commitments received relate mainly to similar guarantees obtained from suppliers or subcontractors in connection with ongoing contracts.

*C. Contingencies: Exceptional Events and Litigation*

The Company is subject to various legal proceedings and claims arising in the normal course of its business. In the management opinion, the probable outcomes of these actions will not materially affect and have not materially affected in a recent past the consolidated financial position, results of operations, or the net assets of the Company and its subsidiaries.

Provisions related to any litigation are recorded, when necessary, under the "Contingencies related to Contracts" line item, disclosed in **Note 25 — Provisions** or in the costs of ongoing contracts.

The main current litigation consists in the following:

**ITP Litigation**

On December 21, 2001, a French company, Interpipe SA (ITP), filed a complaint with the Tribunal de Commerce (Commercial Court) of Versailles against Coflexip, Coflexip Stena Offshore Ltd. and Coflexip Stena Offshore International (respectively renamed Technip France, Technip UK Ltd. and Technip Offshore

# EXHIBIT C

# LOW SULFUR GASOLINE PROJECT
## US VI – SAINT CROIX



skypic.com

9-7832 St. Croix Refinery to E. End
Aerials Only Gallery 508-295-5551(c)



**KICK OFF MEETING**
*Rome, March 9 ÷ 11 2005*

*Technip*
**TECHNIP ITALY**



2

# WELCOME TO PARTICIPANTS AND SAFETY NOTES

*Vincenzo Laganà*

*Technip*
**TECHNIP ITALY**

# AGENDA

## 1st DAY (Wednesday, 9° March 2005)

- Welcome to participants and Safety notes
- Project Goal
- Introduction of Teams, Mobilization and Offices
- Technip Project Organization
- Hovensa Project Organization
- Contract Scope and Responsibilities
- Coordination Procedures and Communication Protocols
- Summary Project Schedule and 90 Days Schedule Presentation
- Project Execution Plan Guidelines:
  - *Project Strategy and key issues*
  - *Successful Design Execution*
  - *FEED Package Review Plan*
  - *Soil Investigation*
  - *Documentation Review and Acceptance*
  - *Drawings Management*
  - *It Technology and Data Integration*
  - *Document Control*

*Technip*

**TECHNIP ITALY**





3

# AGENDA

## 2nd DAY (Thursday, 10th March 2005)

- HSE Plan Guidelines
- Quality Plan Guidelines
- Construction Plan Guidelines
- Pre-commissioning Plan Guidelines
- Procurement Plan and Material Management:
  - *Procurement Principles*
  - *Major Equipment Purchasing Schedule*
  - *Inspection Activity Plan*
  - *Expediting Plan*
- Project Control
  - *Project Planning Presentation*
  - *WBS & Earned Value Matrix*
- Change Orders and Invoicing
  - *Change Order Procedure*
  - *Invoicing Procedure*
  - *HOVENSA Expenditure Curves*

*Technip*
TECHNIP ITALY

HOVENSA

4

# AGENDA



5

## 3rd DAY (Friday, 11th March 2005)

- DD7 Project Review
- Technical Meetings:
  - → *Project Engineering Management*
  - → *Process Review*
  - → *Compressor and Rotating Equipment*
  - → *PV&HE (Reactors and Texas Tower)*
  - → *Heaters*
  - → *Piping Design*
  - → *LSG Metallurgy Plant Diagram*
  - → *Instrumentation and Electrical*
- Wrap-up and Close-out

*Technip*
**TECHNIP ITALY**



6

# PROJECT GOAL

BUILD A GASOLINE HYDROTREATER UNIT AT THE EXISTING HOVENSA SAINT CROIX REFINERY, TO PRODUCE 50,000 BPSD OF LOW SULFUR (20 PPM MAX) GASOLINE, BASED ON EXXON MOBIL SCANFINING PROCESS TECHNOLOGY

*Technip*

**TECHNIP ITALY**

# INTRODUCTION OF TEAMS, MOBILIZATION AND OFFICE

## *Vincenzo Laganà*

HOVENSA | 7

*Technip*
**TECHNIP ITALY**

# MOBILIZATION STATUS

- Mobilization of Technip resources has started and is in progress in the following areas:

**Project Group**
- Management
- Document Control

**Project Control**
- Overall Project and early activities planning

**Process Design**
- Check of process specifications for critical equipment

**Procurement**
- Requisitioning activities for inquiry for critical items

**Engineering**
- Discipline leaders mobilized



*Technip*
**TECHNIP ITALY**

8

# TECHNIP OFFICE LAYOUT



HOVENSA

9

ROMA
10 Km

INTERNATIONAL
AIRPORT
15 Km

HOLIDAY INN HOTEL

VIALE CASTELLO DELLA MAGLIANA

BUILDING C

BUILDING B

BUILDING F

BUILDING A

BUILDING D

OUTSIDE PARKING

RAILWAY STATION

N

Technip
TECHNIP ITALY

# PROJECT OFFICE LAYOUT



1 – PROJECT DIRECTOR ENG. V. LAGANA'
2 – ENGINEERING MANAGER ENG. R.GIANNINI
3 – SECRETARY MRS. M.MUSCIA
4 – PROJECT ENGINEER ENG. C.SABELLI
4 – PROCUREMENT COORDINATOR MR. G.SELLERI
4 – COST CONTROL COORDINATOR MR. S.VIOLA
5 – PROJECT ENGINEER
6 – PIPING – STRESS – CIVIL
7 - ELECTRICAL

*Technip*

**TECHNIP ITALY**

8 - INSTRUMENT
9 – P&I COORDINATOR MR. E.DE LEONIBUS
10 – PROCESS DESIGN
11 – PROCESS MANAGER ENG. G.FICOCCILLI
12 – PLANNING MR. I.JURKOVIC – MRS. V.CILIBERTI
13 – CLIENT OFFICE
14 – CLIENT OFFICE
15 – MEETING ROOM

HOVENSA

10

HOVENSA

11

# TECHNIP PROJECT ORGANIZATION

## *Vincenzo Laganà*

**Technip**
**TECHNIP ITALY**

# TECHNIP PROJECT ORGANIZATION CHART



12

HOVENSA

**PROJECT EXECUTIVE SPONSOR**
*E.GORY*

**PROJECT DIRECTOR**
*V.LAGANA'*

**IT MANAGER**
*F.GIORDANI*

**PROJECT HSE MANAGER**
*P. DI RUBBO*

**H.O. CONSTRUCTION MANAGER**
*A.MARGAGLIO*

**PROCUREMENT MANAGER**
*G.SELLERI*

**COST CONTROL MANAGER**
*S. VIOLA*

**CONTRACT MANAGER**
*G. ZERBONI*

**PROJECT QA MANAGER**
*R. DI GIULIO*

**ENGINEERING MANAGER**
*R. GIANNINI*

**ENGINEERING GROUP**
*(See Chart)*

**PROCESS MANAGER**
*G. FICOCCILLI*

**PLANNING ENGINEER**
*V. CILIBERTI*

*Technip*

**TECHNIP ITALY**

# CONTRACT SCOPE and RESPONSIBILITIES

## *Vincenzo Laganà*



**Technip**
**TECHNIP ITALY**

HOVENSA

16

# CONTRACT SCOPE AND RESPONSIBILITIES

- **Scope of Work**
  Detail Engineering, Material Procurement and Construction of a FCC Gasoline Hydrotreater Unit, having a capacity of 50,000 BPSD

- **Type of contract**
  LSTK for the scope of work up to MC (precommissioning included) + commissioning and start-up services on reimbursable basis + performance tests (included in lumpsum portion)

- **Schedule**
  21 months from L.O.I. ⟶ M.C. within 10th Nov. '06





*Technip*
**TECHNIP ITALY**

17

# CONTRACT SCOPE AND RESPONSIBILITIES

## Scope of Work Highlights (Process and Engineering)

- "Rely upon" data as listed in chapter 10 of appendix A (Scope of Work), corresponding to documents of appendix F (FEED Package). In addition to these, soil data as per appendix N are "rely upon" information

- Maximization of modular approach (or shop assembly)

- Coordination with HOVENSA and with outside Battery Limits Contractor (battery limits, FAT, etc.)

- Permitting (expected local permits are listed in appendix A): Technip Italy to prepare necessary documentation to support HOVENSA to obtain all necessary construction, environmental and buildings permits

*Technip*
**TECHNIP ITALY**



18

# CONTRACT SCOPE AND RESPONSIBILITIES

- 3D CAD Model will be provided by Contractor. Three formal model reviews will be conducted as per point 3.0.6 of "Scope of Work"

- Documents for HOVENSA review listed in appendix A

- "As built" drawings list as fixed in appendix A

- Operating manual to be assembled by HOVENSA. Technip Italy to provide specific documentation for this purpose (see appendix B, point 8.4.7)

- Technip Italy's obligations per discipline to comply with contractual scope of work are listed in appendix A "Scope of Work" (to be reviewed during this kick off meeting)



19

*Technip*
**TECHNIP ITALY**

# CONTRACT SCOPE AND RESPONSIBILITIES

## Scope of Work Highlights (Procurement)

- Technip Italy will perform purchasing, expediting, inspection, shipping and site delivery works for the equipment and material necessary to build the unit

- Approved vendor list to be used for purchasing purposes

- Spare parts for construction/precommissioning/start-up in Technip Italy scope. Two years spare parts recommended list to be provided.

- RoRo dock in HOVENSA premises is available for large equipment off-loading from barge



*Technip*
**TECHNIP ITALY**

20

# CONTRACT SCOPE AND RESPONSIBILITIES

## Scope of Work Highlights (Construction and Precommissioning)

- Technip Italy will provide labor, supervision, construction equipment, TCF, consumable and other required tools to perform the work

- Item provided by HOVENSA are listed in appendix I

- Rigging regulated by lifting procedure as per appendix A

- Appendix X includes the check list to ensure Mechanical Completion achievement and to fix battery limits between Technip Italy precommissioning works and HOVENSA subsequent activities

- Mechanical Completion to be achieved on a "system by system" turnover basis. "System turnover package" to include documents as per point 6.1 of appendix A

*Technip*
**TECHNIP ITALY**




21

# CONTRACT SCOPE AND RESPONSIBILITIES

## Contract Highlights (Warranties and Performance tests)

- Mechanical warranties: 12 months from acceptance of performance tests or 18 months after M.C.

- 10 years warranty for "Structural Defects"

- Performance test to be performed within 60 days from M.C. or 90 days from commencement of operation (whichever comes earlier) for warranties and payment obligations purpose. Performance guarantees are deemed met for all purposes if tests are not performed within 240 days from M.C.

*Technip*

**TECHNIP ITALY**



22

# CONSTRUCTION ORGANIZATION

- A Technip USVI (T.P.I.V) registered entity will sign the Construction Contract with HOVENSA

- The execution of the Construction Contract, until the Mechanical Completion, will be in the hand of a Site Supervision Team, under the general management of the EPC Project Director and having some of the Project Team personnel in staff

- During the civil works and erection phases, the Site Supervision Team, headed by the Site Manager, will manage the construction activities

- During the phase of precommissionig the activities will be coordinated by the Start-up Manager

- Contractor site organization chart as indicated

*Technip*

**TECHNIP ITALY**



113

# EXHIBIT D

# APPENDIX Q
## PARENT GUARANTY AGREEMENT

### GUARANTY AGREEMENT

**GUARANTY AGREEMENT** (the "Guaranty") dated [Month, Date], 2004, by CONTRACTOR PARENT, a _____ corporation, with an office at _____, ("Guarantor"), for the benefit of HOVENSA L.L.C., a U.S. Virgin Islands limited liability company, with an office at #1 Estate Hope Christiansted, VI 00820 ("Owner").

### RECITALS:

A.    Guarantor is the parent company of _____ ("Contractor").

B.    Owner has entered into an agreement with Contractor dated _____ ("Agreement") for _____ at Owner's Refinery in St. Croix, USVI.

C.    As a condition to entering into the Agreement with Contractor, Owner requested Guarantor to provide a parent company guarantee of Contractor's performance under the Agreement.

D.    Guarantor is willing to enter into this Guaranty to satisfy Owner's request.

### THE PARTIES AGREE AS FOLLOWS:

1. Guarantor unconditionally and irrevocably guarantees to Owner that if Contractor fails to perform or observe the terms of the Agreement, Guarantor will immediately upon first demand in writing by Owner notifying Guarantor of Contractor's breach under the Agreement, perform or take such steps as are necessary to achieve performance or observance of these terms and will indemnify Owner against all losses, damages, claims and costs arising from the failure to the extent of Contractor's liability under the Agreement.

2. The liability of Guarantor will not be reduced or discharged by any alteration in the relationship between Contractor and Owner which has been consented to by Contractor in writing (with or without the knowledge or consent of Guarantor), or by any forbearance or indulgence by Owner towards Contractor or Guarantor whether as to payment, time, performance or otherwise.

3. Guarantor will make any payment due hereunder on first written demand without set-off or counterclaim and without any legal formality such as protest or notice being necessary, and waives all privileges or rights which it may have as a guarantor, including any right to require Owner to claim payment or to exhaust remedies against Contractor or any other person, but always to the extent Contractor has not cured its breach under the Agreement.  Notwithstanding the above, Guarantor will have available to it, in any action or proceeding by Owner seeking performance of this Guaranty, or

Based upon GEPS Master Form APPX Q - PARENT GUARANTEE VER 2 JAN 30-05.DOC
Page 1 of 2
Rev 31 January, 2005

C:\Documents and Settings\cpatterson\Local Settings\Temporary Internet Files\OLK17\Appx Q - Parent Guarantee Ver 2 Jan 30-05.doc



damages for its non-performance, all defenses that Contractor would be able to raise in any action by Owner against Contractor seeking performance or damages for non-performance under the Agreement..

4. The obligations of Guarantor will continue in effect after termination of the Agreement until all Contractor's obligations and liabilities under the Agreement have been discharged or have expired.

5. This Guaranty will be binding on the successors and assigns of Guarantor and will extend to and inure for the benefit of the successors and permitted assignees of Owner. Owner may assign or transfer all or any of its right, title and interest in this Guaranty upon such terms as Owner may think fit to any agent for any syndicate of banks and financial institutions providing credit and guaranty facilities to Owner in connection with the Agreement. No person other than Owner or any permitted assignees is intended as a beneficiary of this Guaranty nor will any such person have any rights hereunder. Guarantor may not otherwise assign or otherwise transfer any of its rights or obligations hereunder.

6. If there is any claim under this Guaranty, Guarantor will be entitled to assert any defense, set-off or counterclaim that Contractor could assert had such claim been made directly against any person under the Agreement.

7. This Guaranty will be governed by and construed in accordance with the laws of the State of New York, U.S.A. Any dispute arising out of or in connection with this Guaranty will be settled in the same manner as in Article 24 [EP]/27 [C] of the [EP/C] Agreement."

   **IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above.


Based upon GEPS Master Form APPX Q - PARENT GUARANTEE VER 2 JAN 30-05.DOC

Page 2 of 2

Rev 31 January, 2005

C:\Documents and Settings\cpatterson\Local Settings\Temporary Internet Files\OLK17\Appx Q - Parent Guarantee Ver 2 Jan 30-05.doc


# EXHIBIT E

-----Original Message-----
From: egory@technip.com [mailto:egory@technip.com]
Sent: January 21, 2005 11:53 AM
To: Karp, Al
Cc: gsarigiannis@technip.com; smespoulhes@technip.com;
jphuard@technip.com; mdieudonne@technip.com; jmtajan@technip.com;
MFinnen@technip.com
Subject: HOVENSA/CONTRACTUAL MATTER

Following our discussion on Thursday January 20 please find hereunder
Technip proposed draft of the following Articles :

-Article 3.9.1. of EP Contract
(See attached file: Vendor Warrany.doc)
<<Vendor Warrany.doc>>

-Article 19.4 of the Coordination Procedure Appendix B
(See attached file: Hovensa 19.4 rev 21 01 05.doc)
<<Hovensa 19.4 rev 21 01 05.doc>>

-Parent Company Guarantee Appendix Q
(See attached file: Appx Q - Parent Guaranty rev 21 01
05.doc)
<<Appx Q - Parent Guaranty rev 21 01 05.doc>>

Etienne GORY
CEO LATIN AMERICA
TECHNIP
Tel : 0039 06 65 98 39 30
Fax :0039 06 65 98 37 60
Mail : egory@technip.com

# APPENDIX   Q
# PARENT GUARANTY AGREEMENT

### GUARANTY AGREEMENT

**GUARANTY AGREEMENT** (the "Guaranty") dated [Month, Date], 2004, by CONTRACTOR PARENT, a _____ corporation, with an office at _____, ("Guarantor"), for the benefit of HOVENSA L.L.C., a U.S. Virgin Islands limited liability company, with an office at #1 Estate Hope Christiansted, VI 00820 ("Owner").

### RECITALS:

A.    Guarantor is the parent company of _____ ("Contractor").

B.    Owner has entered into an agreement with Contractor dated _____ ("Agreement") for _____ at Owner's Refinery in St. Croix, USVI.

C.    As a condition to entering into the Agreement with Contractor, Owner requested Guarantor to provide a parent company guarantee of Contractor's performance under the Agreement.

D.    Guarantor is willing to enter into this Guaranty to satisfy Owner's request.

**THE PARTIES AGREE AS FOLLOWS:**

1.  Guarantor unconditionally and irrevocably guarantees to Owner that if Contractor fails to perform or observe the terms of the Agreement, Guarantor will immediately upon first demand in writing by Owner notifying Guarantor of Contractor's breach under the Agreement perform or take such steps as are necessary to achieve performance or observance of these terms and will indemnify Owner against all losses, damages, claims and costs arising from the failure to the extent of Contractor's liability under the Agreement.

2.  The liability of Guarantor will not be reduced or discharged by any alteration in the relationship between Contractor and Owner which has been consented to by Contractor in writing (with or without the knowledge or consent of Guarantor), or by any forbearance or indulgence by Owner towards Contractor or Guarantor whether as to payment, time, performance or otherwise.

3.  Guarantor will make any payment due hereunder on first written demand without set-off or counterclaim and without any legal formality such as protest or notice being necessary, and waives all privileges or rights which it may have as a guarantor, including any right to require Owner to claim payment or to exhaust remedies against Contractor or any other person but always to the extent Contractor has not cured its breach under the Agreement. Notwithstanding the above, the Guarantor shall have available to it, in any action or proceeding by Owner seeking performance of this Guaranty, or

Based upon GEPS Master Form APPX Q - PARENT GUARANTY REV 21 01 05 (4)
Page 1 of 2
Rev 21 January, 2005

C:\Documents and Settings\jsmith\Local Settings\Temporary Internet Files\OLKA1\Appx Q - Parent Guaranty rev 21 01 05 (4).doc

| | |
|---|---|
| **Deleted:** justified | |
| **Deleted:** as a condition to such payment by Guarantor under this Guaranty | |
| **Deleted:** them | |
| **Deleted:** APPX Q - PARENT GUARANTY REV 21 12 04 | |
| **Deleted:** 22 December, 2004 | |
| **Deleted:** C:\Documents and Settings\mdieudonne\My Documents\Travail.Doc\HOVENSA\Appx Q - Parent Guaranty rev 21 12 04.doc | |

damages for its non-performance, all defences which Contractor would be able to raise in an action by Owner against Contractor seeking performance or damages for non-performance under the Agreement.

4.  The obligations of Guarantor will continue in effect after termination of the Agreement until all Contractor's obligations and liabilities under the Agreement have been discharged or have expired.

5.  This Guaranty will be binding on the successors and assigns of Guarantor and will extend to and inure for the benefit of the successors and permitted assignees of Owner.  Owner may assign or transfer all or any of its right, title and interest in this Guaranty upon such terms as Owner may think fit to any agent for any syndicate of banks and financial institutions providing credit and guaranty facilities to Owner in connection with the Agreement.  No person other than Owner or any permitted assignees is intended as a beneficiary of this Guaranty nor will any such person have any rights hereunder.  Guarantor may not otherwise assign or otherwise transfer any of its rights or obligations hereunder.

6.  If there is any claim under this Guaranty, Guarantor will be entitled to assert any defense, set-off or counterclaim that Contractor could assert had such claim been made directly against any person under the Agreement.

7.  This Guaranty will be governed and construed in accordance with the laws of the State of New York, United States of America. Any dispute arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with the said Rules. **HOLD**

        **IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above.

| | |
|---|---|
| **Deleted:** APPX Q - PARENT GUARANTY REV 21 12 04 | |
| **Deleted:** 22 December, 2004 | |
| **Deleted:** C:\Documents and Settings\ndieudonne\My Documents\Travail.Doc\HOVENSA\Appx Q - Parent Guaranty rev 21 12 04.doc | |

Based upon GEPS Master Form APPX Q - PARENT GUARANTY REV 21 01 05 (4)

Page 2 of 2

Rev 21 January, 2005

C:\Documents and Settings\jsmith\Local Settings\Temporary Internet Files\OLKA1\Appx Q - Parent Guaranty rev 21 01 05 (4).doc

# EXHIBIT F

**From:** smespoulhes@technip.com [mailto:smespoulhes@technip.com]
**Sent:** Monday, January 24, 2005 10:37 AM
**To:** Karp, Al
**Cc:** Friedman, Douglas; egory@technip.com; gsarigiannis@technip.com; Crovesi, Marco; Dunphy, Kara (Hovensa); jphuard@technip.com; Marano, Martin; Otero, Pablo
**Subject:** Re: TECHNIP OPEN EP ISSUES RESPONSE: Parent Guarantee


We do agree with those modifications.


Stéphane



"Karp, Al"
<AKarp@hess.com>         To:     <smespoulhes@technip.com>, <jphuard@technip.com>, <gsarigiannis@technip.com>, <egory@technip.com>
                         cc:     "Marano, Martin" <mmarano@hess.com>, "Crovesi, Marco" <h001mc0@hovensa.com>, "Otero,
24/01/2005 14:01         Pablo" <POtero@hovensa.com>, "Dunphy, Kara (Hovensa)" <h053kd0@hovensa.com>, "Friedman, Douglas"
                         <DFriedman@hess.com>
                         Subject:     TECHNIP OPEN EP ISSUES RESPONSE: Parent Guarantee



D Friedman comments below:

The guaranty is as discussed.  Dispute resolution was not resolved at the
time.  I suggest the following: "Any dispute arising out of or in connection
with this Guaranty will be settled in the same manner as in Article 24
(EP)/27 (C) of the ____ Agreement."

As cleanup matters, I suggest using the American spelling of "defenses" in
Par. 3 and deleting the "the" in front of "Guarantor" in the same
paragraph.

# EXHIBIT G

CIVIL COURT OF ROME

**Petition pursuant to art. 700 of the Italian Civil Procedure Code**

for:

**TECHNIP ITALY S.p.A.**, with registered office in Rome, viale Castello della Magliana 68, P. IVA 01874901004, in the person of Dott. Marco Villa, CFO and Ing. Arturo Grimaldi, General Director, Legal Representatives *pro-tempore*; as well as

**TPVI LTD**, a company incorporated under the laws of US Virgin Islands, with registered office in 1, Hibiscus Alley, Charlotte Amalie, St. Thomas, US Virgin Istands, in the person of Mr. Etienne Gory, in his capacity as legal representative *pro-tempore*;

both represented and defended, also disjointly, by Daniela Jouvenal Long and Sergio Calderara, of the Rome bar, and domiciled at their firm in Rome, Piazza di Pietra, 26, pursuant of a power of attorney at the end of the present petition

WHEREAS

**1.** TECHNIP ITALY S.p.A. (hereinafter, "**Technip**") and TPVI LTD (hereinafter, "**TPVI**") are both companies of the multinational group Technip, headed by Technip S.A., a company incorporated under French law;

**2.** Technip and TPVI Ltd. Have enetered into on 10 March 2005 with HOVENSA L.L.C., a company with registered office in 1 Estate Hope, Cristiansted (VI) 00820-5652, US Virgin Islands (hereinafter, "**Hovensa**"), agreements for the "turn key" construction of hydrotreatment plants for sulphur low-content petrol, in Saint Croix, US Virgin Islands, at Hovensa's petrol refinery;

**3.** Such agreements provide for works that are defined as "Engineering & Procurement" and "Construction", and include a series of complex activities for the project, supply and construction, as well as the consequential stipulation of all contracts necessary in order to realize the plant and the supervision of the project;

4. In particular, following a precise request from Hovensa, the work was distributed among into two different contracts, independent one from the other; therefore: Technip, on 10 March 2005 entered into the "Engineering & Procurement" contract for an global agreed amount of, originally, US$ 77.000.000= and identified with n. HVS-0663 (hereinafter the "**Technip Contract**"), while TPVI on the same date entered into the "Construction" agreement for aglobal agreed amount of, originally, US$ 50.000.000= and identified with n. HVS-0664 (hereinafter the "**TPVI Contract**"); such contracts are structured in such a fashion that they are independent from each other, although referring to the same project;

5. both contracts – ruled by the laws of the State of New York – provided that Hovensa would receive a bank guarantee as a guarantee – indeed – of the obligations taken in the relevant contract and thus equal to 10% of the value of each of them;

6. such guarantee has been – for each contract – regularly issued by UniCredit Banca d'Impresa (hereinafter, "**Unicredit**"), for an amount which originally was, as agreed, progressively increased in parallel with the development of the works and the issuing of the relevant invoices;

7. As a consequence Unicredit issued in favour of Hovensa:

**a)** an "*Irrevocable Stand-By Letter of Credit*" dated 22 March 2005 "by order of Technip", for an amount of US dollars 30.800,00 (thirtythousandeighthundred/00), that, following a series of letters, was increased up to the current amount of US dollars 7.080.683,88 (sevenmillioneightythousandsixhundredeightythree/88), as indicated in the Unicredit letter dated 24 April 2007 (**doc. n. 1**); and

**b)** an "*Irrevocable Stand-By Letter of Credit*" dated 22 August 2005 "by order of TPVI" for an amount of US dollars 48.125,00 (fourtyeightthousandonehundredeightyfive/00), that, following a series of letters, was increased up to the current amount of US dollars 6.074.490,00 (sixmillionseventyfourthousandandfourhundredandninety/00), as indicated in the

2

Unicredit letter dated 14 March 2007 (**doc. n. 2**);

both guarantees are subject to the *"Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication n° 500"* rules (hereinafter, **"UCP"**) and, for the possible items not provided therein, to the laws of the State of New York;

**8.** both guarantees provide that Hovensa may draw down the guarantee – having in this case to receive the payment of the amount requested within 7 working days from the request - provided that the following is produced: (i) signed request for payment for draw down of the *stand-by letter of credit* n. 460830345935 and n. 460830854774 respectively, and (ii) statement from an Hovensa Officer with the following wording: "Technip is in breach in respect of the terms of the Agreement n. HVS-0663 of 10 March 2005 between Hovensa L.L.C. and Technip (the "Agreement") and we request hereby the payment of the amount of (*in letters*) ($) pursuant to your Standby Letter of Credit n. [.....]". In both guarantees the text is identical, except for the number of the letter of credit and of the agreement (respectively): contract n. 0663 – Letter of Credit 460830345935 and contract n. 0664 and Letter of Credit 460830854774);

**9.** both guarantees have been issued by request of Technip, presented respectively with letter of 21 2005 (sic!) with regards to Technip's own guarantee (**doc. n. 3**) , anc with letter of 10 August 2005 with reference to the TPVI's guarantee (**doc. n. 4**). In both cases, as mentioned, the subject requesting the issuing of the guarantee is Technip which, in both cases, undertook to reimburse to Unicredit the sums that the latter may pay to Hovensa pursuant to the guarantees, with an additional interest for each day of delay in respect of the request and in addition to any expenses or sots that Unicredit may incur. Each of the letters requesting the issuing of the guarantee expressly states "the present waiver is subject and shall be interpreted according to Italian laws. Any dispute or claim deriving from the present agreement shall be regulated solely by Italian laws – Tribunal of Rome";

3

10. after the execution of the two contracts, a series of events have occurred, partially related to the request of further and new works by Hovensa, partially related to specific situations that occurred with the sub-contractors, also - but not only – as a consequence of the extraordinary events that occurred in the area in the period August-September 2005, known as "Katrina Hurricane" and "Rita Hurricane", so that, following reserves by Technip and TPVI, and subsequent discussions with the customer Hovensa, a settlement agreement dated 31 March 2006 was executed among Technip, TPVI and Hovensa (hereinafter the **"Settlement" doc n. 5**);

11. pursuant to the alla Settlement, all TPVI obligations in relation to the Mechanical Completion referred to in the Counstruction Contract should have been completed before 20 November 2006;

12. however, for a series of circumstances that have been and are argued among the parties, the Mechanical Completion has not been completed within such date; but a series of onerous activities have remained that must be carried out in order to complete the project, activities which have been carried out, until tody, and continue to be carried out, by TPVI with Hovensa's full consent;

13. Technip and TPVI deem that Hovensa is responsible for such delay, to the extent that on 15 December they sent to Hovensa a letter where they detail the terms of the matter, indicating Hovensa's liabilities, and they ask an economical refund, although reserving to specify more in details their claim ("Claims") (**doc. n. 6**), a letter to which Hovensa replied on 18 January 2007  generically rejecting the economic requests stated by Technip and TPVI and requesting at the same time details in support of the Claims;

14. in the meantime Hovensa  issued and sent respectively to Technip and TPVI invoices payable within 30 days with which it asked for the payment for the delay penalties provided by the agreement for the period up to 31 December 2006, and subsequently every month,

4

up to reaching the amounts equivalent in practice to the ones of the *Letter of Credits* (**doc. n. 7 e doc. n. 8**);

**15.** Technip and TPVI have each rejected the invoices, returning the same each time to Hovensa, with the motivation that the amounts to which the invoices refer where not deemed to be due, because they considered the delay attributable to Hovensa itself, as already well known by Hovensa (**doc. n. 9 e doc. n. 10**);

**16.** in the period from January to date, as said, notwithstanding the issuing of penalty invoices by Hovensa, TPVI continued to carry out it work and there have been no objections of any other kind, so that all seemed to lead to think that it was barely a "normal" discussion aimed at renegotiating the final price. Indeed, in the meantime, Hovensa, was paying additional costs for contracts with sub-contractors executed in its name and on its account by TPVI in accordance with the clause 23.2 of the TPVI Contract, which provides that Hovensa may avial itself of such power (mainly for fiscal reasons) having in this case to pay directly such sub-contractors, detracting the relevant cost form the amounts to be paid to TPVI on the basis of the relevant contract. This has actually occurred and Hovensa paid the relevant amounts, although it tried to request the refund from TPVI of the huge amount derivino therefrom, as indicated ultimately in the objection letter (cfr. doc. 12 b, *infra*). As said, since such sums were increasing, the request for penalties seemed to fall within a design aimed at finding reciprocal claims, in order to find a settlement at the end of the works, to which Hovensa had – and evidently still has – a great interest.

**17.** however, unexpectedly, Technip and TPVI received each from Hovensa a letter dated 29 March 2007, containing a formal warning pursuant to articles 11.3 of the Technip Contract and 14.3 of the TPVI Contract, and a letter addressed to Technip dated 1 June 2007, where Hovensa attributes to Technip that it has not cured its breaches, and reserves

5

to act pursuant to the TPVI Contract clauses (**docc. n. 12 a), 12 b) e 12 c)**, respectively);

18. contextually, as found out subsequently by Technip, Hovensa drew down on both guarantees for the maximum amount for which the *Letters of Credit* were issued, with a consequent inevitable draw down of the counter-guarantees of Technip by Unicredit (**docc. n. 13 a) e 13 b)**);

19. even before being informed of the draw down by Hovensa, both Technip and TPVI had replied to the objection letters (**docc. n. 14 a) e 14 b)**);

20. therefore Technip realized that Hovensa wants to cash, in the meantime, the maximum amount of the guarantees, amounting to over 13 million dollars, and then, presumably, discuss with the strength of having cashed such amounts, and however Technip believes that such draw down is taking place illegitimately, but also that its interests and those of TPVI would not be sufficiently protected if it recurred only to ordinary proceedings, in consideration of the time requested: the negative assessment of the obligation of Unicredit to pay what Hovensa requested in respect of the *Letter of Credit* would have a very limited impact if, in the meantime, the payment had been made.  In addition, the agreements among Technip, TPVI and Hovensa provide for a amicable dispute resolution procedure and, in any case, for the exclusive jurisdiction of the New York Courts (unless the parties agree to resort to Arbitration), and from such decision also the decision of the possible proceedings in the merit, to be started by the current parties, would depend;

21.  the Technip and TPVI positions are different, because each has executed with Hovensa an autonomous contract, while the objections concern the non delivery of works which are not part of the Technip Contract; however, considering that at least part of the documents are substantially identical, and that both contracts are to be seen within a single project, the petitioners have decided to file a single petition in order to minimize judicial activity;

6

Now therefore, Technip and TPVI believe that they are entitled to file this petition in front of this Honourable Court, as they do, so that the same may order, as an interim measure, to Unicredit, not to pay the amounts requested for the following reasons in

## LAW

**Draw down in breach of the *bona fide* obligation.**

The draw down of the guarantees buy Hovensa is not in good faith.

From the aforementioned description of the facts, such fact appears to be obvious. Indeed, while on one side Hovensa was keeping close contacts with Technip and TPVI; through the persons in charge of the project, and was arguing at length and since a lot of time on the circumstances that brought to the non delivery of the works within the terms provided by the agreement, on the other side it did not hesitate to issue invoices for the delay penalties, and subsequently – when reaching a number of invoices sufficient to cover the full amount of both guarantees – to draw dons the same.

It should not be underestimated the fact that Technip and TPVI have ever since July 2006 communicated that the situation was critical and requested Hovensa cooperation in order to complete the project with mutual satisfaction, or at least in such a fashion that they shall not bear alone all additional costs and burdens (and, *summa iniuria*, also the delay penalties) which derived from choices and settings of Hovensa, which on the contrary, was not entitled thereto according to the agreements.

Even within the narrow limits of the summary proceedings with reference to the merits, which occurs in the proceedings such as this one, it should nevertheless be pointed that contractually Hovensa cannot impose no subcontractor, even if it can approve or disapprove the single subcontractor chosen by Technip/TPVI (see on this point clause n. 20.1 of Technip Contract (**docc. n. 15 a) e 15 b)** and n. 23.1 of TPVI Contract (**docc. n. 16 a) e 16 b)**). However, Hovensa insisted at length with TPVI so that the latter would

7

choose Tiger St. Croix Construction Inc. of the Turner group (hereinafter, "**Tiger**", in the documents sometimes referred to with the name of the mother company "**Turner**") for construction works, granting that the same held the necessary skills, contrary to TPVI's belief, which on the contrary would have preferred to avail itself of another company (Sun) which in Hovensa's view did not have the skills to carry out Mechanical works (but that, subsequently, at least in another project, was used by Hovensa for Mechanical works).

Among other things, Tiger had originally accepted an agreement which provided for a unit-based payment (forfait), whicle subsequently it requested a contract which provide for reimbursement; Sun, on the contrary, had accepted an agreement based of unit payments (forfait) for the amount of work carried out and did not request a modification thereof (these circumstances, which have not only been formally objected, but may also be confirmed by acquiring summary witness information). TPVI has decided to bend itself to Hovensa's insistence, as resulting from the wording of art. 2 of the Settelement (doc. 5, cit.), which expressly makes the provisions contained therein subject to the execution by TPVI of the agreement with Tiger: if this had not happened, the Settlement would have not been executed and TPVI would have not even been recognized the payment of the amount of three million dollars, that Hovensa had accepted to pay as a settlement for the construction agreement, in addition to the amount originally provided, in consideration of the numerous and proved additional costs suffered. Obviously, TPVI deemed that the agreements reached with Tiger – due to Hovensa's specific requests – would have, on one side, lead Tiger to follow scrupulously the terms and in particular the timing of the agreement, and on the other side would have implied that Hovensa would have covered the possibile additional costs.

Unfortunately, this did not happen. Tiger did not carry out the work within the given deadlines and has therefore made it necessary for the current petitioners to take the burden

8

to carry out, make others carry out and supervise some specific additional works: also a summary of the letter from Tiger of 21 October 2006 (**doc. n. 17**) makes it immediately possible to understand that the later was fully aware – 20 days from the agreed expiry date of 10 November 2006! – of the huge delay that had been gained, considering that it guarantees the undertaking to bring on the island in the future more workers, promising bonuses to workers reaching certain targets of productivity, and consider that the work may continue at least for all November and December (to the extent that it addresses the issue of holidays).

Hovensa did not minimally take into account of Tiger's liability for delays, to the extent that it deemed it to be absolutely normal to draw down on the guarantees, notwithstanding during the monthly checks on the status of progression of works, it was on several occasions informed of the situation (this happened at least on four verifications, from August to November 2006: as an example the email with the relevant presentation of 25 August 2006 is enclosed - **doc. n. 18** – and the presentation of 16 November 2006 - **doc. n. 19** – in particular see page 14 of the presentation of 25 August evidencing the total lack of human resources made available by Tiger, as well as page 12 of the presentation of 16 November where the delay piled up by Tiger over the time is shown, as well as the consequential additional man/hour due): thus obviously breaching the sinnalagmatic principle, and of duty of *bona fide*.

In addition, Hovensa was of no help in facing the problems that arose, asking even to re-make some specific works on the basis of a wrong interpretation of some construction standards, which originally had not been criticized or objected by Hovensa itself. Finally, Hovensa, during the operation of the industrial structure where the referenced plant is being built, omitted to adopt the relevant cautiousness, to the extent that it caused gas exhalations during work shifts, even at night, which caused the site to be evacuated, with

the consequent delays. Such facts have all been the object of detailed objections and reserves by TPVI, in particular with the letters of 21 and 26 September and 1 October 2006 **(docc. n. 20 a), 20 b) and 20 c))**.

The petitioners are well aware that such circumstances in the facts may not and should not be subject to the examination of this Court, both in consideration of the limitations which characterize the present proceedings, and because the contractual relationships between the parties are subject to the exclusive jurisdiction of the Courts of New York: what we would like to point out here, however, is that Hovensa has always been informed, at least since August 2006, of how critical the project was, and that the relevant causes that, according to the petitioners, were to the same exclusively attributable. But Hovensa did not hesitate to avail itself of the draw down on guarantees in order to (make an attempt to) obtain a lager contractual strength, but it did so illegitimately and, for sure, not in *bona fide*.

Indeed, as mentioned, the two contracts, respectively for "Engineering and Procurement" and "Construction", have two separate objects and have always been different and autonomous one from the other, also as a consequence of Hovensa's express request. Now, it is obvious that a possible delay in the delivery of the mechanical construction works, is totally independent from the "Engineering and Procurement" contract. And, as a matter of fact, Hovensa itself in its objection letters, refers to delays in the delivery, of a Mechanical Construction nature: even in the case, which we do not believe to be true, that such delay was deemed to be attributable to TPVI, the possible penalties would need to be borne by TPVI.

The objections raised again Technip on the delays of the works for mechanical construction are therefore totally illegitimate and against bona fide, as well as the consequential draw down of the guarantees issued pursuant to the "Engineering and Procurement" contract. There have never been an objection or a complaint from Hovensa

10

in respect of Technip, with reference to the mechanical construction works, except at the moment of the draw down on guarantees.

While in the case of TPVI there is the possibility that a formal logic may abstractly exist (notwithstanding all the aforementioned comments), in the case of Technip the request of draw down by Hovensa does not appear to bear at least those minimum necessari requirements of logical connection which constitute the ground for a *bona fide* draw down. The draw down of the guarantees according to both contracts constitutes an *escamotage* which is, certainly, convenient to obtain, in fact, the doubling of the amount abstractly due, but just the same way illegitimate.

The attitude of the customer, at this point, is clear: it formed in advance some documents (the invoices), on the grounds of which it could state that there is a breach of the petitioners and thus legitimate the draw down of the guarantee.

It is obvious that the parties – in front of the appropriate Court – shall solve the dispute pending between them: but it is just as obvious that Hovensa plans to do it after having cashed the maximum amounts that it may manage to cash on the grounds of the guarantees. And since the agreed dispute resolution mechanism provides for a first extra judicial phases, which aims at facilitating the reaching of a settlement, it is just as obvious that whoever will hold the cash (i.e. has cashed as much money as possible) will be in a better negotiating position.

We are therefore in front of an obvious case of Hovensa abusino its own right, which can only be legally qualified as a wilful mis-exercise of the same right. And this both under the profile by itself (issuing invoices for penalties in connection to facts which are debated by both parties) and under the profile of duplication of the same guarantees because, as said, in the worst case scenario – the actual liability for the delay – this may only be attributed to who had the duty to comply with the terms for that work, i.e. TPVI.

This is obvious not only from reading the agreements but also form reading the Settlement, where it is always and solely made reference to TPVI in relation to the expiry of the date for the delivery of the mechanical construction works.

This legitimated the *exceptio doli* by the petitioners, and their subsequent request for an interim injunction preventing the draw down of the guarantees and/or Unicredit to retrieve the sums, in general and at least in relation to the guarantee concerning the "Engineering and Procurement" contract.

**Invalidity of the draw down.**

Even if we were not to take into consideration – but we wouldn's know how – the aforementioned breach of the obligation to behave in *bona fide*, the draw down shall be prevented because carried out in beach of the procedure.

Indeed, Hovensa has issued the invoices for the penalties without any notice, calculating the same pursuant to Enclosure "K" to Technip Contract and TPVI Contract, identical for both contracts (**doc. n. 21**).

However, the same enclosure provides, under item 2.4, that "*Except for the amounts disputed, all other payments due to Hovensa by the Contractor (including payments due to Hovensa as a guarantee or based on the terms contained in the present agreement) shall be paid to Hovensa within 30 day from the date of receipt by the contractor of Hovensa's invoice*".

Now, it is indisputable that the amounts that Hovensa believes to be entitled to, and in relation to which it drew down the guarantees which are being disputed are "*disputed amounts*". Not only because the petitioners hereby challenge that such sums are due, but also because for several months TPVI has indicated that because of Tiger's fault, sub-contractor warmly recommended by Hovensa, it would not be able to comply with the terms of delivery, in such a way qualifying ever since then the penalties which are requested today as "disputed amounts", if ever they were requested.

One could ask when, at this point, the disputed amounts are due. The agreements only state that all payments that Technip/TPVI should have made to Hovensa would have become due within 30 days, but exclude that such obligation applies to "disputed amounts": this means that also for the "disputed amounts" Hovensa is not authorised to issue an invoice and thus to request and obtain (even through the draw down of guarantees) an immediate payment. If there are "disputed amounts", the procedure for the disputes shall be followed, as provided, respectively, by art. 24.2 of Technip Contract and 27.2 of TPVI Contract. And thus the amicable settlement attempt should be made, in order, in case of a negative outcome, resort to the Courts of the State of New York, except if the parties decide to recur to Arbitration.

We can anticipate the objection of which sums are due by TPVI to Hovensa, apart from those disputed: the TPVI Contract is structured in such a fashion that there may be various sums due by the contractor to Hovensa, for contracts that the latter executes directly, pursuant to a right which derives from the agreement (cfr. art. 23.2 TPVI Contract, doc. n. 16 a), cit.) obviously detracting such amounts from the global amount of the contract. Such hypothesis, however, is provided uniquely in the TPVI Contract, which, being the Construction Contract, provides for the use of sub.contractors. On the contrary, it is obvious that the "Engineering and Procurement" contract – thus the one substanzially regulating planning and the supply of the entire project – may not, because of its nature, provide for the use of any subcontractor: and indeed, the clause equivalent to art. 23 of the TPVI Contract, i.e. art. 20 of Technip Contract cfr. doc. 15 a), cit., does not contain the aforementioned provision of art. 23.2. Since it is a general and udisputed interpretation principle that clauses should be interpreted in such a way that they make sense, rather than so that they don't, we wonder which would be the "disputed amounts" and when the same would be due, if amounts such as the referenced ones were not included in the "disputed

13

amounts".

All this having been said, it must be note that also in the non believed event that Hovensa be deemed entitled to issue invoice payable after thirty days even for the "disputed amounts", as apparently Hovensa has held, it has however breached clause 2.1, para. 4, last sentence, of Appendix D exhibit 1 to the Technip Contract and the TPVI Contract (doc. n. 22), which provides that "*before any draw down on the letter of credit [simply so defined]*" *Hovensa must give the notice provided for by art. 11.3 of the EP Contract* [Technip Contract] *or art. 14.3 of the construction contract* [the TPVI Contract], *respectively*".

In the case under exam, Hovensa has given the notice pursuant to said article suimultaneously with the draw down on the guarantees. But the contractual provision has the aim of permitting ti cure the breach – as read expressly the clause – or, logically, to permit objection. In this case, instead, Hovensa's hurry is not legitimate, and can be explained only with the intent – partially concealed – of drawing down – i.e., cashing – before that the other party can discuss or start the dispute resolution procedure. Which is an implicit confirmation of the plaintiffs' thesis. In fact, by not actually permitting Technip and TPVI to answer to the objections letters before drawing on the guarantees, Hovensa is implicitly admitting that said answer affects (rather, prevents) its right to draw down, in the sense that no draw down is permitted while the procedure for dispute resolution is in place. Therefore, the procedure contractually provided for has not been complied with, if not in a formalistic way and therefore Hovensa does not have the right to draw down on the guarantees: and if it does so, it does it breaching the duties of good faith.

At any rate, attached is the letter by which Mr. Paparella, with offices in New York, in today's date (5th June 2007) has started – in the name and on behalf of Technip and TPVI – the dispute resolution procedure, which provides for a first phase of direct negotiation between the parties, further to a formalisation in that sense, pursuant to the provision of

14

art. 27.2 of the TPVI Contract and art. 24.2 of the Technip Contract (doc. n. 23).

**Non independence of the guarantees**

The above would be sufficient to ground the request for an order to Unicredit not to pay if the guarantee were independent, as the mentioned circumstances (lack of good faith in the draw down itself and in the relevant modalities) make the draw down a fraudulent one, that is typically objected to by the application for an interim measure.

But the guarantees under discussion are not independent at all.

It is true that they are ruled by the UCP and ultimately by the laws of New York, which seem to give to the Standby Lettres of Credit tha characteristics of independent guarantees, but it is also true that they have both been issued in Italy upon request of the ordering party, that in both cases is the same company, Technip Italy – incorporated under the laws of Italy.

That we are discussing a guarantee is undoubted, the doubts concern the kind of guarantee, and therefore on the possible objections.

The limits of this case do not permit a thorough discussion on the nature of the independent guarantees with respect to non independent ones [*fideiussione*], and on the relevant functions and characteristics.

It is therefore sufficient to recall that the case law that has led to acknowledge the existence on non typical guarantee contracts, that have a specific degree of independence has not been able to exceed, because the "independent" contract must still have a cause, which is the guarantee, and therefore cannot be totally free from any link to an (other) contract and therefore completely unrelated to *fideiussione*, the typical contract that becomes the parameter for reference. In other words, the independence cannot be transformed into abstractness.

In the case at issue, para. 2.1 of Appendix D exhibit 1 of the Technip Contract and the

TPVI Contract (doc. n. 22, mentioned), clearly provides that the letters of credit be issued to guarantee the payment of penalties for late delivery: but whether said penalties are due can be ascertained only with reference to the relevant contract.

On the other hand, the guarantees are those typically used for documentary credits, i.e. those drawn upon by submission of certain documents, basically, the documents representing the claim: in fact, the publication of the ICC to which reference is made to define the rules to be applied to the guarantees includes a detailed list of the "requisites for acceptability for each category of transport documents". This mentioned in the foreword, and appears clearly in examining the index of the publication (doc. n. 24).

But there is no documentation – within the meaning used with respect to documentary credits – than can take the place of an ascertainment of the fact that penalties are due, as provided for in the contracts of Technip and TPVI.

In fact, in this case the "documents" are a self issued certificate of the guaranteed creditor. But this kind of guarantee is clearly not suited for the use (instrumental, in the plaintiffs' view) that Hovensa makes of them. In fact, the documents to be produced are a simple statement of the creditor, stating that the other party is in breach. This appears *ictu oculi* as an excessive freedom in particular with respect to assessment, granted to the creditor, so that it influences, in our view the validity itself of the guarantee. The document, *per se* necessary for the existence of a documentary credit, must appear weak to the beneficiary itself, given that t5he same has deemed it necessary to create for its benefit an additional document – the invoice – based on which then be able to issue the document requested for the draw down of the guarantee.

But such not straight forward mechanism simply proves that the guarantee is not an independent one, but is strictly linked to the underlying contract.

It is known that the use of the standby letters of credit in the practice of international trade

16

derives from the specific US and Canadian rules *"as in the US and in Canada the law prohibits the banks to issue guarantees, said prohibitions has been substantially circumvented by the issuance of <standby letters of credit> that utilise the mechanism of documentary credit for the purposed of guarantee"* (Franco Bonelli, *Le garanzie bancarie a prima domanda*, Giuffrè, 1991, p. 7). Inevitably, being it impossible to simply apply one system to another, there are consequences. There from derives the need to asses to which kind of guarantee – and therefore which kind of rules – are to be referred to in the case at issue.

Case law has often examined whether a guarantee was independent or not, and has always stated that the actual will of the parties must be looked for, even in presence of clauses such as "at simple request", or "on demand" that can be inserted even into a contract that maintains the characteristics of non independence typical of *fideiussione*, even if the parties have provided that payment must occur within a short period of time upon simple notice to the debtor and without the need for the latter's consent, and without the latter's possibility to object (Cass., sez. III, 3rd October 2005, n. 19300).

But in the case under exam the are not even said expressions: Unicredit undertakes to pay within 7 working days, upon presentation of "documents", but there is no other undertaking, such as – for example – the one of not raising objections pertaining to the underlying contract. Said argument on wording is sufficient; case law has in fact held that *"the lack of the element of non independence, which characterises the independent guarantee contract (performance bond) and differentiates the same from fideiussione must necessarily be stated in the contract by using a specific clause apt to indicate that the guarantor cannot raise vis-à-vis the creditor the objections to which the main debtor is entitled …"* (Cass., sez. III, 7th January 2004, n. 52 [*emphasised*]) and that *"as the payment on demand clause is not incompatible with the application of the mentioned rule of the civil code [art. 1957], it is for the judge to ascertain, on a case-by-case basis, the actual will expressed by the parties by negotiating the said clause"* (Cass. Sez. I, 4th July 2003, n. 10574).

17

And in fact, clearly because aware of the fact that the draw down can under certain circumstances occur in a completely instrumental way, the Tribunal of Milan on 19th July 2002 stated that "*the demand guarantee for performance of obligations of the contractor does not include all of the obligations deriving from the contract, but only the obligation to perform works*" and "*for the purposes of drawing on a demand guarantee it is necessary to prove the serious breach of the contractor*" (in rep. Foro It. 2003, v. "*Appalto*", n. 37).

And still another judge on the merits of a case states that "*the clause included into a contract providing payment upon written request of the guaranteed party within the time limit of thirty days (term to be considered in favour of the guarantor, giving the latter the time to decide how to proceed before being considered in breach) does not show the independence of the guarantee with respect to the main obligation, as it is not provided, for the guaranteed party, the possibility of claiming the immediate payment upon simple request, or without exceptions; therefore, to said contract the rules on fideiussione must be applied*" (A. Genova, 6th April 2000, in Rep. Foro It. 2002, v. "*Fideiussione e mandato di credito*" n. 26).

In the case under exam, we repeat, the facts evolved in an instrumental way: TPVI mentioned since a long time the impossibility of delivering within the time limit established, specifying the reasons thereof and saying that they are due to Hovensa; as a matter of fact, the plaintiffs not only require that Hovensa do not debit them the penalties for delay, but also that it undertakes to refund the damages that they have suffered and are still suffering (see doc. 6, mentioned): this is very different from guaranteeing the good performance of a plant, which is the reason fore which guarantees are normally issued.

In conclusion, the guarantees drawn by Hovensa are not at all independent, but rather strictly linked to the contract that provides for their issuance. Therefore, the plaintiffs are entitled to oppose to the guarantor all the objections that they can oppose to the guaranteed entity, first of all the fraudulent draw down of the guarantees, based un an alleged breach that however does not exist – with respect to Technip – or – with respect

18

to TPVI – is not due to the same.

**Capacity of the plaintiffs to stand in Court and jurisdiction of the Court.**

There should be no doubts as to the capacity of the plaintiffs to stand in Court and on the jurisdiction of the Court. In fact, the guarantees under discussion have been issued by Unicredit Banca d'Impresa Spa, Branch of Roma centro – via Sardegna 44 – Rome, and the text of the guarantee reads that the beneficiary is authorised to draw down on them at said branch.

Furthermore, the guarantees have been issued further to a request in that sense of the ordering party, which in both cases is Technip: they have therefore been issued implementing a mandate given by an Italian company to an Italian bank, in Italy, and that, as provided in the request of issuance of the guarantees itself, is expressly ruled by Italian law and submitted to the jurisdiction of the Tribunal of Rome.

It is true that the contracts with Hovensa, beneficiary of the guarantees, are rules by the laws of the State of New York, and that any dispute related to said contracts are submitted – in the absence of an amicable solution reached pursuant to a specified procedure, contractually agreed upon – to the US District Court, Souther District of New York (USA), but this would not prevent the jurisdiction of Italian Courts for the granting of interim measures, as expressly provided by art. 10 of Law 218/1995 on international private law.

As regards the applicable law, it has been said that Technip, in requesting the bank to issue the guarantees has expressly provided that said order (mandate) be regulated by Italian law: besides, even pursuant to international private law rules there would not be any doubt that the same would be the regulating law, as Italy is the country with which the obligation (to fulfil the guarantee) has the strictest link, this depending on where the bank is located (Rome), being the bank the entity that must provide the specific activity (see art. 57 of L.

19

218/1995, which refers to the Rome convention on contractual obligations).

Case law and commentators plainly admit the capacity of the party ordering the guarantee to request the order of refraining from both paying the guarantees (and possible counterguarantees) and from debiting the relevant amount to the said party (see, out of a number: Tr. Rome, 6th novembre 1998, in Giust. Civ. 1999, II, 3457; Tr. Udine, 22nd June 1995, in Giur. It. 1996, I, 2, 428; Tr. Rome, 26th May 1995, in Foro it. 1996, I, 1091; Tr. Milan 20th March1991, in B.B.T.C. 1992, II, 741). Some decisions have also held that said capacity is grounded in the mandate relationship itself, that binds the ordering party to the guaranteeing bank, insofar as the mandating has the right to request a diligent and proper fulfilment of the guarantee contract, based on the principles ruling the mandate and the rules on good faith (see: Tr. Rome, 6th Novembre 1998, in Giust. Civ. 1999, II, 3457; Tr. Modena, 24th March 1998, in Giur. It. 1999, 50).

It is constant case law, repeated even recently: *"the application for an interim measure filed by an Italian entrepreneur vis-à-vis an Italian bank, to which it had been ordered the issuance of an international demand guarantee, and aiming at obtaining an order of suspending payment of the guarantee or, in a subordinated way, a statement as to the inefficacity of the debiting action to which the bank in entitled vis-à-vis the applicant based on the payment of the guarantee falls under the jurisdiction of the Italian courts because the juridical relationship between the plaintiff and the bank – on which the application is based – must be regarded as falling within the definition of mandate"* (tr. Verona, 20th May 2001, in Rep. Foro it. 2002, v. *"provvedimenti di urgenza"*, n. 23); and in addition *"The entity ordering demand counter guarantees … has the capacity to apply for interim measures against the bank who is a counter guarantor in order to obtain an order not to pay to the guaranteeing bank … because the ordering entity, once the counter guaranteeing bank, in the absence of a request for an order not to pay, has paid the counter guarantees, could not avoid being debited the relevant amount"* (Tr. Genova, 24th September 2001, in Rep. Foro it. 2002, v. *"provvedimenti di urgenza"*, n. 76).

20

**Requisites for the interim measure**

As regards the existence of the specific requisites for the granting of the interim measure, namely the *fumus boni iuris* and the *periculum in mora*, the plaintiffs mention the following.

As regards the *fumus*, the various arguments and reasoning above demonstrate clearly that the draw down on the guarabntees by Hovensa occurs with fraud, under a twofold aspect: on the one side, because it deems in breach also Technip, which is instead not a party to the contract concerning Mechanical Construction (and the relevant timing), and on the other side because Hovensa exercised a right for purposes which are different to the ones pertaining to it. This is deemed to apply in any circumstance under which there is not a genuine objection by the beneficiary: "*this is a standard that can easily be applied which has actually been expressly or implicitly been adopted in the almost totality of the decisions pronounced in the subject matter*" (F. Bonelli, mentioned, p. 109, footnote 70).

As regards the *periculum*, it should be considered that given the situation and the discussion presently going on between the parties, it is clear that Hovensa plans to discuss of the merits of the case from a strong standpoint, i.e., after having cashed a material amount, and precisely more than 13,000,000.00 dollars. Said amount, although Technip is a solid company with a good *portfolio* of clients, could not be paid without having serious consequences both on the financial situation of Technip, and on its image, as it would be mentioned as having suffered a draw down, circumstance that – at least! – will make it more expensive for Technip to obtain the next guarantee: but its activity cannot be carried out without bank guarantees.

This substantially changes the respective parties' position, affecting the equilibrium between them: the guarantee aimed at ensuring the correct performing of the works (in fact, it is provided that the relevant amount be cut down by 50% at the issuance of the acceptance certificate of the works by Hovensa) is in fact used to cut down – in practice –

21

the relevant compensation. But to this it should be added that the plaintiffs will obtain a much lower amount than expected anyways, considering that the discussions between the parties indeed concern a growth in costs that according to Hovensa must be borne entirely by the plaintiffs, who, in turn, deem that the situation is the latter's responsibility. And pursuant to the contract, if there is at least a co-responsibility of Hovensa, the penalties for late delivery are not due.

It is true that at least theoretically the plaintiffs could exercise an action to recover the amounts unduly paid, but this would oblige Technip (as having ordered the guarantees, and sole destinee of the debiting action of Unicredit) to start an action in the US Virgin Islands, register office of Hovensa. With regards to the difficulties of such an action, deriving form the location of the applicable law, it is not necessary to make a lengthy discussion, and the same applies to the difficulties concerning possible enforcement proceedings. The guarantee in fact provides that payment be made directly to Hovensa, which has only had to send a letter, while Technip should start a complex lawsuit, with the relevant risks and in particular, the relevant timing.

In balancing the different interests, the non granting of the interim measure applied for would certainly be more detrimental to the plaintiffs than to the resistant. On the other hand, if the measure applied for were granted, they would not be too much in advantage with respect to Hovensa.

For the abovementioned reasons

The plaintiff companies ask that your Honour, *inaudita altera parte*,

- as a principal request, orders Unicredit Banca d'Affari, with offices in Rome, via Sardegna, 44, not to make the payment requested by Hovensa on the basis of the Letters of Credit issued by the same, and having n. 460830345935 and n. 460830854774 (or, at least, order not to pay the amounts requested on the basis of the Letter of Credit n.

460830345935 guaranteeing the obligations of Technip Italy), that have been drawn upon not in good faith;

- as a subordinated request, orders Unicredit Banca d'Affari with offices in Rome, via Sardegna, 44 not to debit to technip Italy S.p.A. the amounts paid to Hovensa and all the cost borne by said Unicredit on the basis of the mentioned Letters of Credit, and having n. 460830345935 and n. 460830854774 (or, at least, order not to debit the amounts paid to Hovensa on the basis of the Letter of Credit n. 460830345935 guaranteeing the obligations of Technip Italy);

- as an even subordinated request, in the event that Your Honour deems it impossible to proceed without summoning the parties in order to make a decision, it is requested that Your Honour orders that meanwhile Unicredit temporarily stops the payment of the mentioned guarantees.

With the award of expenses and fees.

For the purposes of the payment of Court duties, it is mentioned that the amount of this case exceeds € 520,000.00 and therefore the amount due is the highest divided by 50%, and therefore corr4esponds to € 550.00.

The following are filed:

1. Letter from Unicredit dated 24th April 2007 increasing the amount of the Irrevocable Stand by letter of Credit guaranteeing the obligations of Technip;

2. Letter from Unicredit dated 14th March 2007 increasing the amount of the Irrevocable Stand by letter of Credit guaranteeing the obligations of TPVI;

3. request by Technip to Unicredit to issue the Irrevocable Stand By Letter of Credit in the interest of Technip itself, and undertaking of the obligation to counter guarantee the bank;

4. request by Technip to Unicredit to issue the Irrevocable Stand By Letter of Credit in the interest of TPVI, and undertaking of the obligation to counter guarantee the bank;

23

5. Settlement Agreement 31st march 2006;

6. letter from technip and TPVI to Hovensa dated 15th December 2006;

7. invoices issued by Hovensa to Technip for penalties for delay and relevant documentation;

8. invoices issued by Hovensa to TPVI for penalties for delay and relevant documentation;

9. rejection of invoices by Technip;

10. rejection of invoices by Technip;

11. [missing]

12 a), 12 b) and 12 c). Letters by Hovensa to Technip dated 29th may 2007; letter by Hovensa to TPVI dated 29th May 2007; letter by Hovensa to Technip dated 1st June 2007;

13 a) and 13 b). draw down 0on the guarantees by Hovensa, draw down of the counter guaranteed by Unicredit;

14 a) e 14 b). Technip's answer to Hovensa's objections; TPVI's answer to Hovensa's objections;

15 a) e 15 b). Translation of part of the Technip contract; complete text of the Technip contract;

16 a) e 16 b). Translation of part of the TPéVI contract; complete text of the TPVI contract;

17. letter by Tiger dated 21st October 2006;

18. e.mail and related slides dated 25 August 2006

19. slides of 16th November 2006;

20 a), 20 b) e 20 c). TPVI's letters dated 21st and 26th September, and 1st October 2006;

21. Appendix "K" to Technip contract and TPVI contract;

22. Appendix "D" to Technip contract and TPVI contract;

23. letter sent on dated 5th June 2007 by M. paparella to Hovensa;

24

24. index of CCI publication  n. 500.

Persons informed on the facts are Messrs. Ing. Vincenzo Laganà; ing. Raoul Luciani; ing.

Andrea Margaglio.

Rome, 5th June 2007

[*signed*]

Avv. Daniela Jouvenal Long


Avv. Sergio Calderara

25

Power of Attorney

The undersigned Dr. Marco Villa, Financial Director, and ing. Arturo Grimaldi, CEO, legal representatives *pro-tempore* of Technip Italy s.p.a., with registered offices in Rome, viale Castello della Magliana 68, appoint Ms. Daniela Jouvenal Long and Mr. Sergio Calderara, of the Bar of Rome, even severally, so that they may represent, assist and defend the same in the present case and in all its phases and grades, granting them the widest powers permitted by the law, including those of having substitutes, summoning third parties, settle, find a conciliation, waive the case and accept waivers, and elect domicile at their offices in Rome, piazza di Pietra. 26

Rome, 5th June 2007

[*signed*]                                                                           [*signed*]

———————                                                           ————

The signatures are true:

*Signed* Daniela Jouvenal Long

Power of Attorney

The undersigned Etienne Gory, in his capacity as legal representative *pro-tempore* of TPVI LTD, having registered offices in 1, Hibiscus Alley, Charlotte Amalie, St. Thomas, US Virgin Islands, appoints Ms. Daniela Jouvenal Long and Mr. Sergio Calderara, of the Bar of Rome, even severally, so that they may represent, assist and defend the same in the present case and in all its phases and grades, granting them the widest powers permitted by the law, including those of having substitutes, summoning third parties, settle, find a conciliation, waive the case and accept waivers, and elect domicile at their offices in Rome, piazza di Pietra. 26

Rome, 5th June 2007

[*signed*]

26

---

The signature is true:

*Signed*  Daniela Jouvenal Long

[*stamps*]

27

Tribunal of Rome

The designated Judge, in the person of Ms. Paola Agresti;

Having read the application;

Deeming it preferable to hear the defendant on the reasons for the application,

For the abovementioned reasons, having seen art. 669 sexies of the code of civil procedure

a) establishes the hearing of 20th June 2007 at 12.40 for the parties to attend;

b) grants time until 14th June 2007 for serving the application and the decree to the defendant, authorising as of now that the urgent service occurs by fax.

Rome, 7th June 2007

The Judge Paola Agresti

[*signed*]

[*stamp*]

28

This is a true copy of the original issued upon request of avv. Jouvenal

Rome, 11th June 2007

[*signed*]

[*stamps*]

29

# EXHIBIT H

IL GIUDICE

a scioglimento della propria riserva e decidendo sul ricorso ex
art. 700 cpc proposto dalle Società Technip Italy Spa e TPVI
LTD ,in persona dei rispettivi legali rapp.ti pro – tempore , nei
confronti della Società Unicredit Banca d'Impresa Spa , in
persona del Presidente e legale rapp.te pro – tempore , e nei
confronti di Hovensa L.L.C., in persona del legale rapp.te pro –
tempore ;

letti gli atti ed esaminati i documenti prodotti;

premesso :                'R

che le ricorrenti Technip Italy Spa e TPVI LTD hanno adito il
Giudice ,perché sia inibito alla Unicredit Banca d'Impresa Spa
di effettuare il pagamento richiesto da Hovensa , sulla base delle
Lettere di credito    da questa emesse , ed aventi nn.
460830345935 e n. 460830854774 ( o quantomeno inibire il
pagamento richiesto sulla base della    Lettera di credito n.
460830345935 a garanzia delle obbligazioni Technip Italy ) ,
ovvero , in via subordinata , inibire alla Unicredit di addebitare a
Technip Italia spa gli importi pagati ad Hovensa e tutti i costi
sopportati in base alle predette lettere di credito ( o quantomeno
sulla base della Lettera di credito n. 460830345935 a garanzia
delle obbligazioni Technip Italy  ), assumendo, fra l'altro ,
l'abusività e l'invalidità dell'escussione stessa  ;

che presupposto della domanda  è , infatti , l'avvenuta
escussione delle garanzie , con lettera del 29\5\07, per l'importo
massimo per cui  sono state rilasciate le Letters of Credit , con
conseguente inevitabile escussione delle controgaranzie  di
Technip da parte di Unicredit , sulla base di una richiesta di
pagamento di fatture avanzata da Hovensa di cui si contesta
integralmente la legittimità;

che , infatti , le ricorrenti deducono, in primo luogo, l'abusiva
escussione delle garanzie , in violazione dell'obbligo di buona
fede , in quanto i ritardi nella consegna dei lavori appaltati
sarebbero stati determinati  dal comportamento del sub-

appaltatore Tiger , scelto su pressanti insistenze della stessa Hovensa , e che Hovensa era ben a conoscenza delle criticità del progetto e delle relative cause non certo addebitabili esclusivamente alle ricorrenti ed atteso , altresì, che , poiché i lamentati ritardi fanno riferimento solo alla consegna di Costruzione Meccanica , essi riguardano, solo il contratto " Construction " stipulato da TPVI , e , pertanto, doveva eventualmente essere escussa solo la garanzia relativa a tale contratto e non anche la garanzia relativa al contratto " Engineering e Procurement " ;

che , inoltre , le ricorrenti eccepiscono l'invalidità dell'escussione della garanzia , in primo luogo , in quanto trattasi di " somme contestate " , per le quali , ai sensi dell'all.to "K" punto 2.4 ( doc. 22 fasc. ric.) non poteva emettersi fattura , ma vi era l'onere di seguire la procedura per le contestazioni prevista dall'art. 24.2 del Contratto Technip e 27.2 del Contratto TPVI , ed , inoltre , in quanto Hovensa ha violato l'art. 2.1 quarto paragrafo , ultima frase dell'allegato D exhibit 1 ( doc. 22 fasc. ric. ) dando la comunicazione , ai sensi degli artt. 11.3 Accordo EP ( Contratto Technip ) e dell'art. 14.3 Accordo di costruzione ( Contratto TPVI ) contemporaneamente all'escussione delle garanzie :

che , infine ,le ricorrenti eccepiscono la natura accessoria e non autonoma della garanzia escussa , con la conseguente legittimazione per le ricorrenti medesime di opporre al garante le eccezioni opponibili al garantito , ribadendo , quindi, il fumus ed il periculum dell'invocato provvedimento cautelare ;

verificato :

che la resistente Unicredit Banca d'Impresa Spa ,costituitasi nel presente procedimento , ha confermato l'avvenuta concessione delle garanzie , riaffermandone la natura autonoma , precisando di non aver ancora effettuato alcun versamento di somme in esecuzione della stessa , rimettendosi alle determinazioni del Tribunale con riguardo alla domanda principale , chiedendo , tuttavia , il rigetto della domanda subordinata tesa ad inibire alla medesima Banca di escutere le controgaranzie prestate da Technip;

che si è , altresì, costituita Hovensa L.L.C. , ribadendo la natura autonoma della garanzia , l'insussistenza della violazione della buona fede , la ritualità dell'escussione , l'unicità del rapporto d'appalto e , quindi, dei due contratti , per cui legittima doveva ritenersi l'escussione delle due garanzie , ed ,in definitiva, l'insussistenza dei presupposti richiesti dall'art. 700 cpc per l'adozione di un provvedimento d'urgenza e l'infondatezza delle pretese della ricorrente ;

osserva quanto segue:

Il ricorso proposto deve ritenersi inammissibile per difetto dei presupposti richiesti dall'art. 700 cpc .

Deve innanzi tutto premettersi che le garanzie in questione sono certamente autonome e non consentono all'obbligato di opporre eccezioni di sorta fondate sul rapporto sottostante a garanzia del quale esse sono state prestate .

In particolare con le due lettere denominate " Irrevocable Stand – by Letter of Credit " , la Banca Unicredit si è obbligata a pagare a Hovensa , entro sette giorni lavorativi una certa somma , dietro presentazione di due documenti , e cioè una richiesta di pagamento , quale escussione della garanzia , ed una dichiarazione di un funzionario della Hovensa , il cui fac – simile è riportato nel testo della garanzia . E' pacifico che le parti hanno concordato ( Appendix D , Exhibit 5 ) che il diritto di escutere le garanzie sarebbe stato regolato dalle "Uniforms Customs and Practice for Documentary Credits ( doc. 7 fasc. Unicredit ) che stabiliscono espressamente che le lettere di credito per loro natura " ..sono transazioni separate dalle vendite o dagli altri contratti sui quali sono basate .." e che ".. Conseguentemente , la promessa di una banca di pagare ..negoziare e\o adempiere ad alcuna obbligazione prevista nella lettera di credito , non è soggetta a contestazioni del cliente con riguardo alle sue relazioni con la Banca ordinante ed il Beneficiario ..".

Peraltro la chiara astrattezza dei crediti documentari prevista dal predetto art. 3 , applicabile alle garanzie in questione , è circostanza non validamente contraddetta dalle deduzioni di parte ricorrente , che si limita a generiche considerazioni circa la necessità di raccordare i principi italiani alla normativa internazionale , ma non può revocarsi in dubbio che le parti abbiano inteso creare una obbligazione contrattuale indipendente della Banca emittente in favore del beneficiario e, ai sensi della

legge regolatrice del rapporto , ogni questione relativa all'andamento ed all'esecuzione del rapporto sottostante non può giustificare il mancato pagamento .

Ancora deve ritenersi che le deduzioni di parte ricorrente , secondo cui i due menzionati contratti sarebbero autonomi e distinti e che , pertanto, l'escussione della garanzia dovrebbe limitarsi al solo contratto " Construction " ( " Construction Agreement " ) è anch'essa infondata .

L'unitarietà del rapporto in questione è stata ribadita da parte resistente Hovensa e confermata da vari elementi documentali , non validamente contraddetti dal dato fromale invocato dalle ricorrenti .

In primo luogo , infatti, le lettere di intenti per i contratti "
Engineering e Procurement " e " Construction " sono state sottoscritte dai medesimi due rapp.ti di Technip , l'emissione di entrambe le garanzie è stata richiesta alla Banca Unicredit dalla sola Technip , TPVI ( firmataria del contratto " Construction " )è stata costituita da Technip appositamente per l'operazione otto giorni prima della data di sottoscrizione dei contratti .

Inoltre l'Appendix D, prevede che la responsabilità , le obbligazioni ed i requisiti applicabili all'appaltatore saranno riferiti ad entrambi gli appaltatori dei rispettivi contratti , e quindi , sia Technip che TPVI , l'Appendix K , identica nei due contratti e firmata da tutte le parti , prevede che l'appaltatore paghi le penali ( " Schedule Liquidated Damages ") per ciascun giorno successivo al novembre 2006 ,qualora non sia stato raggiunto il completamento meccanico del progetto e tale Appendix è rimasta invariata anche dopo che le penali sono state modificate nel marzo 2006 con il " Settlement Agreement ".

Tale Appendice prevede , quindi , che anche la Technip fosse direttamente obbligata al completamento meccanico dell' appalto e che anche la Technip fosse direttamente obbligata al pagamento delle penali entro i limiti del 10% del prezzo totale .

Ancora , a riprova dell'unicità del rapporto l'Appendix E , che fissa le fasi dell'intero progetto , dalla progettazione alla realizzazione , fissando il termine della data del completamento meccanico è preparata esclusivamente da Technip , e all'art. 6.2 del contratto "
Engineering e Procurement ", sottoscritto da Technip si precisa che il ruolo di gestione del progetto esecutivo sarebbe stato svolto da una società " affiliata " ( cioè TPVI ) e che la stessa Technip non avrebbe cercato di esonerarsi dalla propria responsabilità derivante dalla mancata esecuzione del progetto , inclusa quella di eventuali ritardi nella consegna , allegando o opponendo che la responsabilità fosse della società affiliata esecutrice del progetto.

Infine anche nel "Settlement Agreement " la responsabilità per i ritardi nella consegna dei lavori è sempre attribuita indistintamente al " Contractor ", vale a dire sia a Technip che a TPVI .

Quanto detto , in ordine alla natura delle garanzie in questione e alla sostanziale unitarietà dei contratti , vale ad escludere , con riguardo al "fumus boni iuris", la sussistenza della cd. "prova liquida" idonea a fondare l'exceptio doli sollevata dalle ricorrenti .

In primo luogo , infatti , attesa la natura automa delle garanzie prestate , nessuna eccezione relativa all'inadeguatezza del sub – appaltatore ( Tiger ) ed alla complessiva criticità della situazione di cui Hovensa sarebbe stata edotta , può essere esaminata per bloccare il pagamento , né alcuna deduzione afferente il rapporto sottostante può consentire alla Banca obbligata , né all'ordinante di rifiutare il pagamento .

Inoltre , le considerazioni sull'unitarietà dei rapporti intercorsi fra le parti escludono che possa ritenersi effettuata in violazione della buona fede l'escussione di entrambe le lettere di garanzia .

Ancora devono ritenersi infondate , sempre in ordine al " fumus " le affermazioni delle ricorrenti circa l'irritualità dell'escussione delle garanzie .

In primo luogo , infatti , è smentita " per tabulas " l'affermazione che la comunicazione prevista dagli artt. 11.3 Accordo EP ( Contratto Technip ) e 14.3 Accordo di costruzione ( Contratto TPVI ) sia stata fatta contemporaneamente all'escussione delle garanzie , in quanto le comunicazioni in questione sono del 29\5\07 ( docc. 6 e 7 ) , in mancanza di riscontro Hovensa ha, poi, trasmesso una seconda comunicazione ( docc. 8 e 9 ) e , quindi, in data 4\6\07 ( cfr. data e firma di ricezione della Banca ) ha consegnato alla Banca Unicredit la documentazione utile all'escussione , richiedendo il pagamento a termine di garanzie ( docc. 10 e 11 ) .

Inoltre del tutto infondata è l'affermazione secondo cui l'escussione delle garanzie sarebbe avvenuta per fatture che non potevano essere emesse perché relative a "somme contestate " e ciò ai sensi del punto 2.4 dell'all.to K ai due contratti ( doc. 21 fasc. ric. ). Invero la norma tradotta in italiano recita : " Salvo che per gli importi in contestazione , tutti gli altri pagamenti da effettuarsi dall'appaltatore in favore di Hovensa ( compresi quelli dovuti a Hovensa a titolo di garanzia o comunque a termini del presente Contratto ) saranno dovuti entro trenta giorni dal ricevimento da parte dell'appaltatore delle fatture di Hovensa " limitandosi , quindi, la norma a stabilire un termine entro cui effettuare i pagamenti ( 30 gg dal ricevimento delle fatture ) , termine che non vale , per le "somme contestate" ( " salvo che per gli importi in

contestazione " ) per le quali , come evidenziato dalle stesse ricorrenti , deve seguirsi la procedura per le contestazioni prevista dagli artt. 24.2 del Contratto Technip e 27.2 del Contratto TPVI .
E' evidente , che da tale norma non può certo evincersi il divieto ad emettere fatture per "somme contestate", né esiste norma nei contratti di appalto in questione che limiti la possibilità di escutere le garanzie in pendenza di una procedura negoziale di soluzione della controversia per le somme in contestazione .
Riguardo ,poi, all'ulteriore requisito del periculum in mora si deve rilevare che la ricorrente non ha in alcun modo provato la concreta sussistenza del " periculum " paventato e del tutto genericamente dedotto , né " a parte creditoris " , né " parte debitoris ".
Dovendosi provvedere in ordine alle spese del presente giudizio, non può che seguirsi il criterio della soccombenza .

PQM

Visto l'art. 700 cpc ;

respinge ogni istanza per l'adozione di un provvedimento di urgenza ;
condanna le ricorrenti Technip Italy Spa e TPVI LTD a rimborsare alla parte resistente Unicredit Banca d'Impresa Spa le spese di giudizio che liquida in complessive Euro 6.375,00 ,di cui Euro 1.375,00 per competenze , Euro 5.000,00 per onorari, oltre spese generali Iva e Cpa come per legge ;
condanna, ancora , le ricorrenti Technip Italy Spa e TPVI LTD a rimborsare alla parte resistente Hovensa L.L.C. le spese di giudizio che liquida in complessive Euro 8.485,00 ,di cui Euro 1.485,00 per competenze Euro 7.000,00 per onorari, oltre spese generali Iva e Cpa come per legge .

Così deciso in Roma il 2\7\07

Si comunichi                    Il Giudice

                          d.ssa Paola Agresti

THE JUDGE

delivering a decision on the Petition pursuant to Article 700 Code of Civil Procedure, at the instance of the companies Technip Italy Spa and TPVI LTD, in the person of their respective legal representatives *pro tempore*, against Unicredit Banca d'Impresa Spa, in the person of its legal representative *pro tempore* and against Hovensa L.L.C., in the person of the legal representative *pro tempore*;

having read the deeds and examined the documents exhibited;

Whereas:

the Petitioners, Technip Italy Spa and TPVI LTD, applied to the Judge, for an order enjoining Unicredit Banca d'Impresa Spa from making the payment requested by Hovensa, on the basis of the Letters of Credit issued by same, no. 460830345935 and no. 460830854774 (or at least enjoining the payment requested on the basis of Letter of Credit No. 460830345935 in guarantee of the obligations of Technip Italy) or, as an alternative plea, to enjoin Unicredit from charging to Technip Italia SpA the amounts paid to Hovensa and all costs sustained on the basis of the aforementioned Letters of Credit (or at least on the basis of Letter of Credit No. 460830345935 in guarantee of the obligations of Technip Italy), alleging *inter alia* the wrongful and invalid nature of the draw down itself;

the basis for the claim is, in fact, the draw down of the guarantee, by letter of May 29, 2007 for the maximum amount for which the Letters of Credit were issued, with consequent inevitable draw down by Unicredit of Technip's counter guarantees, on the basis of a request for payment of invoices made by Hovensa of which the entire legitimacy is contested;

in actual fact, the petitioners sustain, firstly, the wrongful nature of the draw down, in breach of the obligation of good faith, insofar as the delays in delivery of the works were caused by the conduct of the subcontractor Tiger, chosen at the pressing insistence of Hovensa itself, and that Hovensa was well aware of the problems with the project and the relative causes which were certainly not exclusively attributable to the petitioners and, given also that since the delays complained of referred only to the delivery of the Mechanical Construction, said delays relate only to the "Construction" contract, concluded by TPVI , and therefore only

the guarantee relative to that contract should have been drawn down and not also the guarantee relative to the "Engineering & Procurement" contract;

furthermore, the petitioners object to the invalidity of the draw down of the guarantees, firstly, because these are "disputed amounts" in relation to which, pursuant to Appendix K, point 2.4, (Exhibit 22, petitioners' file) invoices could not be issued, as there was the obligation to follow the procedure for contestations provided by Article 24.2 of the Technip Contract and 27.2 of the TPVI Contract and, furthermore, because Hovensa had breached Article 2.1 fourth paragraph, last sentence of Appendix D, Exhibit 1 (Exhibit 22 petitioners' file) giving the communication, pursuant to Articles 11.3 E&P Agreement (Technip Contract) and Article 14.3 Construction Agreement (TPVI Contract) simultaneously with the draw down of the guarantees;

finally, the petitioners challenge the accessory and non-autonomous nature of the guarantees drawn down, consequently legitimizing the petitioners to bring against the guarantor the objections which can be brought against the guaranteed party, reiterating therefore *fumus* [strong presumption of its rights] and the *periculum* [real danger in delay] for the interim measure applied for;

Having verified:

that the respondent Unicredit Banca d'Impresa Spa had entered appearance in these proceedings, confirmed the granting of the guarantees, reaffirming their autonomous nature, specifying that the bank had not yet made any payment of sums in execution of the same, awaiting determination by the Court with reference to the principal claim, requesting, however, the refusal of the alternative plea to enjoin said Bank from drawing down the counter-guarantees granted by Technip;

that Hovensa L.L.C. had also entered appearance, reiterating the autonomous nature of the guarantee, the non-existence of breach of good faith, the procedural correctness of the draw down, the unitary nature of the contracting relationship and therefore of the two contracts, so that the draw down of the two guarantees must be considered legitimate, and, definitively the non-existence of the presumptions required by Article

700 Code of Civil Procedure for the adoption of interim measures and groundless nature of the petitioner's party claims;

comments as follows:

The petition brought must be held inadmissible due to lack of the conditions required by Article 700 of the Code of Civil Procedure.

Firstly, it must be stated as a premise that the guarantees in question are certainly autonomous and do not allow the obliged party to bring any objections of any kind on the basis of the relationship underlying the guarantee for which it was granted.

In particular, in terms of the two letters entitled "Irrevocable Stand-by Letter of Credit", Unicredit is obliged to pay to Hovensa, within seven business days, a certain sum on presentation of two documents, that is a request for payment, such as draw down of the guarantee, and a declaration by an official of Hovensa, the facsimile of said declaration being set forth in the text of the guarantee. It is not in dispute that the parties agreed (Appendix D, Exhibit 5) that the right to draw down the guarantees would be governed by the "Uniform Customs and Practice for Documentary Credits" (Exhibit 7 Unicredit file) which expressly establishes that letters of credit by their very nature" ..are separate transactions from the sales or other contracts on which they are based .." and that "..Consequently, the promise by a bank to pay… ..negotiate and/or fulfill any obligation provided in the letter of credit, is not subject to objections by the customer with regard to its relations with the ordering Bank and the Beneficiary .." .

Moreover the clearly abstract nature of documentary credits provided by the aforementioned Article 3, applicable to the guarantees in question, is a circumstance which is not validly disproven by the submissions made by the petitioner party, which are limited to generic considerations regarding the necessity to link the Italian principles with the international rules, but there is no doubt that the parties intended to create an independent contractual obligation for the issuing bank in favor of the beneficiary and, pursuant to the law governing the relationship, any matter relative to the performance and execution of the underlying relationship cannot justify failure to pay.

Once again it must be held that the arguments put forward by the petitioner party, according to which the two aforementioned contracts are autonomous and distinct and that, therefore

the draw down of the guarantees should be limited only to the "Construction Agreement") are also unfounded. The unitary nature of the relationship in question has been reiterated by the respondent Hovensa and confirmed by various documentary elements, not validly refuted by the formal aspect relied on by the petitioners.

Firstly, in actual fact, the Letters of Intent for the "Engineering & Procurement Agreement" and "Construction Agreement" were signed by the same two representatives of Technip, the issue of both the guarantees was requested of Unicredit bank by Technip alone, TPVI (signatory of the "Construction" Agreement) was a company incorporated by Technip specifically for the transaction, eight days prior to the date of signing of the Agreements. Furthermore Appendix D, provides that the liability, obligations and the requisites applicable to the contactor refer to both contractors in their respective Agreements, and therefore, both Technip and TPVI. Appendix K, identical in the two contracts and signed by all the parties, provides that the contractor shall pay the penalties ("Schedule Liquidated Damages") for each day following November 2006, should the mechanical completion of the project not have been achieved and that Appendix remains unchanged even following the amendment of the penalties in March 2006 by the "Settlement Agreement".

That Appendix provides, therefore, that also Technip was directly obliged as regards the mechanical completion of the contract, and that also Technip was directly obliged to pay the penalties within the limits of 10% of the total price. Again, in confirmation of the unitary nature of the relationship, Appendix E, which establishes the stages of the entire project, from planning to the production, fixing the date of the time limit for mechanical completion was prepared exclusively by Technip, and Article 6.2 of the Contract "Engineering & Procurement", signed by Technip specifies that the role of management of the executive project would be performed by an "affiliate" company (that is TPVI) and that the said Technip would not attempt to extricate itself from its responsibilities arising out the failure to perform the project, including any delays in delivery, alleging or objecting that the liability was that of the affiliated company, which was carrying out the project.

Finally, also in the "Settlement Agreement" the liability for delays in the delivery of the works is always attributed indistinctly to the "Contractor", that is to say both to Technip and to TPVI. Having said that, as regards the nature of the guarantees in question and the substantial unitary nature of the contract, it is worth excluding, with regard to the "*fumus*

*bonis iuris*", the subsistence of any so-called "immediate proof" suitable to ground *exceptio doli* [a plea of fraud] raised by the petitioners.

Firstly, in fact, given the autonomous nature of the guarantees granted, no objection relative to the unsuitability of the sub-contractor (Tiger) and the overall problematical situation of which Hovensa was aware, can be taken into consideration in order to block the payment, nor can any submission relating to the underlying relationship allow the obliged Bank, nor the orderer to refuse payment.

Furthermore, the considerations regarding the unitary nature of the relationships between the parties exclude any consideration that the draw down of both letters of guarantee was in breach of good faith.

Again as regards" fumus" the petitioners' affirmations regarding the procedural irregularity of the draw down of the guarantee must also be regarded as groundless.

Firstly, the affirmation that the communication provided by Articles 11.3 of the E&P Agreement (Technip Contract) and 14.3 Construction Agreement (TPVI Contract) was made simultaneously with the draw down of the guarantees is disproven by the documentary evidence, insofar as the communications in question are dated May 29, 2007 (Exhibits 6 and 7). Receiving no response Hovensa then transmitted a second communication (Exhibits 8 and 9) and therefore on June 4, 2007 (see date and signature of receipt by the Bank) delivered to Unicredit Bank the documentation required for the draw down, requesting payment according to the terms of the guarantees (Exhibits 10 and 11).

Furthermore, completely unfounded is the affirmation according to which the draw down of the guarantees was based on invoices which could not be issued because they related to "disputed sums", and that is pursuant to point 2.4 of Appendix K to the two contracts (Exhibit 21 petitioners' file). Indeed, the rule translated into Italian states: ["Except for the disputed amounts, all other payments to be made by the contractor to Hovensa (including those due to Hovensa in respect of guarantees or in any event in terms of this Contract) shall be due within thirty days from receipt by the contractor of Hovensa's invoice"]: the rule limiting itself, therefore, to establishing a time limit within which to make the payments (30 days from the receipt of the invoices), time limit which does not apply to the "disputed sums" ("Except for the disputed amounts") for which, as emphasized by the said petitioners, must follow the procedure for contestations provided by Article 24.2 of the Technip Contract and 27.2 of the TPVI Contract.

It is clear that there cannot be inferred from that rule any prohibition on issuing invoices for "disputed sums" nor does there exist any provision in the relevant contracts which limits the possibility to draw down guarantees while a negotiating procedure is pending for a solution to the dispute about the sums contested.

Regarding, then, the further requirement of *periculum in mora* it must be pointed out that the petition has not in any way proven the real subsistence of the "*periculum*" feared and argued in a completely generic manner, whether "*parte creditoris*" or "*parte debitoris*".

As regards an award of costs in these proceedings, they can only be awarded against the losing party.

FOR THESE REASONS

Given Article 700 Code of Civil Procedure;

Refuses all pleas for the adoption of an Order for Interim Measures;

Orders the petitioners Technip Italy Spa and TPVI Ltd to reimburse the respondent Unicredit Banca d'Impresa Spa the expenses of these proceedings which are awarded in a total of Euro 6,375.00 of which Euro 1,375.00 for charges, Euro 5,000.00 for fees, in addition to general expenses, VAT and CPA [Italian Lawyers' Pension and Welfare Fund] as required by law;

Orders the petitioners Technip Italy Spa and TPVI LTD to reimburse the respondent Hovensa L.L.C. the expenses of these proceedings which are awarded in a total of Euro 8,485.00 of which Euro 1,485.00 for charges, Euro 7,000.00 for fees, in addition to general expenses, VAT and CPA [Italian Lawyers' Pension and Welfare Fund] as required by law;

Thus decided in Rome on 2 July 2007

Let it be known

The Judge

Ms. Paola Agresti        [Stamp: Deposited in the Clerk's office on 2 July 2007. The Clerk: Silvana Renzi ]




TRIBUNALE ORDINARIO DI ROMA

Ufficio Asseveramento Perizie e Traduzioni

VERBALE DI GIURAMENTO

CRONOLOGICO

N. 4788

Roma, 2 MAG. 2008

IL COLLABORATORE

Addì 2-5-08 avanti al sottoscritto Cancelliere è presente

_____ Signor VITTORIA CAMPANA _____

traduttore della lingua INGLESE _____

(iscritto / non iscritto, all'Albo dei Consulenti Tecnici del Tribunale di

_____ dal _____ ) identificato con documento

CI

N. AU1432640 rilasciato da Comune di CROSIA

il 14-3-06 il quale chiede di asseverare con giuramento la

traduzione del documento: Provvedimento

Tribunale _____,

unito in: originale / copia conforme all'originale / fotocopia semplice / altro:

_____. Il Cancelliere, previa ammonizione

sulla responsabilità penale (art.483 c.p.) derivante da dichiarazioni mendaci,

invita il comparente al giuramento, che egli presta ripetendo:  "Giuro di

avere bene e fedelmente adempiuto all'incarico affidatomi al solo scopo di

far conoscere la verità".

Letto, confermato e sottoscritto.

IL CANCELLIERE C1
Anna Fata Guastatore

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HOVENSA L.L.C., | §<br>§<br>§ | CIVIL ACTION NO. 08-CV-12211 |
| VS. | §<br>§ | |
| TECHNIP ITALY S.P.A. and<br>TECHNIP S.A. | §<br>§<br>§ | **DECLARATION OF<br>JONATHAN B. SMITH** |

Jonathan B. Smith declares under penalty of perjury as follows:

1.      I am an attorney at Shipley Snell Montgomery LLP and represent Plaintiff HOVENSA L.L.C. in an "of counsel" capacity in this action.

2.      I submit this Declaration in support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint for Failure to Join an Indispensable Party, Failure to State a Claim and Lack of Personal Jurisdiction (hereafter "Plaintiff's Memorandum").

3.      Attached as Exhibit A to Plaintiff's Memorandum are true and correct copies of selected pages from Technip's "Annual and Sustainable Development Report 2005," which is available on Technip's website, www.technip.com.

4.      Attached as Exhibit B to Plaintiff's Memorandum are true and correct copies of selected pages from Technip's Form 20-F filed with the Securities and Exchange Commission for the fiscal year ended December 31, 2006, which is available on Technip's website, www.technip.com.

5.     Attached as Exhibit C to Plaintiff's Memorandum are true and correct copies of selected slides from a PowerPoint presentation entitled "Low Sulfur Gasoline Project US VI — Saint Croix" provided to representatives of Plaintiff.

6.     Attached as Exhibit D to Plaintiff's Memorandum is a true and correct copy of Appendix Q to the Construction Agreement, which is attached as Exhibit 1 to Technip's Memorandum in Law.

7.     Attached as Exhibit E to Plaintiff's Memorandum is a true and correct copy of a printout of an e-mail dated January 21, 2005 and attachment from the e-mail account assigned to Al Karp.

8.     Attached as Exhibit F to Plaintiff's Memorandum is a true and correct copy of a printout of an e-mail dated January 24, 2005 from the e-mail account assigned to Al Karp.

9.     Attached as Exhibit G is a true and correct copy of a Petition Pursuant to Article 700 of the Italian Civil Procedure Code in the Civil Court of Rome that Technip Italy served on Plaintiff.

10.     Attached as Exhibit H is a certified English translation of the decision dated July 2, 2007 and rendered by the Civil Court of Rome, Judge Ms. Paola Agresti, on the Petition Pursuant to Article 700 of the Italian Civil Procedure Code filed by Technip Italy.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 5, 2008
       Houston, Texas

Jonathan B. Smith