HUGHES HUBBARD & REED LLP
Christopher Paparella
John Fellas
Hagit Elul
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
paparella@hugheshubbard.com

*Attorneys for Defendants Technip Italy S.p.A. and Technip S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HOVENSA L.L.C., | |
| Plaintiff, | |
| -vs- | Case No.: 08 CIV. 1221 (NRB) |
| TECHNIP ITALY S.P.A and TECHNIP S.A., | **DECLARATION OF ETIENNE GORY** |
| Defendants. | |

Etienne Gory declares as follows under penalty of perjury under the laws of the United States of America:

1.      I am Chief Executive Officer – Latin America of Defendant Technip Italy S.p.A. ("Technip Italy"). I am also President of TPVI, Ltd. ("TPVI"). I held these positions at all times relevant to the matters discussed in this declaration and the statements herein are based on my personal knowledge.

2.      I submit this declaration to put before the Court certain facts and documents in connection with Defendants' motion to dismiss Plaintiff Hovensa L.L.C.'s ("Hovensa") First Amended Complaint (the "Amended Complaint"). Among other things, I wish to show the Court that the Construction Agreement involved in this case is

between Hovensa and TPVI. TPVI did not sign the Construction Agreement as agent for Technip Italy. Technip Italy and Hovensa are parties to a separate Engineering and Procurement ("E&P") Agreement. Hovensa never claimed before starting this lawsuit that the Construction Agreement was between it and Technip Italy. Hovensa asserted at certain points that Technip Italy was liable under the E&P Agreement for TPVI's alleged breaches of the Construction Agreement (which Technip Italy disputed), but Hovensa always asserted that the Construction Agreement was between it and TPVI.

3.     I also wish to show the Court that Technip S.A. never signed or agreed to be bound by any parent guaranty of the Construction Agreement and E&P Agreement. In January 2005, during negotiations of the Construction Agreement and E&P Agreement, Technip France and Hovensa negotiated certain changes to the parent guaranty form annexed as Exhibit Q to the Agreements. However, Hovensa and Technip S.A. never finalized and signed the guaranty. Hovensa never sent any claim or other letters to Technip S.A. Hovensa never mentioned any Technip S.A. guaranty in its numerous claim letters to TPVI and Technip Italy or in an Italian lawsuit arising from Hovensa's draw down on TPVI's and Technip Italy's letters of credit.

4.     This case arises from a project for the engineering, procurement and construction of a Low Sulfur Gasoline Hydrotreater (LSG) at Hovensa's refinery in St. Croix in the U.S. Virgin Islands (the "Project"). Hovensa drafted all the project agreements involved in this case, including the Construction Agreement between Hovensa and TPVI and the E&P Agreement between Hovensa and Technip Italy. Drafts of the Construction Agreement and E&P Agreement which Hovensa prepared and circulated to bidders on the Project in October 2004 are Exhibits 1 and 2 hereto.

5.    Hovensa also drafted all the appendices to the Construction Agreement and the E&P Agreement. The appendices drafted by Hovensa included a form of parent guaranty (Appendix Q) (Exhibit 3 hereto). They also included a form of agreement (the "agency agreement") to be used if Hovensa exercised its right under the Construction Agreement to contract directly with a proposed subcontractor in order to gain certain Virgin Islands tax advantages (Appendix AC) (Exhibit 4 hereto). Hovensa's form of agency agreement states specifically that the Construction Agreement contractor was signing the contract as Hovensa's agent.

6.    Hovensa divided the work to be done on the project between two separate contracts in order to gain certain U.S. Virgin Islands tax advantages. One contract was an "offshore" E&P Agreement to be performed outside the U.S. Virgin Islands; the other was "onshore" Construction Agreement to be performed in the U.S. Virgin Islands.

7.    Hovensa's original drafts of the Construction Agreement and E&P Agreement provided that the Agreements would be performed by two separate, related companies. Article 4.8 of the draft Construction Agreement, "Engineering Services," provided that "HOVENSA will provide all engineering and procurement Work directly or through an engineer of its choice (the "Engineer")....CONTRACTOR and Engineer are affiliated companies". Article 6.2 of the draft E&P Agreement, "Construction Services," provided that "HOVENSA will provide all construction services directly or through a construction contractor of its choice (the "Construction Contractor")...CONTRACTOR and Construction Contractor are affiliated companies". (*See* Exhibits 1 and 2.) I believe that Hovensa was motivated in this regard by U.S.

Virgin Islands tax considerations. These clauses remained unchanged in the final signed agreements.

8.    After several months of negotiations, on March 10, 2005 in Rome, Italy, Hovensa and TPVI, a U.S. Virgin Islands subsidiary of Technip Italy, signed the Construction Agreement and Hovensa and Technip Italy signed the E&P Agreement.[1] (Exhibits 5 and 6 hereto.) A Technip France employee named Georges Sarigiannis on my Latin America team had earlier initialed some of the Appendices to the Agreements including the guaranty form annexed to the Construction Agreement (but not the guaranty form annexed to the E&P Agreement). Mr. Sarigiannis' initialing was done in the course of compiling the exhibits to the Agreements. It was not intended to have any significance. No representative of Technip S.A. was present at the March 10, 2005 meeting or signed or initialed the guaranty forms or any other part of the Agreements.

9.    The division of the Project work between TPVI and Technip Italy in the final agreements was consistent with Hovensa's original proposed agreements. Article 4.8 of the Construction Agreement and 6.2 of the E&P Agreement, provided that the agreements were being entered into and performed by corporate affiliates.

10.    TPVI did not sign the Construction Agreement as Technip Italy's agent. TPVI entered into and performed the Construction Agreement and was paid by Hovensa (although substantial amounts remain unpaid). Prior to starting this action, Hovensa never asserted that TPVI had signed the Construction Agreement as Technip Italy's

---

[1]    The statement in Technip S.A.'s Annual and Sustainable Development Report (Exhibit A to Plaintiff's Memorandum of Law in Opposition to Defendants Motion to Dismiss, dated May 5, 2008) that TPVI is 100% "controlled" by Technip S.A. is made in connection with French accounting and company reporting rules and results from the fact that Technip S.A. owns 100% of Technip Italy, which owns 100% of TPVI.

agent. The Construction Agreement and the other Project documents contradict such an assertion.

11.    The Construction Agreement states that it is an "Agreement dated March 10, 2005 between Hovensa L.L.C., a U.S. Virgin Islands limited liability company ("Hovensa") and TPVI, a U.S. Virgin Islands corporation[.]" The Construction Agreement defines TPVI the "Contractor" thereunder. The Construction Agreement was signed only by Hovensa and TPVI. The Construction Agreement does not state that TPVI was acting as Technip Italy's agent thereunder. (*See* Exhibit 5.)

12.    Exhibit 7 hereto is a copy of the Settlement Agreement signed by Hovensa, Technip Italy, and TPVI. Paragraph B of the Settlement Agreement states the Construction Agreement is between Hovensa and TPVI and that the E&P Agreement is between Hovensa and Technip Italy.

13.    Exhibit 8 hereto are copies of invoices issued by TPVI to Hovensa dated March 2, 2007 and January 16, 2008 for work performed under the Construction Agreement requesting Hovensa make wire transfer payment to TPVI's bank account at the Bank of Nova Scotiabank—St. Croix U.S. Virgin Islands. Hovensa paid the invoices by wiring funds to TPVI's bank account as directed on the invoice.

14.    Exhibits 9, 10, and 11 hereto are copies of claim letters under the Construction Agreement dated May 29, June 1, and June 26, 2007 Hovensa sent to TPVI.

15.    Exhibit 12 hereto is a copy of an invoice dated January 11, 2007 from Hovensa to TPVI for "Schedule Liquidated Damages" under the Construction Agreement.

16.    Exhibit 13 hereto is a copy of the "Irrevocable Standby Letter of Credit" posted by TPVI under the Construction Agreement. Exhibit 14 hereto is a copy of a letter from Hovensa to TPVI dated March 23, 2007 requesting that "TPVI increase Letter of Credit as required by Article 32.3 of the C Agreement."

17.    Exhibit 15 hereto is a copy of a letter from Hovensa to UniCredit Banca d'Impressa dated May 30, 2007, with attachments, by which Hovensa drew down on the letter of credit posted by TPVI. Hovensa's letter states that its draw down is based on TPVI's alleged breaches of the Construction Agreement.

18.    Exhibit 16 hereto is Hovensa's filing in a lawsuit Technip Italy and TPVI commenced in Rome to attempt to prevent Hovensa's draw down under Technip Italy's and TPVI's letters of credit. Hovensa asserted in its filing that the Construction Agreement was between it and TPVI and the E&P Agreement was between it and Technip Italy. While Hovensa claimed that Technip Italy was liable under the E&P Agreement for alleged breaches by TPVI of the Construction Agreement, Hovensa did not claim that Technip Italy was a party to the Construction Agreement or that TPVI had signed the Construction Agreement as Hovensa's agent.

19.    If Hovensa and Technip Italy had intended that the Construction Agreement was to be between Hovensa and Technip Italy, then either Technip Italy would have signed the Construction Agreement or the Construction Agreement would have provided specifically that TPVI was signing as Technip Italy's agent. For example, Hovensa included specific language in its form of agency agreement that TPVI was signing as Hovensa's agent. (Exhibit 4 hereto.) The final agency agreement that TPVI signed as Hovensa's agent with the mechanical erection contractor Tiger is annexed as

Exhibit 17. Consistent with Hovensa's form, this agency agreement states that "Hovensa is acting through its agent TPVI" and the signature block states that it is signed "Hovensa by TPVI LTD, Agent."

20.    Hovensa's Memorandum of Law in Opposition to Defendants' Motion to Dismiss annexes a January 21, 2005 e-mail from me and a January 24, 2005 e-mail from Stephane Mespouhles of Technip France (who was part of my Latin America team) discussing changes to the guaranty form that was Appendix Q to the draft Construction and E&P Agreements. These emails did not state that Technip S.A. accepted the guaranty and agreed to be bound by it. The emails were written while the Construction Agreement and E&P Agreement were still being negotiated. Those negotiations continued through February 2005 and we did not finalize and sign the Agreements until March 10, 2005.

21.    Hovensa had dropped its demand for a parent guaranty by the time of the kick off meetings held in Rome between Hovensa, TPVI and Technip Italy. Hovensa's parent guaranty form (Appendix Q to the Construction and E&P Agreements) states "**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above." (Exhibit 3.) However, although the parties signed the Construction Agreement and the E&P Agreement, Hovensa did not request signature of the parent guaranty form (or even mention it) and did not provide us with a final version of the form that Hovensa had signed. Hovensa and Technip S.A. never signed the guaranty form.

22.    Hovensa did not mention the parent guaranty at any later time during the Project. At no time prior to commencing this action did Hovensa claim that Technip S.A.

had guaranteed TPVI's performance under the Construction Agreement or Technip Italy's under the E&P Agreement under the parent guaranty form or otherwise. Hovensa wrote TPVI and Technip Italy numerous claim letters. None of these letters make any reference to a Technip S.A. guaranty or liability. (See, for example, Exhibits 9-12 hereto.) Likewise, Hovensa's filing in the Italian lawsuit under the letters of credit, despite containing a detailed description of Hovensa's view of the parties' contractual relationships, does not mention any guaranty from Technip S.A. (*See* Exhibit 16 hereto.)

23.     Annexed hereto as Exhibit 18 hereto is a copy of an excerpt of Appendix A to the Construction Agreement which sets forth that TPVI was to install and commission the recycle compressors referred to in Count Two of the First Amended Complaint.

24.     Technip Italy and TPVI are willing to arbitrate all their disputes with Hovensa, including, but not limited to, the disputes raised in this action pursuant to the dispute resolution clauses contained in the E&P Agreement and the Construction Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 3rd, 2008
       Rome, Italy

Etienne Gory

EXHIBIT 1

## CONSTRUCTION AGREEMENT

AGREEMENT dated _____, 200__, between HOVENSA L.L.C., a U.S. Virgin Islands limited liability company ("HOVENSA") and _____ corporation ("CONTRACTOR").

## EXPLANATORY STATEMENT:

A.  HOVENSA wishes to retain CONTRACTOR to perform Work in connection with the construction of a _____ and related facilities (the "Facilities") to be located at HOVENSA's petroleum refinery in St. Croix, U.S. Virgin Islands (the "Refinery"), as described in Appendix A attached.

B.  CONTRACTOR is willing to perform the Work on a lump sum basis under the terms of this Agreement.

THE PARTIES AGREE AS FOLLOWS:

I.    SCOPE

1.1    This Agreement consists of this document, the following documents which are attached and any other document which is incorporated in this Agreement by reference:

1.1.1    Appendix A:    Scope of Work

1.1.2    Appendix B:    Coordination Procedures

1.1.3    Appendix C:    Engineering Standards

1.1.4    Appendix D:    Compensation and Terms of Payment

   Exhibit 1: Terms of Payment

   Exhibit 2: Cash Flow Curves

   Exhibit 3: Earned Value Matrix

   Exhibit 4: Project Cost Breakdown

   Exhibit 5: Letter of Credit

   Exhibit 6: Contract Change Orders

   Exhibit 7: Contractor Affidavit: Liens

1.1.5    Appendix E:    Project Schedule

   Exhibit 1: Master Project Schedule

   Exhibit 2: Tentative Refinery Turnaround Schedule

   Exhibit 3: Refinery Holiday Schedule

1.1.6    Appendix F:    FEED Package

   *Exhibit 1: Process Description*

   *Exhibit 2: Process Interlocks & Compressor Controls Summary*

   *Exhibit 3: Equipment List*

   *Exhibit 4: Material Selection Diagrams*

   *Exhibit 5: Reactor Specifications & Drawings*

   *Exhibit 6: EMRE / KBR BDS Package (2 volumes)*

   *Exhibit 7: EMRE / KBR DBS Package (1 volume)*

   *Exhibit 8: EMRE Design Notes (1 volume)*

   *Exhibit 9: EMRE Design Review Milestones*

   *Exhibit 10: P&IDs*

   *Exhibit 11: Auxiliary Equipment Datasheets*

   *Exhibit 12: Preliminary Electrical Load List*

   *Exhibit 13: HVAC Pressurized Buildings Standard*

   *Exhibit 14: Plot Plans & B.L. Piping Sketch*

1.1.7    Appendix G:    Technical Questions and Answers

1.1.8    Appendix H:    Commercial Questions and Answers

1.1.9    Appendix I:    Items Provided by HOVENSA

1.1.10   Appendix J:    Performance Guarantees

1.1.11   Appendix K:    Schedule and Performance Liquidated Damages

1.1.12   Appendix L:    Construction Workforce

1.1.13   Appendix M:    Ocean Transportation Information

Exhibit 1: Hovensa RO RO Dock Information

Exhibit 2: Title to Materials

Exhibit 3: Ocean Shipping Support Design for Major Equipment

Exhibit 4: Freight Forwarders

*Exhibit 5: Marine & Terminal Regulations*

1.1.14   Appendix N:    Statement Regarding Site Conditions

Exhibit 1: MEC Topographical Map

*Exhibit 2: Preliminary Geotechnical Investigation Report - URS*

1.1.15   Appendix O:    Radio Information

1.1.16   Appendix P:    Use of Non-Domestic Materials

1.1.17   Appendix Q:    Parent Guarantee Letter

1.1.18   Appendix R:    Approved Vendors List

1.1.19   Appendix S:    Equipment and Instrument Data Sheet Forms

1.1.20   Appendix T:    Mechanical Integrity Forms

1.1.21   Appendix U:    *Open*

1.1.22   Appendix V:    ASD Manual Table of Contents

1.1.23   Appendix W:    I&C Responsibility Matrix

1.1.24   Appendix X:    Mechanical Completion Checklist

1.1.25   Appendix Y:    PHA Guidance – Guidelines of Deviation

1.1.26   Appendix Z:    BEDD Sheets

1.1.27  Appendix AA:  Conflict of Interest

1.1.28  Appendix AB:  HOVENSA Standard Contract Attachments

1.1.29  Appendix AC:  Agency Agreement

1.1.30  Appendix AD:  Organizational Chart and Key Personnel Resumes

1.1.31  Appendix AE:  Unit Rates for Reimbursable Work due to Variation

1.1.32  Appendix AF:  Equipment Lease Agreement

     Exhibit 1: Sample Equipment Lease

     Exhibit 2: General Procedures For Using Equipment Lease Agreement

1.1.33  Appendix AG: TEMPORARILY LEFT BLANK

1.1.34  Appendix AH:  Federal Contractor Certificate of Compliance

1.2    The services generally to be performed by CONTRACTOR under this Agreement (the "Work") are set forth in Appendix A.

1.3    The items generally to be provided by HOVENSA and others under this Agreement are set forth in Appendix I.

1.4    For any work in addition to that defined in this Agreement, HOVENSA will advise CONTRACTOR in writing of the extent of Work required.  HOVENSA may also direct CONTRACTOR in writing to perform sufficient conceptual engineering to define appropriately the scope of additional work.

1.5    If there is any conflict between this Agreement and any of the Appendices, the more stringent requirement on the CONTRACTOR will control.  If there is any conflict between Appendices, it will be brought to HOVENSA's attention promptly for resolution.  If there is any conflict arising from any change in any Appendix, the Appendix of the latest date will control.

1.6    All parts of the Work reasonably inferred from and not expressly mentioned in Appendix A or included in Appendix I, will be performed as an obligation of CONTRACTOR under this Agreement and Appendix A.

II.    <u>DEFINITION OF THE FACILITIES</u>

4

2.1    The "Facility" or "Facilities" means the _____ and related facilities to be constructed at the Refinery as described in Appendix A.

III.    COORDINATION OF WORK

3.1    Administrative Procedures

3.1.1   CONTRACTOR acknowledges receipt of the HOVENSA Coordination Procedures, which are incorporated by reference, and the Table of Contents of which is attached as Appendix B, and CONTRACTOR will comply with the HOVENSA Coordination Procedures in performing the Work.  If there is any conflict between any part of the Coordination Procedures and this Agreement, the more stringent requirement on CONTRACTOR will control.  HOVENSA reserves the right to issue additions to, or revisions of, the HOVENSA Coordination Procedures in writing at any time during the course of the Work; provided that, if the additions or revisions would increase or decrease the cost of or time required for CONTRACTOR to perform the Work, this Agreement will be modified accordingly, pursuant to Article X.

3.2    Engineering Standards

3.2.1 CONTRACTOR acknowledges receipt of the HOVENSA Engineering Standards which are incorporated by reference, and the Table of Contents of which is attached as Appendix C (the "Standards"), which contain HOVENSA's design and construction criteria and CONTRACTOR will complete the Work in accordance with the Standards.  If there is any conflict between any part of the Standards and this Agreement, the Agreement will control.  HOVENSA reserves the right to issue additions to or revisions of the Standards during the course of the Work, and will handle these additions or revisions in accordance with the HOVENSA Coordination Procedures, provided that if the additions or revisions would materially increase or decrease the cost of or time required for CONTRACTOR to perform the Work or otherwise materially affect CONTRACTOR's obligations, this Agreement will be modified accordingly pursuant to Article X.

3.3    Proprietary Information

5

3.3.1  CONTRACTOR agrees that all information supplied to it by HOVENSA is proprietary and CONTRACTOR will not use or disclose to others any such information without HOVENSA's written consent except as may be necessary to perform the Work, provided that for purposes of use by CONTRACTOR proprietary information will not include the following:

3.3.1.1       information which, at the time of disclosure to CONTRACTOR is in the public domain;

3.3.1.2       information which, after disclosure to CONTRACTOR, enters the public domain;

3.3.1.3       information which, prior to disclosure to CONTRACTOR, was already in CONTRACTOR's possession and was not acquired from HOVENSA;

3.3.1.4       information that, subsequent to disclosure to CONTRACTOR is obtained by CONTRACTOR from a third party who has the right to disclose such information without binder of secrecy.

Notwithstanding the foregoing, no information supplied to CONTRACTOR by HOVENSA will be disclosed to others even if it falls within one of the exceptions to the definition of proprietary information listed above.

3.3.2       Any agreements or representations between CONTRACTOR and HOVENSA entered into prior to the effective date hereof relating to secrecy or confidentiality of information will survive the signing of this Agreement  or any completion of the Work, or any other termination or cancellation of this Agreement, each in accordance with the terms of the other agreement or representation.

3.4     Personnel; Independent Contractor

3.4.1  CONTRACTOR warrants that it will employ properly qualified, and where appropriate, properly licensed or certified personnel necessary to perform the Work.

3.4.2  In performing the Work, CONTRACTOR is acting as an independent contractor and reserves the right to hire or discharge employees, designate the classification and hours of work for each employee and to supervise and control the manner of performance of the Work.

6

3.4.3   Prior to assigning personnel to the Work, CONTRACTOR will submit for HOVENSA's review the names and work experience of, and licenses or certificates held by, personnel nominated to fill key Work positions, including Project Superintendent, Resident Engineer, Construction Superintendent and Area Superintendent.  Personnel will not be assigned to or removed from these key positions without sufficient notification to HOVENSA.  The fact that such notification is required will not affect CONTRACTOR's status as an independent contractor under this Agreement.

3.4.4   CONTRACTOR will furnish HOVENSA with an electronic and hard copy weekly manning curve by craft.  The form of the breakdown will be acceptable to HOVENSA.

3.4.5   CONTRACTOR will employ a competent Project Superintendent at the project site during the progress of the Work.  The Project Superintendent will at all times be satisfactory to HOVENSA.

3.4.6   CONTRACTOR will employ an ample work force of qualified personnel and properly schedule the Work to maintain the rate of progress required to meet the scheduled completion *dates in accordance with the Master Project Schedule Appendix E.*  Each Monday, CONTRACTOR will provide a weekly progress report in a form acceptable to HOVENSA that relates to the prior week.  If CONTRACTOR fails to maintain a rate of progress satisfactory to HOVENSA, CONTRACTOR will place additional personnel on the Work, *increase the work day or work week duration, expedite materials and equipment and / or* reorganize work methods in order that the progress of Work be brought up to and maintained at the required rate of progress, all without additional cost to HOVENSA.

3.4.7  CONTRACTOR will ensure that labor employed by it and its subcontractors on the premises of HOVENSA comply with HOVENSA's Workplace Violence Policy.  To insure the safety of all those in the facility, CONTRACTOR must establish and enforce safety, security and personnel conduct regulations that are not inconsistent with HOVENSA's guidelines.  CONTRACTOR will submit its policies to HOVENSA prior to the start of Work.  CONTRACTOR must establish similar guidelines for its subcontractors and monitor their compliance.  Further, CONTRACTOR and HOVENSA will use all reasonable efforts to prevent labor disputes that may interfere with construction of the Facilities and will

7

promptly take all reasonable steps that may be available in connection with the resolution of violations

of collective bargaining agreements and jurisdictional disputes.    CONTRACTOR will promptly advise

HOVENSA if there is any dispute.

        3.4.8 In the performance of the Work, CONTRACTOR will, to the fullest extent

practicable and consistent with applicable law, employ and promote qualified Virgin Islands residents

for positions at all levels within CONTRACTOR's organization, regardless of age, race, creed, color,

sex, national origin or ancestry.  CONTRACTOR will comply with all laws requiring registration of job

vacancies with the Virgin Islands Department of Labor. If CONTRACTOR reasonably determines that it

is unable to locate sufficient qualified construction labor from the Virgin Islands and, as a result, if

CONTRACTOR necessarily resorts to recruiting labor from off-island, from the continental United

States or elsewhere, CONTRACTOR will so advise HOVENSA in writing.

    3.5   <u>Warranties</u>

      3.5.1  <u>Workmanship</u>.

        3.5.1.1 CONTRACTOR warrants that the Facilities will be constructed in a competent,

efficient and workerlike manner using new and first class materials following current state of the art,

where practicable, petroleum refinery construction practice and in accordance with the plans and

specifications provided by HOVENSA and in accordance with the standards of care and diligence

normally practiced by recognized construction firms.  CONTRACTOR recognizes that the soil

conditions at the Facility may require special considerations and has represented its Work will take into

account and address these conditions.  Accordingly, CONTRACTOR warrants that the foundation and

structural work will be performed in accordance with the standards of care and diligence normally

practiced by recognized construction firms in performing services of a similar nature and  will be free of

defects within the parameters set by the Engineering Standards in Appendix C ("Structural Warranty").

CONTRACTOR warrants the Work against defects and will promptly correct, repair or replace, at its

expense, any field workmanship which is defective or does not conform to the final plans and

specifications of the Work ("Defective Work") within the twelve (12) month period following Acceptance

(as defined in Appendix B) or thirty-six (36) months after Mechanical Completion (as defined in

8

Paragraph 5.2), whichever occurs first, or within ten (10) years from HOVENSA's commencement of operation of the Facility as to the Structural Warranty (the "Warranty Period"). If HOVENSA believes that Defective Work has arisen, HOVENSA will notify CONTRACTOR in writing of the Defective Work describing the non-conformance.    Expenditures for construction labor and materials will be borne by CONTRACTOR.  CONTRACTOR will not be obligated to perform remedial services for Work which becomes Defective Work as a result of ordinary wear and tear, improper operation or maintenance. CONTRACTOR will be obligated to provide, as a remedial obligation, any additional miscellaneous bracing of piping, structures or equipment that may be required after start-up of the Facilities to control vibration.

        3.5.1.2 If any of the warranties in Section 3.5 is breached, CONTRACTOR will repair, replace, and/or correct the applicable portion of the Work, as required, immediately or on an expedited basis such that it meets the requirements of this Agreement, at no cost to HOVENSA.  CONTRACTOR will provide construction services to begin corrective action on the affected portion of the Work as soon as reasonably possible after receipt by CONTRACTOR of HOVENSA's notice referred to above, and will submit its plan of action to HOVENSA not later than thirty-six hours after receipt of the notice. CONTRACTOR will, at its sole expense, disassemble, remove, replace and reinstall the Defective Work to the extent necessary, while minimizing the downtime to HOVENSA, for CONTRACTOR to perform its warranty obligations.  CONTRACTOR will use all reasonable efforts to remedy any failure or breach so as to minimize revenue loss to HOVENSA and to avoid disruption of HOVENSA's operations. HOVENSA will provide CONTRACTOR with access to the Facility to perform its warranty obligations under this Agreement, so long as such access does not unreasonably interfere with operation of the Facility.  CONTRACTOR's obligations under this Article 3.5 are collectively called the "Repairs."

        3.5.1.3 All responsibility for pursuing Contractor's subcontractors or sub-vendors for support will remain with Contractor, as well as providing whatever is needed in addition to the subcontractor's or sub-vendors' material/equipment warranty to ensure that the Repairs are made at no charge to HOVENSA.

3.5.1.4 HOVENSA will provide CONTRACTOR's representatives reasonable access to the Facility for the purpose of observing the operation and maintenance thereof upon reasonable notice during times agreed by HOVENSA and CONTRACTOR.  CONTRACTOR acknowledges that warranty Work must be coordinated with the ongoing operations of the Facility.

3.5.2    Mechanical Equipment and Material Warranty.

3.5.2.1        All equipment and material furnished by CONTRACTOR will be new unless otherwise agreed to by HOVENSA in writing.  CONTRACTOR will purchase material and equipment in accordance with approved specifications.  CONTRACTOR will purchase all miscellaneous bulk items.

3.5.2.2        CONTRACTOR will be responsible for individual performance guarantees on equipment purchased by CONTRACTOR from third parties and for inspection of, and workmanship on, equipment purchased from third parties by CONTRACTOR.  CONTRACTOR will exercise care and diligence in the selection of the equipment or material to be obtained, and CONTRACTOR will demand reasonable warranties, which will be no less favorable than the standard warranty available in the industry and will be.  These warranties will be made available to HOVENSA to the extent of their terms, and, where possible, be in HOVENSA's name either singly or jointly with CONTRACTOR.

3.5.2.3 CONTRACTOR will pursue recourse against vendors and suppliers for faulty or defective material or equipment

3.5.3    The warranties and remedies for breach of warranty in this Agreement are the exclusive warranties and remedies by CONTRACTOR applicable to the Work and are in lieu of any other warranties, express or implied.

3.6    Inspection and Rejection of Materials and Workmanship.

3.6.1  The Work performed, including materials and workmanship, is subject to inspection and test by HOVENSA at any reasonable time, at any place where the manufacture or performance will be carried on.  HOVENSA  has the right to review the progress of CONTRACTOR's work. Advance notice of readiness for inspection will be given as specified in the Agreement or

10

otherwise not fewer than two (2) or more than four (4) working days.  HOVENSA's failure to make inspection or test or to discover defects or to object thereto will not prejudice or operate as a release or waiver of the rights of HOVENSA including the right to inspect or reject at a later time, nor will it release CONTRACTOR.  Unless otherwise specified herein, CONTRACTOR will furnish at such facilities that which may be necessary for the making of the inspection and tests.

       3.6.2 Surplus Materials, Tools and Equipment.  Surplus materials, tools and equipment will be inventoried by CONTRACTOR at the completion of the Work and removed in accordance with HOVENSA's written instructions.  All of CONTRACTOR's and its subcontractors' temporary construction buildings will be removed, as directed by HOVENSA in writing, by CONTRACTOR or its subcontractors upon completion of Work.

       3.6.3 Jobsite Conditions.  CONTRACTOR has inspected the Facilities' site and soil conditions, warrants that it has the skills necessary to perform the Work hereunder, has knowledge of the labor and skilled craftspersons supply in the area, and will make all reasonable efforts to obtain sufficient labor to perform the Work within the schedule dates referred to herein.

       3.6.4 CONTRACTOR's Organization.  Attached as Appendix AD are organization charts showing lines of authority and communications for CONTRACTOR's employees who will be engaged in the Work.

IV.    OBLIGATIONS OF CONTRACTOR

    4.1    General

       4.1.1  ***The Work will be executed as expeditiously as possible.  HOVENSA will make the FACILITY available to CONTRACTOR for performance of the WORK twenty four (24) hours a day; seven (7) days a week.  CONTRACTOR will establish consistent work week, work day schedules and notify HOVENSA forty eight (48) hours in advance of any necessary adjustments in CONTRACTOR's Work schedule in order that the necessary support services may be provided.***

4.1.2   All construction will proceed in a neat and workerlike manner.  The premises will be maintained by CONTRACTOR in a safe and orderly condition throughout the performance of the Work and, at the completion thereof, will be left in a safe, neat and orderly condition.

4.1.3   Subject to Appendix I, CONTRACTOR will furnish all labor, machinery, material, consumables, equipment, tools (marked conspicuously), supplies, fuel, transportation, and do everything necessary to complete the Work in accordance with this Agreement.

4.1.4 Notwithstanding any plans or specifications, CONTRACTOR is responsible for timely inspection of any work at the site done by others which may affect the Work or to which the Work must be joined, to ascertain its suitability for use in relation to the Work and will immediately advise HOVENSA of any deficiencies therein.  HOVENSA will then have a reasonable time to have such deficiencies corrected, if the correction is HOVENSA's responsibility.

4.1.5 CONTRACTOR's Project Completion schedule is attached as Appendix E. CONTRACTOR may not change the Schedule without HOVENSA's written approval.  CONTRACTOR will promptly advise HOVENSA, in writing, of any anticipated deviations from the Schedule. Float is defined as the difference between the scheduled completion date for a project or any milestone within the project and the required completion date for the project or milestone.  Under this Agreement, Float will belong to the Project and will not be considered to be for the exclusive use or benefit of either party. Extensions of time for meeting any milestone dates under the Agreement will be granted only to the extent that equitable time adjustments requested by a party for affected activities exceed the total Float as affected by changes or delays in the Work.

4.1.6   ***CONTRACTOR acknowledges that time is of the essence in the performance of this Agreement and will be responsible for delays caused by CONTRACTOR.***

4.2    Special Conditions for Field Erection

4.2.1   CONTRACTOR will obtain HOVENSA's written approval for type, size and location of any temporary buildings, parking facilities and service storage areas.  CONTRACTOR will remove all temporary construction buildings and equipment on completion of the Work unless otherwise instructed in writing by HOVENSA. CONTRACTOR will return the site areas occupied by those

12

temporary facilities to the same condition as they were in when turned over to CONTRACTOR by HOVENSA.

4.2.2    CONTRACTOR will notify HOVENSA promptly in writing when it becomes aware of any latent physical conditions at the site differing materially from those in existence upon inspection of the site by CONTRACTOR.

4.2.3    No form of advertising not required by law will be permitted at the Work site, nor will photographs of the Refinery or Work site be permitted without written approval of HOVENSA.

4.2.4    CONTRACTOR will be responsible for requiring each employee to display identification as may be required by HOVENSA.  All prescribed identification will be immediately delivered to HOVENSA for cancellation upon termination of any employee.

4.2.5    CONTRACTOR will provide HOVENSA with a daily list of personnel and equipment authorized to enter HOVENSA's property for Work reasons.

4.2.6    No visitors to the site will be permitted without written approval by HOVENSA.

4.2.7    If the HOVENSA Fire Department responds to an alarm which, in HOVENSA's sole judgment, was necessitated as a result of CONTRACTOR's negligence in the performance of the Work, CONTRACTOR will pay HOVENSA an Emergency Response Fee of $15,000.00.  The fee will be assessed each time the HOVENSA Fire Department responds to an alarm. The cost for any Emergency Response Fee will be either re-billed to CONTRACTOR or deducted from HOVENSA's payment to CONTRACTOR.

4.3    Compliance with Law, Permits and Regulations

4.3.1    CONTRACTOR will comply with all federal, state or other laws, regulations, ordinances or rules which pertain to the Work and HOVENSA will not be liable for, and CONTRACTOR will defend and indemnify HOVENSA against, any violation by CONTRACTOR of any laws, regulations, ordinances or rules.  If the cost of the Work or the time required to render the Facilities "Ready for Charge" (as defined) is materially increased or decreased by reason of any law, regulation, ordinance or rule of any governmental authority or applicable industry codes or standards not in effect on the effective date of this Agreement, the sums payable to CONTRACTOR or the Ready for Charge or

13

completion date and such other provisions of this Agreement as may be affected thereby, will be equitably adjusted pursuant to Article X.

4.3.2    CONTRACTOR certifies compliance with the Fair Labor Standards Act of 1938, as amended, and all invoices will so certify.  Except as otherwise specified, HOVENSA will secure and pay for the building permit and all licenses and easements for permanent structures.  All other necessary permits required for prosecution of the Work will be obtained by CONTRACTOR and be in the name of HOVENSA, where possible.

4.4    Safety

4.4.1 CONTRACTOR will comply with all Federal OSHA, EPA, State, and Territorial laws and regulations as these pertain to CONTRACTOR's responsibilities (including OSHA Hazard Communication Standard, 29 C.F.R. §1910.1200, OSHA Process Safety Management Standard, 29 C.F.R. §1910.119, and EPA Risk Management Program, 40 C.F.R. §68), as well as with HOVENSA's Safety Guidelines and Requirements for Contractors (the "Guidelines"), Exhibit 12, for safety, health, and fire protection.  Prior to commencing the Work, CONTRACTOR is responsible for becoming acquainted with safety and health laws and regulations, HOVENSA's Guidelines, equipment manufacturers' guidelines for safe use and operation of equipment, and any additional safety requirements which may be necessary to complete the work safely.  CONTRACTOR will take all necessary precautions to keep the Job Site free from recognized hazards that are likely to cause injury, death, illness, or damage to property.  CONTRACTOR is responsible for preparation, administration, and compliance with its own safety procedures which must be designed to be in compliance with the above. It is a requirement that CONTRACTOR adhere to HOVENSA's established safe work practices, which require strict adherence to OSHA's PSM Standard and the EPA's Risk Management Program by all contractors.

4.4.2    In accordance with OSHA's PSM Standard and the EPA's Risk Management Program, to ensure that employees can perform their job tasks in a safe manner, CONTRACTOR must adhere to HOVENSA's written procedures to maintain the ongoing integrity of process equipment, and must train each employee in the work practices necessary to safely perform his/her job.

14

CONTRACTOR must assure that employees are instructed in: (a) the known and potential hazards of the job, (b) the processes, (c) the known and potential hazards of the processes, (d) maintaining the ongoing integrity of the process equipment, and (e) the applicable provisions of the emergency action plan.

4.4.3   CONTRACTOR must document that each employee has received the required training, and must have evidence that the employee has understood it. This information must be maintained as a record, and must include the employee's name, date of training, and the means used to verify that the employee understood the training.

4.5   Services

4.5.1   As defined in Appendix A, CONTRACTOR will provide all construction services, including but not limited to project management services, field construction management, construction planning and scheduling, construction cost monitoring and control, supply of direct hire field labor, supervision of direct hire and subcontract field labor, supply of construction equipment, small tools, consumables, temporary and field office facilities, first aid services, preparation of field purchase requisitions, coordination and integration with engineering, field inspection and testing, coordination with vendors' service representatives, cost estimating, receipt, storage, care, and inventory maintenance of project materials, all as necessary to perform the Work and as authorized by HOVENSA, and exclusive of those services and equipment defined as furnished by HOVENSA.

4.5.2   CONTRACTOR will provide subcontract administration services including bid package preparation, solicitation, analysis, conditioning, award, and supervision of those portions of the Work that are to be subcontracted.

4.6   Assessments

4.6.1  CONTRACTOR will pay all U. S. federal, state and locally imposed contributions, assessments and taxes that are based upon the wages or other remuneration paid to persons employed by CONTRACTOR on the Work.

4.7   Pollution Abatement and Noise

15

4.7.1   CONTRACTOR will perform the Work so it will comply with all environmental laws, orders, rules, regulations and permits currently in effect or proposed in an official register.

4.7.2.   CONTRACTOR's design and individual items of equipment, and piping connected to the equipment, will comply with United States federal noise intensity restrictions.

4.8   Engineering Services - HOVENSA will provide all engineering and procurement Work directly or through an engineer of its choice (the "Engineer"). CONTRACTOR will cooperate and coordinate with Engineer as required. CONTRACTOR and Engineer are affiliated companies and CONTRACTOR will not use any delays or any action or inaction by Engineer to excuse any breach or nonperformance, including delay, by CONTRACTOR under this Agreement. CONTRACTOR will be responsible for payment of any additional costs incurred by HOVENSA as a result of any delays caused by CONTRACTOR.

4.9   Cooperation in Financing. CONTRACTOR will furnish information, consents, certificates, opinions of counsel, and other documents or assistance-related to CONTRACTOR's corporate authorization to undertake the obligations in this Agreement as may be reasonably requested by any lender for its sole use for the financing of the Facility. The parties agree to negotiate in good faith concerning any reasonable amendment or addition to this Agreement required by any lender.

V.   Completion of Construction

**5.1   The Work will be installed and will be mechanically completed in accordance with Appendix A and Appendix B and in compliance with the Process Safety Management requirements of Appendix Y.**

**5.2   On reaching Mechanical Completion, as defined in Article 6 of Appendix A, of all systems, including resolving any exceptions, CONTRACTOR will issue a Notice of Completion. HOVENSA will have thirty (30) working days after CONTRACTOR has delivered the Notice of Completion to reject the Notice of Completion in writing. The rejection notice will list incomplete items. CONTRACTOR will make changes as necessary to bring the Work to a state of completion and reissue the Notice of Completion to HOVENSA. The above time limitations will apply. The process will be repeated until the Notice of Completion is accepted by HOVENSA.**

VI.   HOVENSA's OBLIGATIONS

**6.1 HOVENSA's obligations are set out in Appendix I; Items Provided by HOVENSA.**

VII.   INDEMNITY; INSURANCE REQUIREMENTS

16

7.1.1    CONTRACTOR will defend, indemnify and release HOVENSA and its parents, affiliates, successors and assigns and the Joint Venture partners, their parents, subsidiaries and affiliates (collectively called "Indemnified Parties"), up to the gross sum of the first $10,000,000 for each occurrence and a total of $10,000,000 in the annual aggregate, against all claims, causes of action, damages, liabilities, attorneys' fees and related expenses (herein "Claims") which the Indemnified Parties may suffer or for which the Indemnified Parties may be liable, (whether such Claims result by reason of any other contract imposing or requiring the assumption of Claims by the Indemnified Parties), by reason of actual or claimed injury (including death) to any person including employees of CONTRACTOR and its subcontractors, or actual or claimed damage to any property (including loss of use), directly or indirectly caused or contributed to, or claimed to be caused or contributed to by reason of any act, omission or negligence, including strict liability, whether active or passive, of CONTRACTOR, its employees or its subcontractors, or of anyone for whose acts they are liable, or of anyone acting under their direction or control, or in connection with, or incident to, performance of this Contract, unless caused by the sole negligence or sole willful misconduct of the Indemnified Parties. CONTRACTOR will do this notwithstanding the Virgin Islands Comparative Negligence Statute, Title 5 V.I.C. Section 1451. In all cases covered hereunder, CONTRACTOR will initially defend the Indemnified Parties until it is judicially determined that any liability was caused by the sole negligence or sole willful misconduct of the Indemnified Parties exclusive of any fault of the plaintiff, plaintiff's employer, or any other party or non-party to the lawsuit. If it is so determined, HOVENSA will reimburse CONTRACTOR or its insurance carrier for all judgments and expenses incurred, including the costs incurred by CONTRACTOR or its insurer in defending any Claims arising from such liability.

7.1.2.1    To the extent any claims exceed the limits set forth in Article 7.1.1, CONTRACTOR will defend and indemnify the Indemnified Parties from any claim, liability, loss, cost or expense claimed by third parties for property damage or bodily injury, including death, to the extent caused by the negligence or willful misconduct of CONTRACTOR, its agents, employees or CONTRACTOR's affiliates, in connection with CONTRACTOR's performance of the Work.

7.1.2.2  To the extent any claims exceed the limits set forth in Article 7.1.1, HOVENSA will defend and indemnify CONTRACTOR from any claim, liability, loss, cost or expense claimed by third parties for property damage and bodily injury, including death, to the extent caused by the negligence or willful misconduct of the Indemnified Parties, its agents or employees in connection with CONTRACTOR's performance of the Work.

7.1.2.3  To the extent any claims exceed the limits set forth in Article 7.1.1, CONTRACTOR and HOVENSA agree that for claims of third parties attributable to the joint negligence or willful misconduct of the parties, each will be liable to the third party to the extent of its negligence or willful misconduct.

7.2  Before CONTRACTOR starts any work, CONTRACTOR will, at its expense, maintain and require its subcontractors to maintain during the performance of the Work, insurance in form and with insurance companies satisfactory to HOVENSA and authorized to do business in the U.S. Virgin Islands as follows:

7.2.1  Worker's Compensation insurance covering CONTRACTOR's obligations under all applicable laws and Employer's Liability insurance in the amount of $500,000 per occurrence.

7.2.2  General Liability insurance for the duration of the Work, including any maintenance period, including contractual liability and completed operations (for three years after completion of the Work), with limits of $10,000,000 combined single limit, per occurrence, bodily injury and property damage, with $10,000,000 annual aggregate. All insurance provided by CONTRACTOR under this Agreement will have limits and aggregates, if any, dedicated to this Agreement.

7.2.3  To the fullest extent possible, CONTRACTOR's general liability insurance will cover the indemnity agreements and obligations in Articles 7.1.1, 7.1.2.1 and 7.1.2.3.

7.2.4  Automobile Liability insurance, with limits of $5,000,000 combined single limit per occurrence, bodily injury and property damage.  The automobile insurance will apply to all vehicles used by CONTRACTOR.

18

7.2.5  CONTRACTOR will pay any contributions for unemployment insurance and disability benefits for the employees of CONTRACTOR required by the laws of the state or territory in which the Work is being performed.

7.2.6. CONTRACTOR will immediately notify HOVENSA's Safety Department either orally or by fax, of any incident occurring on or regarding HOVENSA's property, which results in property damage, personal injury, or death. CONTRACTOR will also furnish HOVENSA with two (2) copies of a written report of any such incident within three (3) days of its occurrence.

7.3  CONTRACTOR will provide "All Risk" Builders Risk Insurance which will include, but not be limited to, all materials, equipment, supplies, civil works and machinery forming part of or intending to form part of the Work, including common facilities and facilities which are improvements, tie-ins, connections and additions to existing facilities, pipelines and all other real and personal property, collectively known as the Work, including testing of the Facilities and during their operation until the Facilities are operating to HOVENSA's satisfaction, and twelve (12) months' extended maintenance period thereafter. All insurance provided by CONTRACTOR under this Agreement will have limits and aggregates, if any, dedicated to this Agreement.

7.4  Prior to the commencement of any Work, CONTRACTOR will furnish to HOVENSA sufficient certificates of all the insurance to be provided by CONTRACTOR, which certificates will provide that the insurance will not be canceled until at least thirty (30) days written notice is given to HOVENSA c/o Administrative Services. CONTRACTOR will promptly notify HOVENSA in writing of any changes to insurance policies that adversely affect the Indemnified Parties.  All polices of insurance provided by CONTRACTOR will be primary to any other insurance available to the Indemnified Parties and will name HOVENSA and its parents, affiliates, successors and assigns and the Joint Venture partners, their parents, subsidiaries and affiliates and all contractors and subcontractors as additional insureds (except worker's compensation) and provide for waiver of underwriters' rights of subrogation against the parties listed above, and any third party designated by HOVENSA.  Insurance certificates must be identified with contract number.

VIII.    CONSEQUENTIAL LOSS EXCLUSION

19

8.1 Neither party will be liable to the other for punitive, indirect, incidental or consequential damages loss of profits, loss of product or business interruption however it be caused, including the fault or negligence of either party, except to the extent recovered from an indemnified party by a third party.

IX.    REPRESENTATIVES OF PARTIES

9.1    CONTRACTOR will appoint a Project Manager who will be authorized to act on behalf of CONTRACTOR and with whom HOVENSA may consult at all reasonable times concerning the Work, and whose instructions, requests and decisions will be binding upon CONTRACTOR, except that the individual will have no authority to amend or waive any of the terms of this Agreement.  The Project Manager will at all times be acceptable to HOVENSA.

9.2    HOVENSA will appoint one individual who will be authorized to act on behalf of HOVENSA and with whom CONTRACTOR may consult at all reasonable times concerning the Work and whose instructions, requests and decisions will be binding upon HOVENSA, except that the individual will have no authority to amend or waive any of the terms of this Agreement.

X.    COMPENSATION

10.1  HOVENSA will compensate CONTRACTOR for the Work as set forth in Appendix D.

10.2  HOVENSA may draw against any retained amounts or other security to cure any breach by CONTRACTOR of this Agreement or any obligation arising under this Agreement.

10.3    CONTRACTOR will submit invoices during the performance of the Work in accordance with Appendix D "Compensation and Terms of Payment." CONTRACTOR will furnish an Affidavit of Release of Liens in the form attached as Appendix AG with all invoices.  CONTRACTOR will show any applicable Sales or Use Taxes separately on all invoices submitted to  HOVENSA for payment. In order to ensure that the correct amount of tax is withheld, CONTRACTOR agrees to invoice HOVENSA separately for Services rendered in the U.S. Virgin Islands and outside the U.S. Virgin Islands.  Invoices not so designated will be subject to the income tax withholding, unless the required documentation has been provided to HOVENSA by CONTRACTOR.

XI.    TAXES

20

11.1  CONTRACTOR will be responsible for all applicable Virgin Islands taxes.  The amount charged HOVENSA by CONTRACTOR will be presumed to include all taxes and CONTRACTOR will not separately invoice HOVENSA for them.

11.2  CONTRACTOR  will be required to obtain a St. Croix business license and is responsible for the payment of its Virgin Islands income tax liability.

11.3  Personal income taxes may be due to the Virgin Islands government by CONTRACTOR's employees and must be withheld by CONTRACTOR, as required by law.

11.4  CONTRACTOR will register with and contribute to the Virgin Islands Worker's Compensation Fund.  This registration is in addition to any contributions CONTRACTOR may make to its home state Worker's Compensation fund.

11.5  CONTRACTOR will pay unemployment taxes to the Virgin Islands Employment Security Agency, as well as federal Unemployment Tax and FICA.

XII.    SURPLUS MATERIALS

12.1  Upon completion of the Work, HOVENSA will review all "Surplus Materials" and will have the option to retain ownership of any surplus materials on terms to be agreed on by the parties. "Surplus Materials" will include commodities only and will exclude engineered equipment, tagged items, waste or scrap, surplus resulting from changes in the Work pursuant to Article XIII, or materials not requisitioned by CONTRACTOR.

XIII.    CHANGES IN THE WORK

**13.1 Changes in the work will be handled in accordance with Appendix B and Appendix D.**

XIV.    BREACH; TERMINATION OR SUSPENSION OF WORK

14.1 HOVENSA will have the right to terminate this Agreement or any specific Work assignment given under this Agreement, at any time and for any reason, without cause, on twenty-four (24) hours' written notice to CONTRACTOR.  If there is a termination by HOVENSA, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination and for the period required by HOVENSA for the orderly cessation of the Work.

21

14.2  The occurrence of any of the following events is a Breach of this Agreement:

14.2.1  any defect in the Work which HOVENSA, in its sole judgment, determines to be material;

14.2.2  Failure, after notice has been given to CONTRACTOR of any unsafe, unsound or defective work, to begin immediately, and diligently proceed with, steps necessary to correct such work;

14.2.3  Failure to proceed with or complete the Work in accordance with the Agreement;

14.2.4  HOVENSA has reasonable grounds to believe that CONTRACTOR is or may become bankrupt, insolvent or unable to pay its debts as they become due;

14.2.5  CONTRACTOR fails to maintain materials, equipment, and personnel of such kinds and in such places as in HOVENSA'S sole judgment are reasonably required for CONTRACTOR'S performance hereunder;

14.2.6  Breach of any warranty or representation of this Agreement; or

14.2.7  Contractor becomes involved in any labor difficulties not covered in Article XV which, in HOVENSA's sole judgment, may impede or slow down the Work.

14.2.8  Failure to comply with any provision of this Agreement, which failure HOVENSA, in its sole judgment, deems to be material.

14.3  If there is a Breach under Article 14.2, HOVENSA, in its discretion, will have the right on twenty-four (24) hours' written notice to (a) terminate this Agreement or any Work assigned hereunder pursuant to this Article, (b) invoke such other legal remedies as may be available to HOVENSA and (c) proceed with its personnel or those of others and take possession and use all equipment and materials at the site (all of which CONTRACTOR agrees to leave for that purpose).

14.4    On any Breach, CONTRACTOR will not be entitled to any further payment until the matter is remedied to the satisfaction of HOVENSA, and CONTRACTOR will then be paid only an amount as is reasonably due for Work properly performed by CONTRACTOR less all damage, loss and additional expense suffered by HOVENSA as a result of the Breach.  If the damage, loss and expense exceeds the amount due CONTRACTOR, the amount will be paid immediately to HOVENSA by

CONTRACTOR.  No remedy afforded to HOVENSA either under this Agreement or as a matter of law will be deemed to be exclusive or limit any other rights or remedies available to HOVENSA.

14.5    HOVENSA may at any time suspend performance of all or any part of the Work by giving twenty-four (24) hours' written notice to CONTRACTOR.  The suspension may be continued by HOVENSA for a period of up to forty-five (45) calendar days, during which HOVENSA may, at any time, by written notice, require CONTRACTOR to resume performance of the Work.  If at the end of the forty-five (45) day period of suspension HOVENSA has not required a resumption of the Work, that portion of the Work that has been suspended may be terminated by either party on twenty-four (24) hours' written notice to the other party.  If there is a termination, or if this Agreement is terminated for force majeure, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination and for the period required by HOVENSA for the orderly cessation of the terminated Work.

14.6    If there is a termination for any reason, CONTRACTOR will cooperate in minimizing costs and losses, including transfer of Work in progress to HOVENSA and as a condition to further payment hereunder in the event of termination CONTRACTOR will comply with HOVENSA's instructions concerning the time and manner of termination of the Work and will without additional charge execute assignments or other documents as HOVENSA may require to vest in HOVENSA all, or any part as HOVENSA may require, of such rights in subcontracts or purchase orders as CONTRACTOR may have placed in relation to this Agreement.  If such termination occurs, HOVENSA reserves the right to perform the Work with its forces.

14.7.    Any termination of this Agreement will not affect the warranty, secrecy, confidentiality or other obligations of this Agreement which by their nature would survive.

XV.    FORCE MAJEURE

15.1 Any delays in or failure of performance by either party under this Agreement will not constitute Breach  hereunder or give rise to any claims for damages if and to the extent caused by occurrences beyond the foreseeable control of the affected party and which could have been avoided by the affected party's reasonable best efforts, including but not limited to, acts of governmental

authority, acts of God, strikes or other concerted acts of workers, fires, explosions, riots, wars, rebellions and sabotage.

15.2  Resumption of Work will be covered as under Article 14.5.

15.3  For  events of Force Majeure lasting more than fifteen (15) continuous days, HOVENSA and CONTRACTOR will negotiate in good faith an adjustment to the Project Schedule (with associated relief for liquidated damages) and the Contract Price for the additional costs reasonably incurred by CONTRACTOR as a direct result of the event of Force Majeure.

XVI.    PATENTS AND SIMILAR RIGHTS

16.1  Except for claims or suits based upon plans, drawings or specifications furnished by HOVENSA, CONTRACTOR will indemnify HOVENSA from all costs, damage, loss and expense as a result of any infringement or claim of infringement of any patent, copyright, trade secret or other proprietary right (including attorneys' fees and expert fees) and for changes or replacement and related costs to avoid infringements arising from the performance of the Work.  At HOVENSA's request, CONTRACTOR will defend any action arising out of any infringement or claim; HOVENSA will be entitled to be fully advised and to participate in any such action.  No action will be settled or discontinued, nor will judgment be permitted to be entered if, in HOVENSA's sole opinion, its interests would be adversely affected.  Upon notice from HOVENSA or from third parties of a claim arising from any property right, CONTRACTOR may procure for HOVENSA the fully paid-up right to continue using the designs, processes or other property, replace them with non-infringing substitutes, or avoid the infringement or claim thereof by modifications thereto, as long as the Facilities or production from them is not adversely affected.  Such obligations to defend and indemnify HOVENSA against a claim arising from patent, copyright, trade secrets or other property right will survive the Notice of Mechanical Completion date.

XVII.   ASSIGNMENT

17.1  The rights and obligations under this Agreement are not assignable by either party without the written consent of the other party (except that such rights and obligations may be assigned without consent to the successor of either party or to a person, firm or corporation acquiring all or substantially

24

all of the business and assets of such party). No assignments of the rights and obligations of a party to this Agreement will be valid unless such rights and obligations are assumed by the assignee. When assigned in accordance with the foregoing, the rights and obligations of a party to this Agreement will be binding upon and be for the benefit of the assignee, but the assignor will remain liable to the other party for its obligations under this Agreement.

XVIII.    AUDIT

18.1  CONTRACTOR and CONTRACTOR's subcontractors will permit HOVENSA or its agents or representatives, without undue delay, to have access at reasonable times to review and audit all records and accounts necessary to ensure and validate CONTRACTOR's compliance with this Agreement. Reviews and audits may be made within two (2) years of last invoice.

18.2  CONTRACTOR will require, in contracts with any subcontractors who perform services in connection with this Agreement, that HOVENSA or its agents or representatives, without undue delay, will have access to review and audit all subcontractor's records and accounts necessary to ensure and validate compliance with this Agreement. Subcontractor reviews and audits may be made within two (2) years of last invoice.

XIX.    WAIVER

19.1  A waiver on the part of HOVENSA or CONTRACTOR of any term or breach of this Agreement will not constitute a precedent nor bind either party to a subsequent waiver of any succeeding term or breach.

XX.    ENTIRETY OF CONTRACT

20.1  This Agreement, including the Appendices and other documents incorporated by reference, is the entire agreement between HOVENSA and CONTRACTOR regarding the matters covered herein and there are no other agreements, representations or obligations for the services described herein.

XXI.    SECRECY AND PUBLICITY

25

21.1  CONTRACTOR will not without written approval of HOVENSA give any publicity pertaining to the Facilities nor divulge to any third parties any details pertaining to the Work or any of HOVENSA's facilities except as necessary for the due performance of the Work.

XXII.  UNDERLINE CONFLICT OF INTEREST

22.1  CONTRACTOR acknowledges that HOVENSA has issued a policy relating to conflicts of interest between HOVENSA and its employees, attached as Appendix AA.  In order to assure compliance with the policy, CONTRACTOR will not, before, during or after performance of the Work, make, offer, provide or agree to make, offer or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value to (i) any employee, agent or representative of HOVENSA, (ii) any member of their immediate families, (iii) anyone claiming to act or acting for or in behalf of any such person, nor will CONTRACTOR permit any person described in (i), (ii) or (iii) above, to have any financial or economic interest in CONTRACTOR or any subsidiary or affiliate of CONTRACTOR.  If CONTRACTOR is requested to make or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value, by any person described in (i), (ii) or (iii) above, CONTRACTOR will report the request immediately to HOVENSA in the manner provided for the giving of notice under this Agreement.  The failure by CONTRACTOR to strictly adhere to the provisions of this Article will be deemed by CONTRACTOR and HOVENSA to be a material breach of this Agreement, and at HOVENSA's sole option will be grounds for immediate suspension or termination, by reason of default, of this Agreement.  All subcontracts or material supply contracts permitted or required in connection with performance of the Work will contain provisions in substantially the same form and substance as this Article binding subcontractors or material suppliers to the same obligations hereunder as CONTRACTOR.

XXIII.  SUBCONTRACTS AND DELEGATION

23.1.  CONTRACTOR will not subcontract or delegate any of its obligations under this Agreement without the written consent of HOVENSA.  HOVENSA's approval of any subcontract will not relieve CONTRACTOR of any of its obligations under this Agreement.  CONTRACTOR will, for the

protection of HOVENSA, demand warranties from all subcontractors and vendors for services performed and material provided. These warranties will be made available to HOVENSA to the full extent of their terms and will extend for twelve (12) months after services have been performed and accepted or for such other period of time as may be obtained from such subcontractors. This provision will not affect CONTRACTOR's other obligations hereunder.

23.2    For any subcontractor approved by HOVENSA under this Agreement, HOVENSA will have the option to contract directly with that subcontractor for services to be provided in connection with the Work (such subcontractor is referred to in Articles 23.2 and 23.3 as the "HOVENSA Contractor using the Form set out in Appendix AC"). If this occurs, CONTRACTOR will manage the contract for HOVENSA and will defend and indemnify HOVENSA, subject to the limitations on liability provided in this Agreement, in all circumstances in which CONTRACTOR would have had to indemnify HOVENSA under this Agreement if CONTRACTOR had subcontracted directly with the relevant HOVENSA Contractor. In addition, CONTRACTOR will defend and indemnify HOVENSA from all claims based on vicarious liability, respondeat superior, or other similar theories of liability asserted against HOVENSA arising solely out of HOVENSA's passive contractual relationship with the HOVENSA Contractor; provided, however, that CONTRACTOR will have no indemnity obligation or liability for claims, damages (including, without limitation, Liquidated Damages) or actions resulting from, or arising out of, HOVENSA's failure to pay any HOVENSA Contractor any money owed under the governing contract if CONTRACTOR notifies HOVENSA that in CONTRACTOR's reasonable judgment, the HOVENSA Contractor should be paid any amount in dispute. CONTRACTOR will defend and indemnify HOVENSA if HOVENSA, merely because of the fact that it is the signatory to any such contract, is found by a trier of fact to have been grossly negligent in the actual approval or decision to contract with a HOVENSA Contractor selected by CONTRACTOR to perform a particular scope of service.

23.3    HOVENSA and CONTRACTOR will agree upon the general terms to be incorporated into all contracts to be entered into by HOVENSA pursuant to Article 23.2. The terms to be incorporated into all such contracts will be based upon, and incorporate the principles set forth in this Agreement on a corresponding basis to establish to obligations which flow through to the HOVENSA

Contractor, including, without limitation, indemnity provisions consistent with those undertaken by CONTRACTOR under this Agreement, to protect both HOVENSA and CONTRACTOR. After HOVENSA's approval of a particular HOVENSA Contractor, CONTRACTOR will use its best efforts to obtain the HOVENSA Contractor's acceptance of such terms or to obtain such other terms as are reasonably obtainable. CONTRACTOR will forward copies of the executed contract to HOVENSA. As part of the Work, CONTRACTOR will manage and supervise the performance of the HOVENSA Contractor's obligations and assist HOVENSA in enforcing the terms of the contract. In the performance of its obligations pursuant to this Article 23.3, CONTRACTOR will act as HOVENSA's agent in the supervision and administration of the contracts entered into with the HOVENSA Contractors, and each contract will so notify the HOVENSA Contractor of CONTRACTOR's authorization to so act for and on behalf of HOVENSA.

XXIV.  AS-BUILT DRAWINGS

24.1  CONTRACTOR will provide all information required to allow the original drawings to be updated to "as-built."

XXV.  NOTICES

25.1  All notices will be sent by facsimile and by Certified Mail, Return Receipt Requested or recognized overnight carrier.

25.2  All notices and communications required to be given CONTRACTOR will be in duplicate, the original addressed to:

CONTRACTOR TO ADVISE

25.3 All notices and communications required to be given to HOVENSA will be addressed to:

Project Director-[PROJECT NAME]

1 Estate Hope

Christiansted, U.S. Virgin Islands 00820-5652

Facsimile No.

and a copy to:

28

Vice President and Chief Administrative Officer

1 Estate Hope

Christiansted, U.S. Virgin Islands 00820-5652

Facsimile No.:

and a copy to:

Director, Administrative Services

1 Estate Hope

Christiansted, U.S. Virgin Islands 00820-5652

Facsimile No.:

and a copy to:

PDVSA V.I., Inc.

1A Frederiksberg Gade

St. Thomas, U.S. Virgin Islands, 00802

Facsimile No.

XXVI.  LIENS

26.1  CONTRACTOR will defend and indemnify HOVENSA against the attachment of liens or encumbrances of any vendor or subcontractor relating to the Work.

XXVII.  GOVERNING LAW/DISPUTE RESOLUTION

27.1  Governing Law - This Agreement will be governed by and construed under the internal laws of the State of New York, U.S.A.

27.2 Dispute Resolution.

27.2.1  If there is a dispute between HOVENSA and CONTRACTOR on the application or interpretation of this Agreement, the aggrieved Party will promptly notify the other Party of its intent to invoke this dispute resolution procedure within ten (10) business days after the dispute arises.  If the Parties fail to resolve the dispute within the ten (10) business days after delivery of the Notice, each Party will, within five (5) business days thereafter, nominate an officer of its management to meet at the Facility, or at any other agreed location, to resolve the dispute.  If the Parties are unable to resolve the

dispute to their satisfaction within ten (10) business days after the nomination, each Party, without further delay, will have the right to submit the dispute to arbitration for settlement. The arbitration will be conducted in the City of New York, State of New York, United States of America, in the English language in accordance with the rules of procedure of the American Arbitration Association (the "AAA"). Each party will nominate within thirty (30) days of the commencement of proceedings one arbitrator. If any Party fails to nominate an arbitrator within the stated time period, the AAA will appoint an arbitrator for the Party. The two arbitrators nominated by the Parties or appointed by the AAA for any Party will jointly nominate a third arbitrator, who will chair the arbitration panel. If the arbitrators nominated by the Parties do not succeed in nominating a third arbitrator within ten (10) days, the arbitrator will be appointed by the AAA. The award of the arbitral tribunal will be final and binding upon the Parties. Any arbitration will be "baseball" type arbitration. Judgment on the award rendered may be entered in either the state or federal courts of New York or any other court having jurisdiction, or application may be made to such court for judicial acceptance of the award or order of enforcement. The dispute resolution procedures set forth in this Section will be the sole and exclusive dispute resolution procedures available to the Parties under this Agreement.

27.2.2 The Parties hereby irrevocably consent to personal jurisdiction in the State of New York and waive any objection to the venue in the courts of the State of New York, County of New York or the U.S. District Court for the Southern District of New York.

27.2.3 CONTRACTOR will cause a provision substantively the same as this Section 24.2 to be included in any contract between CONTRACTOR and any subcontractor to ensure that all disputes arising out of the performance of the Work, or any portion thereof, are subject, to the fullest extent possible, to the dispute resolution procedures set forth in Section 24.2(a) and (b).

## XXIX. NON-COLLUSIVE BIDDING

29.1 If this Agreement was awarded on the basis of competitive bidding, CONTRACTOR warrants that it has not consulted with any other contractor or person who has bid on the Work and that its bid was arrived at independently of any discussions or collusion with others.

## XXX. EQUAL OPPORTUNITY

30.1 <u>Non-Discrimination in Employment</u> - CONTRACTOR will comply with the Equal Opportunity clause published in the regulations of the U.S. Department of Labor implementing Executive Order 11245, which is incorporated in this Agreement by reference.

30.2 <u>Affirmative Action for Handicapped Workers</u> - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor Implementing Section 503 of the Rehabilitation Act of 1973, Public Law 93-112m as amended, which are incorporated in this Agreement by reference.

30.3 <u>Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era</u> - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503, Title V of the Vietnam Era Veteran's Readjustment Assistance Act of 1972, Public Law 92-540, as amended, and Executive Order 11701, which are incorporated in this Agreement by reference.

30.4 <u>Certification of Nonsegregated Facilities</u> - CONTRACTOR certifies that it does not and will not maintain any facilities it provides for its employees in a manner which will result in segregation on the basis of race, color, religion, sex or national origin, or permit its employees to perform their services at any location, under its control, where segregated facilities are maintained; and that it will obtain a similar certification prior to the award of any nonexempt subcontract.

30.5 <u>Minority Business Enterprises</u> - CONTRACTOR will comply with the minority business enterprise clauses and regulations published by the U.S. Department of Commerce implementing Executive Order 11625, which are incorporated in this Agreement by reference.

XXXI. <u>AMENDMENTS</u>

No amendments to the Agreement will be enforceable against either party unless in writing and signed by the parties.

XXXII <u>TAX WITHHOLDING</u>

32. The laws of the U.S. Virgin Islands require HOVENSA to withhold from contractors who are foreign (non USVI)corporations, an income tax of 11% from all payments made by HOVENSA for services performed by CONTRACTOR in the USVI. For all other foreign (non-USVI) entities and non-

resident aliens, the withholding tax rate is 10%. Payments made to U. S. citizens or for services rendered outside the USVI, are not subject to withholding. Unless CONTRACTOR has provided HOVENSA with a copy of CONTRACTOR's USVI business license, and an IRS form W-8ECI, as proof that CONTRACTOR is exempt from the income tax withholding for payments otherwise subject to withholding, HOVENSA will withhold and pay the requisite amounts to the USVI Bureau of Internal Revenue.

IN WITNESS WHEREOF, this Agreement and the attached Appendices have been reviewed by agents of both parties and this Agreement is executed, stamped with Corporate Seals and delivered, by the authorized officials of each corporation.

ATTEST:                                  HOVENSA L.L.C.


_____ _____              BY:_____


ATTEST:


_____ _____              BY:_____

EXHIBIT 2

## ENGINEERING AND PROCUREMENT AGREEMENT

AGREEMENT dated          , 200__, between HOVENSA L.L.C., a U.S. Virgin Islands limited liability company ("HOVENSA") and _____, a _____ corporation ("CONTRACTOR").

### EXPLANATORY STATEMENT:

A.      HOVENSA wishes to retain CONTRACTOR to perform engineering design, procurement and project management in connection with construction of a _____ and related facilities at HOVENSA's petroleum refining facility located at St. Croix, United States Virgin Islands (the "Refinery").

B.      CONTRACTOR is willing to perform these services on a lump sum basis under the terms of this Agreement.

THE PARTIES AGREE AS FOLLOWS:

I.      SCOPE

1.1      This Agreement consists of this document, the following documents which are attached and any other document which is incorporated in this Agreement by reference:

1.1.1    Appendix A:    Scope of Work

1.1.2    Appendix B:    Coordination Procedures

1.1.3    Appendix C:    Engineering Standards

1.1.4    Appendix D:    Compensation and Terms of Payment

Exhibit 1: Terms of Payment

Exhibit 2: Cash Flow Curves

Exhibit 3: Earned Value Matrix

Exhibit 4: Project Cost Breakdown

Exhibit 5: Letter of Credit

Exhibit 6: Contract Change Orders

Exhibit 7: Contractor Affidavit: Liens

1.1.5   Appendix E:   Project Schedule

Exhibit 1: Master Project Schedule

Exhibit 2: Tentative Refinery Turnaround Schedule

Exhibit 3: Refinery Holiday Schedule

1.1.6   Appendix F:   FEED Package

*Exhibit 1:  Process Description*

*Exhibit 2:  Process Interlocks & Compressor Controls Summary*

*Exhibit 3:  Equipment List*

*Exhibit 4:  Material Selection Diagrams*

*Exhibit 5:  Reactor Specifications & Drawings*

*Exhibit 6:  EMRE / KBR BDS Package (2 volumes)*

*Exhibit 7:  EMRE / KBR DBS Package (1 volume)*

*Exhibit 8:  EMRE Design Notes (1 volume)*

*Exhibit 9:  EMRE Design Review Milestones*

*Exhibit 10: P&IDs*

*Exhibit 11: Auxiliary Equipment Datasheets*

*Exhibit 12: Preliminary Electrical Load List*

*Exhibit 13: HVAC Pressurized Buildings Standard*

*Exhibit 14: Plot Plans & B.L. Piping Sketch*

1.1.7   Appendix G:   Technical Questions and Answers

1.1.8   Appendix H:   Commercial Questions and Answers

1.1.9   Appendix I:   Items Provided by HOVENSA

2

1.1.10  Appendix J:   Performance Guarantees

1.1.11  Appendix K:   Schedule and Performance Liquidated Damages

1.1.12  Appendix L:   Construction Workforce

1.1.13  Appendix M:   Ocean Transportation Information

      Exhibit 1: Hovensa RO RO Dock Information

      Exhibit 2: Title to Materials

      Exhibit 3: Ocean Shipping Support Design for Major Equipment

      Exhibit 4: Freight Forwarders

      ***Exhibit 5: Marine & Terminal Regulations***

1.1.14  Appendix N:   Statement Regarding Site Conditions

      Exhibit 1: MEC Topographical Map

      ***Exhibit 2: Preliminary Geotechnical Investigation Report - URS***

1.1.15  Appendix O:   Radio Information

1.1.16  Appendix P:   Use of Non-Domestic Materials

1.1.17  Appendix Q:   Parent Guarantee Letter

1.1.18  Appendix R:   Approved Vendors List

1.1.19  Appendix S:   Equipment and Instrument Data Sheet Forms

1.1.20  Appendix T:   Mechanical Integrity Forms

1.1.21  Appendix U:   ***Open***

1.1.22  Appendix V:   ASD Manual Table of Contents

1.1.23  Appendix W:   I&C Responsibility Matrix

1.1.24  Appendix X:   Mechanical Completion Checklist

1.1.25  Appendix Y:   PHA Guidance – Guidelines of Deviation

1.1.26  Appendix Z:   BEDD Sheets

1.1.27  Appendix AA:  Conflict of Interest

1.1.28  Appendix AB:  HOVENSA Standard Contract Attachments

1.1.29  Appendix AC:  Agency Agreement

1.1.30  Appendix AD:  Organizational Chart and Key Personnel Resumes

1.1.31  Appendix AE:  Unit Rates for Reimbursable Work due to Variation

1.1.32  Appendix AF:  Equipment Lease Agreement

Exhibit 1: Sample Equipment Lease

Exhibit 2: General Procedures For Using Equipment Lease Agreement

1.1.33  Appendix AG: TEMPORARILY LEFT BLANK

1.1.34  Appendix AH:  Federal Contractor Certificate of Compliance

1.2      The services generally to be performed by CONTRACTOR under this Agreement (the "Work") are set forth in Appendix A.

1.3      The items generally to be provided by HOVENSA and others under this Agreement are set forth in Appendix I.

1.4      For any work in addition to that defined in this Agreement, HOVENSA will advise CONTRACTOR in writing of the extent of services required.  HOVENSA may also direct CONTRACTOR in writing to perform sufficient conceptual engineering to define appropriately the scope of additional work.

1.5      If there is any conflict between this Agreement and any of the appendices, the more stringent requirement on CONTRACTOR will control.  If there is any conflict between appendices, it will be brought to HOVENSA's attention promptly for resolution.  If there is any conflict arising from any change in any Appendix, the Appendix of the latest date will control.

1.6      All parts of the Work reasonably inferred from and not expressly mentioned in Appendix A or included in Appendix I, will be performed as an obligation of CONTRACTOR under this Agreement and Appendix A.

II.    DEFINITION OF THE FACILITIES

4

2.1     The "Facility" or "Facilities" means the _____ and related facilities to be constructed at the Refinery as described in Appendix A.

III.     <u>COORDINATION OF WORK</u>

3.1     <u>Administrative Procedures</u>

CONTRACTOR acknowledges receipt of the HOVENSA Coordination Procedures, which are incorporated by reference, and the Table of Contents of which is attached as Appendix B, and CONTRACTOR will comply with the HOVENSA Coordination Procedures in performing the Work.  If there is any conflict between any part of the Coordination Procedures and this Agreement, the more stringent requirement on CONTRACTOR will control.  HOVENSA reserves the right to issue additions to, or revisions of, the HOVENSA Coordination Procedures in writing at any time during the course of the Work; provided that, if the additions or revisions would increase or decrease the cost of or time required for CONTRACTOR to perform the Work, this Agreement will be modified accordingly, pursuant to Article X.

3.2     <u>Engineering Standards</u>

CONTRACTOR acknowledges receipt of the HOVENSA Engineering Standards which are incorporated by reference, and the Table of Contents of which is attached as Appendix C (the "Standards"), which contain HOVENSA's design and construction criteria and CONTRACTOR will perform the Work in accordance with the Standards.  If there is any conflict between any part of the Standards and this Agreement, the Agreement will control.  HOVENSA reserves the right to issue additions to or revisions of the Standards during the course of the Work, and will handle these additions or revisions in accordance with the HOVENSA Coordination Procedures, provided that if the additions or revisions would materially increase or decrease the cost of or time required for CONTRACTOR to perform the Work or otherwise materially affect

5

CONTRACTOR'S obligations, this Agreement will be modified accordingly pursuant to Article X.

3.3     Proprietary Information

3.3.1 All drawings, specifications, bills of material, material specifications, calculations, operating instructions, design data and other engineering design information produced by CONTRACTOR, the cost or expense of which is included in CONTRACTOR's compensation, will become the property of HOVENSA, and the originals will be provided to HOVENSA within two (2) weeks after successful completion of performance acceptance testing as set forth in Appendix B. HOVENSA will have the right to use any engineering design, process studies and other technical services in the construction or reconstruction, duplication, operation and maintenance of any HOVENSA facility and any facilities of its parents, subsidiaries or affiliates and the Joint Venture partners and their parents, subsidiaries and affiliates or to transfer these rights to any successor owner of the Facility

3.3.2    All information supplied to CONTRACTOR by HOVENSA, its members or affiliates of its members, provided that any use or disclosure to others as may be necessary to perform the Work will be made under a binder of secrecy substantively the same as the one that binds the parties hereto, is proprietary and CONTRACTOR will not use or disclose to others any such information without HOVENSA's written consent, except as may be necessary to perform the Work; provided that for purposes of use by CONTRACTOR, proprietary information will not include the following:

3.3.2.1         information which, at the time of disclosure to CONTRACTOR, is in the public domain;

3.3.2.2         information which, after disclosure to CONTRACTOR, enters the public domain;

6

3.3.2.3        information which, prior to disclosure to CONTRACTOR, was already in CONTRACTOR's possession and was not acquired from HOVENSA;

3.3.2.4        information which, subsequent to disclosure to CONTRACTOR, is obtained by CONTRACTOR from a third party who has the right to disclose such information without binder of secrecy.

Notwithstanding the foregoing, no information supplied to CONTRACTOR by HOVENSA will be disclosed to others even if it falls within one of the exceptions to the definition of proprietary information listed above.

3.3.3   Any agreements or representations between CONTRACTOR and HOVENSA entered into prior to the effective date of this Agreement relating to secrecy or confidentiality of information will survive the signing of this Agreement or any completion of the Work, or any other termination or cancellation of this Agreement, each in accordance with the terms of the other agreement or representation.

3.4    Personnel; Independent Contractor

3.4.1   CONTRACTOR warrants that it will employ properly qualified, and where appropriate, properly licensed or certified personnel necessary to perform the Work.

3.4.2   In performing the Work, CONTRACTOR is acting as an independent contractor and reserves the right to hire or discharge employees, designate the classification and hours of work for each employee and to supervise and control the manner of performance of the Work.

3.4.3   Prior to assigning personnel to the Work, CONTRACTOR will submit for HOVENSA's review the names and work experience of, and licenses or certificates held by, personnel nominated to fill key work positions, such as _____. Personnel will not be assigned to or removed from these key

7

positions without sufficient notification to HOVENSA.  The fact that this notification is required will not affect CONTRACTOR's status as an independent contractor hereunder.

3.5.    Warranties

3.5.1    CONTRACTOR warrants for twelve (12) months following *Final Acceptance of Performance Testing* (as defined in Appendix B) or thirty-six (36) months after Mechanical Completion (as defined in Appendix B), whichever occurs first (the "Warranty Period"):

3.5.1.1 The design of the Facility furnished by it and its performance of the Work will be in accordance with the Standards and any special job specifications or requirements and other data and engineering criteria developed and provided by HOVENSA, its process know-how Licensors or its equipment suppliers, as set out in this Agreement.

3.5.1.2 The Work will be executed in a competent, efficient manner following current state of the art, where practicable, petroleum refinery engineering practice and in accordance with the standards of care and diligence normally practiced by recognized engineering firms.

3.5.1.3 CONTRACTOR will be responsible for performance guarantees on purchased equipment systems to meet the requirements of Article 3.5.8.

3.5.1.4 CONTRACTOR will be responsible for individual performance guarantees on equipment purchased from third parties and for inspection of, and workmanship on, equipment purchased from third parties.

3.5.1.5 CONTRACTOR will provide HOVENSA with written performance guarantees as set forth in Appendix J, which guarantees are consistent with the design basis.

3.5.1.6 CONTRACTOR will perform the Work in accordance with Appendix A and the performance guarantee obligations of Appendix J.

8

3.5.1.7 Any breach of the above warranties will constitute a
"Defect."   If HOVENSA believes there is a Defect, HOVENSA will notify
CONTRACTOR of the Defect in writing describing the nature of the Defect.

3.5.2 CONTRACTOR recognizes that the soil conditions at the Facility
site require special engineering considerations and has represented its design will take
into account and address these conditions.  Accordingly, CONTRACTOR warrants the
foundation and structural designs will be performed in accordance with the standards of
care and diligence normally practiced by recognized engineering firms in performing
services of a similar nature and  will be free of defects within the parameters set by the
Engineering Standards in Appendix C ("Structural Warranty").  If (a) within the one (1)
year period following termination of CONTRACTOR's Work as set forth in Article XI, or
(b) within ten (10) years from HOVENSA's commencement of operation of the Facility,
any part of the Facilities is found to be defective or inoperable by reason of  defects in
the Work resulting from CONTRACTOR's failure to perform the Work in accordance with
the standard of care and diligence specified in this Article 3.5.2 ("Structural Defects"),
CONTRACTOR will furnish, free of charge, new designs, other engineering services and
other project management services required to remedy or correct the Structural Defects,
provided HOVENSA has notified CONTRACTOR in writing, within a reasonable time, but
not later than thirty (30) days after discovery of the deficiencies and within thirty (30)
days after the expiration of the warranty period, describing the nature of the Structural
Defect.

3.5.3.1 If any of the warranties set forth in 3.5.1 or 3.5.2 is
breached, CONTRACTOR will furnish, free of charge, new designs, other engineering
services and other project management services required to remedy or correct any
Defects or Structural Defects.   CONTRACTOR will use all reasonable efforts to remedy
any Structural Defect so as to minimize revenue loss to HOVENSA and to avoid

9

disruption of HOVENSA's operations.  CONTRACTOR's obligations under this Article 3.5.3.1 are collectively called the "Repairs."

       3.5.3.2 All responsibility for pursuing Contractor's subcontractors or sub-vendors for support will remain with Contractor, as well as providing whatever is needed in addition to the subcontractor's or sub-vendors' material/equipment warranty to ensure that the Repairs are made at no cost to HOVENSA.

       3.5.3.3 If Defects or Structural Defects in CONTRACTOR's Work or equipment procurement result in additional field construction costs to remedy the deficiencies or defects caused, CONTRACTOR will bear the cost of the additional construction labor, materials and equipment required for the correction of the defects or deficiencies.

       3.5.4   CONTRACTOR'S warranty does not extend to defects or damages to the extent due to (i) improper operation or maintenance of the Plant by HOVENSA, or (ii) normal wear and tear.

       3.5.5   HOVENSA will provide CONTRACTOR's representatives reasonable access to the Facility for the purpose of observing its operation and maintenance on reasonable notice during times agreed by HOVENSA and CONTRACTOR. CONTRACTOR acknowledges that warranty Work must be coordinated with the ongoing operations of the Refinery.

       3.5.6   CONTRACTOR will review all data provided to it by HOVENSA, its process know-how Licensors or its equipment suppliers and notify HOVENSA in writing of inconsistencies or questions that require resolution in order to keep possible remedial work to a minimum.

       3.5.7   The warranties and remedies for breach of warranty in this Agreement are the exclusive warranties and remedies by CONTRACTOR applicable to the Work and are in lieu of any other warranties, express or implied.

10

3.5.8    <u>Performance Guarantees</u> - CONTRACTOR guarantees that the Facility will be capable of performing as defined under Appendix J.  CONTRACTOR's responsibility will extend until a successful completion of **performance** test runs of the Facility in accordance with Appendix B.

3.5.9    <u>Materials and Equipment</u> - CONTRACTOR will pursue recourse against vendors and suppliers for faulty or defective material or equipment.

3.6    <u>HOVENSA's review of CONTRACTOR's work</u> - HOVENSA will have the right to review the progress of CONTRACTOR's Work as it proceeds.

3.7    <u>HOVENSA's Acceptance of CONTRACTOR's Work</u> - Upon completion of CONTRACTOR's design for any part of the Facilities and prior to commencing work on the final detailed design of that part, CONTRACTOR will submit key drawings and documents for HOVENSA's written acceptance in accordance with Appendix B; the key drawings and documents will consist of general specifications and standards, foundation design, welding procedures, plot plans, process flow diagrams, piping and instrumentation diagrams, electrical one-line drawings, electrical area classification drawings, underground conceptual drawings, building layouts and any other drawings as agreed upon in writing by HOVENSA and CONTRACTOR.  HOVENSA will have the right to require modifications to the drawings and documents and HOVENSA will notify CONTRACTOR in writing of its acceptance or of any modifications within fifteen (15) working days after HOVENSA's receipt of them.

3.8    <u>Ownership of Drawings and Data</u> - All technology, drawings, specifications, calculations, bills of material, material specifications, operating instructions and other engineering information produced hereunder and deliverable to HOVENSA by CONTRACTOR will become the property of HOVENSA, and the original as-built drawings will be provided to HOVENSA within two (2) weeks after successful completion of performance acceptance testing as defined in Appendix B.

3.9     Vendor Equipment

3.9.1    Where new equipment is to be purchased for the Facilities, CONTRACTOR warrants the accuracy and adequacy of its specifications and requisitions for the equipment. CONTRACTOR will, for the protection of HOVENSA, demand warranties from all vendors for machinery, equipment and materials used and installed in the Work, which will be no less favorable than the standard warranty available in the industry. These warranties will be made available to HOVENSA to the full extent of their terms, and, where possible, be in HOVENSA's name. These warranties will extend for a minimum of twelve (12) months after the machinery, equipment or materials have been placed in operation or after services have been performed, and accepted. Title to all equipment and materials will pass to HOVENSA, if shipped by water, on the high seas outside the territorial limits of any jurisdiction on board the vessel, or, if shipped by air, in international airspace, outside the territorial limits of any jurisdiction, on the aircraft, transporting them to the Virgin Islands. Risk of loss will pass from CONTRACTOR to Construction Contractor at the time the equipment or materials are first unloaded on St. Croix from the vessel or aircraft.

IV.    OBLIGATIONS OF CONTRACTOR

4.1 The Work will be executed as expeditiously as possible, in accordance with HOVENSA- approved schedules. The Project Schedule is attached as Appendix E. The procurement and delivery dates of operating equipment and materials are listed on Appendix E. Float is defined as the difference between the scheduled completion date for a project or any milestone within the project and the required completion date for the project or milestone. Under this Agreement, Float will belong to the Project and will not be considered to be for the exclusive use or benefit of either party. Extensions of time for meeting any milestone dates under the Agreement will be granted only to the extent

12

that equitable time adjustments requested by a party for affected activities exceed the total Float as affected by changes or delays in the Work.

    4.2   <u>Compliance With Laws, Permits and Regulations</u>

        4.2.1   CONTRACTOR will comply with all United States federal, state, U.S. Virgin Islands or other laws, regulations, ordinances or rules that pertain to the Work and HOVENSA will not be liable for, and CONTRACTOR will indemnify HOVENSA against, any violation by CONTRACTOR of any laws, regulations, ordinances or rules.

    4.3   <u>Pollution Abatement, Noise and Safety</u>

        4.3.1   CONTRACTOR will design the Work so it complies with all environmental laws, orders, rules, regulations and permits in effect or proposed in an official register.

        4.3.2   CONTRACTOR will design the Work so it will comply with all rules, regulations, orders, standards and interpretations promulgated under the Occupational Safety and Health Act (1970), as amended, and any state or territorial laws.

    4.4   <u>Permits</u>

        Where appropriate, all permits and licenses required for the Work and which will be obtained by CONTRACTOR will be in the name of HOVENSA.

    4.5   <u>Assessments</u>

        CONTRACTOR will pay all U.S. federal, state and locally imposed contributions, assessments and taxes which are based upon the wages or other remuneration paid to persons employed by CONTRACTOR on the Work. CONTRACTOR will insure that no state or local sales tax is imposed on items purchased for the Facilities.  CONTRACTOR will provide export certificates to the vendors and otherwise comply with the law of the applicable state to insure no sales tax is either charged or due.

13

4.6    Patents

4.6.1 CONTRACTOR will defend and indemnify HOVENSA against all claims, loss, damage and expense arising out of the infringement of any United States patent, copyright, trade secrets or other property rights and asserted against HOVENSA in connection with the performance of the Work or subsequent operation of the Facility, provided HOVENSA promptly notifies CONTRACTOR in writing of the threat or commencement of any suit or claim and permits CONTRACTOR to control its defense. CONTRACTOR will pay any settlement, judgment and all court costs awarded against HOVENSA in any suit and all compensation and expenses of its own counsel and experts in connection with the suit or claim. HOVENSA may be represented by counsel of its selection, at its expense. HOVENSA will cooperate fully in the defense of any suit or proceeding, at CONTRACTOR's expense, to the extent of furnishing evidence which is within HOVENSA's control. Upon notice from HOVENSA or from third parties of a claim arising from any property right, CONTRACTOR may procure for HOVENSA the paid-up right to continue using the designs, processes or other property, replace them with noninfringing substitutes, or avoid the infringement or claim thereof by modifications thereto, as long as the Facilities or production from them are not adversely affected.

4.6.2 For any equipment, materials and accessories which are purchased by CONTRACTOR in the performance of the Work, CONTRACTOR will exert all reasonable efforts to obtain from the suppliers thereof statements agreeing to hold HOVENSA harmless against any and all United States patent infringements. If indemnification is not available, CONTRACTOR will notify HOVENSA prior to purchase of the equipment, materials and accessories. CONTRACTOR will not have any liability to HOVENSA for patent infringement by vendors or subcontractors providing materials or equipment of their design.

14

4.7    Inspection, Expediting and Traffic.  CONTRACTOR will provide all inspection, expediting and traffic control (including marshalling yard and freight forwarding) services for all operating equipment and materials required for the Facilities.

4.8    Cooperation in Financing.  CONTRACTOR will furnish information, consents, certificates, opinions of counsel, and other documents or assistance-related to CONTRACTOR's corporate authorization to undertake the obligations in this Agreement as may be reasonably requested by any lender for its sole use for the financing of the Facility.  The parties will negotiate in good faith concerning any reasonable amendment or addition to this Agreement required by any lender.

**V.    Deleted**

VI.    HOVENSA's WORK AND SERVICES

6.1  Materials and Services - HOVENSA will provide, at its expense, land, materials, equipment and services as listed in Appendix I.

6.2    Construction Services - HOVENSA will provide all construction services directly or through a construction contractor of its choice (the "Construction Contractor").  CONTRACTOR will cooperate and coordinate with Construction Contractor as required.  CONTRACTOR and Construction Contractor are affiliated companies and CONTRACTOR will not use any delays or any action or inaction by Construction Contractor to excuse any breach or nonperformance, including delay, by CONTRACTOR under this Agreement.

**6.3    CONTRACTOR acknowledges that time is of the essence in the performance of this Agreement and will be responsible for delays caused by CONTRACTOR.**

6.4    Start-Up Services - HOVENSA will be responsible for all start-up services with support of CONTRACTOR.

VII.    INDEMNITY; INSURANCE REQUIREMENTS

15

7.1    CONTRACTOR will defend, indemnify and release HOVENSA and its parents, affiliates, successors and assigns and the Joint Venture partners and their parents, subsidiaries and affiliates (collectively called "Indemnified Parties"), up to the gross sum of the first $10,000,000 for each occurrence and a total of $10,000,000 in the annual aggregate, against all claims, causes of action, damages, liabilities, attorneys' fees and related expenses (herein "Claims") which the Indemnified Parties may suffer or for which the Indemnified Parties may be liable, (whether such Claims result by reason of any other contract imposing or requiring the assumption of Claims by the Indemnified Parties), by reason of actual or claimed injury (including death) to any person, or actual or claimed damage to any property (including loss of use), directly or indirectly caused or contributed to, or claimed to be caused or contributed to by reason of any act, omission or negligence, including strict liability, whether active or passive, of CONTRACTOR, its employees or its subcontractors, or of anyone for whose acts they are liable, or of anyone acting under their direction or control, or in connection with, or incident to, performance of this Contract, unless caused by the sole negligence or sole willful misconduct of the Indemnified Parties.  CONTRACTOR will do this notwithstanding the Virgin Islands Comparative Negligence Statute, Title 5 V.I.C. Section 1451.  In all cases covered hereunder, CONTRACTOR will initially defend the Indemnified Parties until it is judicially determined that any liability was caused by the sole negligence or sole willful misconduct of the Indemnified Parties exclusive of any fault of the plaintiff, plaintiff's employer, or any other party or non-party to the lawsuit.  If it is so determined, HOVENSA will reimburse CONTRACTOR or its insurance carrier for all judgments and expenses incurred, including the costs incurred by CONTRACTOR or its insurer in defending any Claims arising from such liability.

7.1.1   To the extent any claims exceed the limits set forth in Article 7.1, CONTRACTOR will defend and indemnify the Indemnified Parties from any claim,

16

liability, loss, cost or expense claimed by third parties for property damage or bodily injury, including death, to the extent caused by the negligence or willful misconduct of CONTRACTOR, its agents, employees or CONTRACTOR's affiliates, in connection with CONTRACTOR's performance of the Work.

7.1.2  To the extent any claims exceed the limits set forth in Article 7.1, HOVENSA will defend and indemnify CONTRACTOR from any claim, liability, loss, cost or expense claimed by third parties for property damage and bodily injury, including death, to the extent caused by the negligence or willful misconduct of the Indemnified Parties, its agents or employees in connection with CONTRACTOR's performance of the Work.

7.1.3  To the extent any claims exceed the limits set forth in Article 7.1, for claims of third parties attributable to the joint negligence or willful misconduct of CONTRACTOR and the Indemnified Parties, each will be liable to the third party to the extent of its negligence or willful misconduct.

7.2  Before CONTRACTOR starts any work, CONTRACTOR will, at its expense, maintain and require its subcontractors to maintain during the performance of the Work, insurance in form and with insurance companies satisfactory to HOVENSA and authorized to do business in the U.S. Virgin Islands as follows:

7.2.1 Worker's Compensation insurance covering CONTRACTOR's obligations under all applicable laws and Employer's Liability insurance in the amount of $500,000 per occurrence.

7.2.2 General Liability insurance, including contractual liability and completed operations, with limits of  $10,000,000 combined single limit, per occurrence, bodily injury and property damage, with $10,000,000 annual aggregate.

7.2.3 To the fullest extent possible, CONTRACTOR's general liability insurance will cover the indemnity agreements and obligations in Articles 7.1.1, 7.1.2.1 and 7.1.2.3.

17

7.2.4 Automobile Liability insurance, with limits of $5,000,000 combined single limit per occurrence, bodily injury and property damage. The automobile insurance will apply to all vehicles used by CONTRACTOR.

7.2.5 If any subcontractor is permitted to perform any of the Work, CONTRACTOR will maintain protective liability insurance covering the operations of the subcontractor in the amounts as set forth in Articles 7.2.2 and 7.2.4.

7.2.6 CONTRACTOR will pay any contributions for unemployment insurance and disability benefits for the employees of CONTRACTOR required by the laws of the state or territory in which the Work is being performed.

7.2.7 Prior to the commencement of any work, CONTRACTOR will furnish to HOVENSA sufficient certificates of all the insurance to be provided by CONTRACTOR, which certificates will provide that the insurance will not be canceled until at least thirty (30) days written notice is given to HOVENSA c/o Administrative Services. CONTRACTOR will promptly notify HOVENSA in writing of any changes to insurance policies which adversely affect HOVENSA. All polices of insurance provided by CONTRACTOR will be primary to any other insurance available to the Indemnified Parties and will name HOVENSA and its parents, affiliates, successors and assigns and the Joint Venture partners and their parents, subsidiaries and affiliates and HOVENSA's designated representative as additional insureds (except for worker's compensation) and provide for waiver of underwriters' rights of subrogation against the Indemnified Parties and any third party designated by HOVENSA. Insurance certificates must be identified with contract number.

7.2.8 CONTRACTOR will immediately notify HOVENSA's Safety Department either orally or by fax, of any incident occurring on or regarding HOVENSA's property, which results in property damage, personal injury, or death. CONTRACTOR will also furnish HOVENSA with two (2) copies of a written report of any such incident within three (3) days of its occurrence.

18

7.3  CONTRACTOR will arrange for "All Risk" Cargo Insurance covering all materials, supplies, equipment and components forming part of or used in the Work via any conveyance.  The insurance will be placed on the basis of worldwide to worldwide to ultimate destination in St. Croix, U.S. Virgin Islands, where coverage will cease at first place of rest at the Work site after discharge from vessel.  HOVENSA and Construction Contractor will be named as additional insureds and underwriters' rights of subrogation will be waived against HOVENSA, the Joint Venture partners, their parents, subsidiaries and affiliates and subcontractors and Construction Contractor.

7.4  HOVENSA may place other insurance for its own interest. CONTRACTOR will cooperate with HOVENSA and HOVENSA's insurance representatives in placement of these coverages and, if requested by HOVENSA, coordinate placement of these insurances with the insurances arranged by CONTRACTOR.

7.5  Neither party will be liable to the other for punitive, indirect, incidental or consequential damages, loss of profits, loss of product or business interruption however it be caused, including the fault or negligence of either party, except to the extent recovered from an indemnified party by a third party.

VIII.    REPRESENTATIVES OF PARTIES

8.1  CONTRACTOR will appoint a Project Manager who will be authorized to act on behalf of CONTRACTOR and with whom HOVENSA may consult at all reasonable times concerning the Work, and whose instructions, requests and decisions will be binding upon CONTRACTOR, except that the individual will have no authority to amend or waive any of the terms of this Agreement.  The Project Manager will at all times be acceptable to HOVENSA.

8.2  HOVENSA will appoint one individual who will be authorized to act on behalf of HOVENSA and with whom CONTRACTOR may consult at all reasonable times concerning the Work and whose instructions, requests and decisions will be binding

19

upon HOVENSA, except that the individual will have no authority to amend or waive any of the terms of this Agreement.

IX.    COMPENSATION

9.1  HOVENSA will compensate CONTRACTOR for the Work as set forth in Appendix D.

9.2  HOVENSA may draw against any retained amounts or other security to cure any breach by CONTRACTOR of this Agreement or any obligation arising under this Agreement.

9.3    CONTRACTOR will submit invoices during the performance of the Work in accordance with Appendix D.  CONTRACTOR will furnish an Affidavit of Release of Liens in the form attached as Appendix AG with all invoices.  CONTRACTOR will show any applicable Sales or Use Taxes separately on all invoices submitted to HOVENSA for payment. In order to ensure that the correct amount of tax is withheld, CONTRACTOR agrees to invoice HOVENSA separately for Services rendered in the U.S. Virgin Islands and outside the U.S. Virgin Islands.  Invoices not so designated will be subject to the income tax withholding, unless the required documentation has been provided to HOVENSA by CONTRACTOR.

X.    CHANGES IN THE WORK

10.1 Changes in the Work are addressed in *Coordination Procedure Appendix B and Compensation & Terms of Payment appendix D.*

*10.2    Deleted*

XI.    BREACH, TERMINATION OR SUSPENSION OF WORK

11.1    HOVENSA will have the right to terminate this Agreement or any specific work assignment given under this Agreement, at any time and for any reason, without cause, on twenty-four (24) hours' written notice to CONTRACTOR.  If there is such a termination by HOVENSA, HOVENSA will compensate CONTRACTOR in accordance

20

with Appendix D based on the percentage of the Work completed up to the date of termination and for the period required by HOVENSA for the orderly cessation of the Work.

11.2 The occurrence of any of the following events is a Breach of this Agreement:

11.2.1  any defect in the Services which HOVENSA, in its sole judgment, determines to be material;

11.2.2  Failure, after notice has been given to CONTRACTOR of any unsafe, unsound or defective work, to begin immediately, and diligently proceed with, steps necessary to correct such work;

11.2.3  Failure to proceed with or complete the Services in accordance with the Agreement;

11.2.4  HOVENSA has reasonable grounds to believe that CONTRACTOR is or may become bankrupt, insolvent or unable to pay its debts as they become due;

11.2.5  CONTRACTOR fails to maintain materials, equipment, and personnel of such kinds and in such places as in HOVENSA'S sole judgment are reasonably required for CONTRACTOR'S performance hereunder;

11.2.6  Breach of any warranty or representation of this Agreement; or

11.2.7  Contractor becomes involved in any labor difficulties not covered in Article XII which, in HOVENSA's sole judgment, may impede or slow down the Work.

11.2.8  Failure to comply with any provision of this Agreement, which failure HOVENSA, in its sole judgment, deems to be material.

11.3    If there is a Breach under Article 11.2, HOVENSA, in its discretion, will have the right on twenty-four (24) hours' written notice to CONTRACTOR to (a) terminate this Agreement or any Work assigned hereunder pursuant to Article 11.1, and (b) invoke such other legal remedies as may be available to HOVENSA.

21

11.4    Upon the occurrence of any event of Breach set forth above, CONTRACTOR will not be entitled to any further payment until the matter is remedied to the satisfaction of HOVENSA, whereupon CONTRACTOR will then be paid only the amount as is reasonably due for Work properly performed by CONTRACTOR less all damage, loss and additional expense suffered by HOVENSA as a result of the Breach. If the damage, loss and expense exceeds the amount due CONTRACTOR, the amount will be paid immediately to HOVENSA by CONTRACTOR.  No remedy afforded to HOVENSA either under this Agreement or as a matter

of law will be deemed to be exclusive or limit any other rights or remedies available to HOVENSA.

11.5    HOVENSA may at any time suspend performance of all or any part of the Work by giving twenty-four (24) hours' written notice to CONTRACTOR.  This suspension may be continued by HOVENSA for a period of up to forty-five (45) calendar days or one hundred eighty (180) calendar days if related to an event of force majeure, during which time HOVENSA may at any time, by written notice, require CONTRACTOR to resume performance of the Work.  If at the end of the forty-five (45) day period of suspension, or one hundred eighty (180) day period if related to an event of force majeure, HOVENSA has not required a resumption of the Work, that portion of the Work that has been suspended may be terminated by either party on twenty-four (24) hours' written notice to the other party.  If there is such a termination, or if this Agreement is terminated for a force majeure, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination for and for the period required by HOVENSA for the orderly cessation of the terminated Work.

11.6    If there is a termination for any reason, CONTRACTOR will cooperate in keeping costs and losses to a minimum, including transfer of Work in progress to

22

HOVENSA.  As a condition to further payment hereunder if there is a termination, CONTRACTOR will comply with HOVENSA's instructions concerning the time and manner of termination of the Work and will without additional charge execute such assignments or other documents as HOVENSA may require to vest in HOVENSA all, or such part as HOVENSA may require, of such rights in subcontracts or purchase orders as CONTRACTOR may have placed in relation to this Agreement.  If such termination occurs, HOVENSA reserves the right to perform the Work with its forces.

11.7    Any termination of this Agreement will not affect the warranty, secrecy, confidentiality or other obligations under this Agreement which by their nature would survive.

XII.    FORCE MAJEURE

12.1 Any delays in or failure of performance by either party under this Agreement will not constitute Breach hereunder or give rise to any claims for damages to the extent caused by occurrences beyond the foreseeable control of the affected party, and which could not have been avoided by the affected party's reasonable best efforts, including but not limited to, acts of governmental  authority, acts of God, strikes or other concerted acts of  workers, fires, explosions, riots, wars, rebellions and sabotage.

12.2 Resumption of Work will be covered as under Article 11.5.

12.3 For events of Force Majeure lasting more than fifteen (15) continuous days, HOVENSA and CONTRACTOR will negotiate in good faith an adjustment to the Project Schedule (with associated relief for liquidated damages) and the Contract Price for the additional costs reasonably incurred by CONTRACTOR as a direct result of the event of Force Majeure.

XIII.    OWNERSHIP OF MATERIALS AND EQUIPMENT

13.1    All materials, equipment, tools and other articles of a tangible nature required by CONTRACTOR in connection with the Work, including rights thereto or to services paid by CONTRACTOR, the cost or expense of which is reimbursable to CONTRACTOR, excluding items rented from or by CONTRACTOR or provided under the Billing Rate and Fee, will be requisitioned and purchased by CONTRACTOR and become the property of HOVENSA.

XIV.    <u>ASSIGNMENT</u>

14.1 The rights and obligations under this Agreement  are not assignable by either party without the written consent of the other party (except that such rights and obligations may be assigned without such consent to the successor of either party or to a person, firm or corporation acquiring all or substantially all of the business and assets of such party).  No assignments  of the rights and obligation of a party to this Agreement will be valid unless such rights and obligations are assumed by the assignee.  When assigned in accordance with the foregoing, the rights and obligations of a party to this Agreement will be binding upon and be for the benefit of the assignee, but the assignor will remain liable to the other party for its obligations under this Agreement.

XV.    <u>AUDIT</u>

15.1 CONTRACTOR and CONTRACTOR's subcontractor's will permit HOVENSA or its agents or representatives, without undue delay, to have access at reasonable times to review and audit all records and accounts necessary to ensure and validate CONTRACTOR's compliance with this Agreement.  Reviews and audits may be made within two years of last invoice.

15.2 CONTRACTOR will require, in contracts with any subcontractors who perform services in connection with this Agreement, that HOVENSA or its agents or representatives, without undue delay, will have access to review and audit all subcontractor's records and accounts necessary to ensure and validate compliance with

24

this Agreement. Subcontractor reviews and audits may be made within two years of last invoice.

XVI.    WAIVER

16.1 A waiver on the part of HOVENSA or CONTRACTOR of any term or breach of this Agreement will not constitute a precedent nor bind either party to a subsequent waiver of any succeeding term or breach.

XVII.    ENTIRETY OF AGREEMENT

17.1 This Agreement, including the Appendices and other documents incorporated by reference is the entire agreement between HOVENSA and CONTRACTOR regarding the matters covered herein and there are no other agreements, representations or obligations for the services described herein.

XVIII.    SECRECY AND PUBLICITY

18.1 CONTRACTOR will not, without written approval of HOVENSA, give any publicity pertaining to the Facilities nor divulge to any third parties any details pertaining to the Work or any of HOVENSA's facilities except as absolutely necessary for the due performance of the Work.

XIX.    CONFLICT OF INTEREST

19.1 CONTRACTOR acknowledges that HOVENSA has issued a policy relating to conflicts of interest between HOVENSA and its employees, a copy of which is attached as Appendix AA. In order to assure compliance with this policy, CONTRACTOR will not, before, during or after performance of the Work, make, offer, provide or agree to make, offer or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value to (i) any employee, agent or representative of HOVENSA, (ii) any member of their immediate families, or (iii) anyone claiming to act or acting for or in behalf of any such person, nor will CONTRACTOR permit any person described in (i), (ii) or (iii) above, to have any

25

financial or economic interest in CONTRACTOR or any subsidiary or affiliate of CONTRACTOR.  If CONTRACTOR is requested to make or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value, by any person described in (i), (ii) or (iii) above, CONTRACTOR will report the request immediately to HOVENSA in the manner provided for the giving of notice under this Agreement.  The failure by CONTRACTOR to adhere strictly to the provisions of this Article will be deemed by CONTRACTOR and HOVENSA to be a substantial and material breach of this Agreement, and at HOVENSA's sole option will be grounds for immediate suspension or termination, by reason of Breach, of this Agreement.  All subcontracts or material supply contracts permitted or required in connection with performance of the Work will contain provisions in substantially the same form and substance as this Article binding the subcontractors or material suppliers to the same obligations hereunder as CONTRACTOR.

XX.    SUBCONTRACTS AND DELEGATION

20.1 CONTRACTOR will not subcontract or delegate any of its obligations under this Agreement without the written consent of HOVENSA.  HOVENSA's approval of any subcontract will not relieve CONTRACTOR of any of its obligations under this Agreement.  CONTRACTOR will, for the protection of HOVENSA, demand warranties from all subcontractors with respect to services performed.  These warranties will be made available to HOVENSA to the full extent of the terms thereof and will extend for a minimum of twelve (12) months after services have been performed and accepted or for such other period of time as may be obtainable from such subcontractors.  This provision will not affect CONTRACTOR's other obligations hereunder.

XXI.    AS-BUILT DRAWINGS

21.1 CONTRACTOR will, during the course of construction of the Facilities, produce originals of  "as-built" drawings to show the condition of the Facilities after the

26

completion of the Work.  The "as-built" drawings required by HOVENSA are listed in Appendix A.

XXII.   <u>NOTICES</u>

22.1 All notices will be sent by facsimile and by Certified Mail, Return Receipt Requested or recognized overnight carrier.

22.2 All notices and communications required to be given CONTRACTOR will be in duplicate, the original addressed to:

(CONTRACTOR TO ADVISE)

27

22.3  All notices and communications required to be given to HOVENSA will be addressed to:

Project Manager – (PROJECT NAME)

     1 Estate Hope

     Christiansted, U.S. Virgin Islands 00820-5652

     Facsimile No.

and a copy to:

     Vice President and Chief Administrative Officer

     1 Estate Hope

     Christiansted, U.S. Virgin Islands 00820-5652

     Facsimile No.:

and a copy to:

     Director, Administrative Services

     1 Estate Hope

     Christiansted, U.S. Virgin Islands 00820-5652

     Facsimile No.:

and a copy to:

     PDVSA V.I., Inc.

     1A Frederiksberg Gade

     St. Thomas, U.S. Virgin Islands, 00802

     Facsimile No.

XXIII.  <u>LIENS</u>

23.1  CONTRACTOR will indemnify HOVENSA against the attachment of liens or encumbrances where CONTRACTOR has wrongfully failed to pay a vendor or subcontractor.

28

XXIV. GOVERNING LAW; DISPUTE RESOLUTION

    24.1 Governing Law - This agreement will be governed by and construed under the internal laws of the State of New York, U.S.A.

    24.2 Dispute Resolution.

    24.2.1 If there is a dispute between HOVENSA and CONTRACTOR on the application or interpretation of this Agreement, the aggrieved Party will promptly notify the other Party of its intent to invoke this dispute resolution procedure within ten (10) business days after the dispute arises. If the Parties fail to resolve the dispute within the ten (10) business days after delivery of the Notice, each Party will, within five (5) business days thereafter, nominate an officer of its management to meet at the Facility, or at any other agreed location, to resolve the dispute. If the Parties are unable to resolve the dispute to their satisfaction within ten (10) business days after the nomination, each Party, without further delay, will have the right to submit the dispute to arbitration for settlement. The arbitration will be conducted in the City of New York, State of New York, United States of America, in the English language in accordance with the rules of procedure of the American Arbitration Association (the "AAA"). Each party will nominate within thirty (30) days of the commencement of proceedings one arbitrator. If any Party fails to nominate an arbitrator within the stated time period, the AAA will appoint an arbitrator for the Party. The two arbitrators nominated by the Parties or appointed by the AAA for any Party will jointly nominate a third arbitrator, who will chair the arbitration panel. If the arbitrators nominated by the Parties do not succeed in nominating a third arbitrator within ten (10) days, the arbitrator will be appointed by the AAA. The award of the arbitral tribunal will be final and binding upon the Parties. Any arbitration will be "baseball" type arbitration. Judgment on the award rendered may be entered in either the state or federal courts of New York or any other court having jurisdiction, or application may be made to such court for judicial acceptance of the

award or order of enforcement. The dispute resolution procedures set forth in this Section will be the sole and exclusive dispute resolution procedures available to the Parties under this Agreement.

24.2.2 The Parties hereby irrevocably consent to personal jurisdiction in the State of New York and waive any objection to the venue in the courts of the State of New York, County of New York or the U.S. District Court for the Southern District of New York.

24.2.3 CONTRACTOR will cause a provision substantively the same as this Section 24.2 to be included in any contract between CONTRACTOR and any subcontractor to ensure that all disputes arising out of the performance of the Work, or any portion thereof, are subject, to the fullest extent possible, to the dispute resolution procedures set forth in Section 24.2.1 and 24.2.2.

## XXV. NON-COLLUSIVE BIDDING

25.1 If this Agreement was awarded on the basis of competitive bidding, CONTRACTOR warrants that it has not consulted with any other contractor or person who has bid on the Work and that its bid was arrived at independently of any discussions or collusion with others.

## XXVI. EQUAL OPPORTUNITY

26.1.    Non-Discrimination in Employment - CONTRACTOR will comply with the equal opportunity clause published in the regulations of the U.S. Department of Labor implementing Executive Order 11246, which is incorporated in this Agreement by reference.

26.2.    Affirmative Action for Handicapped Workers - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503 of the Rehabilitation Act of 1973, Public Law 93-112, as amended, which are incorporated in this Agreement by reference.

26.3    Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503, Title V of the Vietnam Era Veteran's Readjustment Assistance Act of 1972, Public Law 92-540, as amended, and Executive Order 11701, which are incorporated in this Agreement by reference.

26.4.    Certification of Nonsegregated Facilities - CONTRACTOR certifies that it does not and will not maintain any facilities it provides for its employees in a manner which will result in segregation on the basis of race, color, religion, sex or national origin, or permit its employees to perform their services at any location, under its control, where segregated facilities are maintained; and that it will obtain a similar certification prior to the award of any non-exempt subcontract.

26.5.    Minority Business Enterprises - CONTRACTOR will comply with the minority business enterprise clauses and regulations published by the U.S. Department of Commerce implementing Executive Order 11625, which are incorporated in this Agreement by reference.

XXVII.    AMENDMENTS

27. No amendments to this Agreement will be enforceable against either party unless in writing and signed by the parties

XXVIII.    WITHHOLDING TAX.

28. The laws of the U.S. Virgin Islands require HOVENSA to withhold from contractors who are foreign (non USVI) corporations, an income tax of 11% from all payments made by HOVENSA for services performed by CONTRACTOR in the USVI. For all other foreign (non-USVI) entities and non-resident aliens, the withholding tax rate is 10%. Payments made to U. S. citizens or for services rendered outside the USVI, are not subject to withholding. Unless CONTRACTOR has provided HOVENSA with a copy of CONTRACTOR's USVI business license, and an IRS form W-8ECI, as proof that

31

CONTRACTOR is exempt from the income tax withholding for payments otherwise subject to withholding, HOVENSA will withhold and pay the requisite amounts to the USVI Bureau of Internal Revenue.

IN WITNESS WHEREOF, this Agreement and the attached appendices have been reviewed by agents of both parties and this Agreement is executed, stamped with Corporate Seals and delivered, by the authorized officials of each corporation.

ATTEST:                                    HOVENSA L.L.C.

_____                              By

ATTEST:

_____                              By

32

EXHIBIT 3

*Construction Contract*

# APPENDIX Q
# PARENT GUARANTY AGREEMENT

### GUARANTY AGREEMENT

   **GUARANTY AGREEMENT** (the "Guaranty") dated [Month, Date], 2004, by CONTRACTOR PARENT, a _____ corporation, with an office at _____, ("Guarantor"), for the benefit of HOVENSA L.L.C., a U.S. Virgin Islands limited liability company, with an office at #1 Estate Hope Christiansted, VI 00820 ("Owner").

### RECITALS:

A.    Guarantor is the parent company of _____ ("Contractor").

B.    Owner has entered into an agreement with Contractor dated _____ ("Agreement") for _____ at Owner's Refinery in St. Croix, USVI.

C.    As a condition to entering into the Agreement with Contractor, Owner requested Guarantor to provide a parent company guarantee of Contractor's performance under the Agreement.

D.    Guarantor is willing to enter into this Guaranty to satisfy Owner's request.

### THE PARTIES AGREE AS FOLLOWS:

1. Guarantor unconditionally and irrevocably guarantees to Owner that if Contractor fails to perform or observe the terms of the Agreement, Guarantor will immediately upon first demand in writing by Owner notifying Guarantor of Contractor's breach under the Agreement, perform or take such steps as are necessary to achieve performance or observance of these terms and will indemnify Owner against all losses, damages, claims and costs arising from the failure to the extent of Contractor's liability under the Agreement.

2. The liability of Guarantor will not be reduced or discharged by any alteration in the relationship between Contractor and Owner which has been consented to by Contractor in writing (with or without the knowledge or consent of Guarantor), or by any forbearance or indulgence by Owner towards Contractor or Guarantor whether as to payment, time, performance or otherwise.

3. Guarantor will make any payment due hereunder on first written demand without set-off or counterclaim and without any legal formality such as protest or notice being necessary, and waives all privileges or rights which it may have as a guarantor, including any right to require Owner to claim payment or to exhaust remedies against Contractor or any other person, but always to the extent Contractor has not cured its breach under the Agreement. Notwithstanding the above, Guarantor will have available to it, in any action or proceeding by Owner seeking performance of this Guaranty, or

Based upon GEPS Master Form APPX Q - PARENT GUARANTEE VER 2 JAN 30-05.DOC

Page 1 of 2

Rev 31 January, 2005

C:\Documents and Settings\cpatterson\Local Settings\Temporary Internet Files\OLK17\Appx Q - Parent Guarantee Ver 2 Jan 30-05.doc



damages for its non-performance, all defenses that Contractor would be able to raise in any action by Owner against Contractor seeking performance or damages for non-performance under the Agreement..

4.  The obligations of Guarantor will continue in effect after termination of the Agreement until all Contractor's obligations and liabilities under the Agreement have been discharged or have expired.

5.  This Guaranty will be binding on the successors and assigns of Guarantor and will extend to and inure for the benefit of the successors and permitted assignees of Owner.  Owner may assign or transfer all or any of its right, title and interest in this Guaranty upon such terms as Owner may think fit to any agent for any syndicate of banks and financial institutions providing credit and guaranty facilities to Owner in connection with the Agreement.  No person other than Owner or any permitted assignees is intended as a beneficiary of this Guaranty nor will any such person have any rights hereunder.  Guarantor may not otherwise assign or otherwise transfer any of its rights or obligations hereunder.

6.  If there is any claim under this Guaranty, Guarantor will be entitled to assert any defense, set-off or counterclaim that Contractor could assert had such claim been made directly against any person under the Agreement.

7.  This Guaranty will be governed by and construed in accordance with the laws of the State of New York, U.S.A.  Any dispute arising out of or in connection with this Guaranty will be settled in the same manner as in Article 24 [EP]/27 [C] of the [EP/C] Agreement."

     **IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above.

Based upon GEPS Master Form APPX Q - PARENT GUARANTEE VER 2 JAN 30-05.DOC
Page 2 of 2
Rev 31 January, 2005

C:\Documents and Settings\cpatterson\Local Settings\Temporary Internet Files\OLK17\Appx Q - Parent Guarantee Ver 2 Jan 30-05.doc



# APPENDIX Q
# PARENT GUARANTY AGREEMENT

### GUARANTY AGREEMENT

**GUARANTY AGREEMENT** (the "Guaranty") dated [Month, Date], 2004, by CONTRACTOR PARENT, a _____ corporation, with an office at _____, ("Guarantor"), for the benefit of HOVENSA L.L.C., a U.S. Virgin Islands limited liability company, with an office at #1 Estate Hope Christiansted, VI 00820 ("Owner").

### RECITALS:

A.       Guarantor is the parent company of _____ ("Contractor").

B.       Owner has entered into an agreement with Contractor dated _____ ("Agreement") for _____ at Owner's Refinery in St. Croix, USVI.

C.       As a condition to entering into the Agreement with Contractor, Owner requested Guarantor to provide a parent company guarantee of Contractor's performance under the Agreement.

D.       Guarantor is willing to enter into this Guaranty to satisfy Owner's request.

### THE PARTIES AGREE AS FOLLOWS:

1.  Guarantor unconditionally and irrevocably guarantees to Owner that if Contractor fails to perform or observe the terms of the Agreement, Guarantor will immediately upon first demand in writing by Owner notifying Guarantor of Contractor's breach under the Agreement, perform or take such steps as are necessary to achieve performance or observance of these terms and will indemnify Owner against all losses, damages, claims and costs arising from the failure to the extent of Contractor's liability under the Agreement.

2.  The liability of Guarantor will not be reduced or discharged by any alteration in the relationship between Contractor and Owner which has been consented to by Contractor in writing (with or without the knowledge or consent of Guarantor), or by any forbearance or indulgence by Owner towards Contractor or Guarantor whether as to payment, time, performance or otherwise.

3.  Guarantor will make any payment due hereunder on first written demand without set-off or counterclaim and without any legal formality such as protest or notice being necessary, and waives all privileges or rights which it may have as a guarantor, including any right to require Owner to claim payment or to exhaust remedies against Contractor or any other person, but always to the extent Contractor has not cured its breach under the Agreement. Notwithstanding the above, Guarantor will have available to it, in any action or proceeding by Owner seeking performance of this Guaranty, or

Based upon GEPS Master Form APPX Q - PARENT GUARANTEE VER 2 JAN 30-05.DOC
Page 1 of 2

Rev 31 January, 2005

C:\Documents and Settings\cpatterson\Local Settings\Temporary Internet Files\OLK17\Appx Q - Parent Guarantee Ver 2 Jan 30-05.doc

damages for its non-performance, all defenses that Contractor would be able to raise in any action by Owner against Contractor seeking performance or damages for non-performance under the Agreement..

4.  The obligations of Guarantor will continue in effect after termination of the Agreement until all Contractor's obligations and liabilities under the Agreement have been discharged or have expired.

5.  This Guaranty will be binding on the successors and assigns of Guarantor and will extend to and inure for the benefit of the successors and permitted assignees of Owner.  Owner may assign or transfer all or any of its right, title and interest in this Guaranty upon such terms as Owner may think fit to any agent for *any syndicate of banks and financial institutions providing credit and guaranty facilities to Owner in* connection with the Agreement.  No person other than Owner or any permitted assignees is intended as a beneficiary of this Guaranty nor will any such person have any rights hereunder.  Guarantor may not otherwise assign or otherwise transfer any of its rights or obligations hereunder.

6.  If there is any claim under this Guaranty, Guarantor will be entitled to assert any defense, *set-off or* counterclaim that Contractor could assert had such claim been made directly against any person under the Agreement.

7.  This Guaranty will be governed by and construed in accordance with the laws of the State of New York, U.S.A.  Any dispute arising out of or in connection with this Guaranty will be settled in the same manner as in Article 24 [EP]/27 [C] of the [EP/C] Agreement."

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first written above.

Based upon GEPS Master Form APPX Q - PARENT GUARANTEE VER 2 JAN 30-05.DOC
Page 2 of 2
Rev 31 January, 2005

C:\Documents and Settings\cpatterson\Local Settings\Temporary Internet Files\OLK17\Appx Q - Parent Guarantee Ver 2 Jan 30-05.doc

EXHIBIT 4

HOVENSA L.L.C.
Low Sulfur Fuels Project
APPENDIX AC – AGENCY AGREEMENT

## CONTRACT FORM OF AGREEMENT

| | | | |
|---|---|---|---|
| Contractor: | ABC Company | Contract No.: | ??? |
| Address: | | Work Location: | St. Croix, U.S. Virgin Islands |
| | | Issuing Office | XXX |
| Contact: | | Address: | |
| Telephone: | | | |
| Facsimile: | | Register No.: | |
| D-U-N-S No.: | | Commodity Code: | |

This Contract is effective as of the ?? day of ???, 2005, between HOVENSA L.L.C. (OWNER), acting through its agent XXX, Inc. (XXX) and the above named CONTRACTOR that all Work specified below, which is a portion of the goods and services to be provided by CONTRACTOR, and, in accordance with all the provisions, consisting of the following Contract Documents:

> Contract Form of Agreement
> Exhibit "A" General Conditions, dated:
> Exhibit "B" Special Conditions, dated:
> Exhibit "C" Quantities, Pricing and Data, dated:
> Exhibit "D" Scope of Work and Technical Specifications, dated:
> Exhibit "E" Drawings, dated:

1.  WORK TO BE PERFORMED: Except as specified elsewhere in the Contract, CONTRACTOR will furnish all plant; labor; materials; tools; supplies; equipment; transportation; supervision; technical, professional and other services; and will perform all operations necessary and required to satisfactorily:

    Brief job description here.

2.  SCHEDULE: The Work will be performed in accordance with the dates set forth in the Exhibit "B" clause titled "COMMENCEMENT, PROGRESS AND COMPLETION OF THE WORK."

3.  COMPENSATION: As full consideration for the satisfactory performance by CONTRACTOR of this Contract, OWNER will pay to CONTRACTOR compensation in accordance with the prices set forth in Exhibit "C" and the payment provisions of this Contract.



This Contract embodies the entire agreement between OWNER and CONTRACTOR and supersedes all other writings or oral understandings.  The parties will not be bound by or be liable for any statement, representation, promise, inducement or understanding not set forth herein.

OWNER:                                    CONTRACTOR:

HOVENSA L.L.C.
By: XYZ Company, Inc., Agent

Authorized                                Authorized
Signature: _____             Signature: _____

Print Name: _____            Print Name: _____

Print Title:                              Print Title: _____

EXHIBIT 5

**CONSTRUCTION AGREEMENT**

AGREEMENT dated March 10ᵗʰ, 2005, between HOVENSA L.L.C., a U.S. Virgin Islands limited liability company ("HOVENSA") and TPVI, a U.S. Virgin Islands corporation having an office at One Hibiscus Alley, Charlotte Amalie, St. Thomas, U.S. Virgin Islands ("CONTRACTOR").

**EXPLANATORY STATEMENT:**

A.  HOVENSA wishes to retain CONTRACTOR to perform Work in connection with the construction of a Low Sulfur Gasoline Hydrotreater and related facilities (the "Facilities") to be located at HOVENSA's petroleum refinery in St. Croix, U.S. Virgin Islands (the "Refinery"), as described in Appendix A attached.

B.  CONTRACTOR is willing to perform the Work on a lump sum basis under the terms of this Agreement.

THE PARTIES AGREE AS FOLLOWS:

I.    SCOPE

1.1    This Agreement consists of this document, the following documents which are attached and any other document which is incorporated in this Agreement by reference:

      1.1.1   Appendix A:   Scope of Work

      1.1.2   Appendix B:   Coordination Procedures

      1.1.3   Appendix C:   Engineering Standards

      1.1.4   Appendix D:   Compensation and Terms of Payment

           Exhibit 1: Terms of Payment

           Exhibit 2: Cash Flow Curves



Exhibit 3: Earned Value Matrix

Exhibit 4: Project Cost Breakdown

Exhibit 5: Letter of Credit

Exhibit 6: Contract Change Orders

Exhibit 7: Contractor Affidavit: Liens

1.1.5   Appendix E:   Project Schedule

Exhibit 1: Master Project Schedule

Exhibit 2: Tentative Refinery Turnaround Schedule

Exhibit 3: Refinery Holiday Schedule

1.1.6   Appendix F:   FEED Package

Exhibit 1: Process Description

Exhibit 2: Process Interlocks & Compressor Controls Summary

Exhibit 3: Equipment List

Exhibit 4: Material Selection Diagrams

Exhibit 5: Reactor Specifications & Drawings

Exhibit 6: EMRE / KBR BDS Package (2 volumes)

Exhibit 7: EMRE / KBR DBS Package (1 volume)

Exhibit 8: EMRE Design Notes (1 volume)

Exhibit 9: EMRE Design Review Milestones

Exhibit 10: P&IDs

Exhibit 11: Auxiliary Equipment Datasheets

Exhibit 12: Preliminary Electrical Load List

Exhibit 13: HVAC Pressurized Buildings Standard

Exhibit 14: Plot Plans & B.L. Piping Sketch

Exhibit 15 - EMRE/KBR Process Simulations

1.1.7   Appendix G:   Technical Questions and Answers

1.1.8   Appendix H:   Commercial Questions and Answers

1.1.9   Appendix I:   Items Provided by HOVENSA

1.1.10  Appendix J:   Performance Guarantees

1.1.11  Appendix K:   Schedule and Performance Liquidated Damages

1.1.12  Appendix L:   Construction Workforce

1.1.13  Appendix M:   Ocean Transportation Information

        Exhibit 1: Hovensa RO RO Dock Information

        Exhibit 2: Title to Materials

        Exhibit 3: Ocean Shipping Support Design for Major Equipment

        Exhibit 4: Freight Forwarders

        *Exhibit 5: Marine & Terminal Regulations*

1.1.14  Appendix N:   Statement Regarding Site Conditions

        Exhibit 1: MEC Topographical Map

        *Exhibit 2: Preliminary Geotechnical Investigation Report - URS*

1.1.15  Appendix O:   Radio Information

1.1.16  Appendix P:   Use of Non-Domestic Materials

1.1.17  Appendix Q:   Parent Guarantee Letter

1.1.18  Appendix R:   Approved Vendors List

1.1.19  Appendix S:   Equipment and Instrument Data Sheet Forms

1.1.20  Appendix T:   Mechanical Integrity Forms

1.1.21  Appendix U:   Deleted

1.1.22  Appendix V:   ASD Manual Table of Contents

1.1.23  Appendix W:   I&C Responsibility Matrix

1.1.24  Appendix X:   Mechanical Completion Checklist

1.1.25  Appendix Y:   PHA Guidance – Guidelines of Deviation

1.1.26  Appendix Z:   BEDD Sheets

1.1.27  Appendix AA   Intentionally Left Blank

1.1.29  Appendix AB   HOVENSA Standard Contract Attachments

1.1.29  Appendix AC: Agency Agreement

1.1.30  Appendix AD: Organizational Chart and Key Personnel Resumes

1.1.31  Appendix AE: Unit Rates for Reimbursable Work due to Variation

1.1.32  Appendix AF: Equipment Lease Agreement

    Exhibit 1: Sample Equipment Lease

    Exhibit 2: General Procedures For Using Equipment Lease Agreement

1.1.33  Appendix AG: Deleted

1.1.34  Appendix AH: Federal Contractor Certificate of Compliance

1.2    The services generally to be performed by CONTRACTOR under this Agreement (the "Work") are set forth in Appendix A.

1.3    The items generally to be provided by HOVENSA and others under this Agreement are set forth in Appendix I.

1.4    For any work in addition to that defined in this Agreement, HOVENSA will advise CONTRACTOR in writing of the extent of Work required.  HOVENSA may also direct CONTRACTOR in writing to perform sufficient conceptual engineering to define appropriately the scope of additional work.

1.5    If there is any conflict between the Articles of this Agreement and any of the Appendices, the Articles will control.  If there is any conflict between Appendices, it will be brought to HOVENSA's attention promptly and the more stringent requirement on CONTRACTOR will control, unless otherwise agreed.  If there is any conflict arising from any change in any Appendix, the Appendix of the latest date will control.

1.6    All parts of the Work reasonably inferred from and not expressly mentioned in Appendix A or included in Appendix I, will be performed as an obligation of CONTRACTOR under this Agreement and Appendix A.

II.    DEFINITION OF THE FACILITIES





2.1    The "Facility" or "Facilities" means the Low Sulfur Gasoline Hydrotreater and related facilities at HOVENSA's petroleum refining facility located at St. Croix, United States Virgin Islands (the "Refinery") as described in Appendix A.

III.    COORDINATION OF WORK

3.1    Administrative Procedures

3.1.1    CONTRACTOR acknowledges receipt of the HOVENSA Coordination Procedures, which are incorporated by reference, and the Table of Contents of which is attached as Appendix B, and CONTRACTOR will comply with the HOVENSA Coordination Procedures in performing the Work. If there is any conflict between any part of the Coordination Procedures and the Articles of this Agreement, the Articles will control. If there is any conflict within the Coordination Procedures or between the Coordination Procedures and any of the Appendices, it will be brought to HOVENSA's attention promptly and the more stringent requirement on CONTRACTOR will control, unless otherwise agreed. HOVENSA reserves the right to issue additions to, or revisions of, the HOVENSA Coordination Procedures in writing at any time during the course of the Work; provided that, if the additions or revisions would increase or decrease the cost of or time required for CONTRACTOR to perform the Work, this Agreement will be modified accordingly, pursuant to Article X.

3.2    Engineering Standards

3.2.1 CONTRACTOR acknowledges receipt of the HOVENSA Engineering Standards which are incorporated by reference, and the Table of Contents of which is attached as Appendix C (the "Standards"), which contain HOVENSA's design and construction criteria and CONTRACTOR will perform the Work in accordance with the Standards. If there is any conflict between any part of the Standards and the Articles of this Agreement, the Articles will control. If there is any conflict within the Standards or between the Standards and any of the Appendices, it will be brought to HOVENSA's attention promptly and the more stringent requirement on CONTRACTOR will control, unless otherwise agreed. HOVENSA reserves the right to issue additions to or revisions of the Standards during the




course of the Work, and will handle these additions or revisions in accordance with the HOVENSA

Coordination Procedures, provided that if the additions or revisions would materially increase or

decrease the cost of or time required for CONTRACTOR to perform the Work or otherwise materially

affect CONTRACTOR'S obligations, this Agreement will be modified accordingly pursuant to Article X.

    3.3    Proprietary Information

    3.3.1  CONTRACTOR agrees that all information supplied to it by HOVENSA is

proprietary and CONTRACTOR will not use or disclose to others any such information without

HOVENSA's written consent except as may be necessary to perform the Work, provided that for

purposes of use by CONTRACTOR proprietary information will not include the following:

    3.3.1.1    information which, at the time of disclosure to CONTRACTOR is in the

public domain;

    3.3.1.2    information which, after disclosure to CONTRACTOR, enters the public

domain;

    3.3.1.3    information which, prior to disclosure to CONTRACTOR, was already in

CONTRACTOR's possession and was not acquired from HOVENSA;

    3.3.1.4    information that, subsequent to disclosure to CONTRACTOR is obtained

by CONTRACTOR from a third party who has the right to disclose such information without binder of

secrecy.

    Notwithstanding the foregoing, no information supplied to CONTRACTOR by HOVENSA

will be disclosed to others even if it falls within one of the exceptions to the definition of proprietary

information listed above.

    3.3.2    Any agreements or representations between CONTRACTOR and

HOVENSA entered into prior to the effective date hereof relating to secrecy or confidentiality of

information will survive the signing of this Agreement or any completion of the Work, or any other

termination or cancellation of this Agreement, each in accordance with the terms of the other

agreement or representation.

    3.4    Personnel, Independent Contractor





3.4.1   CONTRACTOR warrants that it will employ properly qualified, and where appropriate, properly licensed or certified personnel necessary to perform the Work.

3.4.2   In performing the Work, CONTRACTOR is acting as an independent contractor and reserves the right to hire or discharge employees, designate the classification and hours of work for each employee and to supervise and control the manner of performance of the Work.

3.4.3   Prior to assigning personnel to the Work, CONTRACTOR will submit for HOVENSA's review the names and work experience of, and licenses or certificates held by, personnel nominated to fill key Work positions, including Construction Manager or HSE Manager.  Personnel will not be assigned to or removed from these key positions without sufficient notification to HOVENSA. The fact that such notification is required will not affect CONTRACTOR's status as an independent contractor under this Agreement.

3.4.4   CONTRACTOR will furnish HOVENSA with an electronic and hard copy weekly manning curve by craft.  The form of the breakdown will be acceptable to HOVENSA.

3.4.5   CONTRACTOR will employ a competent Construction Manager at the project site during the progress of the Work.  The Construction Manager will at all times be satisfactory to HOVENSA.

3.4.6   CONTRACTOR will employ an ample work force of qualified personnel and properly schedule the Work to maintain the rate of progress required to meet the scheduled completion *dates in accordance with the Master Project Schedule Appendix E.* Each Monday, CONTRACTOR will provide a weekly progress report in a form acceptable to HOVENSA that relates to the prior week.  If CONTRACTOR fails to maintain a rate of progress satisfactory to HOVENSA and that jeopardizes the achievement of the Mechanical Completion date as defined in Appendix E, CONTRACTOR will place additional personnel on the Work, *increase the work day or work week duration, expedite materials and equipment and / or* reorganize work methods in order that the progress of Work be brought up to and maintained at the required rate of progress, all without additional cost to HOVENSA.



3.4.7    CONTRACTOR will ensure that labor employed by it and its subcontractors on the premises of HOVENSA comply with HOVENSA's Workplace Violence Policy. To insure the safety of all those in the facility, CONTRACTOR must establish and enforce safety, security and personnel conduct regulations that are not inconsistent with HOVENSA's guidelines. CONTRACTOR will submit its policies to HOVENSA prior to the start of Work. CONTRACTOR must establish similar guidelines for its subcontractors and monitor their compliance. Further, CONTRACTOR and HOVENSA will use all reasonable efforts to prevent labor disputes that may interfere with construction of the Facilities and will promptly take all reasonable steps that may be available in connection with the resolution of violations of collective bargaining agreements and jurisdictional disputes, subject to Article 13. CONTRACTOR will promptly advise HOVENSA if there is any dispute.

3.4.8 In the performance of the Work, CONTRACTOR will, to the fullest extent practicable and consistent with applicable law, employ and promote qualified Virgin Islands residents for positions at all levels within CONTRACTOR's organization, regardless of age, race, creed, color, sex, national origin or ancestry. CONTRACTOR will comply with all laws requiring registration of job vacancies with the Virgin Islands Department of Labor. If CONTRACTOR reasonably determines that it is unable to locate sufficient qualified construction labor from the Virgin Islands and, as a result, if CONTRACTOR necessarily resorts to recruiting labor from off-island, from the continental United States or elsewhere, CONTRACTOR will so advise HOVENSA in writing. CONTRACTOR will ensure that these same obligations apply to its subcontractors.

3.5    Warranties

3.5.1   Workmanship.

3.5.1.1 CONTRACTOR warrants that the Facilities will be constructed in a competent, efficient and workerlike manner using new and first class materials following current state of the art, where practicable, petroleum refinery construction practice and in accordance with the plans and specifications provided by HOVENSA and in accordance with the standards of care and diligence normally practiced by recognized construction firms. CONTRACTOR recognizes that the soil conditions at the Facility site, as reflected in this Agreement, require special considerations and has

represented its Work will take into account and address these conditions. Accordingly, CONTRACTOR warrants that the foundation and structural work will be performed in accordance with the standards of care and diligence normally practiced by recognized construction firms in performing services of a similar nature and will be free of defects, except to the extent caused by force majeure or due to soil or subsoil conditions found to be different from those described in Appendix N, Exhibit 2, within the parameters set by the Engineering Standards in Appendix C ("Structural Warranty"). CONTRACTOR warrants the Work against defects and will promptly correct, repair or replace, at its expense, any field workmanship which is defective or does not conform to the final plans and specifications of the Work ("Defective Work") within twelve (12) months following **Final Acceptance of Performance Testing** (as defined in Article 11.0 of Appendix B) or eighteen (18) months after Mechanical Completion (as defined in Appendix A), whichever occurs first (the "Warranty Period"). If HOVENSA believes that Defective Work has arisen, HOVENSA will notify CONTRACTOR in writing of the Defective Work describing the non-conformance. Expenditures for construction labor and materials will be borne by CONTRACTOR. CONTRACTOR will not be obligated to perform remedial services for Work which becomes Defective Work as a result of (i) ordinary wear and tear, (ii) improper operation or maintenance of the Facilities by HOVENSA, (iii) normal wear and tear, (iv) normal corrosion or erosion, provided CONTRACTOR complies with all requirements of the Work, or (v) defective materials or equipment not supplied by CONTRACTOR or CONTRACTOR's subcontractors, vendors or suppliers, whether arising in contract, tort (including negligence) or otherwise. CONTRACTOR will be obligated to provide, as a remedial obligation, any additional miscellaneous bracing of piping, structures or equipment that may be required after start-up of the Facilities to control vibration.

3.5.1.2 If any of the warranties in Section 3.5 is breached, CONTRACTOR will repair, replace, and/or correct the applicable portion of the Work, as required, immediately or on an expedited basis such that it meets the requirements of this Agreement, at no cost to HOVENSA. CONTRACTOR will provide construction services to begin corrective action on the affected portion of the Work as soon as reasonably possible after receipt by CONTRACTOR of HOVENSA's notice referred to above, and will submit its plan of action to HOVENSA not later than thirty-six hours after receipt of the notice.

CONTRACTOR will, at its sole expense, disassemble, remove, replace and reinstall the Defective Work to the extent necessary, while minimizing the downtime to HOVENSA, for CONTRACTOR to perform its warranty obligations. CONTRACTOR will use all reasonable efforts to remedy any failure or breach so as to avoid disruption of HOVENSA's operations. HOVENSA will provide CONTRACTOR with access to the Facility to perform its warranty obligations under this Agreement, so long as such access does not unreasonably interfere with operation of the Facility. CONTRACTOR's obligations under this Article 3.5 are collectively called the "Repairs."

3.5.1.3 All responsibility for pursuing Contractor's subcontractors or sub-vendors for support will remain with Contractor, as well as providing whatever is needed in addition to the subcontractor's or sub-vendors' material/equipment warranty to ensure that the Repairs are made at no charge to HOVENSA.

3.5.1.4 HOVENSA will provide CONTRACTOR's representatives necessary access to the Facility for the purpose of observing the operation and maintenance thereof upon reasonable notice during times agreed by HOVENSA and CONTRACTOR.

3.5.2    Construction Mechanical Equipment and Material Warranty.

3.5.2.1    All construction equipment and construction material furnished by CONTRACTOR and incorporated in the Work will be new unless otherwise agreed to by HOVENSA in writing. CONTRACTOR will purchase construction material and construction equipment in accordance with approved specifications. CONTRACTOR will purchase all miscellaneous bulk items.

3.5.2.2 Deleted.

3.5.2.3 CONTRACTOR will pursue recourse against vendors and suppliers for faulty or defective material or equipment.

3.5.3    The warranties and remedies for breach of warranty in this Agreement are the exclusive warranties and remedies by CONTRACTOR applicable to the Work and are in lieu of any other warranties, express or implied, whether under this Agreement, at law or otherwise. HOVENSA expressly disclaims other guarantees or warranties of any kind or description, whether express or





implied, and whether arising under law or equity or trade custom, including warranties of merchantability and fitness for a particular purpose.

3.6    Inspection and Rejection of Materials and Workmanship.

3.6.1   The Work performed, including materials and workmanship, is subject to inspection and test by HOVENSA at any reasonable time, at any place where the manufacture or performance will be carried on. HOVENSA has the right to review the progress of CONTRACTOR's work. Advance notice of readiness for inspection will be given as specified in the Agreement or otherwise not fewer than two (2) or more than four (4) working days. HOVENSA's failure to make inspection or test or to discover defects or to object thereto will not prejudice or operate as a release or waiver of the rights of HOVENSA including the right to inspect or reject at a later time, nor will it release CONTRACTOR. Unless otherwise specified herein, CONTRACTOR will furnish at such facilities that which may be necessary for the making of the inspection and tests.

3.6.2   Surplus Materials, Tools and Equipment. Surplus materials, tools and equipment will be inventoried by CONTRACTOR at the completion of the Work and removed in accordance with HOVENSA's written instructions. All of CONTRACTOR's and its subcontractors' temporary construction buildings will be removed, as directed by HOVENSA in writing, by CONTRACTOR or its subcontractors upon completion of Work.

3.6.3   CONTRACTOR has inspected the Facilities' site and soil conditions, and it has the skills necessary to perform the Work hereunder, has reasonable knowledge of the labor and skilled craftspersons supply in the area, and will make all reasonable efforts to obtain sufficient labor to perform the Work within the schedule dates referred to herein. Initially, CONTRACTOR will be entitled to rely upon information and data on soil and subsoil communicated by HOVENSA in writing and contained in this Agreement. Contractor's price and schedule are based on this information. Subsequent to the signing of this Agreement, CONTRACTOR will perform its own soil and subsoil testing as soon as possible but not later than thirty (30) days from the date HOVENSA makes the area available, and will inform HOVENSA of the results of said testing and survey. If the results of said testing and survey reveal discrepancies or contradictions with information and data on soil and subsoil

11



as contained in this Agreement or show unexpected site conditions having an impact on either the price or the schedule conditions as agreed under the Agreement, then CONTRACTOR will be entitled to a Change Order for a corresponding adjustment in the compensation and/or the Project Schedule. At the time of performing the Work on Facilities site, if CONTRACTOR encounters underground obstructions or hindrances not shown on or inaccurately described in said drawings, plans or specifications, limited to pipes, conduits, cables and sewers, CONTRACTOR will be entitled to a corresponding Change Order as per Article XIII.

    3.6.4  <u>CONTRACTOR's Organization</u>. Attached as Appendix AD are organization charts showing lines of authority and communications for CONTRACTOR's employees who will be engaged in the Work.

IV.   <u>OBLIGATIONS OF CONTRACTOR</u>

   4.1  <u>General</u>

    4.1.1  The Work will be executed as expeditiously as possible so that Mechanical Completion is achieved in accordance with the Project Schedule. HOVENSA will make the FACILITY available to CONTRACTOR for performance of the WORK twenty four (24) hours a day; seven (7) days a week. CONTRACTOR will establish consistent work week, work day schedules and notify HOVENSA forty eight (48) hours in advance of any necessary adjustments in CONTRACTOR's Work schedule in order that the necessary support services may be provided. Labor rates for stand-by time when specifically ordered by Owner will be at the rate set forth in Appendix AE. Work stoppages of fewer than 60 minutes will not reimbursed.

    4.1.2  All construction will proceed in a neat and workerlike manner. The premises will be maintained by CONTRACTOR in a safe and orderly condition throughout the performance of the Work and, at the completion thereof, will be left in a safe, neat and orderly condition.

    4.1.3  Subject to Appendix I, CONTRACTOR will furnish all labor, machinery, material, consumables, equipment, tools (marked conspicuously), supplies, fuel, transportation, and do everything necessary to complete the Work in accordance with this Agreement.

    4.1.4  Notwithstanding any plans or specifications, CONTRACTOR is responsible for joint and timely inspection, together with HOVENSA, of any work at the site done by others which may affect the Work or to which the Work must be joined, to reasonably ascertain its suitability for use in relation to





the Work and will immediately agree with HOVENSA on what measures should be taken for the purpose of correction of any deficiencies therein. HOVENSA will then have a reasonable time to have such deficiencies corrected, if the correction is HOVENSA's responsibility.

4.1.5    CONTRACTOR's Project Completion schedule is attached as Appendix E. CONTRACTOR may not change the Schedule without HOVENSA's written approval. CONTRACTOR will promptly advise HOVENSA, in writing, of any anticipated deviations from the Schedule. Changes in the Work that do not affect the critical path will not be the basis for a Change in the Project Schedule.

4.1.6    CONTRACTOR will perform the Work in accordance with the Project Schedule as per Appendix E to this Agreement and will be responsible for delays caused by CONTRACTOR to the sole extent of the remedies as provided for under Appendix K.

4.2    Special Conditions for Field Erection

4.2.1    CONTRACTOR will obtain HOVENSA's written approval for type, size and location of any temporary buildings, parking facilities and service storage areas. CONTRACTOR will remove all temporary construction buildings and equipment on completion of the Work unless otherwise instructed in writing by HOVENSA. CONTRACTOR will return the site areas occupied by those temporary facilities to the same condition as they were in when turned over to CONTRACTOR by HOVENSA.

4.2.2    Always subject to Article 3.6.3, CONTRACTOR will notify HOVENSA promptly in writing when it becomes aware of any latent physical conditions at the site differing materially from those in existence upon inspection of the site by CONTRACTOR.

4.2.3    No form of advertising not required by law will be permitted at the Work Site, nor will photographs of the Refinery or Work Site be permitted without written approval of HOVENSA.

4.2.4    CONTRACTOR will be responsible for requiring each employee to display identification as may be required by HOVENSA. All prescribed identification will be immediately delivered to HOVENSA for cancellation upon termination of any employee.

4.2.5    CONTRACTOR will provide HOVENSA with a daily list of personnel and equipment authorized to enter HOVENSA's property for Work reasons.



4.2.6  No visitors to the site will be permitted without written approval by HOVENSA.

4.2.7  If the HOVENSA Fire Department responds more than twice to an alarm which, in HOVENSA's reasonable judgment, was necessitated as a result of CONTRACTOR's negligence in the performance of the Work, CONTRACTOR will pay HOVENSA an Emergency Response Fee of $15,000.00. The fee will be imposed each time the HOVENSA Fire Department responds to such an alarm. The cost for any Emergency Response Fee will be either re-billed to CONTRACTOR or deducted from HOVENSA's payment to CONTRACTOR.

4.3  Compliance with Law, Permits and Regulations

4.3.1  CONTRACTOR will comply with all United States federal, state, U.S. Virgin Islands or other laws, regulations, ordinances or rules that pertain to the Work and HOVENSA will not be liable for, and CONTRACTOR will defend and indemnify HOVENSA against, any violation by CONTRACTOR of any laws, regulations, ordinances or rules. The Compensation and/or Project Schedule will be adjusted by a Change Order as per Article XIII as a result of the execution of any new law or regulation or of any change in existing laws and regulations as stated herein above or as a result of any binding change in the interpretation of any applicable said law or regulation of any United States federal, state or local U.S. Virgin Islands authority having jurisdiction over the Agreement and the Work, which occurs after December 9, 2004, (and which will be deemed to include any change in the interpretation or application, including how customs duties are handled, by competent authorities).

4.3.2  CONTRACTOR certifies compliance with the Fair Labor Standards Act of 1938, as amended, and all invoices will so certify. Except as otherwise specified, HOVENSA will secure and pay for the building permit and all licenses and easements for permanent structures. All other necessary permits required for prosecution of the Work will be obtained by CONTRACTOR and be in the name of HOVENSA, where possible.

4.4  Safety

4.4.1 CONTRACTOR will comply with all Federal OSHA, EPA, State, and Territorial laws and regulations as these pertain to CONTRACTOR's responsibilities (including OSHA Hazard Communication Standard, 29 C.F.R. §1910.1200, OSHA Process Safety Management Standard, 29



C.F.R. §1910.119, and EPA Risk Management Program, 40 C.F.R. §168) as well as with HOVENSA's Safety Guidelines and Requirements for Contractors (the "Guidelines"), Exhibit 12, for safety, health and fire protection. Prior to commencing the Work, CONTRACTOR is responsible for becoming acquainted with safety and health laws and regulations, HOVENSA's Guidelines, equipment manufacturers' guidelines for safe use and operation of equipment, and any additional safety requirements which may be necessary to complete the work safely. CONTRACTOR will take all necessary precautions to keep the Work Site free from recognized hazards that are likely to cause injury, death, illness, or damage to property. CONTRACTOR is responsible for preparation, administration, and compliance with its own safety procedures which must be designed to be in compliance with the above. It is a requirement that CONTRACTOR adhere to HOVENSA's established safe work practices, which require strict adherence to OSHA's PSM Standard and the EPA's Risk Management Program by all contractors.

4.4.2   In accordance with OSHA's PSM Standard and the EPA's Risk Management Program, to ensure that employees can perform their job tasks in a safe manner, CONTRACTOR must adhere to HOVENSA's written procedures, as received from HOVENSA on or about execution of the Agreement, to maintain the ongoing integrity of process equipment, and must train each employee in the work practices necessary to safely perform his/her job. CONTRACTOR must assure that employees are instructed in: (a) the known and potential hazards of the job, (b) the processes, (c) the known and potential hazards of the processes, (d) maintaining the ongoing integrity of the process equipment, and (e) the applicable provisions of the emergency action plan.

4.4.3   CONTRACTOR must document that each employee has received the required training, and must have evidence that the employee has understood it. This information must be maintained as a record, and must include the employee's name, date of training, and the means used to verify that the employee understood the training.

4.5    Services

4.5.1   As defined in Appendix A, CONTRACTOR will provide all construction services, including but not limited to project management services, field construction management, construction

planning and scheduling, construction cost monitoring and control, supply of direct hire field labor, supervision of direct hire and subcontract field labor, supply of construction equipment, small tools, consumables, temporary and field office facilities, first aid services, preparation of field purchase requisitions, coordination and integration with engineering, field inspection and testing, coordination with vendors' service representatives, cost estimating, receipt, storage, care, and inventory maintenance of project materials, all as necessary to perform the Work and as authorized by HOVENSA, and exclusive of those services and equipment defined as furnished by HOVENSA

4.5.2   CONTRACTOR will provide subcontract administration services including bid package preparation, solicitation, analysis, conditioning, award, and supervision of those portions of the Work that are to be subcontracted.

4.6   Assessments

4.6.1   CONTRACTOR will pay all U. S. federal, state and locally imposed contributions, assessments and taxes that are based upon the wages or other remuneration paid to persons employed by CONTRACTOR on the Work.

4.7   Pollution Abatement and Noise

4.7.1   CONTRACTOR will perform the Work so it will comply with all environmental laws, orders, rules, regulations and permits currently in effect or proposed in an official register.

4.7.2   CONTRACTOR's design and individual items of equipment, and piping connected to the equipment, will comply with United States federal noise intensity restrictions.

4.8   Engineering Services - HOVENSA will provide all engineering and procurement Work directly or through an engineer of its choice (the "Engineer"). CONTRACTOR will cooperate and coordinate with Engineer as required. CONTRACTOR and Engineer are affiliated companies and CONTRACTOR will not use any delays or any action or inaction by Engineer to excuse any breach or nonperformance, including delay, by CONTRACTOR under this Agreement. CONTRACTOR will be responsible for payment of any additional costs incurred by HOVENSA as a result of any delays caused by CONTRACTOR.





16

4.9    Cooperation in Financing  CONTRACTOR will furnish information, consents, certificates, opinions of counsel, and other documents or assistance-related to CONTRACTOR's corporate authorization to undertake the obligations in this Agreement as may be reasonably requested by any lender for its sole use for the financing of the Facility and will be compensated by HOVENSA on a reimbursable basis for any related costs and expenses, if any, relating to such assistance. The parties agree to negotiate in good faith concerning any reasonable amendment or addition to this Agreement required by any lender.

4.10    Duty of Care and Custody in the Work and the Facilities.

CONTRACTOR will have care, custody and control of all materials and equipment furnished by it and for all materials and equipment delivered to it by HOVENSA which are to be incorporated in the Work and the Facilities and for all Work completed or in progress until the earlier of Mechanical Completion or delivery of the Facilities to Company pursuant to the terms of this Agreement, at which time risk of loss will pass to HOVENSA. In the event of loss or damage to the Work or the Facilities before such time and unless caused either by a Force Majeure event, HOVENSA or any HOVENSA's other contractor(s), CONTRACTOR will repair or replace the lost or damaged items at its sole cost.

V.    Completion of Construction

5.1    The Work will be installed and will be mechanically completed in accordance with Appendix A, Appendix B and Appendix E and in compliance with the Process Safety Management requirements of Appendix Y.

VI.    HOVENSA's OBLIGATIONS

6.1 HOVENSA's obligations are set out in Appendix I; Items Provided by HOVENSA.

VII.    INDEMNITY; INSURANCE REQUIREMENTS

7.1.1    CONTRACTOR will defend, indemnify and release HOVENSA and its members, affiliates, successors and assigns and their parents, subsidiaries and affiliates (collectively called "Indemnified Parties"), up to the gross sum of the first $10,000,000 for each occurrence and a total of $20,000,000 in the aggregate, against all claims, causes of action, damages, liabilities, attorneys' fees and related expenses (herein "Claims") which the Indemnified Parties may suffer or for which the

17

Indemnified Parties may be liable, by reason of actual or claimed injury (including death) to any person, or actual or claimed physical damage to any property (including the Facilities), directly or indirectly caused or contributed to, or claimed to be caused or contributed to by reason of any act, omission or negligence, including strict liability, whether active or passive, of CONTRACTOR, its employees or its subcontractors, or of anyone for whose acts they are liable, or of anyone acting under their direction or control, or in connection with, or incident to, performance of this Contract, unless caused by the sole negligence or sole willful misconduct of the Indemnified Parties.  CONTRACTOR will do this notwithstanding the Virgin Islands Comparative Negligence Statute, Title 5 V.I.C. Section 1451.  In all cases covered hereunder, CONTRACTOR will initially defend the Indemnified Parties until it is judicially determined that any liability was caused by the sole negligence or sole willful misconduct of the Indemnified Parties exclusive of any fault of the plaintiff, plaintiff's employer, or any other party or non-party to the lawsuit.  If it is so determined, HOVENSA will reimburse CONTRACTOR or its insurance carrier for all judgments and expenses incurred, including reasonable attorneys' fees and the reasonable costs incurred by CONTRACTOR or its insurer in defending any Claims arising from such liability.

7.1.2.1  To the extent any claims exceed the limits set forth in Article 7.1.1, CONTRACTOR will defend and indemnify the Indemnified Parties from any claim, liability, loss, cost or expense claimed by third parties for property damage or bodily injury, including death, to the extent caused by the negligence or willful misconduct of CONTRACTOR, its agents, employees or CONTRACTOR's affiliates, in connection with CONTRACTOR's performance of the Work.

7.1.2.2 To the extent any claims exceed the limits set forth in Article 7.1.1, HOVENSA will defend and indemnify CONTRACTOR from any claim, liability, loss, cost or expense claimed by third parties for property damage and bodily injury, including death, to the extent caused by the negligence or willful misconduct of the Indemnified Parties, its agents or employees in connection with CONTRACTOR's performance of the Work.

7.1.2.3 To the extent any claims exceed the limits set forth in Article 7.1.1, CONTRACTOR and HOVENSA agree that for claims of third parties attributable to the joint negligence

18

or willful misconduct of the parties, each will be liable to the third party to the extent of its negligence or willful misconduct.

7.1.3.1 CONTRACTOR will not be liable to HOVENSA for any actual or claimed injury (including death) to any person, or actual or claimed physical damage to any property, including the Work and the Facility caused by HOVENSA's other contractors, other than the HOVENSA Contractors.

7.1.3.2 Beginning twelve (12) months from Commencement of Operations, HOVENSA will defend and indemnify CONTRACTOR, its subcontractors and their respective affiliates against all liability, losses, claims, costs and expenses for injury or damage to any person or property (excluding the property of CONTRACTOR or its subcontractors or the personnel of either of them) that exceed Five Hundred Thousand United States Dollars ($500,000 USD) per occurrence or One Million Five Hundred Thousand United States Dollars ($1,500,000 USD) in the aggregate and to the extent resulting from pollution or contamination physically originating from the Facilities and caused by the discharge or escape of oil or of other pollutants or contaminants arising out of or in any way connected with the performance of the Work on the Work Site, whether caused in whole or in part by the negligence or strict liability of CONTRACTOR, its subcontractors or the personnel of either; provided, however, that CONTRACTOR assumes all liability for and will defend and indemnify HOVENSA for all liability, losses, claims and expenses incurred in the control and removal of any pollution or contamination arising directly from the performance of the Work up to Mechanical Completion and, up to a limit of Five Hundred Thousand United States Dollars ($500,000 USD) per occurrence or One Million Five Hundred Thousand United States Dollars ($1,500,000 USD) in the aggregate, from Mechanical Completion through the end of the Warranty Period, if due to a breach of warranty by CONTRACTOR.

7.2    Before CONTRACTOR starts any work, CONTRACTOR will, at its expense, maintain and require its subcontractors to maintain during the performance of the Work, insurance in form and with insurance companies satisfactory to HOVENSA and authorized to do business in the U.S. Virgin Islands as follows:





19

7.2.1   Worker's Compensation insurance covering CONTRACTOR's obligations under all applicable laws and Employer's Liability insurance in the amount of $1,000,000 per occurrence.

7.2.2   General Liability insurance for the duration of the Work, including any maintenance period, including contractual liability and completed operations (for three years after completion of the Work) with limits of $10,000,000 combined single limit, per occurrence, bodily injury and property damage, with $20,000,000 aggregate.  The policy and amounts of cover set out above are not intended to duplicate the policy or amounts of cover under the EP Agreement with Engineer and the aggregate will cover both this Agreement and the EP Agreement.  HOVENSA will have the option to provide this insurance and if it elects to do so, the lump sum price will be reduced by the applicable amount from Appendix D, Exhibit 8, the indemnity in Article 7.1 will be reversed with HOVENSA providing CONTRACTOR with an indemnity to the same extent.  CONTRACTOR will retain responsibility for the level of deductibles described in Appendix D, Exhibit 8. CONTRACTOR will be named as an additional insured on HOVENSA's policy and any other necessary changes will be made to reflect this arrangement.

7.2.3   To the fullest extent possible, CONTRACTOR's general liability insurance will cover the indemnity agreements and obligations in Articles 7.1.1, 7.1.2.1 and 7.1.2.3.

7.2.4   Automobile Liability insurance, with limits of $5,000,000 combined single limit per occurrence, bodily injury and property damage.  The automobile insurance will apply to all vehicles used by CONTRACTOR.

7.2.5   CONTRACTOR will pay any contributions for unemployment insurance and disability benefits for the employees of CONTRACTOR required by the laws of the state or territory in which the Work is being performed.

7.2.6  CONTRACTOR will immediately notify HOVENSA's Safety Department either orally or by fax, of any incident occurring on or regarding HOVENSA's property, which results in property damage, personal injury, or death.  CONTRACTOR will also furnish HOVENSA with two (2) copies of a written report of any such incident within three (3) days of its occurrence.



7.3  CONTRACTOR will provide "All Risk" Builders Risk Insurance which will include, but not be limited to, all materials, equipment, supplies, civil works and machinery forming part of or intending to form part of the Work, including common facilities and facilities which are improvements, tie-ins, connections and additions to existing facilities, pipelines and all other real and personal property, collectively known as the Work, including testing of the Facilities and during their operation until the Facilities are operating to HOVENSA's satisfaction, and twelve (12) months' extended maintenance period thereafter. All insurance provided by CONTRACTOR under this Agreement will have limits and aggregates, if any, dedicated to this Agreement.

7.4      Except for Workers' Compensation and Automobile Liability insurance for vehicles used outside of the U.S. Virgin Islands, prior to the commencement of any Work, CONTRACTOR will furnish to HOVENSA sufficient certificates of all the insurance to be provided by CONTRACTOR, which certificates will provide that the insurance will not be canceled until at least thirty (30) days written notice is given to HOVENSA c/o Administrative Services. CONTRACTOR will promptly notify HOVENSA in writing of any changes to insurance policies that adversely affect the Indemnified Parties. All policies of insurance provided by CONTRACTOR will be primary to any other insurance available to the Indemnified Parties and will name HOVENSA and its members, affiliates, successors and assigns and their parents, subsidiaries and affiliates and all contractors and subcontractors as additional insureds (except worker's compensation) and provide for waiver of underwriters' rights of subrogation against the parties listed above, and any third party designated by HOVENSA. Insurance certificates must be identified with contract number. All insurance provided by CONTRACTOR under this Agreement will have limits and aggregates, if any, dedicated to this Agreement.

VIII.    CONSEQUENTIAL LOSS EXCLUSION

8.1 Notwithstanding anything to the contrary in this Agreement, neither party will be liable and no claim will be made to the other for any punitive, indirect, incidental or consequential damages, loss of profits, loss of product or business interruption however it be considered, direct or indirect, and no matter how caused, whether any such claim is based or claimed to be based on negligence, fault, breach of warranty, breach of agreement, statute, strict liability by either party or otherwise.



IX.    REPRESENTATIVES OF PARTIES

9.1    CONTRACTOR will appoint a Project Manager who will be authorized to act on behalf of CONTRACTOR and with whom HOVENSA may consult at all reasonable times concerning the Work, and whose instructions, requests and decisions will be binding upon CONTRACTOR, except that the individual will have no authority to amend or waive any of the terms of this Agreement.  The Project Manager will at all times be acceptable to HOVENSA.

9.2    HOVENSA will appoint one individual who will be authorized to act on behalf of HOVENSA and with whom CONTRACTOR may consult at all reasonable times concerning the Work and whose instructions, requests and decisions will be binding upon HOVENSA, except that the individual will have no authority to amend or waive any of the terms of this Agreement.

X.    COMPENSATION

10.1    HOVENSA will compensate CONTRACTOR for the Lump Sum Price of USD$ as detailed in Appendix D.

10.2    Subject to written notice to CONTRACTOR and the cure provisions as stated in Article 14.3, HOVENSA may draw against any retained amounts or other security to cure any Breach by CONTRACTOR of this Agreement or any obligation arising under this Agreement.

10.3    CONTRACTOR will submit invoices during the performance of the Work in accordance with Appendix D "Compensation and Terms of Payment." CONTRACTOR will furnish an Affidavit of Release of Liens in the form attached as Appendix D-7 with all invoices.  CONTRACTOR will show any applicable Sales or Use Taxes separately on all invoices submitted to HOVENSA for payment. In order to ensure that the correct amount of tax is withheld, CONTRACTOR agrees to invoice HOVENSA separately for Services rendered in the U.S. Virgin Islands and outside the U.S. Virgin Islands.  Invoices not so designated will be subject to the income tax withholding, unless the required documentation has been provided to HOVENSA by CONTRACTOR.

XI.    TAXES

11.1    CONTRACTOR will be responsible for all applicable Virgin Islands taxes.  The amount charged HOVENSA by CONTRACTOR will be presumed to include all taxes and CONTRACTOR will



not separately invoice HOVENSA for them. If any U.S.V.I. Gross Receipts Tax becomes due relating to the HOVENSA Contractors, through no action or fault of CONTRACTOR, HOVENSA will be responsible for payment of or reimbursement to CONTACTOR for this tax as well as all related items such as additional charges, penalties and fines.

11.2    CONTRACTOR will be required to obtain a St. Croix business license and is responsible for the payment of its Virgin Islands income tax liability.

11.3    Personal income taxes may be due to the Virgin Islands government by CONTRACTOR's employees and must be withheld by CONTRACTOR, as required by law.

11.4    CONTRACTOR will register with and contribute to the Virgin Islands Worker's Compensation Fund. This registration is in addition to any contributions CONTRACTOR may make to its home state Worker's Compensation fund.

11.5    CONTRACTOR will pay unemployment taxes to the Virgin Islands Employment Security Agency, as well as federal Unemployment Tax and FICA.

XII    SURPLUS MATERIALS

12.1    Upon completion of the Work, HOVENSA will review all "Surplus Materials" and will have the option to retain ownership of any surplus materials on terms to be agreed on by the parties. "Surplus Materials" will include commodities only and will exclude engineered equipment, tagged items, waste or scrap, surplus resulting from changes in the Work pursuant to Article XIII, or materials not requisitioned by CONTRACTOR.

XIII.    CHANGES IN THE WORK

13.1 Changes in the work will be handled in accordance with Appendix B and Appendix D.

XIV.    BREACH; TERMINATION OR SUSPENSION OF WORK

14.1 HOVENSA will have the right to terminate this Agreement or any specific work assignment given under this Agreement, at any time and for any reason, without cause, on seventy-two (72) hours' written notice to CONTRACTOR. If there is such a termination by HOVENSA, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination and for the period required by HOVENSA for the orderly



cessation of the Work, including all reasonable costs incurred by CONTRACTOR to demobilize, remove its resources from the Project, terminate subcontracts and terminate purchase orders with vendors.

    14.2    The occurrence of any of the following events is a Breach of this Agreement:

        14.2.1  Any defect in the Work which HOVENSA, in its sole judgment, determines to be material;

        14.2.2  Failure, after notice has been given to CONTRACTOR of any unsafe, unsound or defective work, to begin immediately, and diligently proceed with, steps necessary to correct such work;

        14.2.3  Failure to proceed with or complete the Work in accordance with the Agreement;

        14.2.4  HOVENSA has reasonable grounds to believe that CONTRACTOR is or may become bankrupt, insolvent or unable to pay its debts as they become due;

        14.2.5  CONTRACTOR fails to maintain materials, equipment, and personnel of such kinds and in such places as in HOVENSA'S sole judgment are reasonably required for CONTRACTOR'S performance hereunder;

        14.2.6  Breach of any warranty or representation of this Agreement; or

        14.2.7  Contractor becomes involved in any labor difficulties not covered in Article XV which, in HOVENSA's sole judgment, may impede or slow down the Work.

        14.2.8  Failure to comply with any provision of this Agreement, which failure HOVENSA, in its sole judgment, deems to be material.

    14.3    If there is a Breach under Article 14.2, HOVENSA will give CONTRACTOR written notice of the Breach and CONTRACTOR will immediately begin and diligently pursue cure of the Breach. If CONTRACTOR does not immediately begin to cure the Breach and diligently pursue the cure, HOVENSA, in its discretion, will have the right on twenty-four (24) hours' written notice to CONTRACTOR to (a) terminate this Agreement or any Work assigned hereunder pursuant to Article 11.1, (b) invoke such other legal remedies as may be available to HOVENSA under the Agreement and (c) proceed with its personnel or those of others and take possession and use all equipment and materials at the site (all of which CONTRACTOR agrees to leave for that purpose)

14.4    Upon the occurrence of any event of Breach set forth above, CONTRACTOR will not be entitled to any further payment until CONTRACTOR has taken the necessary steps so that the Breach is remedied to the satisfaction of HOVENSA, whereupon CONTRACTOR will then be paid only the amount as is due for Work properly performed by CONTRACTOR less all reasonable additional expense suffered by HOVENSA as a result of the Breach.  If the additional expense exceeds the amount due to CONTRACTOR, the amount will be paid immediately to HOVENSA by CONTRACTOR.  Subject to remedies as provided under law which will always be available to HOVENSA, all remedies afforded to HOVENSA under this Agreement will be deemed to be the sole rights or remedies available to HOVENSA whether at law, equity, trade customs or otherwise.

14.5    HOVENSA may at any time suspend performance of all or any part of the Work by giving twenty-four (24) hours' written notice to CONTRACTOR.  This suspension may be continued by HOVENSA for a period of up to forty-five (45) calendar days or one hundred eighty (180) calendar days if related to an event of force majeure (it being understood that in the case of a force majeure no notice from HOVENSA is required), during which time HOVENSA may at any time, by written notice, require CONTRACTOR to resume performance of the Work.  In any case, CONTRACTOR will always be compensated by HOVENSA for reasonable and justified costs or expenses either incurred or suffered as a result thereof from the seventh (7) day of said suspension or from the fifteenth (15th) day if due to force majeure.  Either party will have the right to terminate this Agreement as per conditions under Article 11.1 above, if any such suspension lasts for more than ninety (90) days in the aggregate (one hundred eighty (180) days if due to force majeure).  If there is such a termination, or if this Agreement is terminated for a force majeure, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination for and for the period required by HOVENSA for the orderly cessation of the terminated Work, including all reasonable demobilization costs and reasonable costs linked to terminating subcontracts and purchase orders with vendors incurred by CONTRACTOR as a result thereof.

14.6    If there is a termination for any reason, CONTRACTOR will cooperate in keeping costs and losses to a minimum, including transfer of Work in progress to HOVENSA.  CONTRACTOR will

use all reasonable efforts to comply with HOVENSA's instructions concerning the time and manner of termination of the Work and will without additional charge execute such assignments or other documents as HOVENSA may require to vest in HOVENSA all or such part as HOVENSA may require, of such rights in subcontracts or purchase orders as CONTRACTOR may have placed in relation to this Agreement. If such termination occurs, HOVENSA reserves the right to perform the Work with its forces.

14.7.   Any termination of this Agreement will not affect the warranty, secrecy, confidentiality or other obligations of this Agreement which by their nature would survive.

14.8   If an invoice properly due remains unpaid in whole or in part for more than thirty (30) days, CONTRACTOR may give written notice to HOVENSA and if payment is not made within thirty (30) days of the notice, CONTRACTOR may suspend the Work until receipt from HOVENSA of the full, unpaid amount. If any such invoice remains unpaid in whole or in part for more than ninety (90) days, provided notice has been given as stated above, then CONTRACTOR will be entitled to terminate this Agreement and be compensated by HOVENSA pursuant to conditions as set out under Article 11.1.

XV.   FORCE MAJEURE

15.1  Any delays in or failure of performance by either party under this Agreement will not constitute Breach hereunder or give rise to any claims for damages to the extent caused by occurrences beyond the foreseeable and reasonable control of the affected party, and which could not have been avoided by the affected party's reasonable best efforts, including but not limited to, acts of governmental authority, acts of God, named tropical storms where HOVENSA had advised its subcontractors to suspend work, strikes or other concerted acts of workers, fires, explosions, riots, wars, rebellions and sabotage, freight embargoes, fires, floods, acts of public enemy, civil disturbances, new or changed rules or regulations of any governmental authorities (civil or military) otherwise having jurisdiction over the Work and relating to import or export, and materially affecting performance under the Agreement.

15.2   Resumption of Work will be covered as under Article 14.5.

15.3   For events of Force Majeure lasting more than fifteen (15) continuous days, HOVENSA and CONTRACTOR will negotiate in good faith an adjustment to the Project Schedule (with associated relief for liquidated damages) and the Contract Price for the additional costs reasonably incurred by CONTRACTOR as a direct result of the event of Force Majeure.

XVI    PATENTS AND SIMILAR RIGHTS

16.1   Except for claims or suits based upon plans, drawings or specifications furnished by HOVENSA and subject to Article 16.2, CONTRACTOR will defend and indemnify HOVENSA against all claims, loss, damage and expense arising out of the infringement of any United States patent, copyright, trade secrets or other property rights and asserted against HOVENSA in connection with the performance of the Work or subsequent operation of the Facility, provided HOVENSA promptly notifies CONTRACTOR in writing of the threat or commencement of any suit or claim and permits CONTRACTOR to control its defense.  CONTRACTOR will pay any settlement, judgment and all court costs awarded against HOVENSA in any suit and all compensation and expenses of its own counsel and experts in connection with the suit or claim   HOVENSA may be represented by counsel of its selection, at its expense.  HOVENSA will cooperate fully in the defense of any suit or proceeding, at CONTRACTOR's expense, to the extent of furnishing evidence which is within HOVENSA's control Upon notice from HOVENSA or from third parties, except HOVENSA's process licensors, of a claim arising from any property right, CONTRACTOR may procure for HOVENSA the paid-up right to continue using the designs, processes or other property, replace them with noninfringing substitutes, or avoid the infringement or claim thereof by modifications thereto, as long as the Facilities or production from them are not adversely affected.

16.2   HOVENSA will defend and indemnify CONTRACTOR under the same terms as set out under Article 16.1 above against all claims, loss, damage and expense arising out of the infringement of any patent, copyright, trade secrets or other property rights and asserted against CONTRACTOR or HOVENSA in connection with the performance of the Work or subsequent operation of the Facility, to the extent relating to HOVENSA's know-how Process Licensors.

XVII   ASSIGNMENT



17.1 The rights and obligations under this Agreement are not assignable by either party without the written consent of the other party (except that such rights and obligations may be assigned without consent to the successor of either party or to a person, firm or corporation acquiring all or substantially all of the business and assets of such party). No assignments of the rights and obligations of a party to this Agreement will be valid unless such rights and obligations are assumed by the assignee. When assigned in accordance with the foregoing, the rights and obligations of a party to this Agreement will be binding upon and be for the benefit of the assignee, but the assignor will remain liable to the other party for its obligations under this Agreement.

## XVIII. AUDIT

18.1 CONTRACTOR and CONTRACTOR's subcontractor's will permit HOVENSA or its agents or representatives, without undue delay, to have access at reasonable times to review and audit all records and accounts, except where relating to lump sum prices and as necessary to ensure and validate CONTRACTOR's compliance with this Agreement. Reviews and audits may be made within two years of last invoice.

18.2 To the same extent as stated in Article 18.1, CONTRACTOR will require, in contracts with any subcontractors who perform services in connection with this Agreement, that HOVENSA or its agents or representatives, without undue delay, will have access to review and audit all subcontractor's records and accounts necessary to ensure and validate compliance with this Agreement. Subcontractor reviews and audits may be made within two years of last invoice.

## XIX. WAIVER

19.1 A waiver on the part of HOVENSA or CONTRACTOR of any term or breach of this Agreement will not constitute a precedent nor bind either party to a subsequent waiver of any succeeding term or breach.

## XX. ENTIRETY OF CONTRACT

20.1 This Agreement, including the Appendices and other documents incorporated by reference, is the entire agreement between HOVENSA and CONTRACTOR regarding the matters



covered herein and there are no other agreements, representations or obligations for the services described herein.

XXI    SECRECY AND PUBLICITY

21.1  CONTRACTOR will not without written approval of HOVENSA give any publicity pertaining to the Facilities nor divulge to any third parties any details pertaining to the Work or any of HOVENSA's facilities except as necessary for the due performance of the Work.

XXII   CONFLICT OF INTEREST

22.1    CONTRACTOR acknowledges that HOVENSA has issued a policy relating to conflicts of interest between HOVENSA and its employees, attached as Appendix AB, Exhibit 27.  In order to assure compliance with the policy, CONTRACTOR will not, before, during or after performance of the Work, make, offer, provide or agree to make, offer or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value to (i) any employee, agent or representative of HOVENSA, (ii) any member of their immediate families, (iii) anyone claiming to act or acting for or in behalf of any such person, nor will CONTRACTOR permit any person described in (i), (ii) or (iii) above, to have any financial or economic interest in CONTRACTOR or any subsidiary or affiliate of CONTRACTOR.  If CONTRACTOR is requested to make or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value, by any person described in (i), (ii) or (iii) above, CONTRACTOR will report the request immediately to HOVENSA in the manner provided for the giving of notice under this Agreement.  The failure by CONTRACTOR to strictly adhere to the provisions of this Article will be deemed by CONTRACTOR and HOVENSA to be a material breach of this Agreement, and at HOVENSA's sole option will be grounds for immediate suspension or termination, by reason of default, of this Agreement.  All subcontracts or material supply contracts permitted or required in connection with performance of the Work will contain provisions in substantially the same form and substance as this Article binding subcontractors or material suppliers to the same obligations hereunder as CONTRACTOR.

XXIII  SUBCONTRACTS AND DELEGATION



23.1    CONTRACTOR will not subcontract or delegate any of its obligations under this Agreement without the written consent of HOVENSA. HOVENSA's approval of any subcontract will not relieve CONTRACTOR of any of its obligations under this Agreement. CONTRACTOR will, for the protection of HOVENSA, make all reasonable efforts to obtain warranties from all subcontractors with respect to services performed. These warranties will be made available to CONTRACTOR and assigned to HOVENSA in case of termination or assignment of this Agreement under Article XIV or XVII, to the full extent of the terms thereof and will extend for twelve (12) months after services have been performed and accepted or for such other period of time as may be obtained from such subcontractors. This provision will not affect CONTRACTOR's other obligations hereunder.

23.2    For any subcontractor approved by HOVENSA under this Agreement, HOVENSA will have the option to contract directly with that subcontractor for services to be provided in connection with the Work using the Form set out in Appendix AC. For any equipment lessor approved by HOVENSA under this Agreement, HOVENSA will have the option to contract directly with that subcontractor for equipment or services to be provided in connection with the Work using the Form set out in Appendix AF-Exhibit 1 (such subcontractors and equipment lessors are referred to as the "HOVENSA Contractor"). If this occurs, CONTRACTOR will manage the contract for HOVENSA and will defend and indemnify HOVENSA, subject to the limitations on liability provided in this Agreement, in all circumstances in which CONTRACTOR would have had to indemnify HOVENSA under this Agreement if CONTRACTOR had subcontracted directly with the relevant HOVENSA Contractor, as well as for the condition and maintenance of all covered leased equipment. In addition, CONTRACTOR will defend and indemnify HOVENSA from all claims based on vicarious liability, respondeat superior, or other similar theories of liability asserted against HOVENSA arising solely out of HOVENSA's passive contractual relationship with the HOVENSA Contractor; provided, however, that CONTRACTOR will have no indemnity obligation or liability for claims, damages (including, without limitation, Liquidated Damages) or actions resulting from, or arising out of, HOVENSA's failure to pay any HOVENSA Contractor any money owed under the governing contract if CONTRACTOR notifies HOVENSA that in CONTRACTOR's reasonable judgment, the HOVENSA Contractor should be paid any amount in

dispute. CONTRACTOR will defend and indemnify HOVENSA if HOVENSA, merely because of the fact that it is the signatory to any such contract, is found by a trier of fact to have been grossly negligent in the actual approval or decision to contract with a HOVENSA Contractor selected by CONTRACTOR to perform a particular scope of service.

23.3    HOVENSA and CONTRACTOR will agree upon the general terms to be incorporated into all contracts to be entered into by HOVENSA pursuant to Article 23.2. CONTRACTOR will use reasonable commercial efforts so that the terms to be incorporated into all such contracts will be based upon, and incorporate the principles set forth in this Agreement on a corresponding basis to establish to obligations which flow through to the HOVENSA Contractor, including, without limitation, indemnity provisions consistent with those undertaken by CONTRACTOR under this Agreement, to protect both HOVENSA and CONTRACTOR. After HOVENSA's approval of a particular HOVENSA Contractor, CONTRACTOR will use its best efforts to obtain the HOVENSA Contractor's acceptance of such terms or to obtain such other terms as are reasonably obtainable. CONTRACTOR will forward copies of the executed contract to HOVENSA. As part of the Work, CONTRACTOR will manage and supervise the performance of the HOVENSA Contractor's obligations and enforce the terms of the contract. In the performance of its obligations pursuant to this Article 23.3, CONTRACTOR will act as HOVENSA's agent in the supervision and administration of the contracts entered into with the HOVENSA Contractors, and each contract will so notify the HOVENSA Contractor of CONTRACTOR's authorization to so act for and on behalf of HOVENSA.

23.4    Any money received by HOVENSA from the HOVENSA Contractors in the nature of damages, including Liquidated Damages or enforcement of bank guarantees, will be paid by HOVENSA to CONTRACTOR.

XXIV.  AS-BUILT DRAWINGS

24.1    CONTRACTOR will provide all information required to allow the original drawings to be updated to "as-built."

XXV.  NOTICES

25.1    All notices will be sent by facsimile and by Certified Mail, Return Receipt Requested or recognized overnight carrier.

25.2    All notices and communications required to be given CONTRACTOR will be in duplicate, the

original addressed to:

    TPVI

    One Hibiscus Alley

    Charlotte Amalie, St. Thomas, U.S. Virgin Islands


    25.3 All notices and communications required to be given to HOVENSA will be addressed to:

    Project Director-[PROJECT NAME]

    1 Estate Hope

    Christiansted, U.S. Virgin Islands 00820-5652

    Facsimile No.

and a copy to:

    Vice President and Chief Administrative Officer

    1 Estate Hope

    Christiansted, U.S. Virgin Islands 00820-5652

    Facsimile No.:

and a copy to:

    Director, Administrative Services

    1 Estate Hope

    Christiansted, U.S. Virgin Islands 00820-5652

    Facsimile No.:

and a copy to:

    PDVSA V.I., Inc.

    1A Frederiksberg Gade

    St. Thomas, U.S. Virgin Islands, 00802

    Facsimile No.

XXVI.   LIENS

26.1    CONTRACTOR will defend and indemnify HOVENSA against the attachment of liens or encumbrances of any vendor or subcontractor relating to the Work.

XXVII. GOVERNING LAW/DISPUTE RESOLUTION

27.1    Governing Law - This agreement will be governed by and construed under the laws of the State of New York, U.S.A., without regard to its conflict of law rules.

27.2 Dispute Resolution.

27.2.1 If there is a dispute between HOVENSA and CONTRACTOR on the application or interpretation of this Agreement, the aggrieved Party will notify the other Party of its intent to invoke this dispute resolution procedure within ten (10) business days after the dispute arises. If the Parties fail to resolve the dispute within the ten (10) business days after delivery of the Notice, each Party will, within five (5) business days thereafter, nominate an officer of its management to meet at the Facility, or at any other agreed location, to resolve the dispute. If the Parties are unable to resolve the dispute to their satisfaction within ten (10) business days after the nomination, either Party has the right to commence litigation on the dispute. Any such litigation must be brought exclusively in the U.S. District Court, Southern District of New York, United States of America and the parties hereby submit to the jurisdiction of such courts and waive any objection to venue or jurisdiction in such courts. The dispute resolution procedures set forth in this Section will be the sole and exclusive dispute resolution procedures available to the Parties under this Agreement.

27.2.2 The Parties may agree to resolve the dispute by arbitration. Any arbitration will be conducted in the City of New York, State of New York, United States of America, in the English language in accordance with the rules of procedure of the American Arbitration Association (the "AAA"). Each party will nominate within thirty (30) days of the commencement of proceedings, one arbitrator. If any Party fails to nominate an arbitrator within the stated time period, the AAA will appoint an arbitrator for the Party. The two arbitrators nominated by the Parties or appointed by the AAA for any Party will jointly nominate a third arbitrator, who will chair the arbitration panel. If the arbitrators nominated by the Parties do not succeed in nominating a third arbitrator within ten (10) days, the arbitrator will be appointed by the AAA. The award of the arbitral tribunal will be final and binding upon the Parties.

XXVIII. NON-COLLUSIVE BIDDING

28.1    If this Agreement was awarded on the basis of competitive bidding, CONTRACTOR warrants that it has not consulted with any other contractor or person who has bid on the Work and that its bid was arrived at independently of any discussions or collusion with others.

XXIX.  EQUAL OPPORTUNITY

29.1    Non-Discrimination in Employment - CONTRACTOR will comply with the Equal Opportunity clause published in the regulations of the U.S. Department of Labor implementing Executive Order 11245, which is incorporated in this Agreement by reference.

29.2    Affirmative Action for Handicapped Workers - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503 of the Rehabilitation Act of 1973, Public Law 93-112m as amended, which are incorporated in this Agreement by reference.

29.3    Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503, Title V of the Vietnam Era Veteran's Readjustment Assistance Act of 1972, Public Law 92-540, as amended, and Executive Order 11701, which are incorporated in this Agreement by reference.

29.4    Certification of Nonsegregated Facilities - CONTRACTOR certifies that it does not and will not maintain any facilities it provides for its employees in a manner which will result in segregation on the basis of race, color, religion, sex or national origin, or permit its employees to perform their services at any location, under its control, where segregated facilities are maintained; and that it will obtain a similar certification prior to the award of any nonexempt subcontract.

29.5    Minority Business Enterprises - CONTRACTOR will comply with the minority business enterprise clauses and regulations published by the U.S. Department of Commerce implementing Executive Order 11625, which are incorporated in this Agreement by reference.

XXX.   AMENDMENTS



No amendments to the Agreement will be enforceable against either party unless in writing and signed by the parties.

## XXXI  TAX WITHHOLDING

31.     The laws of the U.S. Virgin Islands require HOVENSA to withhold from contractors who are foreign (non-USVI) corporations, an income tax of 11% from all payments made by HOVENSA for services performed by CONTRACTOR in the USVI. For all other foreign (non-USVI) entities and non-resident aliens, the withholding tax rate is 10%. Payments made to U. S. citizens or for services rendered outside the USVI, are not subject to withholding. Unless CONTRACTOR has provided HOVENSA with a copy of CONTRACTOR's USVI business license, and an IRS form W-8ECI, as proof that CONTRACTOR is exempt from the income tax withholding for payments otherwise subject to withholding, HOVENSA will withhold and pay the requisite amounts to the USVI Bureau of Internal Revenue.

## XXXII. LIMIT ON CONTRACTOR'S LIABILITY.

32.1    CONTRACTOR'S overall limit of liability for obligations, liabilities, guarantees, warranties and indemnification, whether expressed or implied, howsoever arising under or relating to this Agreement and the performance of the Work will be limited as set forth in Appendix D, as it may be revised, and the foregoing limitation will apply whether the liability arises in contract, breach of warranty or tort, including but not limited to negligence and strict liability or otherwise.

32.2    Notwithstanding the above, the following are excluded from this limit of liability:

32.2.1  All sums recovered by CONTRACTOR from the insurance under this Agreement.

32.2.2  CONTRACTOR's obligation to achieve Mechanical Completion as defined in Appendix A.

32.2.3  CONTRACTOR's warranty obligations under this Agreement during the Warranty Period.

32.2.4  Intellectual Property indemnification under Article 16.1.

32.2.5  Maintaining the Work, the Facilities and the site free of any lien.

32.2.6  CONTRACTOR's obligations under Articles 7.1.2.1 and 7.1.2.3.



32.2.7 Fraud by CONTRACTOR or its agents, subcontractors, affiliates or the

HOVENSA Contractors.

32.2.8 Compliance with laws.

32.2.9 Breach of confidentiality.

32.2.10    The following Performance Guarantees as per Appendices G, H, J:

    32.2.10.1    Throughput guarantee of 50,000 bpsd.

    32.2.10.2    $H_2S$ content of stripper effluent.

    32.2.10.3    Reactor outlet pressure.

    32.2.10.4    NOX guarantees.

    32.2.10.5    Unit turndown.

32.3    For the purpose of computing Agreement Price under this Article, Article 33 or in connection with any required retainage, bank guaranty or letter of credit, any amounts paid by HOVENSA to the HOVENSA Contractors or Lessors, as defined in Appendix AF, will be added to the Agreement Price paid to CONTRACTOR.

32.4    If, solely as a result of this Article, any portion of the amounts paid to CONTRACTOR become subject to U.S. Virgin Islands taxation, through no fault of CONTRACTOR, HOVENSA will be responsible for those taxes.

### XXXIII. LIMIT ON HOVENSA'S LIABILITY.

33.1    HOVENSA's overall limit of liability for obligations, liabilities, guarantees, warranties and indemnification, whether expressed or implied, howsoever arising under or relating to this Agreement and the Work will be limited as set forth in Appendix D, as it may be revised, and the foregoing limitation will apply whether the liability arises in contract, breach of warranty or tort, including but not limited to negligence and strict liability or otherwise.

33.2    Notwithstanding the above, the following are excluded from this limit of liability:

33.2.1    HOVENSA's obligation to pay the Compensation due under this Agreement, including any Change Orders.

33.2.2  Intellectual Property indemnification under Article 4.6.3.

33.2.3  HOVENSA's obligations under Articles 7.1.2 and 7.1.3.

33.2.4  Fraud by HOVENSA or its agents, subcontractors or affiliates, except the

HOVENSA Contractors.

33.2.5  Compliance with laws.

33.2.6  Breach of confidentiality.

33.2.7  Any arbitral award in the nature of compensation for Work performed.

33.2.8  Any payments due CONTRACTOR under Articles 11.1, 11.4 or 11.5.

33.3    If, solely as a result of this Article, any portion of the amounts paid to CONTRACTOR

become subject to U.S. Virgin Islands taxation, through no fault of CONTRACTOR, HOVENSA will be

responsible for those taxes.

IN WITNESS WHEREOF, this Agreement and the attached Appendices have been reviewed by

agents of both parties and this Agreement is executed, stamped with Corporate Seals and delivered, by

the authorized officials of each corporation.

ATTEST:                                      HOVENSA L.L.C.

_____                      BY: _____

MARCO GROVES,                                    LARRY KUPPER
V.P. OPERATIONS                                  PRESIDENT

ATTEST:                                      TPVI

_____                      BY: ETIENNE GORY

Georges STAVGIANNIS                              PRESIDENT

EXHIBIT 6

## ENGINEERING AND PROCUREMENT AGREEMENT

AGREEMENT dated March 10th, 2005, between HOVENSA L.L.C., a U.S. Virgin Islands limited liability company ("HOVENSA") and TECHNIP ITALY S.p.A., organized under the laws of Italy ("CONTRACTOR").

### EXPLANATORY STATEMENT:

A.    HOVENSA wishes to retain CONTRACTOR to perform engineering design, procurement and project management in connection with construction of a Low Sulfur Gasoline Hydrotreater and related facilities at HOVENSA's petroleum refining facility located at St. Croix, United States Virgin Islands (the "Refinery").

B.    CONTRACTOR is willing to perform the Work (as defined) on a lump sum basis under the terms of this Agreement.

THE PARTIES AGREE AS FOLLOWS:

I.    SCOPE

1.1    This Agreement consists of this document, the following documents which are attached and any other document which is incorporated in this Agreement by reference:

    1.1.1  Appendix A:   Scope of Work

    1.1.2  Appendix B:   Coordination Procedures

    1.1.3  Appendix C:   Engineering Standards

    1.1.4  Appendix D:   Compensation and Terms of Payment

        Exhibit 1: Terms of Payment

        Exhibit 2: Cash Flow Curves

        Exhibit 3: Earned Value Matrix





Exhibit 4: Project Cost Breakdown

Exhibit 5: Letter of Credit

Exhibit 6: Contract Change Orders

Exhibit 7: Contractor Affidavit: Liens

1.1.5   Appendix E:   Project Schedule

Exhibit 1: Deleted

Exhibit 2: Technip LSG Project Schedule

Exhibit 3: Refinery Holiday Schedule

1.1.6   Appendix F:   FEED Package

Exhibit 1: Process Description

Exhibit 2: Process Interlocks & Compressor Controls Summary

Exhibit 3: Equipment List

Exhibit 4: Material Selection Diagrams

Exhibit 5: Reactor Specifications & Drawings

Exhibit 6: EMRE / KBR BDS Package (2 volumes)

Exhibit 7: EMRE / KBR DBS Package (1 volume)

Exhibit 8: EMRE Design Notes (1 volume)

Exhibit 9: EMRE Design Review Milestones

Exhibit 10: P&IDs

Exhibit 11: Auxiliary Equipment Datasheets

Exhibit 12: Preliminary Electrical Load List

Exhibit 13: HVAC Pressurized Buildings Standard

Exhibit 14: Plot Plans & B.L. Piping Sketch

Exhibit 15 - EMRE/KBR Process Simulations

1.1.7   Appendix G:   Technical Questions and Answers

1.1.8   Appendix H:   Commercial Questions and Answers

1.1.9   Appendix I:    Items Provided by HOVENSA

1.1.10  Appendix J:    Performance Guarantees

1.1.11  Appendix K:    Schedule and Performance Liquidated Damages

1.1.12  Appendix L:    Construction Workforce

1.1.13  Appendix M:    Ocean Transportation Information

      Exhibit 1: Hovensa RO RO Dock Information

      Exhibit 2: Title to Materials

      Exhibit 3: Ocean Shipping Support Design for Major Equipment

      Exhibit 4: Freight Forwarders

      *Exhibit 5: Marine & Terminal Regulations*

1.1.14  Appendix N:    Statement Regarding Site Conditions

      Exhibit 1: MEC Topographical Map

      *Exhibit 2: Preliminary Geotechnical Investigation Report - URS*

1.1.15  Appendix O:    Radio Information

1.1.16  Appendix P:    Use of Non-Domestic Materials

1.1.17  Appendix Q:    Parent Guarantee Letter

1.1.18  Appendix R:    Approved Vendors List

1.1.19  Appendix S:    Equipment and Instrument Data Sheet Forms

1.1.20  Appendix T:    Mechanical Integrity Forms

1.1.21  Appendix U:    Deleted

1.1.22  Appendix V:    ASD Manual Table of Contents

1.1.23  Appendix W:    I&C Responsibility Matrix

1.1.24  Appendix X:    Mechanical Completion Checklist

1.1.25  Appendix Y:    PHA Guidance – Guidelines of Deviation

1.1.26  Appendix Z:    BEDD Sheets

1.1.27  Appendix AA:   Intentionally Left Blank

1.1.28  Appendix AB: HOVENSA Standard Contract Attachments

1.1.29  Appendix AC: Agency Agreement

1.1.30  Appendix AD: Organizational Chart and Key Personnel Resumes

1.1.31  Appendix AE: Unit Rates for Reimbursable Work due to Variation

1.1.32  Appendix AF: Equipment Lease Agreement

　　　　Exhibit 1: Sample Equipment Lease

　　　　Exhibit 2: General Procedures For Using Equipment Lease Agreement

1.1.33  Appendix AG: Deleted

1.1.34  Appendix AH: Federal Contractor Certificate of Compliance

1.2　　The work generally to be performed by CONTRACTOR under this Agreement (the "Work") is set forth in Appendix A.

1.3　　The items generally to be provided by HOVENSA and others under this Agreement are set forth in Appendix I.

1.4　　For any work in addition to that defined in this Agreement, HOVENSA will advise CONTRACTOR in writing of the extent of work required.  HOVENSA may also direct CONTRACTOR in writing to perform sufficient conceptual engineering to define appropriately the scope of additional Work.

1.5　　If there is any conflict between the Articles of this Agreement and any of the Appendices, the Articles will control.  If there is any conflict between appendices, it will be brought to HOVENSA's attention promptly and the more stringent requirement on CONTRACTOR will control, unless otherwise agreed.  If there is any conflict arising from any change in any Appendix, the Appendix of the latest date will control.

1.6　　All parts of the Work reasonably inferred from and not expressly mentioned in Appendix A or included in Appendix I, will be performed as an obligation of CONTRACTOR under this Agreement and Appendix A.

II.　　DEFINITION OF THE FACILITIES



4

2.1     The "Facility" or "Facilities" means the Low Sulfur Gasoline Hydrotreater and related facilities to be constructed at the Refinery as described in Appendix A.

III.     COORDINATION OF WORK

3.1     Administrative Procedures

CONTRACTOR acknowledges receipt of the HOVENSA Coordination Procedures, which are incorporated by reference, and the Table of Contents of which is attached as Appendix B, and CONTRACTOR will comply with the HOVENSA Coordination Procedures in performing the Work.  If there is any conflict between any part of the Coordination Procedures and the Articles of this Agreement, the Articles will control.  If there is any conflict within the Coordination Procedures or between the Coordination Procedures and any of the Appendices, it will be brought to HOVENSA's attention promptly and the more stringent requirement on CONTRACTOR will control, unless otherwise agreed.  HOVENSA reserves the right to issue additions to, or revisions of, the HOVENSA Coordination Procedures in writing at any time during the course of the Work; provided that, if the additions or revisions would increase or decrease the cost of or time required for CONTRACTOR to perform the Work, this Agreement will be modified accordingly, pursuant to Article X.

3.2     Engineering Standards

CONTRACTOR acknowledges receipt of the HOVENSA Engineering Standards which are incorporated by reference, and the Table of Contents of which is attached as Appendix C (the "Standards"), which contain HOVENSA's design and construction criteria and CONTRACTOR will perform the Work in accordance with the Standards.  If there is any conflict between any part of the Standards and the Articles of this Agreement, the Articles will control.  If there is any conflict within the Standards or between the Standards and any of the Appendices, it will be brought to HOVENSA's attention promptly and the more stringent requirement on CONTRACTOR will control,



5

unless otherwise agreed. HOVENSA reserves the right to issue additions to or revisions of the Standards during the course of the Work, and will handle these additions or revisions in accordance with the HOVENSA Coordination Procedures, provided that if the additions or revisions would materially increase or decrease the cost of or time required for CONTRACTOR to perform the Work or otherwise materially affect CONTRACTOR'S obligations, this Agreement will be modified accordingly pursuant to Article X.

3.3     Proprietary Information

3.3.1 All drawings, specifications, bills of material, material specifications, calculations, operating instructions, design data and other engineering design information produced by CONTRACTOR, the cost or expense of which is included in CONTRACTOR's compensation, will become the property of HOVENSA, and the originals will be provided to HOVENSA within two (2) weeks after successful completion of performance acceptance testing as set forth in Appendix B. HOVENSA will have the right to use any engineering design, process studies and other technical services in the construction or reconstruction, duplication (provided it is limited to one duplicate and CONTRACTOR's confidential information is kept confidential and not disclosed to its competitors except it may be disclosed under an appropriate confidentiality agreement as necessary for the duplication of the Facility, operation and maintenance of any HOVENSA facility and any facilities of its members, subsidiaries or affiliates and their parents, subsidiaries and affiliates or to transfer these rights to any successor owner of the Facility.

3.3.2   All information supplied to CONTRACTOR by HOVENSA, its members or affiliates of its members, provided that any use or disclosure to others as may be necessary to perform the Work will be made under a binder of secrecy substantively the same as the one that binds the parties hereto, is proprietary and



6

CONTRACTOR will not use or disclose to others any such information without HOVENSA's written consent, except as may be necessary to perform the Work; provided that for purposes of use by CONTRACTOR, proprietary information will not include the following:

3.3.2.1     information which, at the time of disclosure to CONTRACTOR, is in the public domain;

3.3.2.2     information which, after disclosure to CONTRACTOR, enters the public domain;

3.3.2.3     information which, prior to disclosure to CONTRACTOR, was already in CONTRACTOR's possession and was not acquired from HOVENSA;

3.3.2.4     information which, subsequent to disclosure to CONTRACTOR, is obtained by CONTRACTOR from a third party who has the right to disclose such information without binder of secrecy.

Notwithstanding the foregoing, no information supplied to CONTRACTOR by HOVENSA will be disclosed to others even if it falls within one of the exceptions to the definition of proprietary information listed above.

3.3.3   Any agreements or representations between CONTRACTOR and HOVENSA entered into prior to the effective date of this Agreement relating to secrecy or confidentiality of information will survive the signing of this Agreement or any completion of the Work, or any other termination or cancellation of this Agreement, each in accordance with the terms of the other agreement or representation.

3.4     Personnel; Independent Contractor

3.4.1   CONTRACTOR warrants that it will employ properly qualified, and where appropriate, properly licensed or certified personnel necessary to perform the Work.



7

3.4.2   In performing the Work, CONTRACTOR is acting as an independent contractor and reserves the right to hire or discharge employees, designate the classification and hours of work for each employee and to supervise and control the manner of performance of the Work.

3.4.3   Prior to assigning personnel to the Work, CONTRACTOR will submit for HOVENSA's review the names and work experience of, and licenses or certificates held by, personnel nominated to fill key work positions, such as Project Manager, Procurement Manager, Engineering Manager, Project Control Manager and Process Leader.  Personnel will not be assigned to or removed from these key positions without sufficient notification to HOVENSA.  The fact that this notification is required will not affect CONTRACTOR's status as an independent contractor hereunder.

### 3.5.   Warranties

3.5.1   *CONTRACTOR warrants for twelve (12) months following **Final Acceptance of Performance Testing** (as defined in Article 3.5.8) or eighteen (18) months after Mechanical Completion (as defined in Appendix A), whichever occurs first (the "Warranty Period"):*

3.5.1.1 The design of the Facility furnished by it and its performance of the Work will be in accordance with the Standards and any special job specifications or requirements and other data and engineering criteria developed and provided by HOVENSA, its process know-how Licensors or its equipment suppliers, as set out in this Agreement.

3.5.1.2 The Work will be executed in a competent, efficient manner following current state of the art, where practicable, petroleum refinery engineering practice and in accordance with the standards of care and diligence normally practiced by recognized engineering firms.



8

3.5.1.3 CONTRACTOR will be responsible for mechanical guarantees on purchased equipment systems to meet the requirements of Article 3.5.8.

3.5.1.4 CONTRACTOR will be responsible for individual mechanical guarantees on equipment purchased from third parties and for inspection of, and workmanship on, equipment purchased from third parties.

3.5.1.5 Deleted.

3.5.1.6 CONTRACTOR will perform the Work in accordance with Appendix A.

3.5.1.7 Any breach of the above warranties will constitute a "Defect." If HOVENSA believes there is a Defect, HOVENSA will notify CONTRACTOR of the Defect in writing describing the nature of the Defect.

3.5.2 CONTRACTOR recognizes that the soil conditions at the Facility site, as reflected in this Agreement, require special engineering considerations and has represented its design will take into account and address these conditions. Accordingly, CONTRACTOR warrants the foundation and structural designs will be performed in accordance with the standards of care and diligence normally practiced by recognized engineering firms in performing work of a similar nature and will be free of defects within the parameters set by the Engineering Standards in Appendix C ("Structural Warranty"). If (a) within the one (1) year period following termination of CONTRACTOR's Work as set forth in Article XI, or (b) within ten (10) years from Mechanical Completion, any foundation or structural design is found to be defective ("Structural Defects"), CONTRACTOR will furnish, free of charge, new designs, other engineering services and other project management services required to remedy or correct the Structural Defects, except to the extent due to force majeure, provided HOVENSA has notified CONTRACTOR in writing, within a reasonable time, but not later than thirty (30) days

after discovery of the deficiencies and within thirty (30) days after the expiration of the warranty period, describing the nature of the Structural Defect.

3.5.3.1 If any of the warranties set forth in 3.5.1 or 3.5.2 is breached, CONTRACTOR will furnish, free of charge, new designs, other engineering services and other project management services required to remedy or correct any Defects or Structural Defects. CONTRACTOR will use all reasonable efforts to remedy any Structural Defect so as to avoid disruption of HOVENSA's operations. CONTRACTOR's obligations under this Article 3.5.3.1 are collectively called the "Repairs." For a Repair performed during the first 6 months of the Warranty Period, the Warranty Period will be deemed extended for the balance of the initial 12 months as stated under Article 3.5.1. For a Repair performed after the first 6 months of the Warranty Period, for the remedied Defect only, the Warranty Period will be extended for the balance of the initial 12 months as stated under Article 3.5.1 and an additional period of 6 months.

3.5.3.2 All responsibility for pursuing Contractor's subcontractors or sub-vendors for support will remain with Contractor, as well as providing whatever is needed in addition to the subcontractor's or sub-vendors' material/equipment warranty to ensure that the Repairs are made at no cost to HOVENSA.

3.5.3.3 If Defects or Structural Defects in CONTRACTOR's Work or equipment procurement result in additional field construction costs to remedy the deficiencies or defects caused, CONTRACTOR will bear the cost of the additional construction labor, materials and equipment required for the correction of the defects or deficiencies.

3.5.4 CONTRACTOR'S warranty does not extend to and CONTRACTOR will never be liable for defects or damages to the extent due to (i) improper operation or maintenance of the Plant by HOVENSA, (ii) normal wear and tear, (iii) normal corrosion

10



or erosion, provided CONTRACTOR complies with all requirements of the Work. (iv) defective materials or equipment not supplied by CONTRACTOR or CONTRACTOR's subcontractors, vendors or suppliers, or (v) deficient engineering and design work not furnished by CONTRACTOR or its subcontractors, whether arising in contract, tort (including negligence) or otherwise.

     3.5.5   HOVENSA will provide CONTRACTOR's representatives reasonable access to the Facility for the purpose of observing its operation and maintenance on reasonable notice during times agreed by HOVENSA and CONTRACTOR. CONTRACTOR acknowledges that warranty Work must be coordinated with the ongoing operations of the Refinery.

     3.5.6   CONTRACTOR will review all data provided to it by HOVENSA, its process know-how Licensors or its equipment suppliers and notify HOVENSA in writing of inconsistencies or questions that require resolution in order to keep possible remedial work to a minimum.

     3.5.7   The warranties and remedies for breach of warranty in this Agreement are the exclusive warranties and remedies by CONTRACTOR applicable to the Work and are in lieu of any other warranties, express or implied, whether under this Agreement, at law or otherwise. CONTRACTOR expressly disclaims other guarantees or warranties of any kind or description, whether express or implied, and whether arising under law or equity or trade custom, including warranties of merchantability and fitness for a particular purpose.

     3.5.8  <u>Performance Guarantees</u> - CONTRACTOR guarantees that the Facility will be capable of performing as defined under Appendix J. CONTRACTOR's responsibility will extend until a successful completion of *performance* test runs of the Facility in accordance with Appendix B, Article 11.2. If for reasons not attributable to CONTRACTOR, the Acceptance Test is not performed within sixty (60) days from



11

Mechanical Completion, performance guarantees will be deemed met solely for the purpose calculating time periods under the warranties and for payment obligations. If for reasons not attributable to CONTRACTOR, the Acceptance Test is not performed within two hundred forty (240) days from Mechanical Completion, performance guarantees will be deemed met for all purposes.

3.5.9    Materials and Equipment - CONTRACTOR will pursue recourse against vendors and suppliers for faulty or defective material or equipment, with the support of HOVENSA, if required.

3.6    HOVENSA's review of CONTRACTOR's work - HOVENSA will have the right to review the progress of CONTRACTOR's Work as it proceeds.

3.7    HOVENSA's Acceptance of CONTRACTOR's Work - Upon completion of CONTRACTOR's design for any part of the Facilities and prior to commencing work on the final detailed design of that part, CONTRACTOR will submit key drawings and documents for HOVENSA's written acceptance in accordance with Appendix B; the key drawings and documents will consist of general specifications and standards, foundation design, welding procedures, plot plans, process flow diagrams, piping and instrumentation diagrams, electrical one-line drawings, electrical area classification drawings, underground conceptual drawings, building layouts and any other drawings as agreed upon in writing by HOVENSA and CONTRACTOR. Subject to Appendix B, Section 8.3, HOVENSA will have the right to require modifications to the drawings and documents and HOVENSA will notify CONTRACTOR in writing of its acceptance or of any modifications within ten (10) working days, except for critical items (heater, Texas tower exchanger, reactor, compressor and exchangers) where the response time will be ten (10) calendar days, after HOVENSA's receipt of them.

3.8    Deleted.

3.9    Vendor Equipment



12

3.9.1    Where new equipment is to be purchased for the Facilities, CONTRACTOR warrants the accuracy and adequacy of its specifications and requisitions for the equipment. CONTRACTOR will, for the protection of HOVENSA, demand warranties from all vendors for machinery, equipment and materials used and installed in the Work, which will be no less favorable than the standard warranty available in the industry. These warranties will be made available to HOVENSA to the full extent of their terms and will be in CONTRACTOR's and HOVENSA's names. HOVENSA will attempt to secure enforcement in its name only if CONTRACTOR is in breach of its warranties obligations to HOVENSA and has not properly and timely enforced any related vendor's warranties. These warranties will extend for twelve (12) months after the machinery, equipment or materials have been placed in operation or after services have been performed, and accepted. Title to all equipment and materials will pass to HOVENSA, if shipped by water, on the high seas outside the territorial limits of any jurisdiction on board the vessel, or, if shipped by air, in international airspace, outside the territorial limits of any jurisdiction, on the aircraft, transporting them to the Virgin Islands. Risk of loss will pass from CONTRACTOR to Construction Contractor at the time the equipment or materials are first unloaded on St. Croix from the vessel or aircraft.

3.10    Initially, CONTRACTOR will be entitled to rely upon information and data on soil and subsoil communicated by HOVENSA in writing and contained in Appendix N, Exhibit 2. Contractor's price and schedule are based on this information. HOVENSA will make the Work Site available to CONTRACTOR for testing not later than April 30, 2005. CONTRACTOR will perform any soil and subsoil testing within thirty (30) days of the site being made available. The results of CONTRACTOR's testing will be sent to an independent laboratory for review. CONTRACTOR will notify HOVENSA in writing of the results and any requested Change Order within four (4) to six (6) weeks. If the results of the testing and survey reveal discrepancies or contradictions with information and data on soil and subsoil as contained in this Agreement or show unexpected site conditions having an impact on either the price or the schedule conditions, as agreed under this Agreement, then CONTRACTOR will be entitled to a



13



Change Order for a corresponding adjustment in the compensation and/or the project schedule.. Once CONTRACTOR has performed its testing or elected not to do so, it will have sole responsibility for the soil and subsoil conditions

IV.    OBLIGATIONS OF CONTRACTOR

4.1    The Work will be executed as expeditiously as possible, in accordance with HOVENSA- approved schedules. The Project Schedule is attached as Appendix E. The procurement and delivery dates of operating equipment and materials are listed on Appendix E. Changes in the Work that do not affect the critical path will not be the basis for a Change in the Project Schedule.

4.2    Compliance With Laws, Permits and Regulations

4.2.1    CONTRACTOR will comply with all United States federal, state, U.S. Virgin Islands or other laws, regulations, ordinances or rules that pertain to the Work and HOVENSA will not be liable for, and CONTRACTOR will indemnify HOVENSA against, any violation by CONTRACTOR of any laws, regulations, ordinances or rules.

4.2.2    The Compensation and/or Project Schedule will be adjusted by a Change Order as a result of the execution of any new law or regulation or of any change in existing laws and regulations as stated under 4.2.1. above or as a result of any binding change in the interpretation of any applicable said law or regulation of any United States federal, state or local U.S. Virgin Islands authority having jurisdiction over the Agreement and the Work, which occurs after December 9, 2004, (and which will be deemed to include any change in the interpretation or application, including how customs duties are handled, by competent authorities).

4.3    Pollution Abatement, Noise and Safety



14



4.3.1   CONTRACTOR will design the Work so it complies with all environmental laws, orders, rules, regulations and permits in effect or proposed in an official register.

4.3.2   CONTRACTOR will design the Work so it will comply with all rules, regulations, orders, standards and interpretations promulgated under the Occupational Safety and Health Act (1970), as amended, and any state or territorial laws.

4.4   Permits

Where appropriate, all permits and licenses required for the Work and which will be obtained by CONTRACTOR will be in the name of HOVENSA.

4.5   Assessments

CONTRACTOR will pay all U.S. federal, state and locally imposed contributions, assessments and taxes which are based upon the wages or other remuneration paid to persons employed by CONTRACTOR on the Work. CONTRACTOR will insure that no state or local sales tax is imposed on items purchased for the Facilities.  CONTRACTOR will provide export certificates to the vendors and otherwise comply with the law of the applicable state to insure no sales tax is either charged or due.

4.6   Patents

4.6.1 CONTRACTOR will defend and indemnify HOVENSA against all claims, loss, damage and expense arising out of the infringement of any United States patent, copyright, trade secrets or other property rights and asserted against HOVENSA in connection with the performance of the Work or subsequent operation of the Facility, provided HOVENSA promptly notifies CONTRACTOR in writing of the threat or commencement of any suit or claim and permits CONTRACTOR to control its defense. CONTRACTOR will pay any settlement, judgment and all court costs awarded against



15



HOVENSA in any suit and all compensation and expenses of its own counsel and experts in connection with the suit or claim. HOVENSA may be represented by counsel of its selection, at its expense. HOVENSA will cooperate fully in the defense of any suit or proceeding, at CONTRACTOR's expense, to the extent of furnishing evidence which is within HOVENSA's control. Upon notice from HOVENSA or from third parties of a claim arising from any property right, CONTRACTOR may procure for HOVENSA the paid-up right to continue using the designs, processes or other property, replace them with noninfringing substitutes, or avoid the infringement or claim thereof by modifications thereto, as long as the Facilities or production from them are not adversely affected.

4.6.2    For any equipment, materials and accessories which are purchased by CONTRACTOR in the performance of the Work, CONTRACTOR will exert all reasonable efforts to obtain from the suppliers thereof statements agreeing to hold HOVENSA harmless against any and all United States patent infringements. If indemnification is not available, CONTRACTOR will notify HOVENSA prior to purchase of the equipment, materials and accessories. CONTRACTOR will not have any liability to HOVENSA for patent infringement by vendors or subcontractors providing materials or equipment of their design.

4.6.3    HOVENSA will defend and indemnify CONTRACTOR under the same terms as set out under Article 4.6.1 above against all claims, loss, damage and expense arising out of the infringement of any patent, copyright, trade secrets or other property rights and asserted against CONTRACTOR or HOVENSA in connection with the performance of the Work or subsequent operation of the Facility, to the extent relating to HOVENSA's know-how Process Licensors or plans, drawings or specifications furnished by HOVENSA to CONTRACTOR.



4.7    Inspection, Expediting and Traffic. CONTRACTOR will provide all inspection, expediting and traffic control (including marshalling yard and freight forwarding) services for all operating equipment and materials required for the Facilities.

4.8    Cooperation in Financing. CONTRACTOR will furnish information, consents, certificates, opinions of counsel, and other documents or assistance-related to CONTRACTOR's corporate authorization to undertake the obligations in this Agreement as may be reasonably requested by any lender for its sole use for the financing of the Facility and will be compensated by HOVENSA on a reimbursable basis for any related reasonable costs and expenses, if any, relating to such assistance. The parties agree to negotiate in good faith concerning any reasonable amendment or addition to this Agreement required by any lender.

## V.    *Deleted*

## VI.    HOVENSA's WORK AND SERVICES

6.1 Materials and Services - HOVENSA will provide, at its expense, land, materials, equipment and services as listed in Appendix I.

6.2    Construction Services - HOVENSA will provide all construction services directly or through a construction contractor of its choice (the "Construction Contractor"). CONTRACTOR will cooperate and coordinate with Construction Contractor as required. CONTRACTOR and Construction Contractor are affiliated companies and CONTRACTOR will not use any delays or any action or inaction by Construction Contractor to excuse any breach or nonperformance, including delay, by CONTRACTOR under this Agreement.

6.3    CONTRACTOR will perform the Work in accordance with the Project Schedule as per Appendix E to this Agreement and will be responsible for delays caused by CONTRACTOR to the sole extent of the remedies as provided for under Appendix K.



17



6.4    <u>Start-Up Services</u> - HOVENSA will be responsible for all start-up services with support of CONTRACTOR.

VII.    <u>INDEMNITY; INSURANCE REQUIREMENTS</u>

7.1    CONTRACTOR will defend, indemnify and release HOVENSA and its members, affiliates, successors and assigns and their parents, subsidiaries and affiliates (collectively called "Indemnified Parties"), up to the gross sum of the first $10,000,000 for each occurrence and a total of $20,000,000 in the aggregate, against all claims, causes of action, damages, liabilities, attorneys' fees and related expenses (herein "Claims") which the Indemnified Parties may suffer or for which the Indemnified Parties may be liable, by reason of actual or claimed injury (including death) to any person, or actual or claimed physical damage to any property (including the Facilities), directly or indirectly caused or contributed to, or claimed to be caused or contributed to by reason of any act, omission or negligence, including strict liability, whether active or passive, of CONTRACTOR, its employees or its subcontractors, or of anyone for whose acts they are liable, or of anyone acting under their direction or control, or in connection with, or incident to, performance of this Contract, unless caused by the sole negligence or sole willful misconduct of the Indemnified Parties. CONTRACTOR will do this notwithstanding the Virgin Islands Comparative Negligence Statute, Title 5 V.I.C. Section 1451. In all cases covered hereunder, CONTRACTOR will initially defend the Indemnified Parties until it is judicially determined that any liability was caused by the sole negligence or sole willful misconduct of the Indemnified Parties exclusive of any fault of the plaintiff, plaintiff's employer, or any other party or non-party to the lawsuit. If it is so determined, HOVENSA will reimburse CONTRACTOR or its insurance carrier for all judgments and expenses incurred, including reasonable attorneys' fees and the reasonable costs incurred by CONTRACTOR or its insurer in defending any Claims arising from such liability.



18



7.1.1    To the extent any claims exceed the limits set forth in Article 7.1, CONTRACTOR will defend and indemnify the Indemnified Parties from any claim, liability, loss, cost or expense claimed by third parties for property damage or bodily injury, including death, to the extent caused by the negligence or willful misconduct of CONTRACTOR, its agents, employees or CONTRACTOR's affiliates, in connection with CONTRACTOR's performance of the Work.

7.1.2    To the extent any claims exceed the limits set forth in Article 7.1, HOVENSA will defend and indemnify CONTRACTOR from any claim, liability, loss, cost or expense claimed by third parties for property damage and bodily injury, including death, to the extent caused by the negligence or willful misconduct of the Indemnified Parties, its agents or employees in connection with CONTRACTOR's performance of the Work.

7.1.3    To the extent any claims exceed the limits set forth in Article 7.1, for claims of third parties attributable to the joint negligence or willful misconduct of CONTRACTOR and the Indemnified Parties, each will be liable to the third party to the extent of its negligence or willful misconduct.

7.2    Before CONTRACTOR starts any work, CONTRACTOR will, at its expense, maintain and require its subcontractors to maintain during the performance of the Work, to the sole extent of Work performed in the US Virgin Islands and except for Worker's /Employer's liability, insurance in form and with insurance companies satisfactory to HOVENSA and authorized to do business in the U.S. Virgin Islands as follows:

7.2.1.1 Worker's Compensation insurance covering CONTRACTOR's obligations under all applicable laws and Employer's Liability insurance in the amount of $1,000,000 per occurrence.

7.2.2 General Liability insurance, including contractual liability and completed operations, with limits of $10,000,000 combined single limit, per occurrence, bodily injury and property damage, with a total of $20,000,000 in the aggregate. The policy



19



and amounts of cover set out above are not intended to duplicate the policy or amounts of cover under the Construction Agreement with Construction Contractor and the aggregate will cover both this Agreement and the Construction Agreement. HOVENSA will have the option to provide this insurance and if it elects to do so, the lump sum price will be reduced by the applicable amount from Appendix D, Exhibit 8, the indemnity in Article 7.1 will be reversed with HOVENSA providing CONTRACTOR with an indemnity to the same extent. CONTRACTOR will retain responsibility for the level of deductibles described in Appendix D, Exhibit 8. CONTRACTOR will be named as an additional insured on HOVENSA's policy and any other necessary changes will be made to reflect this arrangement.

7.2.3 To the fullest extent possible, CONTRACTOR's general liability insurance will cover the indemnity agreements and obligations in Articles 7.1.1, 7.1.2.1 and 7.1.2.3.

7.2.4 Automobile Liability insurance, with limits of $5,000,000 combined single limit per occurrence, bodily injury and property damage. The automobile insurance will apply to all vehicles used by CONTRACTOR.

7.2.5   Deleted.

7.2.6 CONTRACTOR will pay any contributions for unemployment insurance and disability benefits for the employees of CONTRACTOR required by the laws of the state or territory in which the Work is being performed.

7.2.7 Except for Workers' Compensation and Automobile Liability insurance for vehicles used outside of the U.S. Virgin Islands, prior to the commencement of any work, CONTRACTOR will furnish to HOVENSA sufficient certificates of all the insurance to be provided by CONTRACTOR, which certificates will provide that the insurance will not be canceled until at least thirty (30) days written notice is given to HOVENSA c/o Administrative Services. CONTRACTOR will promptly notify HOVENSA in writing of any changes to insurance policies which adversely affect HOVENSA. All polices of insurance



20



provided by CONTRACTOR will be primary to any other insurance available to the Indemnified Parties and will name HOVENSA and its members, affiliates, successors and assigns and their parents, subsidiaries and affiliates and HOVENSA's designated representative as additional insureds (except for worker's compensation) and provide for waiver of underwriters' rights of subrogation against the Indemnified Parties and any third party designated by HOVENSA. Insurance certificates must be identified with contract number. All insurance provided by CONTRACTOR under this Agreement will have limits and aggregates, if any, dedicated to this Agreement.

   7.2.8 CONTRACTOR will immediately notify HOVENSA's Safety Department either orally or by fax, of any incident occurring on or regarding HOVENSA's property, which results in property damage, personal injury, or death. CONTRACTOR will also furnish HOVENSA with two (2) copies of a written report of any such incident within three (3) days of its occurrence.

   7.3 CONTRACTOR will arrange for "All Risk" Cargo Insurance covering all materials, supplies, equipment and components forming part of or used in the Work via any conveyance. The insurance will be placed on the basis of worldwide to worldwide to ultimate destination in St. Croix, U.S. Virgin Islands, where coverage will cease at first place of rest at the Work site after discharge from vessel. HOVENSA and Construction Contractor will be named as additional insureds and underwriters' rights of subrogation will be waived against HOVENSA, the Joint Venture members, their parents, subsidiaries and affiliates and subcontractors and Construction Contractor.

   7.4 HOVENSA may place other insurance for its own interest. CONTRACTOR will cooperate with HOVENSA and HOVENSA's insurance representatives in placement of these coverages and, if requested by HOVENSA, coordinate placement of these insurances with the insurances arranged by CONTRACTOR.



7.5  Notwithstanding anything to the contrary in this Agreement, neither party will be liable and no claim will be made to the other for any punitive, indirect, incidental or consequential damages, loss of profits, loss of product or business interruption however it be considered, direct or indirect, and no matter how caused, whether any such claim is based or claimed to be based on negligence, fault, breach of warranty, breach of agreement, statute, strict liability by either party or otherwise.

VIII.    REPRESENTATIVES OF PARTIES

8.1  CONTRACTOR will appoint a Project Manager who will be authorized to act on behalf of CONTRACTOR and with whom HOVENSA may consult at all reasonable times concerning the Work, and whose instructions, requests and decisions will be binding upon CONTRACTOR, except that the individual will have no authority to amend or waive any of the terms of this Agreement.  The Project Manager will at all times be acceptable to HOVENSA.

8.2  HOVENSA will appoint one individual who will be authorized to act on behalf of HOVENSA and with whom CONTRACTOR may consult at all reasonable times concerning the Work and whose instructions, requests and decisions will be binding upon HOVENSA, except that the individual will have no authority to amend or waive any of the terms of this Agreement.

IX.    COMPENSATION

9.1      HOVENSA will compensate CONTRACTOR for the Lump Sum Price of USD $, as detailed in Appendix D.

9.2      Subject to written notice to CONTRACTOR and the cure provisions as stated in Article 11.3, HOVENSA may draw against any retained amounts or other security to cure any Breach by CONTRACTOR of this Agreement or any obligation arising under this Agreement.



22

9.3    CONTRACTOR will submit invoices during the performance of the Work in accordance with Appendix D. CONTRACTOR will furnish an Affidavit of Release of Liens in the form attached as Appendix D-7 with all invoices. CONTRACTOR will show any applicable Sales or Use Taxes separately on all invoices submitted to HOVENSA for payment. In order to ensure that the correct amount of tax is withheld, CONTRACTOR agrees to invoice HOVENSA separately for Work rendered in the U.S. Virgin Islands and outside the U.S. Virgin Islands. Invoices not so designated will be subject to the income tax withholding, unless the required documentation has been provided to HOVENSA by CONTRACTOR.

X.    CHANGES IN THE WORK

10.1 Changes in the Work are addressed in *Coordination Procedure Appendix B and Compensation & Terms of Payment appendix D.*

**10.2    Deleted**

XI.    BREACH, TERMINATION OR SUSPENSION OF WORK

11.1    HOVENSA will have the right to terminate this Agreement or any specific work assignment given under this Agreement, at any time and for any reason, without cause, on seventy-two (72) hours' written notice to CONTRACTOR. If there is such a termination by HOVENSA, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination and for the period required by HOVENSA for the orderly cessation of the Work, including all reasonable costs incurred by CONTRACTOR to demobilize, remove its resources from the Project, terminate subcontracts and terminate purchase orders with vendors.

11.2 The occurrence of any of the following events is a Breach of this Agreement:

11.2.1  Any defect in the Work which HOVENSA, in its sole judgment, determines to be material;



23



11.2.2  Failure, after notice has been given to CONTRACTOR of any unsafe, unsound or defective work, to begin immediately, and diligently proceed with, steps necessary to correct such work;

11.2.3  Failure to proceed with or complete the Work in accordance with the Agreement;

11.2.4  HOVENSA has reasonable grounds to believe that CONTRACTOR is or may become bankrupt, insolvent or unable to pay its debts as they become due;

11.2.5  CONTRACTOR fails to maintain materials, equipment, and personnel of such kinds and in such places as in HOVENSA'S sole judgment are reasonably required for CONTRACTOR'S performance hereunder;

11.2.6  Breach of any warranty or representation of this Agreement; or

11.2.7  Contractor becomes involved in any labor difficulties not covered in Article XII which, in HOVENSA's sole judgment, may impede or slow down the Work.

11.2.8  Failure to comply with any provision of this Agreement, which failure HOVENSA, in its sole judgment, deems to be material.

11.3    If there is a Breach under Article 11.2, HOVENSA will give CONTRACTOR written notice of the Breach and CONTRACTOR will immediately begin and diligently pursue cure of the Breach.  If CONTRACTOR does not immediately begin to cure the Breach and diligently pursue the cure, HOVENSA, in its discretion, will have the right on twenty-four (24) hours' written notice to CONTRACTOR to (a) terminate this Agreement or any Work assigned hereunder pursuant to Article 11.1, and (b) invoke such other legal remedies as may be available to HOVENSA under the Agreement.

11.4    Upon the occurrence of any event of Breach set forth above, CONTRACTOR will not be entitled to any further payment until CONTRACTOR has taken the necessary steps so that the Breach is remedied to the satisfaction of HOVENSA, whereupon CONTRACTOR will then be paid only the amount as is due for

24



Work properly performed by CONTRACTOR less all reasonable additional expense suffered by HOVENSA as a result of the Breach. If the additional expense exceeds the amount due to CONTRACTOR, the amount will be paid immediately to HOVENSA by CONTRACTOR. Subject to remedies as provided under mandatory law which will always be available to HOVENSA, all remedies afforded to HOVENSA under this Agreement will be deemed to be the sole rights or remedies available to HOVENSA whether at law, equity, trade customs or otherwise.

11.5    HOVENSA may at any time suspend performance of all or any part of the Work by giving twenty-four (24) hours' written notice to CONTRACTOR. This suspension may be continued by HOVENSA for a period of up to forty-five (45) calendar days or one hundred eighty (180) calendar days if related to an event of force majeure (it being understood that in the case of a force majeure no notice from HOVENSA is required), during which time HOVENSA may at any time, by written notice, require CONTRACTOR to resume performance of the Work. In any case, CONTRACTOR will always be compensated by HOVENSA for reasonable and justified costs or expenses either incurred or suffered as a result thereof, from the seventh (7) day of said suspension or from the fifteenth (15th) day if due to force majeure. Either party will have the right to terminate this Agreement as per conditions under Article 11.1 above, if any such suspension lasts for more than ninety (90) days in the aggregate (one hundred eighty (180) days if due to force majeure). If there is such a termination, or if this Agreement is terminated for a force majeure, HOVENSA will compensate CONTRACTOR in accordance with Appendix D based on the percentage of the Work completed up to the date of termination for and for the period required by HOVENSA for the orderly cessation of the terminated Work, including all reasonable demobilization costs and reasonable costs linked to terminating subcontracts and purchase orders with vendors incurred by CONTRACTOR as a result thereof.



25



11.6    If there is a termination for any reason, CONTRACTOR will cooperate in keeping costs and losses to a minimum, including transfer of Work in progress to HOVENSA. CONTRACTOR will use all reasonable efforts to comply with HOVENSA's instructions concerning the time and manner of termination of the Work and will without additional charge execute such assignments or other documents as HOVENSA may require to vest in HOVENSA all, or such part as HOVENSA may require, of such rights in subcontracts or purchase orders as CONTRACTOR may have placed in relation to this Agreement. If such termination occurs, HOVENSA reserves the right to perform the Work with its forces.

11.7    Any termination of this Agreement will not affect the warranty, secrecy, confidentiality or other obligations under this Agreement which by their nature would survive.

11.8    If an invoice properly due remains unpaid in whole or in part for more than thirty (30) days, CONTRACTOR may give written notice to HOVENSA and if payment is not made within thirty (30) days of the notice, CONTRACTOR may suspend the Work until receipt from HOVENSA of the full, unpaid amount. If any such invoice remains unpaid in whole or in part for more than ninety (90) days, provided notice has been given as stated above, then CONTRACTOR will be entitled to terminate this Agreement and be compensated by HOVENSA pursuant to conditions as set out under Article 11.1.

XII.    FORCE MAJEURE

12.1 Any delays in or failure of performance by either party under this Agreement will not constitute Breach hereunder or give rise to any claims for damages to the extent caused by occurrences beyond the foreseeable and reasonable control of the affected party, and which could not have been avoided by the affected party's reasonable best efforts, including but not limited to, acts of governmental authority, acts



26



of God, named tropical storms where HOVENSA had advised its subcontractors to suspend work, strikes or other concerted acts of workers, fires, explosions, riots, wars, rebellions and sabotage, freight embargoes, fires, floods, acts of public enemy, civil disturbances, new or changed rules or regulations of any governmental authorities (civil or military) otherwise having jurisdiction over the Work and relating to import or export, and materially affecting performance under the Agreement.

12.2    Resumption of Work will be covered as under Article 11.5.

12.3    For events of Force Majeure lasting more than fifteen (15) continuous days, HOVENSA and CONTRACTOR will negotiate in good faith an adjustment to the Project Schedule (with associated relief for liquidated damages) and the E&P Agreement Price for the additional costs reasonably incurred by CONTRACTOR as a direct result of the event of Force Majeure.

XIII.    Deleted.

XIV.    <u>ASSIGNMENT</u>

14.1 The rights and obligations under this Agreement are not assignable by either party without the written consent of the other party (except that such rights and obligations may be assigned without such consent to the successor of either party or to a person, firm or corporation acquiring all or substantially all of the business and assets of such party).  No assignments of the rights and obligation of a party to this Agreement will be valid unless such rights and obligations are assumed by the assignee.  When assigned in accordance with the foregoing, the rights and obligations of a party to this Agreement will be binding upon and be for the benefit of the assignee, but the assignor will remain liable to the other party for its obligations under this Agreement.

XV.    <u>AUDIT</u>

15.1 CONTRACTOR and CONTRACTOR's subcontractor's will permit HOVENSA or its agents or representatives, without undue delay, to have access at



27



reasonable times to review and audit all records and accounts, except where relating to lump sum prices and as necessary to ensure and validate CONTRACTOR's compliance with this Agreement. Reviews and audits may be made within two years of last invoice.

15.2 To the same extent as stated in Article 15.1, CONTRACTOR will require, in contracts with any subcontractors who perform services in connection with this Agreement, that HOVENSA or its agents or representatives, without undue delay, will have access to review and audit all subcontractor's records and accounts necessary to ensure and validate compliance with this Agreement. Subcontractor reviews and audits may be made within two years of last invoice.

XVI.    WAIVER

16.1 A waiver on the part of HOVENSA or CONTRACTOR of any term or breach of this Agreement will not constitute a precedent nor bind either party to a subsequent waiver of any succeeding term or breach.

XVII.    ENTIRETY OF AGREEMENT

17.1 This Agreement, including the Appendices and other documents incorporated by reference is the entire agreement between HOVENSA and CONTRACTOR regarding the matters covered herein and there are no other agreements, representations or obligations for the Work.

XVIII.    SECRECY AND PUBLICITY

18.1 CONTRACTOR will not, without written approval of HOVENSA, give any publicity pertaining to the Facilities nor divulge to any third parties any details pertaining to the Work or any of HOVENSA's facilities except as absolutely necessary for the due performance of the Work.

XIX.    CONFLICT OF INTEREST

19.1 CONTRACTOR acknowledges that HOVENSA has issued a policy relating to conflicts of interest between HOVENSA and its employees, a copy of which is



28



attached as Appendix AB, Exhibit 27. In order to assure compliance with this policy, CONTRACTOR will not, before, during or after performance of the Work, make, offer, provide or agree to make, offer or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value to (i) any employee, agent or representative of HOVENSA, (ii) any member of their immediate families, or (iii) anyone claiming to act or acting for or in behalf of any such person, nor will CONTRACTOR permit any person described in (i), (ii) or (iii) above, to have any financial or economic interest in CONTRACTOR or any subsidiary or affiliate of CONTRACTOR. If CONTRACTOR is requested to make or provide any payment, gift, fee, discount, commission, percentage, loan, service, entertainment, substantial favor or anything of value, by any person described in (i), (ii) or (iii) above, CONTRACTOR will report the request immediately to HOVENSA in the manner provided for the giving of notice under this Agreement. The failure by CONTRACTOR to adhere strictly to the provisions of this Article will be deemed by CONTRACTOR and HOVENSA to be a substantial and material breach of this Agreement, and at HOVENSA's sole option will be grounds for immediate suspension or termination, by reason of Breach, of this Agreement. All subcontracts or material supply contracts permitted or required in connection with performance of the Work will contain provisions in substantially the same form and substance as this Article binding the subcontractors or material suppliers to the same obligations hereunder as CONTRACTOR.

XX.    SUBCONTRACTS AND DELEGATION

20.1 CONTRACTOR will not subcontract or delegate any of its obligations under this Agreement without the written consent of HOVENSA. HOVENSA's approval of any subcontract will not relieve CONTRACTOR of any of its obligations under this Agreement. CONTRACTOR will, for the protection of HOVENSA, make all reasonable efforts to obtain warranties from all subcontractors with respect to services performed.





29

These warranties will be made available to CONTRACTOR and assigned to HOVENSA in case of termination or assignment of this Agreement under Article XI or XIV, to the full extent of the terms thereof and will extend for twelve (12) months after services have been performed and accepted or for such other period of time as may be obtainable from such subcontractors.   This provision will not affect CONTRACTOR's other obligations hereunder.

XXI.    AS-BUILT DRAWINGS

21.1 CONTRACTOR will, during the course of construction of the Facilities, produce originals of "as-built" drawings to show the condition of the Facilities after the completion of the Work.  The "as-built" drawings required by HOVENSA are listed in Appendix A.

XXII.    NOTICES

22.1 All notices will be sent by facsimile and by Certified Mail, Return Receipt Requested or recognized overnight carrier.

22.2 All notices and communications required to be given CONTRACTOR will be in duplicate, the original addressed to:

(CONTRACTOR TO ADVISE)





22.3  All notices and communications required to be given to HOVENSA will be addressed to:

Project Manager – (PROJECT NAME)

    1 Estate Hope

    Christiansted, U.S. Virgin Islands 00820-5652

    Facsimile No.

and a copy to:

    Vice President and Chief Administrative Officer

    1 Estate Hope

    Christiansted, U.S. Virgin Islands 00820-5652

    Facsimile No.:

and a copy to:

    Director, Administrative Services

    1 Estate Hope

    Christiansted, U.S. Virgin Islands 00820-5652

    Facsimile No.:

and a copy to:

    PDVSA V.I., Inc.

    1A Frederiksberg Gade

    St. Thomas, U.S. Virgin Islands, 00802

    Facsimile No.

XXIII. LIENS

23.1  CONTRACTOR will indemnify HOVENSA against the attachment of liens or encumbrances where CONTRACTOR has wrongfully failed to pay a vendor or subcontractor.





XXIV. <u>GOVERNING LAW; DISPUTE RESOLUTION</u>

24.1 <u>Governing Law</u> - This agreement will be governed by and construed under the laws of the State of New York, U.S.A., without regard to its conflict of law rules.

24.2 <u>Dispute Resolution</u>.

24.2.1 If there is a dispute between HOVENSA and CONTRACTOR on the application or interpretation of this Agreement, the aggrieved Party will notify the other Party of its intent to invoke this dispute resolution procedure within ten (10) business days after the dispute arises. If the Parties fail to resolve the dispute within the ten (10) business days after delivery of the Notice, each Party will, within five (5) business days thereafter, nominate an officer of its management to meet at the Facility, or at any other agreed location, to resolve the dispute. If the Parties are unable to resolve the dispute to their satisfaction within ten (10) business days after the nomination, either Party has the right to commence litigation on the dispute. Any such litigation must be brought exclusively in the U.S. District Court, Southern District of New York, United States of America and the parties hereby submit to the jurisdiction of such courts and waive any objection to venue or jurisdiction in such courts. The dispute resolution procedures set forth in this Section will be the sole and exclusive dispute resolution procedures available to the Parties under this Agreement.

24.2.2 The Parties may agree to resolve the dispute by arbitration. Any arbitration will be conducted in the City of New York, State of New York, United States of America, in the English language in accordance with the rules of procedure of the American Arbitration Association (the "AAA"). Each party will nominate within thirty (30) days of the commencement of proceedings, one arbitrator. If any Party fails to nominate an arbitrator within the stated time period, the AAA will appoint an arbitrator for the Party. The two arbitrators nominated by the Parties or appointed by the AAA for any Party will jointly nominate a third arbitrator, who will chair the arbitration panel. If the arbitrators

nominated by the Parties do not succeed in nominating a third arbitrator within ten (10) days, the arbitrator will be appointed by the AAA. The award of the arbitral tribunal will be final and binding upon the Parties.

24.2.3 CONTRACTOR will cause a provision substantively the same as this Section 24.2 to be included in any contract between CONTRACTOR and any subcontractor to ensure that all disputes arising out of the performance of the Work, or any portion thereof, are subject, to the fullest extent possible, to the dispute resolution procedures set forth in Section 24.2.1 and 24.2.2.

XXV. NON-COLLUSIVE BIDDING

25.1 If this Agreement was awarded on the basis of competitive bidding, CONTRACTOR warrants that it has not consulted with any other contractor or person who has bid on the Work and that its bid was arrived at independently of any discussions or collusion with others.

XXVI. EQUAL OPPORTUNITY

26.1. Non-Discrimination in Employment - CONTRACTOR will comply with the equal opportunity clause published in the regulations of the U.S. Department of Labor implementing Executive Order 11246, which is incorporated in this Agreement by reference.

26.2. Affirmative Action for Handicapped Workers - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503 of the Rehabilitation Act of 1973, Public Law 93-112, as amended, which are incorporated in this Agreement by reference.

26.3 Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era - CONTRACTOR will comply with the affirmative action clause and regulations published by the U.S. Department of Labor implementing Section 503, Title V of the Vietnam Era





Veteran's Readjustment Assistance Act of 1972, Public Law 92-540, as amended, and Executive Order 11701, which are incorporated in this Agreement by reference.

26.4.  Certification of Nonsegregated Facilities - CONTRACTOR certifies that it does not and will not maintain any facilities it provides for its employees in a manner which will result in segregation on the basis of race, color, religion, sex or national origin, or permit its employees to perform their services at any location, under its control, where segregated facilities are maintained; and that it will obtain a similar certification prior to the award of any non-exempt subcontract.

26.5.  Minority Business Enterprises - CONTRACTOR will comply with the minority business enterprise clauses and regulations published by the U.S. Department of Commerce implementing Executive Order 11625, which are incorporated in this Agreement by reference.

XXVII. AMENDMENTS

27. No amendments to this Agreement will be enforceable against either party unless in writing and signed by the parties

XXVIII. WITHHOLDING TAX.

28. The laws of the U.S. Virgin Islands require HOVENSA to withhold from contractors who are foreign (non USVI) corporations, an income tax of 11% from all payments made by HOVENSA for services performed by CONTRACTOR in the USVI. For all other foreign (non-USVI) entities and non-resident aliens, the withholding tax rate is 10%. Payments made to U. S. citizens or for services rendered outside the USVI, are not subject to withholding. Unless CONTRACTOR has provided HOVENSA with a copy of CONTRACTOR's USVI business license, and an IRS form W-8ECI, as proof that CONTRACTOR is exempt from the income tax withholding for payments otherwise subject to withholding, HOVENSA will withhold and pay the requisite amounts to the

 USVI Bureau of Internal Revenue.



XXIX.  LIMIT ON CONTRACTOR'S LIABILITY.

29.1  CONTRACTOR'S overall limit of liability for obligations, liabilities, guarantees, warranties and indemnification, whether expressed or implied, howsoever arising under or relating to this Agreement and the performance of the Work will be limited as set forth in Appendix D, as it may be revised, and the foregoing limitation will apply whether the liability arises in contract, breach of warranty or tort, including but not limited to negligence and strict liability or otherwise.

29.2  Notwithstanding the above, the following are excluded from this limit of liability:

29.2.1  All sums recovered by CONTRACTOR from the insurance under this Agreement.

29.2.2  CONTRACTOR's obligation to achieve Mechanical Completion as defined in Appendix A.

29.2.3  CONTRACTOR's warranty obligations under this Agreement during the Warranty Period.

29.2.4  Intellectual Property indemnification under Article 4.6.1.

29.2.5  Maintaining the Work, the Facilities and the site free of any lien.

29.2.6  CONTRACTOR's obligations under Articles 7.1.1 and 7.1.3.

29.2.7  Fraud by CONTRACTOR or its agents, subcontractors or affiliates.

29.2.8  Compliance with laws.

29.2.9  Breach of confidentiality.

29.2.10  The following Performance Guarantees as per Appendices G, H, J:

29.2.10.1  Throughput guarantee of 50,000 bpsd.

29.2.10.2  $H_2S$ content of stripper effluent.





29.2.10.3    Reactor outlet pressure.

29.2.10.4    NOX guarantees.

29.2.10.5    Unit turndown.

29.3    For the purpose of computing Agreement Price under this Article, Article 30.1 or in connection with any required retainage, bank guaranty or letter of credit, any amounts paid by HOVENSA to the HOVENSA Contractors or Lessors, as defined in Appendix AF, will be added to the Agreement Price paid to CONTRACTOR.

29.4    If, solely as a result of this Article, any portion of the amounts paid to CONTRACTOR become subject to U.S. Virgin Islands taxation, through no fault of CONTRACTOR, HOVENSA will be responsible for those taxes.

## XXX.    LIMIT ON HOVENSA'S LIABILITY.

30.1    HOVENSA's overall limit of liability for obligations, liabilities, guarantees, warranties and indemnification, whether expressed or implied, howsoever arising under or relating to this Agreement and the Work will be limited as set forth in Appendix D, as it may be revised, and the foregoing limitation will apply whether the liability arises in contract, breach of warranty or tort, including but not limited to negligence and strict liability or otherwise.

30.2    Notwithstanding the above, the following are excluded from this limit of liability:

30.2.1  All sums recovered by HOVENSA from the insurance under this Agreement.

30.2.2  HOVENSA's obligation to pay the Compensation due under this Agreement, including any Change Orders.

30.2.3  Intellectual Property indemnification under Article 4.6.3.

30.2.4  HOVENSA's obligations under Articles 7.1.2 and 7.1.3.

30.2.5  Fraud by HOVENSA or its agents, subcontractors or affiliates.



30.2.6  Compliance with laws.

30.2.7  Breach of confidentiality.

30.2.8  Any arbitral award in the nature of compensation for Work performed.

30.2.9  Any payments due CONTRACTOR under Articles 11.1, 11.4 or 11.5.

30.3  If, solely as a result of this Article, any portion of the amounts paid to CONTRACTOR become subject to U.S. Virgin Islands taxation, through no fault of CONTRACTOR, HOVENSA will be responsible for those taxes.

IN WITNESS WHEREOF, this Agreement and the attached appendices have been reviewed by agents of both parties and this Agreement is executed, stamped with Corporate Seals and delivered, by the authorized officials of each corporation.

ATTEST:                                    HOVENSA L.L.C.

MARCO CROVES.                    By _____
V.P. & DEP. C.O.O.                        LARRY KUPFER
                                                            PRESIDENT
ATTEST:

                                                    TECHNIP ITALY S.p.A.

Georges SARIGIANNIS

                                                    By _NICOLA GRECO_
                                                            CEO

EXHIBIT 7

## SETTLEMENT AGREEMENT

Settlement Agreement ("Settlement Agreement") dated March 31, 2006, among HOVENSA L.L.C. ("HOVENSA"), TECHNIP ITALY S.p.A., organized under the laws of Italy (Technip Italy) and TPVI, a U.S. Virgin Islands corporation having an office at One Hibiscus Alley, Charlotte Amalie, St. Thomas, U.S. Virgin Islands (TPVI). Technip Italy and TPVI are collectively referred to herein as "Technip".

### EXPLANATORY STATEMENT:

A.      HOVENSA is the owner and operator of an oil refinery located in St. Croix, U.S. Virgin Islands (the "Refinery").

B.      HOVENSA and Technip Italy entered into a lump sum agreement dated March 10, 2005 (HVS-0663), for engineering design, procurement and project management (the Engineering and Procurement Agreement) in connection with construction of a Low Sulfur Gasoline Hydrotreater and related facilities at the Refinery (the "Facilities"). HOVENSA and TPVI entered into a lump sum agreement dated March 10, 2005 (HVS-0664) for construction of the Facilities (the Construction Agreement). The Engineering and Procurement Agreement and Construction Agreement are referred to collectively as the "Agreements."

C.      Technip has presented claims to HOVENSA under the Agreements for payments of amounts in connection with additional costs it claims to have incurred and will incur by virtue of events it alleges constitute force majeure, as defined in the Agreements (the "Claims").

D.      The parties have now reached an amicable resolution of the Claims. 

1



F.    The terms used in this Settlement Agreement that are Defined Terms in the Agreements have their defined meaning.

**THE PARTIES AGREE AS FOLLOWS:**

1.    In full settlement of the Claims and any claims that have been raised or could have been raised as a result of any event of force majeure occurring up to the date of this Agreement, that has or may affect the Work, and all claims of Technip under the Agreements that have been raised by Technip or could have been raised to date, excluding any claims that Technip may file for changes to the Work related to activities at the Refinery in St. Croix and unrelated to any event of force majeure;

(a)    The sum of Three Million U.S. Dollars ($3,000,000) is added to the lump sum price under the Construction Agreement, Appendix D; Exhibit 1, Section 1.3, bringing the total lump sum price to U.S. **$53,000,000**.

(b)    Section A.2. of Appendix K is deleted and replaced with the following:

> "A.2. For each day that Mechanical Completion is delayed beyond November 10, 2006, except to the extent due to the actions of HOVENSA, CONTRACTOR will pay to HOVENSA Schedule Liquidated damages as follows:"
>
> | | |
> |---|---|
> | 0-35 days | $0 per day |
> | 36-42 days | $65,000 per day |
> | 43-49 days | $85,000 per day |
> | 50-56 days | $100,000 per day |
> | 57-63 days | $120,000 per day |
> | 64 days and thereafter | $200,000 per day " |

(c)    If TPVI achieves Mechanical Completion on or before November 10, 2006, HOVENSA will pay to TPVI an incentive bonus of One Million U.S. Dollars (US$1,000,000).

(d)    If TPVI achieves Mechanical Completion after November 10, 2006, but on or before November 20, 2006, HOVENSA will pay to TPVI an incentive bonus of Seven Hundred and Fifty Thousand U.S. Dollars (US$750,000).

(e)    If TPVI achieves Mechanical Completion after November 20, 2006, but on or before December 1, 2006, HOVENSA will pay to TPVI an incentive bonus of Five Hundred Thousand U.S. Dollars (US$500,000).

(f)    TPVI and HOVENSA acknowledge that TPVI has issued a letter of intent to Tiger St. Croix Construction Inc., Baton Rouge, Louisiana ("Tiger") for Mechanical Works, including but not limited to erection of structural steel, pipe and equipment, and support activities to build the Facilities, but excluding heavy lift. TPVI intends to finalize the mechanical works in the first week of April, 2006.

2.    The payments and incentives set out in Paragraphs 1(a), (c), (d) and (e) and the change set out in Paragraph 1(b) of this Agreement are contingent on TPVI meeting the condition set out in Paragraph 1(f) of this Agreement.

3    In return for the payments, amounts and agreements set out above, Technip releases HOVENSA from all claims and liabilities for all Claims and potential claims under the Agreements, or otherwise, including all change orders (past, present, pending or contemplated), whether submitted, for events, including force majeure events, that have occurred, issues that have arisen or for Work that has been performed as of the date of this Settlement Agreement, including any "impacts" or "ripple" effects.

3



4.    This Settlement Agreement is a compromise of disputed claims and none of the concessions made by either party under this Settlement Agreement will constitute an admission of responsibility or liability on the matters covered in this Settlement Agreement.

5.    All of the terms of this Settlement Agreement will be for and to the benefit of and bind the parties, their successors and assigns.

6.    This Settlement Agreement is the entire agreement regarding the matters herein between the parties.  No representations, warranties or promises have been made or relied upon by any party other than as set forth herein.  This Settlement Agreement operates as an amendment to the Agreements and all terms of the Agreements not expressly amended hereby will remain in effect.  This settlement agreement can only be modified in writing signed by both parties.

7.    This Settlement Agreement may be executed in counterparts, each of which will constitute the same instrument.

8.    This Settlement Agreement is deemed confidential and will not be disclosed to any person, other than by HOVENSA to its members and their parent companies and by Technip Italy and TPVI to their parent company.

9.    This Settlement Agreement takes effect subject to the governing law and dispute resolution provisions set out in the Agreements.



**IN WITNESS WHEREOF**, this Settlement Agreement is executed by the authorized officials of each company.

ATTEST:

HOVENSA L.L.C.

BY: _____

Michael J. Fennessy
Vice President and CFO

ATTEST:

TECHNIP ITALY S.p.A.

BY: _____  E. GORY

TPVI

BY: _____

V. LAGANA'

ATTEST

EXHIBIT 8

**TPVI Ltd.**

Rome March 01, 2007

TLH-HVS-0664-0056

Messrs
HOVENSA LLC
ST. CROIX REFINERY
1 ESTATE HOPE
CHRISTIAN STED
V.I.
00820 5652

Att. Mr John George – Project Manager

c.c.
Mr Van Wood  Major projects Program Managers
Ms Kara Dunphy -  Project Control
Mr Frank Tobienne – Mgr. Accounting Services
Mr Mike Fennessy – VP and CFO
Mrs Teresa Campbell- Document Control
Mr Jeff Crone-    Project Engineer

SUBJECT: Proj. 2229 LOW SULFUR GASOLINE UNIT
         Contract n. HVS-0664
         INVOICE TRANSMISSION

Dear Sirs,

Please find hereto attached one original and two copies of our invoice n. 200700022 dated March 02 , 2007.

TPVI LTD

Vincenzo LAGANA'
( Director)

TPVI LTD
PMO 115 · 4093 Diamond Ruby S.te 7
Christiansted · St Croix 00820 · USVI

**TPVI Ltd.**

# COMMERCIAL INVOICE No.200700022

## DATE  03/02/2007

| REF. PROJ. **2229** | CLIENT CODE **12682** |
|---|---|

**CLIENT:**      HOVENSA L.L.C.
            # 1 Estate Hope
            Christiansted VI
            00820-5652
            U.S.A.
            Att.n   Account Payable

**PAYMENT CONDITIONS:**   payment to be effected by wire transfer within thirty days (30) from invoice receipt, through JP Morgan 270 Park Ave. New York, N.Y. 10017 SWIFT BIC: CHASU33 CHIPS ABA: 278422 FEDWIRE ABA 021000021, Forward to: Bank of Nova Scotiabank, St. Thomas Branch P.O. Box 420 , 214C Altona & Welgunst Charlotte Amalie , St Thomas 00804, ABA # 021606056 , Credit to TPVI Ltd. Current Account # 05892032988  in the Bank of Scotiabank– St Croix  US Virgin Islands

**REFERENCE**          :  Contract no. HVS-0664 signed on  March 10th, 2005

| DESCRIPTION | AMOUNT US$ | |
|---|---|---|
| **CONSTRUCTION FOR LOW SULPHUR GASOLINE HYDROTREATER PROJECT** | | |
| **CONTRACT PRICE: US$ 50,000,000.00** | | |
| Cumulative progress amount up to | 0,00 | |
| Less amount previously invoiced | 0,00 | |
| Sub-Total | | 0,00 |
| **CHANGE ORDERS : US$ 10,000,000.00** | | |
| Cumulative progress amount up to | 0,00 | |
| Less amount previously invoiced | 0,00 | |
| Sub-Total | | 0.00 |
| **CHANGE ORDERS : US$  17,405.00** | | |
| Change Order No. 20 | 17,405.00 | |
| Less amount previously invoiced | | |
| Sub-Total | | 17,405.00 |
| Total to be paid | | 17,405.00 |

**TPVI Ltd.**

**TPVI Ltd.**

Rome January 17, 2007

TLH-HVS-0664-0072

Messrs
HOVENSA LLC
ST. CROIX REFINERY
1 ESTATE HOPE
CHRISTIAN STED
V.I.
00820 5652

Att. Mr John George – Project Manager

*c.c.*   Mr Van Wood  Major projects Program Managers
Ms Kara Dunphy -  Project Control
Mr Frank Tobienne – Mgr. Accounting Services
Mr Mike Fennessy – VP and CFO
Mrs Teresa Campbell-  Document Control

SUBJECT: Proj. 2229 LOW SULFUR GASOLINE UNIT
Contract n. HVS-0664
INVOICE TRANSMISSION

Dear Sirs,

Please find hereto attached one original and two copies of our invoice n. 200700033 dated January 16 , 2008.

TPVI LTD

Vincenzo LAGANA'
( Director)

**TPVI LTD**
PMO 115 - 4093 Diamond Ruby S.te 7
Christiansted - St Croix 00820 - USVI
License No.: 2-1001761-2005

**TPVI Ltd.**

ORIGINAL

# COMMERCIAL INVOICE No.200700033

## DATE  16/01/2008

| REF. PROJ. **2229** | CLIENT CODE **12682** |
|---|---|

**CLIENT:**  HOVENSA L.L.C.
# 1 Estate Hope
Christiansted VI
00820-5652
U.S.A.
Att.n   Account Payable

**PAYMENT CONDITIONS:**  payment to be effected by wire transfer within thirty days (30) from invoice receipt, through JP Morgan 270 Park Ave. New York, N.Y. 10017 SWIFT BIC: CHASU33 CHIPS ABA: 278422 FEDWIRE ABA 021000021, Forward to: Bank of Nova Scotiabank, St. Thomas Branch P.O. Box  420 , 214C Altona & Welgunst Charlotte Amalie , St Thomas 00804, ABA # 021606056 , Credit to TPVI Ltd. Current Account  # 05892032988  in the Bank of Scotiabank– St Croix  US Virgin Islands

**REFERENCE**          :  Contract no. HVS-0664 signed on  March 10th, 2005

| DESCRIPTION | AMOUNT US$ | |
|---|---|---|
| CONSTRUCTION FOR LOW SULPHUR GASOLINE HYDROTREATER PROJECT | | |
| **CHANGE ORDER HVS-0664-033: US$ 323,248.00** | | |
| Amount: | 323,248.00 | |
| Less amount previously invoiced | - | |
| Sub-Total | | 323,248.00 |
| **Total to be paid** | | **323,248.00** |

TPVI Ltd.

EXHIBIT 9



PEOPLE FUELING A BRIGHTER FUTURE
1 Estate Hope
Christiansted, St. Croix, USVI 00820

May 29, 2007

Mr. Vincenzo Lagana
Project Director
TPVI Ltd.
PMO 115 – 4093 Diamond Ruby Suite 7
Christiansted, USVI 00820

Mr. Vincenzo Lagana
Project Director
One Hibiscus Alley
Charlotte Amalie, USVI  00802


Subject:        Low Sulfur Gasoline Unit
                Project 2229 LOW SULPHUR GASOLINE UNIT
                HVS-0664

Reference No: HL-T-0664-0077

Dear Vincenzo:

Pursuant to Article 14.3 of the Construction Agreement No. HVS-0664, between TPVI
("Technip") and Hovensa L.L.C. ("Hovensa"), and dated March 10, 2005 (hereinafter
"Construction Agreement"), this letter serves as formal notice of several breaches of the
Construction Agreement on the part of Technip.  Such breaches include, but are by no
means limited to, the following:

    (1)    Technip has breached Article 14.2.3 of the Construction Agreement by
failing to achieve Mechanical Completion by November 10, 2006.
Indeed, Mechanical Completion still has not been achieved to date.
Accordingly, Technip is required to pay Hovensa Schedule Liquidated
Damages, as set forth in Appendix K to the Construction Agreement (and
amended by Section 1 of the Settlement Agreement dated March 31,
2006), for each day after November 10, 2006 that Mechanical Completion
is delayed.  To date, the total amount of Schedule Liquidated Damages
invoiced to Technip is $6,056,672.  Technip, however, has refused to pay
in breach of its contractual obligations, including its obligations under
Article 14.2.8, Article 4.1.6, and Appendix K of the Construction
Agreement, as amended by Section 1 of the Settlement Agreement dated
March 31, 2006.

    (2)    As a result of Technip's failure to properly schedule, manage, and
supervise construction activities, Hovensa has been forced to pay Technip
and Hovensa Contractors an aggregate sum that substantially exceeds the

HL-T-0664-0077
5/29/2007

Construction Lump Sum Price. Hovensa has invoiced Technip monthly for these overpayments as they have accrued under the Construction Agreement. To date, the total amount of overpayments invoiced to Technip is $17,317,838. Technip, however, has refused to pay in breach of its contractual obligations, including its obligations under Article 14.2.8, Article 23, and Appendix D, Exhibit 1, § 1.3.

(3)     Article 10.3 and Appendix D, Exhibit 7 of the Construction Agreement require that all invoices submitted by Technip be accompanied by an executed Affidavit of Release of Liens. Despite Hovensa's explicit requests that Technip comply with this contractual obligation, Technip has refused and has continued to submit invoices without the required affidavits, in violation of Article 10.3 and Appendix D, Exhibit 7.

Pursuant to Article 14.3 of the Construction Agreement, Hovensa requests that Technip immediately begin to cure the above-referenced breaches by promptly providing Hovensa with (1) a written, unconditional commitment to pay the outstanding amounts set forth in this letter and (2) the required affidavits. In the event that Technip chooses not to immediately begin to cure the above-referenced breaches, please consider this letter as formal notice under Article 14.3 that Hovensa may consider and pursue all legal remedies available to it under the Construction Agreement and/or other applicable law, including but not limited to invocation of the dispute resolution procedure set forth in Article 27.

Very truly yours,

John George
Manager - Projects

jwg / jwg
Attachments - none

cc:     M. Crovesi     M Fennessy     N.V. Wood     K. Dunphy
        LSG Project File 13.1.3

EXHIBIT 10



PEOPLE FUELING A BRIGHTER FUTURE
1 Estate Hope
Christiansted, St. Croix, USVI 00820

June 1, 2007

Mr. Vincenzo Lagana
Project Director
TPVI Ltd.
PMO 115 – 4093 Diamond Ruby Suite 7
Christiansted, USVI 00820

Mr. Vincenzo Lagana
Project Director
One Hibiscus Alley
Charlotte Amalie, USVI  00802

Subject:      Low Sulfur Gasoline Unit
              Project 2229 LOW SULPHUR GASOLINE UNIT
              HVS-0664

Reference No: HL-T-0664-0078

Dear Vincenzo:

Technip has failed to immediately begin to cure the breaches detailed in Hovensa's May 29, 2007 letter (HL-T-0664-0077).

Therefore, Technip is hereby notified that Hovensa will consider and pursue all legal remedies available to it under the Construction Agreement and/or other applicable law, including but not limited to invocation of the dispute resolution procedure set forth in Article 27 of the Agreement.

Very truly yours,

John George
Manager – Projects

jwg / jwg
Attachments - none

cc:      M. Crovesi      M Fennessy      N.V. Wood      K. Dunphy
         LSG Project File 13.1.3

EXHIBIT 11



PEOPLE FUELING A BRIGHTER FUTURE
1 Estate Hope
Christiansted, St. Croix, USVI 00820

**June 26, 2007**

Mr. Vincenzo Lagana
Project Director
TPVI Ltd.
PMO 115-4093 Diamond Ruby Suite 7
Christiansted, USVI 00820

Mr. Vincenzo Lagana
Project Director
One Hibiscus Alley
Charlotte Amalie, USVI 00802

**Subject:**   Low Sulfur Gasoline Unit
Project 2229 LOW SULFUR GASOLINE UNIT
Suspension of Payments Until Breach is Resolved
HLT-0664-0077, HLT-0664-0078

**Reference No: HL-T-0664-0082**

Dear Vincenzo:

Due to Technip's refusal to cure the material breaches of the Construction Agreement detailed in Hovensa's previous correspondence (HLT-0664-0077, HLT-0664-0078), Hovensa hereby invokes its right under Article 14.4 of the Construction Agreement to withhold further payment to Technip.

If and when Technip decides to take the necessary steps to remedy these breaches to the satisfaction of Hovensa, as provided by Article 14.4, Technip will promptly be paid the amount outstanding for work properly performed by Technip, less all reasonable additional expenses incurred by Hovensa as a result of Technip's breaches.

Very truly yours,

John W. George
Manager - Projects
jwg / jbs

cc:  L Kupfer        M. Crovesi        M. Fennesy        N.V. Wood

EXHIBIT 12

## INVOICE



**HOVENSA**
*PEOPLE FUELING A BRIGHTER FUTURE*

#1 ESTATE HOPE, CHRISTIANSTED, VI 00820-5652

**TO:**

TPVI LTD
PMO 115-4093 DIAMOND SUITE 7
CHRISTIANSTED, USVI 00820
ATTENTION: VINCENZO LAGANA

**REMIT WIRE TRANSFER TO:**

HOVENSA L.L.C.
CHASE MANHATTAN BANK
1 CHASE MANHATTAN PLAZA
NEW YORK, N.Y. 10081
ACCT. # 323-022-367
ABA #021-0000-21

| INVOICE DATE | INVOICE NUMBER | CUSTOMER NUMBER | PAYMENT TERMS |
|---|---|---|---|
| 01/11/07 | 011107-001 | N/A | NET 30 DAYS |

| ITEM DESCRIPTION | | AMOUNT |
|---|---|---|
| "Schedule Liquidated Damages" December 21-December 31, 2006 | | |
| SEE ATTACHED LETTER REFERENCE NO: HLT-0664-0050 | $ | 365,700.00 |

INVOICE TOTAL: $ 365,700.00

**REFER ANY QUESTIONS TO:**
DEBRA ROGERS
E-MAIL: drogers@hovensa.com
VOICE PHONE: (340) 692-3955
24 HOUR FAX: (340) 692-3161

# EXHIBIT 13



*[handwritten annotations in top right margin]*

### IRREVOCABLE STAND-BY LETTER OF CREDIT

| | |
|---|---|
| Issuing Bank: | UniCredit Banca d'Impresa SpA<br>Filiale Roma Centro |
| Amount: | U.S. $ 48,125.00 |
| Issue Date: | August 22nd, 2005 |
| Beneficiary: | HOVENSA L.L.C.<br>1 Estate Hope<br>Cristiansted VI 00820-5652 |
| Applicant: | TPVI LTD<br>One Hibiscus Alley<br>Charlotte Amalie, St.Thomas<br>U.S. Virgin Islands |

By order of our client, TPVI LTD - One Hibiscus Alley - Charlotte Amalie, St.Thomas U.S. Virgin Islands, ("Technip"), we hereby establish our Irrevocable Standby Letter of Credit ("Letter of Credit"). We hereby authorize you to draw on UniCredit Banca d'Impresa SpA – Filiale Roma Centro – Via Sardegna, 44 – Rome Italy up to an aggregate amount of USD 48,125.00 (Fourty eight thousand one hundred twenty five USD only), to be available within seven (7) business days to HOVENSA L.L.C. when accompanied by the following documents:

1. Your signed draft drawn on us marked "Drawn under Stand-By Letter of Credit No 460830854774";

2. A statement purportedly signed by an officer of the HOVENSA stating that:

"Technip has failed to perform in accordance with the terms of Agreement No. HVS-0664 dated March 10th, 2005, between HOVENSA L.L.C. and Technip (the "Agreement") and we hereby demand payment in the amount of *(Written Amount) ($)* under your Standby Letter of Credit No. 460830854774";

Upon receipt of documents complying with the terms of this stand-by letter of credit we will effect payment to you, within seven (7) business days, as per your instruction.

The amount of this stand-by letter of credit will be automatically reduced by fifty percent (50%) on remittance to us by Technip of a copy of the Final Acceptance Certificate issued by HOVENSA.

The stand-by letter of credit will expire at the earlier of the expiration of the Warranty Period under the Agreement or June 10, 2008. On its expiry, it will become automatically void, whether returned to us or not. Consequently, any written demand under this stand-by letter of credit must be received by us on or before the date of expiration.

HOVENSA will retain all rights against us notwithstanding any change in the Work (as defined in the Agreement) or any extension of time being made as permitted under the Agreement. HOVENSA may make multiple drawings on this stand-by letter of credit.

This stand-by letter of credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication n°500 (the "Uniform Customs"). As to matters not covered by the Uniform Customs, this Letter of Credit will be governed by the laws of the State of New York.

UniCredit
Banca d'Impresa

UniCredit Banca d'Impresa S.p.A. Sede legale e Direzione Generale 37121 Verona, Garibaldi, 1 – Iscrizione al Registro delle Imprese di Verona, Codice Fiscale e P.Iva n. 03656170960 – Capitale sociale Euro 3.856.300.000 – Banca iscritta all'albo della Banche ed appartenente al Gruppo Bancario UniCredito Italiano iscritto all'albo dei Gruppi Bancari al N° 3135.1 – Aderente al Fondo Interbancario di Tutela dei Depositi – Codice ABI 03226 6 Imposta di bollo assolta in modo virtuale Autorizzazione Agenzia delle Entrate – Ufficio di Verona 2 prot. N. 62562/2002 del 3/12/2002



**UniCredit**
**Banca d'Impresa**

HOVENSA L.L.C.
1 Estate Hope
Cristiansted (VI) 00820-5652
Mr. Mike Fennessy
Hovensa CFO

| | |
|---|---|
| **Reference:** | **Proj. 2229 Low Sulfur Gasoline Hydrotreater – Hovensa.** |
| **Subject:** | **Irrevocable Stand By Letter of Credit n. 460830854774** |
| **Applicant:** | **TPVI LTD – One Hibiscus Alley Charlotte Amalie, St. Thomas U.S.Virgin Islands** |

Dear Sirs,

with reference to our above mentioned Irrevocable Stand By Letter of Credit and according to our customer's instructions please take note that the value of the same is now increased from the actual amount of USD 4,000,000.00 up to the new amount of USD 6,000,000.00

All others terms and conditions unchanged.

Yours faithfully

Rome, November 15, 2006

UniCredit
Banca d'Impresa

UniCredit Banca d'Impresa S.p.A. - Sede Legale e Direzione Generale: 37121 Verona, Via Garibaldi 1 - Iscrizione al Registro delle Imprese di Verona, Codice fiscale e P. IVA n. 03656170963 - Capitale Sociale Euro 4 107.904.666,00 - Banca iscritta all'Albo delle Banche e appartenente al Gruppo Bancario UniCredito Italiano iscritto all'albo dei Gruppi Bancari N° 3135.1 - Aderente al Fondo Interbancario di Tutela dei Depositi - Codice ABI 03226.6
Imposta di bollo, quando dovuta, assolta in modo virtuale - Autorizzazione Agenzia delle Entrate - Ufficio di Verona 2 prot. n. 62662/2002 del 3/12/2002

CARTA INTESTATA - Mod. BC0041/00 - Pag.1/1

EXHIBIT 14



PEOPLE FUELING A BRIGHTER FUTURE
1 Estate Hope
Christiansted, St. Croix, USVI 00820

**March 23, 2007**

Mr.Vincenzo Lagana
Project Director
TPVI Ltd.
PMO 115 – 4093 Diamond Ruby Suite 7
Christiansted, USVI 00820

**Subject:**      Low Sulfur Gasoline Unit
Project 2229 LOW SULFUR GASOLINE UNIT
Re: Agency Contractors Invoices – Letter of Credit Increase

**Reference No: HL-T-0664-0065**

Dear Vincenzo:

Hovensa has made payments to the Hovensa Contractors above the value of the Construction Lump Sum Price.  Please reference HLT-0664-0052, HLT-0664-0064 and other previous correspondence.

Hovensa requests TPVI increase the Letter of Credit as required by Article 32.3 of the C Agreement.  Further payments will be due the HOVENSA Contractors and TPVI must provide the incremental increases to the Letter of Credit contemporaneous with the approved invoiced as is customary on the project.

Very truly yours,

John George
Manager - Projects

jwg / jwg
**Attachments –** Change Order HVS-0664-021
               Invoice 032007-001

cc:     M. Crovesi     M Fennessy     N.V. Wood     K. Dunphy
        LSG Project File 13.1.3

EXHIBIT 15

# HOVENSA

MICHAEL J. FENNESSY
Vice President and Chief Financial Officer

REPLY TO:
HOVENSA L.L.C.
1 Estate Hope
Christiansted  VI 00820-5652

May 30, 2007

Via Courier
UniCredit Banca d'Impresa S.p.A.
Filiale Roma Centro
Via Sardegna, 44
C.A.P. 00187 ROMA

> **Drawn under Stand-By Letter of Credit No. 460830854774**
> **Beneficiary: HOVENSA L.L.C.**
> **Draw Amount: $6,074,490.00**

To whom it may concern:

Enclosed for presentment, please find a signed Draft in the amount of $6,074,490.00 drawn on UniCredit Banca d'Impresa SpA for the benefit of HOVENSA L.L.C. pursuant to Irrevocable Standby Letter of Credit No. 460830854774, as endorsed thereon.

Also enclosed, please find the original statement of an officer of HOVENSA L.L.C. and, for your convenience, a true and correct copy of the Letter of Credit No. 460830854774 and most recent amendment dated March 14, 2007.

Pursuant to the endorsement contained on the signed Draft, please make payment by wire transfer to HOVENSA's account in accordance with the terms of the Letter of Credit. An additional copy of the wire transfer instructions is set forth below:

> Chase Manhattan Bank
> 1 Chase Manhattan Plaza
> New York, NY 10081

> Account No. 323-022-367
> ABA No. 021000021
> Credit To: HOVENSA L.L.C.

Kindly execute a duplicate copy of this letter to indicate receipt of the signed Draft and Officer Statement.

Very truly yours,

Michael J. Fennessy
Vice President & CFO

Received & Acknowledged
UniCredit Banca d'Impresa SpA
_____, 2007

_____

By:

Its:

A (1/2)



MICHAEL J. FENNESSY
Vice President and Chief Financial Officer

REPLY TO:
HOVENSA L.L.C.
1 Estate Hope
Christiansted  VI 00820-5652

May 30, 2007

UniCredit Banca d'Impresa S.p.A.
Filiale Roma Centro
Via Sardegna, 44
C.A.P. 00187 ROMA

Technip has failed to perform in accordance with the terms of Agreement No. HVS-0664 dated March 10th, 2005, between HOVENSA L.L.C. and Technip ("the Agreement") and we hereby demand payment in the amount of Six Million, Seventy-Four Thousand, Four Hundred and Ninety Dollars U.S. ($6,074,490.00) under your Standby Letter of Credit No. 460830854774.

Executed this 30th day of May, 2007

HOVENSA L.L.C.

By: _____

Name: Michael J. Fennessy

Title:  Vice President & CFO

$A\left(\dfrac{2}{2}\right)$



HOVENSA L.L.C.
1 Estate Hope
Cristiansted (VI) 00820-5652
Mr. Mike Fennessy
Hovensa CFO

| | |
|---|---|
| Reference: | Proj. 2229 Low Sulfur Gasoline Hydrotreater – Hovensa. |
| Subject: | Irrevocable Stand By Letter of Credit n. 460830854774 |
| Applicant: | TPVI LTD – One Hibiscus Alley Charlotte Amalie, St. Thomas U.S.Virgin Islands |

Dear Sirs,

with reference to our above mentioned Irrevocable Stand By Letter of Credit and according to our customer's instructions please take note that the value of the same is now increased from the actual amount of USD 6,000,000.00 up to the new amount of USD 6,074,490.00

All others terms and conditions unchanged.

Yours faithfully

Rome, March 14, 2007

UniCredit
Banca d'Impresa

C (1/2)

UniCredit Banca d'Impresa S.p.A. - Sede Legale e Direzione Generale: 37121 Verona, Via Garibaldi 1 - Iscrizione al Registro delle Imprese di Verona, Codice Fiscale e P. IVA n. 03656710960 - Capitale Sociale Euro 4.157.904.896.00 - Banca iscritta all'Albo delle Banche e appartenente al Gruppo Bancario UniCredito Italiano iscritto all'Albo dei Gruppi Bancari N° 3135.1 - Aderente al Fondo Interbancario di Tutela dei Depositi - Codice ABI 03226 6 Impresa di Roma, quando dovuta, assolta in modo virtuale - Autorizzazione Agenzia delle Entrate - Ufficio di Verona 2 prot. n. 52660/2002 del 3/7/2002



*(handwritten annotations, top right)*

**IRREVOCABLE STAND-BY LETTER OF CREDIT**

Issuing Bank:                     UniCredit Banca d'Impresa SpA
                                  Filiale Roma Centro

Amount:                           U.S. $ 48,125.00

Issue Date:                       August 22ⁿᵈ, 2005

Beneficiary:                      HOVENSA L.L.C.
                                  1 Estate Hope
                                  Cristiansted VI 00820-5652

Applicant:                        TPVI LTD
                                  One Hibiscus Alley
                                  Charlotte Amalie, St.Thomas
                                  U.S. Virgin Islands

By order of our client, TPVI LTD - One Hibiscus Alley - Charlotte Amalie, St.Thomas U.S. Virgin Islands, ("Technip"), we hereby establish our Irrevocable Standby Letter of Credit ("Letter of Credit"). We hereby authorize you to draw on UniCredit Banca d'Impresa SpA – Filiale Roma Centro – Via Sardegna, 44 – Rome Italy up to an aggregate amount of USD 48,125.00 (Fourty eight thousand one hundred twenty five USD only), to be available within seven (7) business days to HOVENSA L.L.C. when accompanied by the following documents:

1. Your signed draft drawn on us marked "Drawn under Stand-By Letter of Credit No 460830854774";

2. A statement purportedly signed by an officer of the HOVENSA stating that:

"Technip has failed to perform in accordance with the terms of Agreement No. HVS-0664 dated March 10ᵗʰ, 2005, between HOVENSA L.L.C. and Technip (the "Agreement") and we hereby demand payment in the amount of *(Written Amount) ($)* under your Standby Letter of Credit No. 460830854774";

Upon receipt of documents complying with the terms of this stand-by letter of credit we will effect payment to you, within seven (7) business days, as per your instruction.

The amount of this stand-by letter of credit will be automatically reduced by fifty percent (50%) on remittance to us by Technip of a copy of the Final Acceptance Certificate issued by HOVENSA.

The stand-by letter of credit will expire at the earlier of the expiration of the Warranty Period under the Agreement or June 10, 2008. On its expiry, it will become automatically void, whether returned to us or not. Consequently, any written demand under this stand-by letter of credit must be received by us on or before the date of expiration.

HOVENSA will retain all rights against us notwithstanding any change in the Work (as defined in the Agreement) or any extension of time being made as permitted under the Agreement. HOVENSA may make multiple drawings on this stand-by letter of credit.

This stand-by letter of credit is subject to the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication n°500 (the "Uniform Customs"). As to matters not covered by the Uniform Customs, this Letter of Credit will be governed by the laws of the State of New York.

UniCredit Banca d'Impresa S.p.A. Sede legale e Direzione Generale 37121 Verona, Gentile 1 Inscrizione al Registro delle Imprese di Verona, Codice Fiscale e Piva n. 03656100261 – Capitale sociale Euro 3.656.330.590 – Banca appartenente al Gruppo Bancario UniCredit Italiano iscritto al albo dei Gruppi Bancari N° 3135.1 – Aderente al Fondo Interbancario di Tutela dei Depositi – Codice ABI 03226.6 Iscritta al Ruolo Unico degli Intermediari Finanziari Agenzia Assicurativa – Ufficio di Verona Telefax N. 8045.20302 rev 21/03/2002

EXHIBIT 16

CHIOMENTI
Law Office
Via XXIV Maggio, 43 - 00187 Rome
Phone 06.466221 - Fax 06.46622600

# CIVIL COURT OF ROME

## Sec. XI - Judge Agresti - Hearing of June 20, 2007

### Record of Appearance and Defense

### for Opposing a Provisional Appeal, per Art. 700 of the Civil Procedure Code

**On behalf of HOVENSA L.L.C.,** the headquarters of which is at 1 Estate Hope,

Christiansted, VI 00820-5652 (U.S. Virgin Islands), in the person of the Vice President

and legal representative Mr. Marco M. Crovesi G., represented and defended by attorneys

Andrea Bernava, Carlo Romita, Vittorio Tadei and Cristina Chiomenti, whose office is in

Rome at service address Via XXIV Maggio n. 43, under the power of attorney in the

lawsuit of June 15, 2007, authenticated by Notary Public Lynda G. Mahammad and

containing Annotations (Aia Agreement of October 5, 1961) on June 18, 2007, attached

in "A"                                                              *- opponent*

#### Versus

**Technip Italy S.p.A.** and **TPVI, Ltd.,** represented and defended by attorneys Daniela

Jouvenal and Sergio Calderara                                       *- appellant*

#### and against

**Unicredit Banca d'Impresa S.p.A.**                               *- opponent*

\* \* \* \*

On the evening of Thursday, June 14, 2007, the petitioning company, Hovensa L.L.C.,

received via fax the application for appeal of the present proceedings, filed on June 6,

2007, with related subpoena dated June 7, 2007. With this appeal, the present petitioner

asks the Court for a provisional injunction against Unicredit Banca d'Impresa S.p.A.

prohibiting payment to the latter requested by Hovensa in enforcement of two letters of

credit issued by the aforementioned Italian bank on behalf of Hovensa

*Car*

and governed by U.S. laws.

The appeal illustrates the relationships involving the parties in this proceeding; these relationships can be summarized as follows:

1.    An essentially contractual relationship for the "turn-key" implementation of a low sulfur-content gasoline hydrotreatment plant (even if it does not involve this type of contract, rather a "lump-sum" contract with an all-inclusive cost, executed based on appropriate specifications; therefore, only for purposes of convenience, hereinafter the expression "turn-key" also will be used) located in Saint Croix, U.S. Virgin Islands, at the Hovensa's petroleum refinery. This relationship exists between the appellant companies (the contractors) and the Hovensa company (the contracting entity) and is documented by two agreements, one designated "*Engineering & Procurement*" and signed by Hovensa and Technip Italy S.p.A. (hereinafter "Technip"), and the other entitled "*Construction Agreement*" and signed by Hovensa and TPVI Ltd. (the corporate vehicle created by Technip for the express purpose of signing the contract). The contractual agreements between and among all of the aforementioned parties were partially modified by means of a "Settlement Agreement" dated March 2006. All the contracts are governed by the laws of the State of New York, and all disputes arising therefrom shall be subject exclusively to the appropriate U.S. jurisdiction.

2.    A guarantee relationship exists between Unicredit Banca d'Impresa S.p.A., which is responsible for payment, and Hovensa, which is the beneficiary of the guarantee. In particular, the Unicredit bank issued two identical guarantees, each of which is entitled "*Irrevocable Stand-by Letter of Credit*" and is governed by regulations in the "*Uniform Customs and Practice for*

*Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500*" (hereinafter the "Uniform Customs") and, where not regulated by the latter, by the laws of the State of New York. Therefore, this is a relationship that does not exist between the present appellants.

3.  Finally, the "internal" relationship between the appellants and Unicredit bank relating to the order, by the former to the latter, for issuance of the Irrevocable Stand-by Letters of Credit from Unicredit bank on behalf of Hovensa; essentially, the "writ of indemnity". Clearly, this relationship does not apply to the petitioning company Hovensa.

The appellants are providing a (partial) description of the features and terms of the contractual relationship; they refer to the request for payment by Hovensa to Unicredit bank of the aforementioned guarantees, claiming that said request is contrary to good faith, at least in reference to the enforcement of the guarantee concerning Technip.

The essential aspect of the provisional petition, given the fact that it is subject to the jurisdiction and laws of the State of New York, devolves from the following assertions:

(i)  It would involve two autonomous and distinct (contractual) relationships linking Hovensa, on the one part, and Technip and TPVI, on the other part, since each of the appellants signed a single contract to which a single guarantee would be attached;

(ii)  Technip would not be defaulting or responsible for the defaults alleged by Hovensa, since these defaults would involve only "Mechanical Completion", relative to the single Construction Contract signed only by TPVI: the latter would be obligated and responsible only for the

3

‹‹*Mechanical Completion of Stipulations in the Construction Contract*›› no Later than November 10, 2006;

(iii)  The completion referenced above would not occur yet because of ‹‹*a set of circumstances that were and are the subject of discussion between the parties*››, for which Technip and TPVI ‹‹*hold Hovensa responsible for this delay*››, while Hovensa's objections would arrive ‹‹*completely unexpectedly*›› (pp. 4 and 5 of the appeal);

(iv)  The petitioner, Hovensa, would ‹‹*establish in advance some documents (the invoices), on which it could be asserted that the appellants are in default and therefore the guarantee can be legitimately enforced*›› (p. 11 of the appeal);

(v)  The petitioner's intent would be to face and carry out the proceedings for the purpose of resolving the dispute (prior to the U.S. adjudication) having, nevertheless, already collected the amount of the guarantees, and thereby possessing greater contractual power during a future (feared or proposed) lawsuit in the appropriate U.S. jurisdiction;

(vi)  The aforementioned enforcement of the guarantees by Hovensa would occur informally because Hovensa would have **(a)** ‹‹*issued the invoices for damages without any advance notice*››; these invoices, insofar as they are contested by the appellants, would represent the ‹‹*contested amounts*››, and these amounts would be excluded from the credits payable by Hovensa which, in that case, would be required to go through an out-of-court settlement procedure in accordance with contractual stipulations (pp. 12 and 13 of the appeal); **(b)** if the contractual stipulations

relative to the notice that Hovensa must give prior to enforcement of the guarantee (p. 14 of the appeal).

The above-indicated situation would legitimize ‹‹the exceptio doli *by the appellants and their subsequent request for injunction prohibiting enforcement of the guarantee...in general and at least in relation to the guarantee connected with the Engineering and Procurement contract*›› (p. 12 of the appeal).

Moreover, the appellants, in strict legal terms, claim, albeit subordinately, that the guarantees in question would not be autonomous vis-à-vis the underlying relationship; rather, they would be so-called "accessory" guarantees, subject to the surety bond standard established by law in Italy; for this reason, these same appellants, as the guaranteed parties, could make objections against the guarantor (pp. 15-19 of the appeal). The appeal is executed in support of the active legal capacity of both appellants and the jurisdiction of the judge presiding over the provisional procedure that has begun.

\* \* \*

In this proceeding, Hovensa L.L.C. appears before the court, represented and defended as indicated above, for the purpose of objecting to the entire version of the facts and to the assumptions upon which the appeal is based, and requests that the latter be denied. The appeal is, in fact, reckless, and it proves the appellants' bad faith because of the following reasons:

**I - First.**

**1.** Whereas -- for fundamental and prior explanation -- the present opposing company does not intend to accept any attempt to acknowledge that the Italian A.G.O. has any jurisdiction over the *inter partes* relationship. Furthermore, the aforementioned appeal makes it clear that the United States has exclusive jurisdiction

5

(where applicable by law). Therefore, all of the following claims are solely a function of the denial of the appeal filed in Italy according to Art. 10 L n. 218/95.

**2.** Since an assumption of detrimental aspects was introduced, it is worthwhile to address immediately the subject of active legal capacity, which is dealt with in the final part of the appeal.

It seems to be clear that the appellants are confusing a matter regarding active legal capacity (i.e. official capacity of the substantial position) versus jurisdiction (albeit provisional), since they use the same criteria for justifying the existence of each of them (see p. 19 of the appeal). Therefore, the claim that enforcement of the guarantees can occur at the Rome branch of Unicredit Banca d'Impresa is not only irrelevant in terms of jurisdiction -- since the correct venue would be the place where the payment of the guarantees must be made, i.e. at the foreign beneficiary -- but also in terms of active legal capacity.

On the other hand, regarding the assertion that only Technip ordered the guarantees from the issuing bank, the latter, in the opinion of this writer, demonstrates:

- The internal relationship between the appellants (*rectius*: the appellant Technip) and Unicredit bank, certainly not regarding the relationship with the petitioner Hovensa;

- TPVI's lack of active legal capacity for the requested order submitted to Unicredit bank (since the aforementioned appellants stipulated several times that Technip was the only party that submitted the order to the bank issuing the guarantees: see pp. 3, 19 and 22 of the appeal).

**II - Preliminary remarks and general considerations.**

1) This proceeding deals with the enforcement of typical guarantees,

that is, both of the "*Irrevocable Stand-by Letters of Credit*" established and governed by U.S. "Uniform Customs" law and, residually, by the laws of the State of New York. To reiterate, the guarantees in question are, according to regulatory laws, autonomous and do not allow the obligated party, let alone the third parties with whom the latter has relationships, to make objections regarding the underlying relationship that "caused" the issuance of the guarantees.

2) Regarding the relationship between Hovensa, on the one part, and Technip and TPVI, on the other part, both contractors rendered themselves responsible for a series of defaults vis-à-vis both contracts, from which flowed two principle claims of payment by Hovensa:

> (A)   Of the Schedule Liquidated Damages (hereinafter "the damages") because of failure to comply with the deadlines for mechanical completion of the project (November 2006), as stipulated in Appendix K (identical for both contracts);
>
> (B)   Of the greater costs that Hovensa had to incur on behalf of the subcontractors (the so-called "Hovensa Contractors", as defined in Art. 23.2 of the Construction Agreement); these expenses should be borne by the contracting parties, since Appendix D, Exhibit 1, Par. 1.3 establishes that all payments made to the "Hovensa Subcontractors" (such as Tiger) will be deducted from the turn-key contract price ("*[a]ll payments made to Hovensa Contractors…will be deducted from the Construction Lump Sum Price.*").

The total of the credit claimed to-date is more than 35 million U.S. dollars.

With regard to the above-indicated damages, it is hereby reiterated that the date for the mechanical completion of the project was November 10, 2006.

Nevertheless, to-date the work has not been completed.

Beginning in January of 2007, Hovensa issued the stipulated invoices, but these were never paid.

3) The relationship between Hovensa, Technip and TPVI is unique and both appellants are liable for the effects of contested defaults and for the requested payments.

On this matter, it can be expected that the two original contracts, one signed by Technip and the other signed by TPVI, each stipulate a sole payment for "turn-key" delivery of the plant (USD 50,000,000 to be made for the component associated with Construction; this price was increased by virtue of the Settlement Agreement, as indicated below; USD 77,000,000 for the component associated with the E&P). Therefore, the contractor is subject to cost-related risks, above all the risk of any cost increases.

4) To-date, Hovensa has owed to TPVI and to the subcontractors more than 67,000,000 U.S. dollars. This debt, as stipulated in the agreements indicated above, and just like the "turn-key" payment, Hovensa has the right to recover the amounts that were paid in excess of the same "turn-key" price (i.e. the original USD 50,000,000) and the contractor must take charge of costs for the subcontractors.

5) Hovensa's enforcement on June 4, 2007 of the approximately 13 million U.S. dollars is fully justified by the contractual agreements.

6) Regarding the underlying relationship, the appellants have filed objections to the defaults alleged by Hovensa, without implementing any definite contractual remedy and without taking any appropriate legal steps to resolve the proposed disputes between the parties. The existence of objections (nearly normal - let us say "natural" - in all the relationships linking Hovensa with the appellants), including those that do not comply with the contractual

agreements, do not impede the enforcement of the guarantees; on the contrary.

7) The proposed appeal has insufficient grounds to be upheld.

8) Therefore, Unicredit bank is, to-date, in default vis-à-vis Hovensa.

**III - The assumed independence and autonomy of both contracts; the groundlessness of the hypothesis that only TPVI can be held responsible for the non-fulfillment of the project's mechanical completion within the stipulated deadlines.**

First, it is hereby reiterated that this case deals with legal contracts created and governed according to the laws of the State of New York and that, therefore, all criteria for interpretation based on Italian law are irrelevant and are superseded by the methods for contract valuation (and, in the same way, by the relationships) according to the standards of the laws of the United States.

In terms of these applicable laws, it certainly can be proved that the opponent's hypothesis, according to which both aforementioned contracts would be autonomous and distinct, is legally erroneous and contradictory in many ways, as demonstrated below.

1. Technip negotiated the entire plan of the contract's terms and conditions, the entire project, supervised the contract's execution and managed all aspects thereof; in particular, all agreements were negotiated by the managers of Technip Italy and Technip France, because between November 2004 and February 2005 Technip informed Hovensa that Technip France would control the project. One should consider, for example, the \ letters of intent for the "E&P" and "Construction" contracts that Hovensa sent to Technip S.A., the holding company of the group to which Technip and TPVI belong: these letters of intent were signed by the same two Technip representatives (see doc. 1 and 2; regarding the claim, see only doc. 3). Furthermore, it is the same appellants who, in various parts of the appeal (see pp. 3, 19 and 22 of the appeal), emphasized

the fact that the issuance of both guarantees in question was requested from Unicredit bank only by Technip. Likewise, both appellants state in the appeal that the project's mechanical completion would not be fulfilled yet because of ‹‹*a set of circumstances that were and are the subject of discussion between the parties*››, for which Technip and TPVI ‹‹*hold Hovensa responsible for this delay*›› (p. 4 of the appeal).

2. TPVI is a company that was intentionally incorporated by Technip Italy (and/or Technip S.A.) for the operation (and for related tax issues); in fact, it was incorporated on March 2, 2005, i.e. scarcely eight days before the contract signing date (i.e. the contracts were signed on that date to allow incorporation of the new vehicle-company TPVI). Moreover, the executives and employees of TPVI are entirely or primarily the same as those of Technip (for example, Mr. Vincenzo Laganà, who was named as a result of correspondence among the parties). Therefore, the claim that TPVI's role is completely autonomous and independent from that of Technip is contrary to the truth and ignores the basic control that Technip has wielded over the entire project. On the other hand, one needs only to browse through Technip Italy's web site to learn that this company claims to be the "*magna pars*" of the project (see doc. 4).

3. Many provisions in both contracts, and in particular in the Appendices, are essentially identical (as is acknowledged by the appellants in question: see, for example, p. 12 of the appeal). And one is reminded here that in Anglo-Saxon contract law, Appendices to contracts represent the central aspect of the required report.

Specifically, Appendix D, written by the aforementioned appellants, stipulates that the responsibilities, obligations and requests applicable to the contractor shall be

referred to both contractors of the respective Construction and E&P contracts, that is, to both Technip and TPVI.

Appendix K of the two contracts requires that the general contractor pays the Schedule Liquidated Damages (the penalties) for each day subsequent to November 10, 2006, if the mechanical completion of the project has not been attained. The Schedule Liquidated Damages has been amended on March 2006 with the *"Settlement Agreement"* which took place between all the parties, but for the remainder Appendix K has not been modified. Such an Appendix – it is worth confirming - is identical for the two contracts and has been signed by all the parties.

Appendix E in point, is also significant, prepared exclusively by Technip: it fixes the phases of the entire project and it unifies all aspects of the contract, from the planning to the execution, or rather both the engineering and the construction, with both the establishment of the mechanical completion date on November 10, 2006. Besides, pursuant to Art. 6.3 of the same Appendix the "CONTRACTOR shall perform the Work in conformity with the Project Schedule as from Appendix E of this Agreement and shall be responsible for the delays caused by the CONTRACTOR with the sole extent given by the remedies as foreseen in Appendix K" *("CONTRACTOR will perform the Work in accordance with the Project Schedule as for Appendix E to this Agreement and will be responsible for delays caused by CONTRACTOR to the sole extent of the remedies as provided for under Appendix K ")*.

Further. Pursuant to Appendix K of the contract signed by Technip - the E&P Agreement - it is foreseen that Technip itself was directly obliged for the mechanical completion in point by November 10, 2006 and that, in case of delay, Technip itself should have paid to Hovensa the penalties foreseen by the same Appendix K *("For each day that Mechanical Completion is*

delayed beyond November 10, 2006, except to the extent due to the actions of
HOVENSA, CONTRACTOR will pay to HOVENSA Schedule Liquidated Damages as
follows..." ).

From the structure and from the formulation of Appendix K it turns out besides that
Technip and TPVI are jointly and severally responsible for the penalties (Schedule
Liquidated Damages) within the limits of the 10% of the total price foreseen by the
contracts. For this reason, both plaintiff companies are responsible for the entire amount
of the damages related to the failed attainment of the mechanical completion.

It should be borne in mind, in that respect, that Appendix K foresees that the whole
amount of the Scheduled Liquidated Damages, as foreseen in the E&P Agreement and in
the Construction Agreement, cannot exceed ten percent (10%) of the total "turn key"
contract price and shall constitute the sole and exclusive remedy for Hovensa in regard to
the delay, by the contractor, in the attainment of the mechanical completion *("The*
*aggregate amount of Schedule liquidated damages under both the E&P Agreement and*
*the Construction Agreement will not exceed ten percent (10%) of the total Agreement*
*price, and shall constitute HOVENSA's sole and exclusive remedies in respect of delay by*
*CONTRACTOR in achieving Mechanical Completion.").*

4. For the additional confirmation of the unitary nature of the contract relationship and
therefore of the two contracts, Technip, in Art. 6.2 of the contract by the undersigned (the
E&P Agreement), has expressly indicated and granted that the management role of the
executive project would have been developed by an "affiliated" company - *i.e. TPVI -*
and that the Technip itself would not have tried to exonerate itself from its own liability
consequent upon the missing execution of the project, including that for possible delays
in the delivery, adducing or opposing that the

liability was by the affiliate company executing the project (Article 6.2: *"...[Technip Italy] and Construction Contractor **are affiliated companies** and [Technip Italy] will not use any delays or any action or inaction **by the Construction Contractor** to excuse any breach or nonperformance, including delay, by [Technip Italy] under this Agreement."*).

5. Also from the Settlement Agreement there is confirmation of the unitary nature of the relationship between the parties to the contract. The plaintiffs sustain (instead) that the autonomy and the distinction of the two contracts would also be confirmed by the settlement (the *"Settlement Agreement"* of March 2006) because it would «*always and only mention TPVI in relationship to the deadline for the delivery of the mechanical construction works*» (page 12 of the petition).

Such an affirmation is deceptive, since the reference to the deadline for TPVI is made only for the additional payments, including therein the bonuses, as foreseen in Art. 1 of the Settlement Agreement but the liability for the delays in the delivery of the works (and therefore the matters connected with the deadline for the delivery of the mechanical completion works) it is always attributed indifferently to the "CONTRACTOR", which is to say both Technip and TPVI: that is what the parties have foreseen, always in the Settlement Agreement, in the modification act of Appendix K (cf. Art. 1 (b) of the Settlement Agreement). In short, also at the time of the settlement, Technip has not been exempt by Hovensa from the liability for the penalties due for the delays in the mechanical completion foreseen in the contract.

To the foregoing is added that the settlement agreement (the Settlement Agreement) had been the object indifferently to matters connected to the two contracts, which, thus has been treated in unison (cf. point "A", at the end, of the Settlement Agreement).

6. In conclusion, the thesis of the autonomy and the independence of the relationships, used *ex adverso* both for giving color to the *fumus boni iuris,* and for limiting the effects of the positive prosecution to the sole "TPVI bond" is without grounds.

**IV - The *fumus boni iuris:* on the assumed prosecution of the violation of the bona fide obligation.**

The argument presupposes that the bonds in question are "autonomous" and that, therefore the precautionary motion is based upon the *exceptio doli.*

The plaintiffs based the complaint of the fraudulent prosecution, besides on the thesis - denied in the preceding paragraph - of the autonomy and independence of the contracts, on the circumstances that shall be examined and commented upon below.

1.   The plaintiffs hold Hovensa liable for the delays (indisputable) in the delivery of the works: this would result from correspondence which took place between the parties. In that respect it is sufficient to reply:

   - just what the plaintiffs believe, in addition to existing in missives originating from them, is irrelevant; not without determining that Hovensa "believes" exactly the opposite, as the plaintiffs well know: the indisputable fact is that the delay in question subsists, the effects of which are contractually foreseen;

   - that the circumstance is, so to speak, "neutral", since it deals with matters of merit, to assess it by the standard of foreign law, from the American judge: as the plaintiffs have taken care to specify in various parts of the petition, the question of whether the conduct of Hovensa may have contributed to cause delays must be resolved in two party fashion between the parties in New York and it does not have anything to do with the payment obligation of the Unicredit bank in relationship to the issued bonds.

2.  The Hovensa invoices contractually foreseen have been "rejected" by the plaintiffs, for the very same reasons as above. The '*sub* 1' complaint is without grounds and irrelevant, by itself such a complaint is also without grounds and irrelevant. Rather, it confirms the non-performance of the plaintiffs.

3.  Hovensa, ‹‹*despite the issuance of the penalty invoices››*, it would not have allowed imagining better the identified intentions ‹‹*which deals with a normal dialectic orientated towards reducing the final price››* (page 5 of the petition). The conjecture is gratuitous and frankly a little "ingenuous": It is a fact that Hovensa has issued the invoices for the penalties, thereby incorporating an unequivocal behavior.

4.  Again on page 5 of the petition is read a "step" relative - once again – to the possible intentions of Hovensa with reference to the greater costs sustained by it for the subcontractors: that step is difficult to understand by the person writing it and is therefore contested.

Connected to such matter is, presumably, the complaint according to which Hovensa would have forced Technip and TPVI to use the subcontractor Tiger (pages 7 and subsequent of the petition): such a complaint, the admissibility of which is evidently precluded in this court, is very far from the truth and has been contested verbally not only specifically by the Hovensa, but also many times in writing (cf., for example., the letter of February 15, 2007 - doc. 5).

Anyway, it is worth confirming that it is contractually anticipated that all payments made to the so-called "Hovensa Subcontractors" (such as, for example, Tiger) must be deducted from the "turn key" contract price and from this therefore should be charged to the contractor. It is worthwhile also remembering that, to date, Hovensa has had to pay to TPVI and the subcontractors more than US 67,000,000 dollars.

By the standard of what is so far determined and repeated, by itself the letter of

Hovensa from May 29, 2007 was on the contrary "unexpected".

**5.** On page 7 of the petition is read that the parties of the contractual relationship would have maintained *‹‹close contacts››* and discussions on the reasons for the delay in the delivery of the jobs and, nevertheless, Hovensa continued to issue the invoices for the penalties, subsequently proceeding to the prosecution in point.

Once clarified (by the plaintiffs, it is understood) the outlines of the indicated "close contacts" and discussions, we are left to wonder just what can compose the fraudulent behavior of Hovensa. The subsistence of a dispute or confrontations or discussions between the parties says nothing in order on the assumed fraudulent prosecution.

Because one may speak of fraud in the prosecution it needs, besides the criminal evidence of serious precise and concordant facts, to furnish the criminal evidence that the dispute among the parties is not genuine. To say that the parties were discussing *‹‹on the circumstances that have led to the non-delivery of the works within the contractual term››*, not only says nothing on the nature of the "discussion" (the discussion is characterized by the fact that Hovensa holds the plaintiffs liable and point by point contests the "justification" supplied by them!), but this does not mean to say that such discussions are a sign of a non-existent, non-genuine dispute, or, even sign of fraudulent intent of a party (Hovensa, in the perspective of the plaintiffs). The parties will discuss and they will resolve their dispute in the competent courts (judges of New York State). In the meanwhile, the presuppositions subsisting at least *prima facie* - no more than highly contested by the plaintiffs, to look after properly - for the prosecution of the bonds in question, Hovensa has the right to receive the payment from the obliged party Unicredit Banca d'Impresa (penalty, evidently, on failure of the legal-economic function of the bonds themselves).

On this same standard, is shown deprived of merit, other than gratuitous, either the declaration according to which Hovensa would have availed of the prosecution of the bonds ‹‹*so as (to try) to get a greater contractual force*›› (page 10 of the petition), or that according to which Hovensa might have *"preconstituted some documents (the invoices), on the basis of which to be able to affirm that a breach of the plaintiffs subsists and with this to legitimize the prosecution of the bond"* and it would intend to resolve the dispute in point ‹‹*after having already cashed the maximum that can be cashed based on the bonds*›› (page 11 of the petition). Additionally it may be duplicated using a maxim of the decisions from the case *Ross Bicycles, Inc. v. Citibank,* N.A. 613 N.Y.S. 2d 538, 541 (N.Y. Sup. Ct. 1994): "...*one of the principal purposes of the letters of credit are that to put the seller* [the beneficiary – editor's note] *in the position of greater strength, or rather so as to receive also the payment during the pendent suit of the dispute regarding the contract".* The case may also be cited of *Fluor Daniel Argentina, Inc. v. ANZ Bank,* 13 F. Sup 2d 562 (S.D.N.Y. 1998) *"The letters of credit are of particular importance in international contracts in which, sophisticated investors, notoriously face a series of risks... with respect to the profits deriving from international commerce, but the value of such profits can be anticipated on the base of their degree of legal certainty... the lines of commerce would be slowed down, if not frozen, if the parties that intend to undertake international operations did not have the possibility to rely on letters of credit for the purpose of reducing the uncertainties consequent upon these kinds of operations"* (cf., attached).

Anyway, it is worth remembering that Hovensa is creditor of an amount of around 35 million dollars, for the penalties and the additional costs borne in paying the subcontractors (and obviously such an amount continues to increase).

Insofar, even if Hovensa obtained the 13 million claimed perforce of the pursued bonds, the plaintiffs would still remain debtors towards Hovensa for the sum of around 22 million dollars; it follows from that, with the payment due from the Unicredit bank by force of the bonds, Hovensa would obtain around a third of the total amount due to date: it is not understood what the unfair advantage would be.

And it should be remembered that, if the plaintiffs should come out victorious from the contentious procedure advanced in the USA, Hovensa would have to reimburse them the sum received with the pursuit of the bonds increased by the interest. And nobody doubts that Hovensa is more than solvent (to have an idea, just visit the site www.hovensa.com).

Finally it is worth repeating the declaration, again contained on page 11, according to which *"The prosecution of the bonds based on both the contracts certainly constitutes a convenient ploy, to obtain in fact a doubling of the amount abstractly due...".* Such a declaration is frankly difficult to understand by the one that writes it and it is asked, therefore, if the plaintiffs wish to furnish explanations in this respect.

**V - *it follows:* On the assumed invalidity of the prosecution for assumed (1) pending suite which challenges or disputes the obligation to pay the penalties and (2) violation by Hovensa of the contractual estimates related to the communication to be given before the prosecution of the bonds.**

**(1)** It must first of all be confirmed that the merit of the challenge on the penalties is irrelevant and unobjectionable in comparison to the obligation (which is autonomous) by the Unicredit bank to honor the bonds. By this same standard, every consideration on the subsistence, or at least, of the so-called "contested sums", according to previsions of the contracts between the plaintiffs and Hovensa, is irrelevant and may not therefore be

admitted in this court.

What is indisputable, especially in the context of the summary knowledge reserved for this Judge, is that there is nothing, either in the contracts of the general contractor or in the bonds, that limits the right of Hovensa to pursue the bonds and to obtain the payment, even though a dispute is pending on the liabilities of the parties with respect to the contract or even a mediated procedure for solution of the dispute. On the other hand, such a restraint would not make any sense (juridical and economic) and it would undermine the function (juridical and economic) of the released bonds: if the payment of the bonds could be halted on the simple basis of challenged advanced on the penalties due and if therefore the bonds only could be prosecuted on the outcome of the dispute, then the role of the bonds would not be understood.

Since it deals with American law, on the matter it is worth recalling further the case *Ross Bicycles, Inc. v. Citibank,* N.A. 613 N.Y.S. 2d 538, 541 (N.Y. Sup. Ct. 1994): *"If the client* [the petitioner for the issuance of the letters of credit – editor's note] *believes that the beneficiary does not have the entitlement to the sums foreseen in the letters of credit themselves, such parties can initiate a juridical argument regarding the contract. In fact, one of the principal purposes of the letters of credit is so as to place the vendor* [the beneficiary - editor's note] *in the position of greater strength, or rather so as also to receive the payment during the pendent suit of the dispute regarding the contract."*

As for Articles 24.2 and 27.2, recalled by the plaintiffs, these are nothing more than the clauses of choice of the jurisdiction and the means of resolution of the disputes. But this, once more, has nothing to do with the bonds under safeguard of the credit claimed by Hovensa and with its power, as the "documentary" lender, to pursue the bonds.

**(2)** Regarding the assumed missing communication of the prosecution of the bonds (page 14 of the petition), the Appendix D, Exhibit 1, par. 2.1, of the contracts foresees that *"before every prosecution of the letters of credit Hovensa has to give the communication required pursuant to Art. 11.3 of the E&P Agreement or pursuant to Art. 14.3 of the Construction Agreement."* Such articles of the contracts foresee the discretionary power of Hovensa to invoke any legal remedy after <u>twenty-four hours</u> from the written communication of the imputed breaches.

That is what has happened.

In fact, it is understood that the plaintiffs well knew (and the fact is not contested, since it is widely covered in the petition) from the payment request by Hovensa, both for the penalties and for the increased costs suffered by the subcontractors, Hovensa has transmitted those communications to the plaintiffs on <u>May 29, 2007</u> (cf., doc. 6 and 7), specifying to them the imputed breaches and asking for them to rectify it, as foreseen contractually: as remedy, the plaintiffs would have had to sign promptly the declaration foreseen in the contract within the following twenty-four hours, but they have not done so. Accordingly, fully three days later or rather <u>June 1</u>, Hovensa transmitted a second communication to the plaintiffs (doc. 8 and 9) making known its intention to resort to all the available legal remedies (therefore, also the pursuance of the bonds).

Subsequently, on <u>June 4</u>, Hovensa has delivered to the Unicredit bank the documentation useful to the pursuance, requesting payment according to the terms of the bonds (within the 7 days foreseen); therefore, the prosecution took place June 4, 2007 (cf. doc. 10 and 11).

The letter of June 1, 2007 of TPVI is quite irrelevant (not to say delaying

and dilatory), since it is restricted to contesting the imputed breaches and to refuting the payments requested: therefore, in substance, for what it is worth, a confirmation of the legitimacy of the prosecution of the guarantee.

The same consideration may be valid for the letter of June 4, 2007 of Technip, evidently transmitted when the same plaintiff had notification from Unicredit of the pursuance by Hovensa [underlined and marked with an arrow in right margin source].

By the same standard as above, the declaration of the plaintiffs according to which Hovensa would have made such communication *«contemporaneously with the prosecution of the bonds»* is denied *per tabulas.*

**V - On the assumed "accessorial" nature of the bonds.**

At a certain point of the petition, the plaintiffs try to muddy the waters by arguing that the letters of credit released by the Unicredit bank to the favor or Hovensa, which is the case, such would not be, or rather that the two bonds would not be autonomous, but accessory; and this they do – note taken – by furnishing arguments on the standards of Italian law and the Italian jurisprudence formed in matters of bonds (sic).

The opposing thesis has no merit. Evidently.

The *"Irrevocable Stand-by Letter of Credit"* is a guarantee in force which the Unicredit bank is forced to pay to Hovensa, within seven business days, a certain sum *(«an aggregate amount of... to be available within (7) business days...»*, it says textually) against the presentation of two documents, or rather a letter of request for payment, such as the prosecution of the guarantee and a declaration of an official from Hovensa, the likeness of which is explicitly reported in the bond text (the issuance of which has been requested by Technip itself).

Verify, as the plaintiffs do, the circumstance that, between the documents

to be presented to the obliged bank, there is a declaration deriving - more or less - from the lender itself (or, as desired, assumed as such) superfluous activity appears, since the parties of the contracts in point (Appendix D, Exhibit 5) have agreed (i) in order to be able to prosecute the bonds, Hovensa only had to attach the official declaration that the counterpart has been in breach, (ii) the right to prosecute would have been governed by the "Uniform Customs" norms and by the New York law. It is recalled, then, on the one hand that it is Technip itself which has ordered the issuance of the bonds; on the other hand, that Technip is an important company, belonging to an important French group, that, if it had wanted to insert in the contract further conditions regarding the possibility of prosecution of the bond by Hovensa, it would have been able (and should have) exploited a special negotiation.

It is diriment and fundamental to determine that, pursuant to New York State law, a irrevocable letter of credit constitutes an independent contractual obligation by the issuing bank in favor of the beneficiary and any questions related to the progress and to the execution of the underlying relationship cannot justify the absence of payment: the applicable law does not allow either the obliged bank or the credit opening bank to refuse payment alleging that disputes subsist on the underlying relationship.

The "Uniform Customs" typify the case in point; particularly, Art. 3 foresees the abstractness of the documentary credits.

Bear in mind, for all accounts, the following maxims:

- case *E&H Partners v. Broadway Nat'l Bank, 39* F. Supp.2d 275, 280 (S.D.N.Y. 1998): "A fundamental principle that governs letters of credit and the characteristic that confers their commercial utility and efficacy and that it is the obligation of the issuing bank to honor the

22

payment of the credit issued is independent from the execution of the underlying contract. The duty of the issuing bank to pay on the act of delivery of the credit documents that appear to conform to the terms and conditions of the letter of credit is absolute, upon lack of proof of fraudulent intent by the beneficiary" ("*A fundamental principle governing letters of credit and the characteristic which gives them their commercial utility and efficacy is that the obligation of the issuing bank to honor a draft on the credit is independent of the performance of the underlying contract. The duty of the issuing bank to pay upon the submission of the documents which appear on their face to conform to the terms and conditions of the letter of credit is absolute, absent proof of intentional fraud on the part of the beneficiary.*");

- case *First Commercial Bank v. Gotham Originals, Inc., 64* N.Y.2d 287, 294 (N.Y. 1985) "The payment obligation of the issuer is fixed against presentation of the letter of request for payment and the documents specified in the letter of credit. It is not required to resolve disputes or confrontations regarding the underlying contract (or the operation)." ("*[T]he issuer's obligation to pay is fixed upon presentation of the drafts and the documents specified in the letter of credit. It is not required to resolve disputes or questions of act concerning the underlying transaction.*").

On the other hand, the same Italian Authors that are covered with the case in point have given account of the abstractness and the autonomy of the bonds in point. See, for example, V. Visconti, *The Documentary credits,* Ipsoa Informatica, 1985, page 176, *«According to the principle of the autonomy of the documentary credit,*

*the issuing bank achieves its task to pay the beneficiary against simple presentation of the requested documents, provided that they conform to the credit terms and conditions. The bank does not enter therefore regarding the causes that have related to the use... the obligation of the issuing bank is only that resulting from the bank draft. ...the stand by credit has the purpose to assure the performance relative to a contract. For example, the stand by credit can be used as bid bond, performance bond...».*

While the same Author cited *ex adverso* directly compares the *stand-by letter of credit* to a cautionary deposit in cash.

In short, the parties have desired to constitute bonds endowed with autonomy and abstractness, in application of the American legislation: of the type of, the *stand-by letter of credit* which is the case.

It is not understood, by this standard, in precisely what form the declared power of the plaintiffs to oppose the guarantor (Unicredit) would consist with the objectionable exceptions to the guaranteed party (Hovensa).

We can stop here, on the point. The interpretative criteria offered by the Italian jurisprudence for the qualification of a personal bond as autonomous bond (an exception, for Italian law) in place of the suretyship (the rule, for Italian law) are all known; but it deals with a matter that has nothing to do with the *"Irrevocable Stand-by Letter of Credit"* upheld by U.S. law.

**VI - On the *periculum in mora.***

The absence of the requirement of *fumus* (badge) would make the investigation on the *periculum* superfluous.

Anyway.

The plaintiffs insist, first of all, on the already examined "theory of the point of

strength for Hovensa". We have already pronounced thereon, therefore the postponement is valid.

The other allegation is that Technip would suffer a damage to its reputation that would make it difficult to obtain new bonds in the future: it is to be wondered where the useful *periculum in mora* is in to today's "blocking" petition: if such a risk were really to exist- and on this, take note, there is no trace of evidence - it would be sufficient to pay the issued invoices (as from contractual previsions) by Hovensa and to petition for the intervention of the judge with jurisdiction, chosen by the plaintiffs themselves. But today's petition show the serious persistent refusal of the plaintiffs to respect their obligations assumed: in this perspective, Technip's reputation is already compromised.

The opposing complaint lacks seriousness.

The declaration of closing the appeal is also valid as response, remembering besides that, in case of acceptance of the appeal, Hovensa would remain an unsatisfied creditor of 35 million dollars, a sum that increases monthly.

The function of the bonds is that of assuring immediate payment to Hovensa without requiring that the latter actually has to wait while the dispute on the underlying relationship is not definitely resolved. Rather, the subsistence of a *periculum* must be emphasized, that is to say, "opposed". The credit that Hovensa claims for the only major costs sustained by the subcontractors exceeds 17 million dollars. TPVI is a vehicle-company, a kind of instrumental "box" for the signature (for eminently fiscal reasons) of the Construction Contract. That confirms the ever presence of the risk that TPVI may never face its own obligations, from there every consideration on the joint and several obligation of Technip. And if the thesis of the plaintiffs were true on the autonomy of the contracts and on the subsistence of the debt in the person

25

of TPVI, worse still.

It is perhaps then the case, within the comparative assessment of the interests and the positions, to make known that the plaintiff Technip turns out not to be a novice, not only for serious breaches in execution of orders abroad but also judicial delaying initiatives, evidently oriented towards eluding the observance of its of own obligations. It is not given here, for reasons of privacy, to obtain full information on the pendencies regarding the plaintiff; nevertheless, to whom writes it is known for example that, they are always in relationship to contracts and orders abroad.

Technip Italy S.p.A. has recently been sentenced by force of a foreign arbitration award to the payment of sums in favor of the foreign purchaser [Handwritten in margin: E.A.T.I – Ottavio Quattrocchi - MEDIATOR] and that nevertheless, has not given spontaneous execution to the arbitration award, insofar as the purchaser has had to request here in Italy the effective enforcement of the award, whence it is proceeding to enforcement. The arbitration award has been declared enforceable and Technip has proposed opposition pursuant to c.p.c, Art. 840., opposition (obviously) rejected by the appellate court of Rome, with judgment no. 2968/06 (cf. doc. 12: the name of the creditor has been struck out by us for privacy).

Technip, it looks like, has introduced an appeal for Cassation, petitioning the suspension of the judgment upheld *ex* c.p.c. Art. 373, petition (obviously) rejected with decree of the appellate court in Rome of January 3, 2007 (cf. doc. 13: the name of the creditor has been struck out by us for privacy). Considering the enforceable efficacy of the arbitration award, the creditor, in the persistent refusal of Technip to comply, has promoted an enforceable suit with third parties to this court for around 1,900,000 euros obtaining the case assignment (R.G.E. no. 13485/05).

Finally, only for the sake and completeness of defense we comment uselessly the suggestive (even generic) insinuation on the presumed difficulties that

Technip would encounter in pursuing a lawsuit in the United States Virgin Islands, head office of Hovensa, under the hypothesis of possible recognition of credits to Hovensa. First of all, every dispute between the parties is reserved for the cognizance of the courts in New York. In second place, the United States Virgin Islands are territory of the USA, famously advanced and efficient, as in the Federal Courts. Without counting that Technip has, let's say, a "main office", since it is the headquarters of TPVI. But absorbent in respect to the consideration that the plaintiffs have agreed "to assume the risk" (groundless as may be seen) to have to manage disputes and possible executive initiatives in the United States Virgin Islands: the feared risk and, in other terms, structural risk to the relationship covered.

* * *

At this point, it is worth expending a word with respect to the debtor which is directly involved in this forum by force of the prosecution of the bonds. The Unicredit bank is certainly obligated toward Hovensa and must pay. But has not yet done so, violating (by silence of another) the obligations to which it is constrained by force of the bonds. On this, evidently, Hovensa reserves every initiative, also in consideration of the procedural conduct held in this court.

* * *

Considering the number of pages dedicated so far to the opposing petition, it appears appropriate to make a schematic compilation of the reasons and the grounds for the rejection of the opposition petition, not without having recalled that the jurisdiction on the relationship deduced in judgment is not that of Italian judicial authority.

1.  We are speaking of a delay to the delivery of the contracted works of around seven months, notwithstanding, in the course of the relationship, the parties have had occasion to redefine some aspects of the relationship itself (the well-known

Settlement Agreement).

2.    <u>The extent of the amounts due is not under discussion.</u>                              <u>??</u>

3.    <u>The plaintiffs do not submit for discussion the existence of their contested facts
such as breaches by Hovensa;</u> neither do they place under discussion the
subsistence (and, therefore, the genuineness) of mutual challenges or of a
dispute between them on the merit of the progress of the contractual
relationship; <u>they complain, instead, that the buyer Hovensa would be
delinquent or responsible for the breaches imputed to the plaintiffs; they do
this, it is worth confirming, in front of a Judge not endowed with jurisdiction
and with reference to a legal relationship - the one deduced in the present
judgment - existing between third parties, or rather Hovensa and Unicredit (the
surety relationship).</u>

4.    The dispute between the parties of the contract relationship is genuine. In the
state of the acts, there is no malice or fraud on the part of Hovensa. And this
emerges from the same conjectures advanced in the petition on the assumed
negotiations pending between the parties, profits for a transactive agreement:
perhaps the plaintiffs would intend to sustain their willingness to compromise
on vexatious action? The *exceptio doli* is an exceptional instrument that
unfailingly requires the immediate and certain criminal evidence of fraud,
criminal evidence of the groundless kind.

5.    The plaintiffs, in substance, sustain that the claims of Hovensa should be
exclusively answered by TPVI, therefore that the prosecution of the bond
referred to TPVI would be illegitimate; but also that, as has been is widely said,
it is mistaken, and should be instead concluded in the sense of the permanent
obligation of the Unicredit bank to advance the prosecution of both bonds,
since Hovensa has the right to receive from

each of the plaintiffs the amounts due, obviously in reaching the amounts due

(there are no, so to speak, "duplications" of the credit).

6.   Possible increases or subsequent investigations on the (deficient) *fumus boni*

*iuris* could not even be able to advance to the precautionary judge.

7.   Any economic damage that results from the plaintiffs' managing to find

themselves recognized as the result of an ordinary verdict before a judge with

jurisdiction, even if it is just under an inconvenient "damage to reputation"

ruling, would be entirely indemnifiable, however, by the opposing Hovensa.

**P.T.M.**

HOVENSA L.L.C., as represented and defended in epigraph, seeks the integral rejection

of the opposing petition, insisting with the Unicredit Banca d'Impresa S.p.A. on the

petition for immediate payment by the prosecution of June 4, 2007.

With assignment of expenses and remunerations for the proceedings".

Besides the copy of the petition transmitted via fax by the plaintiffs, the following

documents are filed in copy:

A) Proxy to the lawsuit of June 15, 2007, authenticated by the Notary Public Lynda G.

Mahammad and provided with Apostille of June 18, 2007;

1)   Letters of intent Hovensa/Technip of February 10, 2005;

2)   Letters of intent Hovensa/Technip of February 10, 2005;

3)   Contractual proposal letter of Technip France of December 6, 2004;

4)   Press material from the Technip web site;

5)   Hovensa letter of February 15, 2007;

6)   Hovensa letter of May 29, 2007

7)   Hovensa letter of May 29, 2007;

8)  Hovensa letter of June 1, 2007;

9)  Hovensa letter of June 1, 2007;

10) Hovensa prosecution - Unicredit received June 4, 2007;

11) Hovensa prosecution - Unicredit received June 4, 2007;

12) Decree of appellate court in Rome no. 2986/06 related to Technip Italy;

13) Decree of appellate court in Rome for rejection of adjournment petition proposed

    by Technip Italy;

14) Hovensa letter of February 6, 2007;

15) Hovensa letter of June 5, 2007;

16) Hovensa letter of June 5, 2007;

17) Hovensa letter of January 25, 2007;

18) Sentences of the American courts in matters of letters of credit

19) Hovensa / Technip / TPVI Contract with related Appendices cited in the narrative;

20) Settlement Agreement Hovensa / Technip / TPVI of March 31, 2006.

Rome, June 20, 2007

Atty. Andrea Bernava

Atty. Cristina Chiomenti    [signature]

Atty. Carlo Romita    [signature]

Atty. Vittorio Tadei    [signature]



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Marina Yoffe, hereby certify that the following document is to the best of my

knowledge and belief, a true and accurate translation, of the Hovensa L.L.C.'s Record

of Appearance and Defense for Opposing a Provisional Appeal, per Art. 700 of the

Civil Procedure Code from Italian into English.

_____
Marina Yoffe
Signature

Sworn to before me this
May 27, 2008

_____
Signature, Notary Public

**Pamela Boyle**
Notary Public, State of New York
No. 01BO6181278
Qualified in NEW YORK County
Commission Expires  Jan 28, 2012

_____
Stamp, Notary Public

**CHIOMENTI**
STUDIO LEGALE
Via XXIV Maggio, 43 - 00187 Roma
Tel. 06.466221 - Fax 06.46622600

**TRIBUNALE CIVILE DI ROMA**

**Sez. XI - Giudice Dott.ssa Agresti - Ud. 20.6.2007**

**Memoria di costituzione e risposta**

**per resistere a ricorso cautelare *ex* art. 700 c.p.c.**

Nell'interesse della **HOVENSA L.L.C.**, con sede in 1 Estate Hope, Christiansted, VI 00820-5652 (U.S. Virgin Islands), in persona del Vice Presidente, legale rappresentante, Sig. Marco M. Crovesi G., rappresentata e difesa dagli Avv.ti Andrea Bernava, Carlo Romita, Vittorio Tadei e Cristina Chiomenti, presso lo studio dei quali, in Roma, Via XXIV Maggio n. 43, è elettivamente domiciliata, in virtù di procura alla lite del 15 giugno 2007, autenticata dal Notary Public Lynda G. Mahammad e munita di Apostille (Convenzione dell'Aia del 5 ottobre 1961) in data 18 giugno 2007, allegata *sub* "A"                                                         *- resistente*

**Contro**

la **Technip Italy S.p.A.** e la **TPVI Ltd.**, rappresentate e difese dagli avvocati Daniela Jouvenal e Sergio Calderara                           *- ricorrente*

**e nei confronti**

della **Unicredit Banca d'Impresa S.p.A.**                      *- resistente*

\* \* \* \*

Nella serata di giovedì 14 giugno 2007, la esponente società, Hovensa L.L.C., ha ricevuto via fax il ricorso introduttivo del presente procedimento, depositato il 6 giugno 2007, con pedissequo decreto di comparizione del 7 giugno 2007, ricorso con il quale, per quanto interessa la posizione della odierna esponente, si chiede al Tribunale, in via d'urgenza, d'inibire alla Unicredit Banca d'Impresa S.p.A. il pagamento a questa richiesto dalla Hovensa in escussione di due lettere di credito, emesse dalla medesima banca italiana in favore della Hovensa

*Car*

e rette dal diritto statunitense.

Il ricorso illustra i rapporti che vedono coinvolte le parti di questo procedimento, rapporti che sono sintetizzabili come segue:

1.  Un rapporto essenzialmente di appalto per la realizzazione "chiavi in mano" (anche se non si tratta di un tale tipo di appalto, ma di un appalto "a corpo" con prezzo omnicomprensivo, eseguito sulla base di apposite specifiche; solo per comodità, pertanto, nel seguito si userà anche l'espressione "chiavi in mano") di un impianto di idrotrattamento della benzina a basso contenuto di zolfo, situato a Saint Croix, Isole Vergini Statunitensi, presso la raffineria petrolifera della Hovensa. Tale rapporto è intercorrente tra le società ricorrenti (le appaltatrici) e la società Hovensa (il committente) ed è documentato da due contratti, l'uno denominato "*Engineering & Procurement*" e sottoscritto dalla Hovensa e dalla Technip Italy S.p.A. (di seguito "Technip"), l'altro denominato "*Construction Agreement*" ("Contratto di Costruzione") e sottoscritto dalla Hovensa e dalla TPVI Ltd. (veicolo societario appositamente costituito da Technip per la sottoscrizione del contratto). Gli accordi negoziali fra tutte le indicate parti sono stati parzialmente modificati a mezzo di un "*Settlement Agreement*" del marzo 2006. Tutti i contratti sono retti dalla legge dello Stato di New York ed ogni controversia ad essi inerente è riservata alla giurisdizione esclusiva statunitense.

2.  Un rapporto di garanzia, intercorrente tra la Unicredit Banca d'Impresa S.p.A., quale obbligata al pagamento, e la Hovensa, quale beneficiaria della garanzia. In particolare, la banca Unicredit ha emesso due identiche garanzie, ciascuna denominata "*Irrevocable Stand-by Letter of Credit*" e retta dalle norme della "*Uniform Customs and Practice for*

2

*Documentary Credits (1993 Revisio), Inernational Chamber of Commerce Publication n. 500*" (di seguito le "Uniform Customs") e, per quanto da esse non regolato, dalle leggi dello Stato di New York. Un rapporto, dunque, che non vede parti le odierne ricorrenti.

3. Infine, il rapporto "interno" tra le ricorrenti e la banca Unicredit, quello relativo all'ordine, dalle prime alla seconda, di emissione delle Irrevocable Stand-by Letter of Credit della banca Unicredit in favore della Hovensa; in sostanza il "mandato-manleva". Tale rapporto, ovviamente, non riguarda la esponente società Hovensa.

Le ricorrenti forniscono una descrizione (parziale) delle caratteristiche e delle modalità di svolgimento del rapporto di appalto; riferiscono della richiesta di pagamento della Hovensa alla banca Unicredit delle indicate garanzie, sostenendo che tale richiesta sia contraria a buona fede, quantomeno con riferimento all'escussione della garanzia riferita alla Technip.

Il nucleo essenziale della domanda cautelare d'urgenza, dato atto che la giurisdizione e la legge applicabile sono quelle dello Stato di New York, è affidato ai seguenti argomenti:

(i) si tratterebbe di due autonomi e distinti rapporti (d'appalto) quelli che legano Hovensa, da una parte, e Technip e TPVI, dall'altra parte, giacché ciascuna delle ricorrenti ha sottoscritto un solo contratto, al quale sarebbe collegata una sola garanzia;

(ii) Technip non sarebbe inadempiente, né responsabile per gli inadempimenti lamentati dalla Hovensa, giacché essi riguarderebbero il solo "Completamento Meccanico", relativo al solo Contratto di Costruzione sottoscritto dalla sola TPVI: questa soltanto sarebbe stata obbligata e responsabile per il

3

«*Completamento Meccanico di cui al Contratto di Costruzione*» entro il 10 novembre 2006;

(iii)    il completamento di cui sopra non sarebbe ancora avvenuto per «*una serie di circostanze che sono state e sono oggetto di discussione tra le parti*», tali per cui Technip e TPVI «*ritengono Hovensa responsabile di detto ritardo*», mentre le contestazioni della Hovensa sarebbero giunte «*del tutto inaspettatamente*» (pagg. 4 e 5 del ricorso);

(iv)    la committente Hovensa si sarebbe «*precostituita alcuni documenti (le fatture), sulla base dei quali poter affermare che sussiste un inadempimento delle ricorrenti e con ciò legittimare l'escussione della garanzia*» (pag. 11 del ricorso);

(v)    l'intento della committente sarebbe quello di affrontare e condurre i procedimenti previsti per la soluzione della controversia (innanzi al giudice statunitense) avendo, tuttavia, già incassato l'importo delle garanzie, ed avendo, per questa via, un maggiore potere negoziale durante una futura (paventata o prospettata) lite giudiziaria nella competente giurisdizione statunitense;

(vi)    la stessa escussione delle garanzie da parte della Hovensa sarebbe avvenuta in modo irrituale perché Hovensa avrebbe (**a**) «*senza alcun preavviso emesso le fatture per le penali*», fatture che, in quanto contestate dalle ricorrenti, rappresenterebbero delle «*somme contestate*», e queste sarebbero escluse dai crediti esigibili dalla Hovensa, dovendosi, in tal caso, preventivamente seguire una procedura di composizione amichevole, secondo previsioni contrattuali (pagg. 12 e 13 del ricorso); (**b**) violato le previsioni

4

contrattuali relative alla comunicazione che Hovensa deve dare prima dell'escussione delle garanzie (pag. 14 del ricorso).

Quanto sopra legittimerebbe «*l'exceptio doli da parte delle ricorrenti e la loro conseguente richiesta di inibitoria dell'escussione delle garanzie... in generale e quantomeno in relazione alla garanzia relativa al contratto Engineering and Procurement*» (pag. 12 del ricorso).

Inoltre, le ricorrenti, in punto di stretto diritto, sostengono, ancorché in via subordinata, che le garanzie per cui è causa non sarebbero dotate del carattere della autonomia rispetto al rapporto sottostante, ma sarebbero garanzie c.d. "accessorie", alla stregua della fideiussione prevista dal diritto italiano; ragion per cui, le ricorrenti medesime potrebbero opporre al garante le eccezioni opponibili al garantito (pagg. 15-19 del ricorso).

Il ricorso si completa di argomenti a sostegno della legittimazione attiva di entrambe le ricorrenti e della giurisdizione del giudice adito per l'instaurato procedimento cautelare.

* * *

Hovensa L.L.C. si costituisce nel presente procedimento, come in epigrafe rappresentata e difesa, per contestare integralmente la versione dei fatti e le ragioni poste a fondamento del ricorso, chiedendo il rigetto del medesimo. Il ricorso è infatti temerario e suggella la malafede delle ricorrenti, per quanto viene nel seguito esposto.

**I - In via preliminare.**

**1.** Va premesso – a fondamentale e pregiudiziale chiarimento – che la società odierna resistente non intende accettare alcun tentativo di riconoscere all'A.G.O. italiana giurisdizione alcuna sul rapporto *inter partes*. D'altra parte, lo stesso ricorso dà per pacifico che la giurisdizione esclusiva è statunitense

5

(così come, peraltro, la legge applicabile). Ogni argomento nel seguito sviluppato, pertanto, è esclusivamente funzionale al rigetto del ricorso, presentato in Italia ai sensi dell'art. 10 L n. 218/95.

**2.** Giacché si è introdotta una premessa su aspetti pregiudiziali, vale la pena affrontare subito il tema della legittimazione attiva, trattato nella parte finale del ricorso.

Appare evidente che le ricorrenti stiano confondendo una questione di merito, vale a dire la legittimazione attiva (*i.e.*, la titolarità della posizione sostanziale), con la giurisdizione (ancorché cautelare), giacché utilizzano i medesimi criteri per giustificare la sussistenza dell'una e dell'altra (cfr., pag. 19 del ricorso). E così, l'affermazione secondo la quale l'escussione delle garanzie può avvenire presso la filiale di Roma della Unicredit Banca d'Impresa, non solo è irrilevante in punto di giurisdizione, giacché quel che rileva sarebbe il luogo nel quale deve essere effettuato il_pagamento delle garanzie, vale a dire presso il beneficiario estero, ma nulla dice sulla legittimazione attiva.

Per quanto riguarda, invece, l'affermazione secondo la quale è la sola Technip ad aver ordinato alla banca emittente le garanzie, essa, ad opinione di chi scrive, dà conto:

- del rapporto interno tra le ricorrenti (*rectius*: la ricorrente Technip) e la banca Unicredit, non certo del rapporto con l'esponente Hovensa;

- della carenza di legittimazione attiva della TPVI per il richiesto ordine alla banca Unicredit (giacché le stesse ricorrenti hanno più volte precisato che l'ordine alla banca emittente le garanzie è stato esclusivamente di Technip: cfr., pagg. 3, 19 e 22 del ricorso).

**II - Premessa e considerazioni generali.**

1) In questo procedimento si sta trattando dell'escussione di garanzie tipiche,

6

vale a dire le due "*Irrevocable Stand-by Letter of Credit*" previste e disciplinate dalla normativa statunitense delle "Uniform Customs" e, in via residuale, dalle leggi dello Stato di New York. Come si avrà modo di ribadire, le garanzie in questione sono, secondo la legge regolatrice, autonome e non consentono all'obbligato, men che meno ai terzi con che con questo abbiano rapporti, di opporre eccezioni di sorta fondate sul rapporto sottostante che ha "occasionato" l'emissione delle garanzie.

2) Quanto al rapporto tra la Hovensa, da una parte, e Technip e TPVI, dall'altra parte, le due appaltatrici si sono rese responsabili di una serie di inadempimenti ai due contratti, dai quali sono scaturite due principali pretese di pagamento da parte di Hovensa:

> (A) delle Schedule Liquidated Damages (di seguito "le penali") per il mancato rispetto dei tempi per il completamento meccanico del progetto (novembre 2006), previste dalle Appendix K (identiche per i due contratti);

> (B) dei maggiori costi che Hovensa è stata costretta a sostenere in favore dei subappaltatori (i c.d. "Hovensa Contractors", come definito nell'art. 23.2 del Construction Agreement), costi dei quali si deve fare carico la parte appaltatrice, giacché l'Appendix D, Exihibit 1, par. 1.3, prevede che tutti pagamenti effettuati ai "Subappaltatori Hovensa" (come, ad es., Tiger) saranno dedotti dal prezzo dell'appalto chiavi in mano ("*[a]ll payments made to Hovensa Contractors... will be deducted from the Construction Lump Sum Price.*").

Il totale del credito ad oggi vantato è superiore ai 35 milioni di Dollari USA.

Con riferimento alle sopra indicate penali, va rammentato che la data per il completamento meccanico del progetto era il 10 novembre 2006.

7

Ad oggi, tuttavia, il completamento dell'opera non è avvenuto.

A partire dal gennaio 2007, Hovensa ha emesso le previste fatture, mai pagate.

3) Il rapporto tra Hovensa, Technip e TPVI è unico e vede entrambe le ricorrenti obbligate per gli effetti degli inadempimenti contestati e per i pagamenti richiesti.

Può anticiparsi, al riguardo, che i due originari contratti, l'uno sottoscritto da Technip, l'altro sottoscritto da TPVI, prevedono ciascuno un unico corrispettivo per la consegna "chiavi in mano" dell'impianto da realizzare (USD 50.000.000 per la parte relativa alla Construction, prezzo che è stato aumentato con il Settlement Agreement, come si dirà; USD 77.000.000 per la parte relativa all'E&P). Da ciò deriva che l'appaltatore sopporta i rischi relativi ai costi, primo fra tutti quello della eventuale maggiorazione di essi.

4) Ad oggi, Hovensa ha dovuto pagare a TPVI e ai subappaltatori più di 67.000.000 di Dollari USA. Ai sensi degli accordi, come più sopra indicato, e della stessa natura del corrispettivo "chiavi mano", Hovensa ha il diritto di riottenere le somme che sono state pagate in eccesso rispetto al medesimo prezzo "chiavi mano" (nella specie, gli originari USD 50.000.000) e la parte appaltatrice è tenuta a farsi carico dei costi per i subappaltatori.

5) L'escussione del 4 giugno 2007 della Hovensa, per l'importo di circa 13 milioni di Dollari USA, è avvenuta nel pieno rispetto degli accordi contrattuali.

6) Le ricorrenti, con riferimento al rapporto sottostante, hanno formulato contestazioni sugli inadempimenti loro imputati dalla Hovensa, senza porre in essere alcun concreto rimedio contrattuale e senza adire il giudice competente per la soluzione della prospettata controversia tra le parti. L'esistenza di contestazioni (pressoché normali - diremmo "naturali" - in tutti i rapporti quali quello che lega Hovensa e le ricorrenti), peraltro non conformi agli accordi

8

negoziali, non impedisce punto l'escussione delle garanzie; anzi.

7) Non sussistono i presupposti per l'accoglimento del proposto ricorso.

8) La banca Unicredit è pertanto a tutt'oggi inadempiente verso la Hovensa.

**III - L'assunta indipendenza ed autonomia dei due contratti; l'infondatezza della tesi per cui solo TPVI può essere ritenuta responsabile per il mancato completamento meccanico del progetto nei tempi previsti.**

Va preliminarmente rammentato che si sta trattando di negozi giuridici creati e retti secondo la legge dello Stato di New York e che, pertanto, ogni criterio d'interpretazione alla stregua del diritto italiano è irrilevante e destinato a soccombere rispetto alle modalità di valutazione dei contratti (e delle stesse qualità di parti del rapporto) alla stregua del diritto statunitense.

Proprio alla stregua di tale legge applicabile, può essere senz'altro statuito che la tesi avversaria, secondo la quale i due menzionati contratti sarebbero autonomi e distinti, è errata e contraddetta da vari elementi, giuridicamente determinanti, che di seguito si illustrano.

1. Technip ha negoziato l'intero piano dei termini e delle condizioni contrattuali, l'intero progetto, supervisionando l'esecuzione dell'appalto e gestendone ogni aspetto; più in particolare, tutti gli accordi sono stati negoziati dai responsabili di Tecnip Italy e di Technip France, perché tra il novembre 2004 ed il febbraio 2005 Technip ha rappresentato ad Hovensa che Technip France avrebbe controllato il progetto. Si ponga mente, ad esempio, alle lettere di intenti per i contratti "E&P" e "Construction" che Hovensa trasmise a Technip S.A., la holding del gruppo cui appartengono Technip e TPVI: tale lettere d'intenti sono state sottoscritte dai medesimi due rappresentanti di Technip (cfr., docc. 1 e 2; in argomento, cfr. pure il doc. 3). Peraltro, sono le stesse ricorrenti, qua e là nel ricorso (cfr., pagg. 3, 19 e 22 del ricorso), a porre

9

l'accento sul fatto che l'emissione di entrambe le garanzie per cui è causa è stata richiesta alla banca Unicredit dalla sola Technip. Parimenti, entrambe le ricorrenti dichiarano in ricorso che il completamento meccanico del progetto non sarebbe ancora avvenuto per *«una serie di circostanze che sono state e sono oggetto di discussione tra le parti»*, tali per cui Technip e TPVI *«ritengono Hovensa responsabile di detto ritardo»* (pag. 4 del ricorso).

2. TPVI è una società appositamente costituita da Tecnip Italy (e/o Technip S.A.) per l'operazione (e per i connessi riflessi fiscali); è stata infatti costituita il 2 marzo 2005, vale a dire appena otto giorni prima della data di sottoscrizione dei contratti (*id est*, i contratti sono stati sottoscritti in quella data per consentire la costituzione della nuova società-veicolo TPVI). Per di più, i dirigenti ed i dipendenti di TPVI sono interamente o primariamente i medesimi di Technip (un esempio tra tutti è il sig. Vincenzo Laganà, nominativo risultante nella corrispondenza fra le parti). Pertanto, l'assunto che il ruolo di TPVI sia del tutto autonomo ed indipendente da quello di Technip è contrario al vero e trascura il fondamentale controllo che Technip ha svolto sull'intero progetto. D'altra parte, basti navigare sul sito internet di Technip Italy per essere informati del fatto che la società medesima si cura di precisare di essere la "*magna pars*" del progetto (cfr., doc. 4).

3. Molte delle previsioni dei due contratti, ed in particolare delle Appendici, sono sostanzialmente identiche (come peraltro riconosciuto dalle stesse ricorrenti: cfr., ad es., pag. 12 del ricorso). E non è certo il caso di rammentare in questa sede che, nella contrattualistica anglosassone, le Appendici ai contratti rappresentano il momento centrale del rapporto obbligatorio.

In particolare, l'Appendix D, prodotta dalle stesse ricorrenti, prevede che le responsabilità, le obbligazioni e i requisiti applicabili all'appaltatore saranno

riferiti ad entrambi gli appaltatori dei rispettivi contratti Construction e E&P, vale a dire sia a Technip sia a TPVI.

l'Appendix K dei due contratti richiede che l'appaltatore paghi gli Schedule Liquidated Damages (le penali) per ciascun giorno successivamente al 10 novembre 2006, qualora non sia stato raggiunto il completamento meccanico del progetto. Le Schedule Liquidated Damages sono state emendate nel marzo 2006 con il *"Settlement Agreement"* intercorso tra tutte le parti, ma per il resto l'Appendix K non è stata modificata. Tale Appendice – giova ribadire – è identica per i due contratti ed è stata firmata da tutte le parti.

Significativa, in argomento, è anche l'Appendix E, preparata esclusivamente da Technip: essa fissa le fasi dell'intero progetto ed unifica tutti gli aspetti dell'appalto, dalla progettazione alla realizzazione, vale a dire sia l'engineeing sia la costruzione, con tanto di fissazione della data del completamento meccanico al 10 novembre 2006. Inoltre, ai sensi dell'art. 6.3 della medesima Appendice il "CONTRACTOR eseguirà il Lavoro in conformità con il Project Schedule come da Appendix E di questo Accordo e sarà responsabile per i ritardi causati dal CONTRACTOR con il solo limite dato dai rimedi come previsti nell'Appendix K" (*"CONTRACTOR will perform the Work in accordance with the Project Schedule as per Appendix E to this Agreement and will be responsible for delays caused by CONTRACTOR to the sole extent of the remedies as provided for under Appendix K"*).

Ancora. Ai sensi dell'Appendix K del contratto sottoscritto da Technip – l'E&P Agreement – è previsto che la stessa Technip fosse direttamente obbligata al completamento meccanico in argomento entro il 10 novembre 2006 e che, in caso di ritardo, Technip medesima avrebbe pagato a Hovensa le penali previste dalla Appendix K medesima (*"For each day that Mechanical Completion is*

*delayed beyond November 10, 2006, except to the extent due to the actions of HOVENSA, CONTRACTOR will pay to HOVENSA Schedule Liquidated Damages as follows...").*

Dalla struttura e dalla formulazione delle Appendix K deriva inoltre che Technip e TPVI sono solidalmente responsabili per le penali (Schedule Liquidated Damages) entro i limiti del 10% del prezzo totale previsto dai contratti. Pertanto, entrambe le società ricorrenti sono responsabili dell'intero ammontare dei danni relativi al mancato raggiungimento del completamento meccanico.

Si ponga mente, al riguardo, che l'Appendix K prevede che l'intero ammontare delle Scheduled Liquidated Damages, come previsto nell'E&P Agreement e nel Construction Agreement, non potrà eccedere il 10% del prezzo totale dell'appalto "chiavi in mano" e costituirà il solo ed esclusivo rimedio per la Hovensa rispetto al ritardo, da parte dell'appaltatore, nel raggiungimento del completamento meccanico ("*The aggregate amount of Schedule liquidated damages under both the E&P Agreement and the Construction Agreement will not exceed ten percent (10%) of the total Agreement price, and shall constitute HOVENSA's sole and exclusive remedies in respect of delay by CONTRACTOR in achieving Mechanical Completion.*").

4. Ad ulteriore conferma della natura unitaria del rapporto d'appalto e quindi dei due contratti, Technip, all'art. 6.2 del contratto da essa sottoscritto (l'E&P Agreement), ha espressamente indicato e accordato che il ruolo di gestione del progetto esecutivo sarebbe stato svolto da una società "affiliata" – *i.e.* TPVI - e che la stessa Technip non avrebbe cercato di esonerarsi dalla propria responsabilità derivante dalla mancata esecuzione del progetto, inclusa quella per eventuali ritardi nella consegna, allegando o opponendo che la

responsabilità fosse della società affiliata esecutrice del progetto (Article 6.2:
"...[*Technip Italy*] *and Construction Contractor* **are affiliated companies and**
*[Technip Italy] will not use any delays or any action or inaction* **by**
**Construction Contractor** *to excuse any breach or nonperformance, including*
*delay, by [Technip Italy] under this Agreement.*"). 

5. Anche dal Settlement Agreement si hanno conferme dell'unitarietà del
rapporto tra le parti dell'appalto. Le ricorrenti sostengono (invece) che
l'autonomia e la distinzione dei due contratti sarebbe confermata anche dalla
transazione (il *"Settlement Agreement"* del marzo 2006) perché sarebbe
«*sempre e solo menzionata TPVI in relazione alla scadenza per la consegna dei*
*lavori di costruzione meccanica*» (pag. 12 del ricorso).

Tale affermazione è ingannevole, giacché il riferimento alla scadenza per TPVI
è fatto solo per i pagamenti aggiuntivi, ivi compresi i bonus, come previsto
all'art. 1 del Settlement Agreement, ma la responsabilità per i ritardi nella
consegna dei lavori (e quindi le questioni connesse con la scadenza per la
consegna dei lavori per completamento meccanico) è sempre attribuita
indistintamente al "CONTRACTOR", vale a dire sia Technip che TPVI: ciò è
quanto le parti hanno previsto, sempre nel Settlement Agreement, all'atto della
modifica dell'Appendix K (cfr. art. 1 (b) del Settlement Agreement). Insomma,
anche in occasione della transazione, Technip non è stata esonerata da Hovensa
dalla responsabilità per le penali dovute per i ritardi nel completamento
meccanico previsto nell'appalto.

A quanto sopra si aggiunga che l'accordo di transazione (il Settlement
Agreement) ha avuto ad oggetto indistintamente le questioni attinenti ai due
contratti, i quali, così, sono stati trattati unitariamente (cfr. punto "A", in fine,
del Settlement Agreement).

13

6. In conclusione, la tesi dell'autonomia e dell'indipendenza dei rapporti, *ex adverso* utilizzata vuoi per dare colore al *fumus boni iuris*, vuoi per limitare gli effetti della positiva escussione alla sola "garanzia TPVI" è priva di fondamento.

**IV - Il *fumus boni iuris*: sull'assunta escussione in violazione dell'obbligo di buona fede.**

L'argomento presuppone che le garanzie in discorso siano "autonome" e che, per ciò, la richiesta cautelare sia fondata sull'*exceptio doli*.

Le ricorrenti fondano la doglianza dell'escussione fraudolenta, oltreché sulla tesi – smentita nel paragrafo precedente – dell'autonomia ed indipendenza dei contratti, sulle circostanze che si vanno di seguito ad esaminare e commentare.

**1.** Le ricorrenti ritengono Hovensa responsabile dei ritardi (pacifici) nella consegna dei lavori: ciò risulterebbe da corrispondenza intercorsa tra le parti. Al riguardo basti replicare:

- che quello che ritengono le ricorrenti, peraltro in missive dalle medesime provenienti, è irrilevante; non senza rilevare che Hovensa "ritiene" esattamente il contrario, come ben sanno le ricorrenti: il fatto pacifico è che sussiste il ritardo in questione, gli effetti del quale sono contrattualmente previsti;

- che la circostanza è, per così dire, "neutra", giacché trattasi di questione di merito, da valutarsi alla stregua del diritto straniero, dal giudice statunitense: come le ricorrenti hanno avuto cura di precisare in varie parti del ricorso, la questione se la condotta di Hovensa abbia contribuito a causare ritardi deve essere risolta in contraddittorio tra le parti a New York e non ha nulla a che vedere con l'obbligazione di pagamento della banca Unicredit in relazione alle garanzie emesse.

14

**2.** Le fatture di Hovensa contrattualmente previste sono state "respinte" dalle ricorrenti, per la medesima ragione di cui sopra. Essendo infondata ed irrilevante la doglianza *sub* 1, va da sé che infondata ed irrilevante sia anche tale doglianza. Essa, piuttosto, conferma l'inadempimento delle ricorrenti.

**3.** Hovensa, «*nonostante l'emissione delle fatture per penali*», avrebbe lasciato immaginare non meglio identificate intenzioni «*che si trattasse di una normale dialettica volta a ridiscutere il prezzo finale*» (pag. 5 del ricorso). La congettura è gratuita e francamente un po' "ingenua": sta di fatto che Hovensa ha emesso le fatture per le penali, con ciò integrando una condotta non equivoca.

**4.** Sempre a pag. 5 del ricorso si legge un "passo" relativo – ancora una volta – possibili intenti di Hovensa con riferimento ai maggiori costi da questa sostenuti per i subappaltatori: quel passo è di difficile comprensione per chi scrive ed è dunque contestato.

Collegata a tale argomento è, presumibilmente, la doglianza secondo la quale Hovensa avrebbe costretto Technip e TPVI ad utilizzare il subappaltatore Tiger (pagg. 7 e ss. del ricorso): tale doglianza, il cui ingresso è evidentemente precluso in questa sede, è completamente lontana dal vero ed è stata specificamente contestata dalla Hovensa non solo verbalmente, ma anche più volte per iscritto (cfr., ad es., la lettera del 15 febbraio 2007 - doc. 5).

Ad ogni buon conto, vale la pena ribadire che è contrattualmente previsto che tutti pagamenti effettuati ai c.d. "Subappaltatori Hovensa" (come, ad es., Tiger) devono essere dedotti dal prezzo dell'appalto "chiavi in mano" e di essi deve quindi farsi carico l'appaltatore. E vale pure la pena di rammentare che, ad oggi, Hovensa ha dovuto pagare a TPVI e ai subappaltatori più di 67.000.000 di Dollari USA.

Alla stregua di quanto sinora rilevato e replicato, va da sé che la lettera di

Hovensa del 29 maggio 2007 fosse tutt'altro che "inaspettata".

**5.** A pag. 7 del ricorso si legge che le parti del rapporto d'appalto avrebbero intrattenuto «*stretti contatti*» e discussioni sulle ragioni del ritardo nella consegna dei lavori e, ciononostante, Hovensa continuava ad emettere le fatture per le penali, procedendo, successivamente, all'escussione per cui è causa.

Una volta chiariti (dalle ricorrenti, s'intende) i contorni degli indicati "stretti contatti" e discussioni, c'è da domandarsi in cosa possa consistere la condotta fraudolenta della Hovensa. La sussistenza di una controversia o di contestazioni o discussioni fra le parti non dice nulla in ordine all'assunta escussione fraudolenta.

Perché si possa parlare di frode nell'escussione occorre, oltre alla prova di fatti gravi precisi e concordanti, fornire la prova che la controversia tra le parti non sia genuina. Dire che le parti discutono «*sulle circostanze che hanno portato alla mancata consegna dei lavori nel termine contrattuale*», non solo non dice nulla sui caratteri della "discussione" (la discussione è caratterizzata dal fatto che Hovensa ritiene le ricorrenti responsabili e contesta puntualmente le "giustificazioni" da esse fornite!), ma non vuol certo dire che tali discussioni siano segno di una controversia non genuina, insussistente, ovvero, addirittura, segno di intenti fraudolenti di una parte (Hovensa, nella prospettiva delle ricorrenti). Le parti discuteranno e risolveranno la loro controversia nelle sedi competenti (giudici dello Stato di New York). Nel mentre, sussistendo quantomeno *prima facie* i presupposti – non più di tanto contestati dalle ricorrenti, a ben guardare – per l'escussione delle garanzie in discorso, Hovensa ha diritto di ricevere il pagamento dall'obbligata Unicredit Banca d'Impresa (pena, evidentemente, in venir meno della funzione giuridico-economica delle garanzie medesime).

16

Alla questa stregua, si dimostrano prive di pregio, oltre che gratuite, sia la dichiarazione secondo la quale Hovensa si sarebbe avvalsa dell'escussione delle garanzie «*per (tentare di) ottenere una maggiore forza contrattuale*» (pag. 10 del ricorso), sia quella secondo la quale Hovensa si sarebbe «*precostituita alcuni documenti (le fatture), sulla base dei quali poter affermare che sussiste un inadempimento delle ricorrenti e con ciò legittimare l'escussione della garanzia*» ed intenderebbe risolvere la disputa in essere «*dopo aver già incassato il massimo di quanto possa incassare in base alle garanzie*» (pag. 11 del ricorso). In aggiunta, si potrebbe replicare utilizzando una massima della decisione del caso *Ross Bicycles, Inc. v. Citibank*, N.A. 613 N.Y.S. 2d 538, 541 (N.Y. Sup. Ct. 1994): "*...uno degli scopi principali delle lettere di credito è quello di porre il venditore* [il beneficiario - n.d.r.] *nella posizione di maggior forza, ossia quella di ricevere il pagamento anche durante la pendenza della controversia in merito al contratto*". Può pure citarsi il caso *Fluor Daniel Argentina, Inc. v. ANZ Bank*, 13 F. Sup 2d 562 (S.D.N.Y. 1998) "*Le lettere di credito sono di particolare importanza nei contratti internazionali in cui, investitori sofisticati, notoriamente affrontano una serie di rischi... a fronte dei benefici derivanti dal commercio internazionale, ma il valore di tali benefici può essere previsto sulla base del loro grado di certezza legale... le linee del commercio verrebbero rallentate, se non addirittura congelate, se le parti che intendono intraprendere operazioni internazionali non avessero la possibilità di confidare su lettere di credito al fine di ridurre le incertezze derivanti da questo genere di operazioni*" (cfr., allegato).

Ad ogni buon conto, giova rammentare che Hovensa è creditrice di un importo di circa 35 milioni di Dollari, per le penali ed i costi aggiuntivi sopportati per pagare i subappaltatori (e tale importo continua, ovviamente, ad aumentare).

17

Pertanto, se pure Hovensa ottenesse i 13 milioni richiesti in forza delle garanzie escusse, le ricorrenti resterebbero ancora debitrici nei confronti di Hovensa della somma di circa 22 milioni di Dollari; ne consegue che, con il pagamento di quanto dovuto dalla banca Unicredit in forza delle garanzie, Hovensa otterrebbe circa un terzo dell'importo totale ad oggi dovuto: non si comprende quale sarebbe lo scorretto vantaggio.

E va poi rammentato che, qualora le ricorrenti dovessero uscire vittoriose dal prospettato contenzioso negli USA, Hovensa dovrebbe loro restituire la somma ricevuta con l'escussione delle garanzie maggiorata degli interessi. E nessuno pone in dubbio che Hovensa sia più che solvente (per avere un'idea, basti visitare il sito www.hovensa.com).

Infine, merita replicare alla dichiarazione, sempre contenuta a pag. 11, secondo la quale "*L'escussione delle garanzie in base ad entrambi i contratti costituisce un escamotage certamente conveniente, per ottenere di fatto un raddoppio dell'importo astrattamente dovuto...*". Tale dichiarazione è francamente di difficile comprensione per chi scrive e si chiede, pertanto, che le ricorrenti vogliano fornire chiarimenti al riguardo.

**V - *segue:* Sull'assunta invalidità dell'escussione per assunte (1) pendenza di contestazioni o di controversia sulla debenza delle penali e (2) violazione da parte di Hovensa delle previsioni contrattuali relative alla comunicazione da dare prima dell'escussione delle garanzie.**

**(1)** Va innanzitutto ribadito che il merito delle contestazioni circa le penali è irrilevante ed inopponibile rispetto all'obbligazione (che è autonoma) della banca Unicredit di onorare le garanzie. A questa stregua, ogni considerazione sulla sussistenza, o meno, delle c.d. "somme contestate", secondo previsioni dei contratti tra le ricorrenti e Hovensa, è irrilevante e non può pertanto avere

ingresso in questa sede.

Ciò che è indiscutibile, specialmente nel contesto della cognizione sommaria riservata a codesto Giudice, è che non v'è nulla, né nei contratti dell'appalto né nelle garanzie, che limiti il diritto di Hovensa di escutere le garanzie ed ottenere il pagamento, ancorché sia pendente una controversia sulle responsabilità delle parti del rapporto d'appalto ovvero anche una procedura negoziale di soluzione della controversia. D'altronde, una tale limitazione non avrebbe senso (giuridico ed economico) e minerebbe la funzione (giuridica ed economica) delle rilasciate garanzie: se il pagamento delle garanzie potesse essere fermato sulla semplice base di contestazioni avanzate sulle penali dovute e se dunque le garanzie potessero essere escusse solo all'esito della controversia, allora non si comprenderebbe il ruolo delle garanzie.

Giacché si tratta di legge statunitense, sull'argomento giova richiamare ancora il caso *Ross Bicycles, Inc. v. Citibank,* N.A. 613 N.Y.S. 2d 538, 541 (N.Y. Sup. Ct. 1994): "*Se il cliente* [il richiedente l'emissione delle lettere di credito - n.d.r.] *ritiene che il beneficiario non abbia diritto alle somme previste nelle lettere di credito stesse, tali parti possono iniziare una contesa giuridica in merito al contratto. Infatti, uno degli scopi principali delle lettere di credito è quello di porre il venditore* [il beneficiario - n.d.r.] *nella posizione di maggior forza, ossia quella di ricevere il pagamento anche durante la pendenza della controversia in merito al contratto*".

Quanto agli artt. 24.2 e 27.2, richiamati dalle ricorrenti, essi non sono altro che le clausole di scelta della giurisdizione e dei mezzi di risoluzione delle controversie. Ma ciò, ancora una volta, non ha nulla a che vedere con le garanzie a tutela del credito vantato da Hovensa e con il suo potere, quale creditore "documentario", di escutere le garanzie.

19

(2) In merito all'assunta mancata comunicazione dell'escussione delle garanzie (pag. 14 del ricorso), l'Appendix D, Exhibit 1, par. 2.1, dei contratti prevede che *"prima di ogni escussione delle lettere di credito Hovensa deve dare la comunicazione richiesta ai sensi dell'art. 11.3 dell'E&P Agreement o ai sensi dell'art. 14.3 del Construction Agreement"*. Tali articoli dei contratti prevedono il potere discrezionale di Hovensa di invocare qualsiasi rimedio legale trascorse ventiquattro ore dalla comunicazione scritta degli inadempimenti imputati.

È quanto è accaduto.

Infatti, fermo restando che le ricorrenti ben sapevano (ed il fatto non è contestato, giacché lungamente trattato in ricorso) delle richieste di pagamento da parte di Hovensa, sia per le penali sia per i maggiori costi subiti per i subappaltatori, Hovensa ha trasmesso quelle comunicazioni alle ricorrenti in data 29 maggio 2007 (cfr., docc. 6 e 7), specificando loro gli inadempimenti imputati e richiedendo di porre in essere i rimedi, secondo quanto contrattualmente previsto: come rimedio, le ricorrenti avrebbero dovuto prontamente sottoscrivere la dichiarazione prevista in contratto nelle ventiquattro ore successive, ma ciò non hanno fatto. Di conseguenza, ben tre giorni dopo, vale a dire il 1° giugno, Hovensa ha trasmesso una seconda comunicazione alle ricorrenti (docc. 8 e 9) rendendo nota l'intenzione di ricorrere a tutti i rimedi legali disponibili (dunque, anche l'escussione delle garanzie).

Successivamente, in data 4 giugno, Hovensa ha consegnato alla banca Unicredit la documentazione utile all'escussione, richiedendo il pagamento secondo i termini delle garanzie (entro i previsti 7 giorni); dunque, l'escussione è avvenuta il 4 giugno 2007 (cfr. docc. 10 e 11).

La lettera del 1° giugno 2007 di TPVI è affatto irrilevante (per non dire dilatoria

e defatigatoria), giacché essa si limita a contestare gli inadempimenti imputati ed a rifiutare i pagamenti richiesti: dunque, in sostanza, per quanto possa valere, una conferma della legittimità dell'escussione della garanzia.

La stessa considerazione valga per la lettera datata 4 giugno 2007 di Technip, evidentemente trasmessa quando la medesima ricorrente ha avuto notizia dalla Unicredit dell'escussione della Hovensa. 

Alla stregua di quanto sopra, la dichiarazione delle ricorrenti secondo il quale Hovensa avrebbe fatto tale comunicazione «*contemporaneamente all'escussione delle garanzie*» è smentita *per tabulas*.

**V - Sull'assunto carattere "accessorio" delle garanzie.**

Ad un certo punto del ricorso, le ricorrenti tentano di confondere le acque argomentando che le lettere di credito rilasciate dalla banca Unicredit in favore della Hovensa, per cui è causa, tali non sarebbero, vale a dire che le due garanzie non sarebbero autonome, ma accessorie; e ciò fanno – si badi – fornendo argomenti alla stregua della legge italiana e della giurisprudenza italiana formatasi in materia di fideiussioni (*sic*).

La tesi avversaria è priva di pregio. Palesemente.

La "*Irrevocable Stand-by Letter of Credit*" è una garanzia in forza della quale la banca Unicredit si è obbligata a pagare alla Hovensa, entro sette giorni lavorativi, una certa somma («*an aggregate amount of... to be available within (7) business days...*», dice testualmente) dietro presentazione di due documenti, vale a dire una richiesta di pagamento, quale escussione della garanzia, ed una dichiarazione di un funzionario della Hovensa, il cui fac-simile è espressamente riportato nel testo della garanzia (l'emissione della quale è stata richiesta dalla stessa Technip).

Sindacare, come fanno le ricorrenti, la circostanza che, tra i documenti da

21

presentare alla banca obbligata, vi sia una dichiarazione proveniente – più o meno – dalla stessa creditrice (o, se si vuole, assunta tale) appare attività superflua, giacché le parti dei contratti in questione (Appendix D, Exhibit 5) hanno concordato che (i) per poter escutere le garanzie, Hovensa dovesse solo allegare quella dichiarazione ufficiale che la controparte è stata inadempiente, (ii) il diritto di escutere sarebbe stato governato dalle norme "Uniform Customs" e dalla legge di New York. Si rammenti, poi, da un lato che è la stessa Technip ad aver ordinato l'emissione delle garanzie; dall'altro lato, che Technip è una importante società, appartenente ad un importante gruppo francese, che, se avesse voluto inserire nel contratto condizioni ulteriori riguardanti la possibilità di escussione della garanzia da parte di Hovensa, avrebbe potuto (e dovuto) coltivare un'apposita trattativa.

È fondamentale e dirimente rilevare che, ai sensi della legge dello Stato di New York, una lettera di credito irrevocabile costituisce un'obbligazione contrattuale indipendente della banca emittente in favore del beneficiario ed ogni questione relativa all'andamento e all'esecuzione del rapporto sottostante non può giustificare il mancato pagamento: la legge applicabile non permette né alla banca obbligata né all'ordinante di rifiutare il pagamento allegando che sussistono controversie sul rapporto sottostante.

Le "Uniform Customs" tipizzano la fattispecie; in particolare, l'art. 3 prevede l'astrattezza dei crediti documentari.

Si ponga mente, ad ogni buon conto, alle seguenti massime:

- caso *E&H Partners v. Broadway Nat'l Bank*, 39 F. Supp.2d 275, 280 (S.D.N.Y. 1998): "Un principio fondamentale che governa le lettere di credito e la caratteristica che conferisce loro utilità commerciale ed efficacia è che l'obbligazione della banca emittente di onorare il

pagamento sul credito emesso è indipendente dall'esecuzione del contratto sottostante. Il dovere della banca emittente di pagare all'atto della consegna dei documenti di credito che appaiano conformi ai termini ed alle condizioni della lettera di credito è assoluto, in mancanza di prove di intento fraudolento da parte del beneficiario" ("*A fundamental principle governing letters of credit and the characteristic which gives them their commercial utility and efficacy is that the obligation of the issuing bank to honor a draft on a credit is independent of the performance of the underlying contract. The duty of the issuing bank to pay upon the submission of the documents which appear on their face to conform to the terms and conditions of the letter of credit is absolute, absent proof of intentional fraud on the part of the beneficiary.*");

- caso *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 294 (N.Y. 1985) "L'obbligazione di pagamento in capo all'emittente è fissata dietro presentazione della richiesta di pagamento e dei documenti specificati nella lettera di credito. Non è richiesto di risolvere controversie o contestazioni riguardanti il contratto (o l'operazione) sottostante." ("*[T]he issuer's obligation to pay is fixed upon presentation of the drafts and the documents specified in the letter of credit.  It is not required to resolve disputes or questions of act concerning the underlying transaction.*").

D'altra parte, gli stessi Autori italiani che si sono occupati della fattispecie hanno dato conto dell'astrattezza e dell'autonomia delle garanzie in argomento. Si veda, ed esempio, V. Visconti, *I crediti Documentari*, Ipsoa Informatica, 1985, pag. 176, «*Secondo il principio dell'autonomia del credito documentario,*

*la banca emittente fa fronte al suo impegno di pagare il beneficiario contro*

*semplice presentazione dei documenti richiesti, purché conformi alle condizioni*

*ed ai termini del credito. La banca non entra pertanto in merito alle cause che*

*hanno portato all'utilizzo... l'obbligazione della banca emittente è solo quella*

*risultante dalla credenziale. ...il credito stand by ha lo scopo di assicurare la*

*prestazione relativa ad un contratto. Per esempio, il credito stand by può essere*

*utilizzato quale bid bond, performance bond...».*

Mentre lo stesso Autore citato *ex adverso* addirittura paragona la *stand-by letter of credit* ad un deposito cauzionale in danaro.

Insomma, le parti, hanno voluto costituire garanzie dotate di autonomia ed astrattezza, in applicazione della normativa statunitense: nella specie, le *stand-by letter of credit* per cui è causa.

Non si comprende, a questa stregua, in cosa consisterebbe il dichiarato potere delle ricorrenti di opporre al garante (Unicredit) le eccezioni opponibili al garantito (Hovensa).

Ci si può fermare qui, sul punto. I criteri interpretativi offerti dalla giurisprudenza italiana per la qualificazione di una garanzia personale quale garanzia autonoma (un'eccezione, per il diritto italiano) in luogo della fideiussione (la regola, per il diritto italiano) sono a tutti noti; ma si tratta di questione che non ha nulla a che vedere con la *"Irrevocable Stand-by Letter of Credit"* retta dal diritto statunitense.

**VI - Sul *periculum in mora.***

La carenza del requisito del *fumus* renderebbe superflua l'indagine sul *periculum.*

Ad ogni buon conto.

Le ricorrenti insistono, innanzitutto, sulla già esaminata "teoria del punto di

forza per la Hovensa". Ci siamo già pronunciati, dunque valga il rinvio.

L'altra allegazione è che Technip subirebbe un danno alla reputazione che renderebbe difficoltoso in futuro ottenere nuove garanzie: v'è da chiedersi dove sia il *periculum in mora* utile all'odierno richiesto "blocco": se veramente un tale rischio vi fosse – e di ciò, si badi, non v'è traccia di prova – basterebbe pagare le fatture emesse (come da previsioni contrattuali) dalla Hovensa e richiedere l'intervento del giudice competente, scelto dalle stesse ricorrenti. Ma l'odierno ricorso dimostra il persistente grave rifiuto delle ricorrenti al rispetto degli obblighi assunti: in questa prospettiva, Technip la reputazione già se l'è compromessa.

La doglianza avversaria non è seria.

Ciò valga anche quale risposta alla dichiarazione di chiusura del ricorso, rammentando inoltre che, in caso di accoglimento del ricorso, Hovensa resterebbe un'insoddisfatta creditrice di 35 milioni di Dollari, somma che aumenta mensilmente.

La funzione delle garanzie è quella di assicurare senz'altro l'immediato pagamento ad Hovensa senza richiedere che questa debba attendere sino a quando la controversia sul rapporto sottostante non sia definitivamente risolta.

Piuttosto, va evidenziata la sussistenza di un *periculum*, per così dire, "opposto". Il credito che vanta Hovensa per i soli maggiori costi sostenuti per i subappaltatori supera i 17 milioni di Dollari. TPVI è una società-veicolo, una sorta di "scatola" strumentale alla sottoscrizione (per ragioni eminentemente fiscali) del Contratto di Costruzione. Ciò conferma l'attualità del rischio che TPVI mai possa fare fronte alle proprie obbligazioni, di là da ogni considerazione sull'obbligo solidale di Technip. E se fosse vera la tesi delle ricorrenti sull'autonomia dei contratti e sulla sussistenza del debito in capo alla

25

sola TPVI, peggio ancora.

È poi forse il caso, nell'ambito della valutazione comparativa degli interessi e delle posizioni, rendere noto che la ricorrente Technip risulta essere non nuova, non solo a gravi inadempimenti nell'esecuzione di commesse all'estero, ma anche ad iniziative giudiziali dilatorie, evidentemente volte a sottrarsi al rispetto dei propri obblighi. Non ci è dato, per ragioni di privacy, ottenere complete informazioni sulle pendenze riguardanti la ricorrente; tuttavia, a chi scrive è per esempio noto che, sempre in relazione ad appalti e commesse all'estero, Technip Italy S.p.A. è stata di recente condannata in forza di lodo arbitrale estero al pagamento di somme in favore del committente estero e che, ciononostante, non ha dato spontanea esecuzione al lodo, tanto che il committente estero ha dovuto richiedere qui in Italia l'efficacia esecutiva del lodo, onde procedere all'esecuzione. Il lodo è stato dichiarato esecutivo e la Technip ha proposto opposizione ai sensi dell'art. 840 c.p.c., opposizione (ovviamente) rigettata dalla Corte d'Appello di Roma, con sentenza n. 2968/06 (cfr. doc. 12: il nome del creditore è stato da noi cancellato per riservatezza). Technip, a quanto pare, ha proposto ricorso per Cassazione, chiedendo la sospensione della sentenza impugnata *ex* art. 373 c.p.c., richiesta (ovviamente) rigettata con ordinanza della Corte d'Appello di Roma del 3 gennaio 2007 (cfr. doc. 13: il nome del creditore è stato da noi cancellato per riservatezza). Considerata l'efficacia esecutiva del lodo, il creditore, nel persistente rifiuto di adempiere di Technip, ha promosso un'azione esecutiva presso terzi innanzi a codesto tribunale per circa Euro 1.900.000, ottenendo l'assegnazione (R.G.E. n. 13485/05).

Infine, solo per dovere e completezza di difesa commentiamo l'inutilmente suggestiva (ancorché generica) insinuazione circa le presunte difficoltà che

26

Technip incontrerebbe nell'intentare un'azione nelle Isole Vergini Statunitensi, sede legale di Hovensa, per l'ipotesi di eventuale riconoscimento di crediti verso la Hovensa. Innanzitutto, ogni controversia fra le parti è riservata alla giurisdizione delle corti di New York. In secondo luogo, le Isole Vergini Statunitensi sono territorio degli U.S.A., notoriamente avanzato ed efficiente, con tanto di Federal Court. Senza contare che lì Technip ha, diciamo così, una "sede", giacché v'è la sede di TPVI. Ma assorbente al riguardo è la considerazione che le ricorrenti hanno accettato di "assumersi il rischio" (come si è visto insussistente) di dover gestire controversie ed eventuali iniziative esecutive alle Isole Vergini Statunitensi: il paventato rischio e, in altri termini, strutturale al rapporto di cu si tratta.

\* \* \*

A questo punto, giova spendere una parola nei confronti del debitore che direttamente interessa in questa sede in forza dell'escussione delle garanzie.

La banca Unicredit è senz'altro obbligata verso Hovensa e deve pagare. Ma ciò non ha ancora fatto, violando (a tacer d'altro) gli obblighi ai quali è astretta in forza delle garanzie. Su ciò, evidentemente, Hovensa si riserva ogni iniziativa, anche in considerazione della condotta processuale tenuta in questa sede.

\* \* \*

Considerato il numero di pagine sin qui dedicare al ricorso avversario, appare opportuno fare uno schematico riepilogo delle ragioni a fondamento del rigetto del ricorso avversario, non senza aver rammentato che la giurisdizione sul rapporto dedotto in giudizio non è dell'Autorità giudiziaria italiana.

1.  Stiamo parlando di un ritardo nella consegna dei lavori appaltati di circa sette mesi, nonostante, in corso di rapporto, le parti abbiano avuto occasione di ridefinire taluni aspetti del rapporto medesimo (il noto

Settlement Agreement).

2.  Non è in discussione l'entità degli importi dovuti.

3.  Le ricorrenti non pongono in discussione l'esistenza dei fatti loro contestati quali inadempimenti dalla Hovensa; né pongono in discussione la sussistenza (e, quindi, la genuinità) di reciproche contestazioni o di una controversia tra loro sul merito dell'andamento del rapporto d'appalto; lamentano, invece, che il committente Hovensa sarebbe inadempiente o responsabile degli inadempimenti imputati alle ricorrenti; ciò fanno, giova ribadire, dinanzi ad un Giudice non dotato di giurisdizione e con riferimento ad un rapporto giuridico – quello dedotto nel presente giudizio – intercorrente fra terzi, vale a dire Hovensa e Unicredit (il rapporto di garanzia).

4.  La controversia tra le parti del rapporto d'appalto è genuina. Allo stato degli atti, non c'è dolo o frode da parte di Hovensa. E ciò emerge dalle stesse congetture avanzate nel ricorso circa assunte trattative pendenti tra le parti, utili per un accordo transattivo: intenderebbero, forse, le ricorrenti, sostenere che la loro disponibilità ad una transazione su lite temeraria? L'*exceptio doli* è uno strumento eccezionale, che richiede indefettibilmente l'immediata e certa prova della frode, prova nella specie insussistente.

5.  Le ricorrenti, nella sostanza, sostengono che delle pretese di Hovensa dovrebbe rispondere esclusivamente TPVI, dunque che l'escussione della garanzia riferita a TPVI sarebbe illegittima; ma anche ciò, come si è ampiamente detto, è errato, dovendosi invece concludere nel senso del permanente obbligo della banca Unicredit di dare corso all'escussione di entrambe le garanzie, giacché Hovensa ha il diritto di ricevere da

ciascuna delle ricorrenti gli importi dovuti, ovviamente sino alla concorrenza del dovuto (non vi sono, cioè, "duplicazioni" del credito).

6. Eventuali maggiori o ulteriori indagini sul (carente) *fumus boni iuris* non sarebbero neanche prospettabili al giudice del cautelare.

7. L'eventuale pregiudizio economico che le ricorrenti riuscissero a vedersi riconosciuto all'esito di un giudizio ordinario innanzi al giudice competente, anche sotto la specie dello scomodato "danno alla reputazione", sarebbe comunque interamente risarcibile dalla resistente Hovensa.

### P.T.M.

la HOVENSA L.L.C., come in epigrafe rappresentata e difesa, chiede il rigetto integrale del ricorso avversario, insistendo con la Unicredit Banca d'Impresa S.p.A. nella richiesta di immediato pagamento di cui all'escussione del 4 giugno 2007.

Con vittoria di spese e compensi per il procedimento".

Si depositano, oltre alla copia del ricorso trasmesso via fax dai ricorrenti, i seguenti documenti in copia:

A) Procura alla lite del 15 giugno 2007, autenticata dal Notary Public Lynda G. Mahammad e munita di Apostille in data 18 giugno 2007;

1) Lettera d'intenti Hovensa/Technip del 10 febbraio 2005;

2) Lettera d'intenti Hovensa/Technip del 10 febbraio 2005;

3) Lettera di proposta contrattuale della Technip France del 6 dicembre 2004;

4) Stampa dal sito internet Technip;

5) Lettera Hovensa del 15 febbraio 2007;

6) Lettera Hovensa del 29 maggio 2007

7) Lettera Hovensa del 29 maggio 2007;

8) Lettera Hovensa del 1° giugno 2007;

9) Lettera Hovensa del 1° giugno 2007;

10) Escussione Hovensa – Unicredit ricevuta il 4 giugno 2007;

11) Escussione Hovensa – Unicredit ricevuta il 4 giugno 2007;

12) Sentenza Corte d'Appello di Roma n. 2986/06 relativa a Technip Italy;

13) Ordinanza Corte d'Appello di Roma di rigetto di richiesta di sospensiva proposta dalla Technip Italy;

14) Lettera Hovensa del 6 febbraio 2007;

15) Lettera Hovensa del 5 giugno 2007;

16) Lettera Hovensa del 5 giugno 2007;

17) Lettera Hovensa del 25 gennaio 2007;

18) Sentenze delle corti statunitensi in materia di lettere di credito

19) Contratto Hovensa / Technip / TPVI con relative Appendix citate nella narrativa;

20) Settlement Agreement Hovensa / Technip / TPVI del 31 marzo 2006.

Roma, 20 giugno 2007

Avv. Andrea Bernava

Avv. Cristina Chiomenti

Avv. Carlo Romita

Avv. Vittorio Tadei

30

EXHIBIT 17

HOVENSA L.L.C.
Low Sulfur Gasoline Unit Project

AGENCY AGREEMENT

CONTRACT FORM OF AGREEMENT

Contractor: TIGER ST. CROIX CONSTRUCTION INC.

| | | | |
|---|---|---|---|
| Address: | P. M.B. 164<br>4093 Diamond Ruby – Suite 7<br>Christiansted, VI 00820. | Contract N.° | |
| Contact: | D. McCollister | Work Location: St. Croix, USVI | |
| Telephone: | 800-288-6503 | Address: | Hovensa L.L.C. Refinery |
| Facsimile: | 225-215-6442 | Register N.°: | |
| D-U-N-S N°.: | | Commodity Code: | |

Contract is effective as of the March 16, 2006, between HOVENSA L.L.C. (OWNER), acting through its agent TPVI, LTD and the above named CONTRACTOR that all Work specified below, which is a portion of the goods and services to be provided by CONTRACTOR, and, in accordance with all the provisions, consisting of the following Contract Documents:

Contract Form of Agreement;
Particular Terms and Conditions of Contract, 2229 0000 PTC 1799 06 rev.0;
General Terms and Conditions of Contract, 0000 GTC S01 rev.1;
Exhibit A, Scope of Work, 2229 0000 CSA 1399 06 rev.0;
Exhibit B, Price Schedule, 2229 0000 CSB 1399 06 rev.0;
Exhibit C, Time Schedule, 2229 0000 CSC 1399 06 rev.0;
Exhibit D, Free-issue Drawings, 2229 0000 CSD 1399 06 rev.0;
Exhibit E, Free-issue Specifications, 2229 0000 CSE 1399 06 rev.0;
Exhibit H, Quality Assurance/Quality Control Requirements, 2229 0000 CSH 1399 06 rev.0;
Exhibit I, Health, Safety and Environmental Requirements, 2229 0000 CSI 1399 06 rev.0;
Exhibit J, Coordination Procedure

All documents, drawings, specifications, procedure, etc. attached to and/or mentioned into the above documentation.

1. WORK TO BE PERFORMED: except as specified elsewhere in the Contract, CONTRACTOR will furnish all plant; labor; materials; tools; supplies; equipment; transportation; supervision;

technical, professional and other services; and will perform all operations necessary and required to satisfactorily:

Execute the Mechanical Erection Work related to Low Sulfur Gasoline Unit Project, including steel structures erection, piping fabrication and erection, equipment erection etc.

2.  SCHEDULE: the Work will be performed in accordance with the dates set in Exhibit C, Time Schedule.

3.  COMPENSATION: as full consideration for the satisfactory performance by CONTRACTOR of this Contract, OWNER will pay to CONTRACTOR compensation in accordance with the prices set in Exhibit B, Price Schedule and document 2229 0000 PS 1399 06, and the payment provisions of this Contract.

This Contract embodies the entire agreement between OWNER and CONTRACTOR and supersedes all other writings or oral understandings. The parties will not be bound by or be liable for any statement, representation, promise, inducement or understanding not set forth herein.

Date, 4/7/06

OWNER:

HOVENSA L.L.C.
by TPVI, LTD, Agent

Authorized Signature: Vincenzo Laganà

Print Title:            Company Representative

CONTRACTOR:

TIGER ST. CROIX
CONSTRUCTION INC.

Authorized Signature: D. McCollister

Print Title:            President

EXHIBIT 18

HOVENSA
St. Croix, U.S.V.I.

Low Sulfur Gasoline Unit

Rev. 6
03/03/05

**Appendix A**
**Scope Of Work**

buildings, including crane girders, and crane rails, miscellaneous pipe and electrical supports in accordance with Engineering Standards 470 series.

b.  Grout all pipe racks, columns, structural steel, stairs and ladder pads, and instrument stands.

c.  Furnish all galvanized construction for ladders, stairs, stair landings, handrail, miscellaneous platforms and minor structures.

d.  Furnish all hot dip galvanized construction for major structures including compressor shelter(s) in lieu of painting.

5.6   BUILDINGS

5.6.1   CONTRACTOR will furnish materials and construct the following buildings and equipment shelters as complete, turnkey, fully operational and functional facilities. Refer to section 3.2.2.1, Engineering Standards 440-480, and Appendix F, Exhibit 10 for design details.

a.  ISB1. Electrical Substation Building sized to house all major electrical equipment and provide power for the new LSG Unit. Pre-fabricated steel building is acceptable.

b.  ISB1. Satellite Building sized to house control equipment, marshalling panels, I/O cabinets, etc., for the new LSG Unit. Pre-fabricated steel building is acceptable.

c.  Compressor Shelter(s) sized to house all centrifugal and reciprocating compressors. Will have elevated platforms for top and bottom equipment access, open sides with 8 foot partial siding, and maintenance bridge crane.

d.  CEMS & Analyzer Shelter(s) sized to house all CEMS and analyzer equipment.

5.7   MECHANICAL

5.7.1   CONTRACTOR will:

a.  Furnish and install equipment (vessels, exchangers, pumps, heater, compressors, etc.) as shown on the Equipment List, and in accordance with equipment specifications in Appendix F and Engineering Standards 500-700 series.

b.  Remove all spiders, shipping braces, lifting lugs and tailing lugs after vessel erection. Maintain any equipment purges until piping or internals work starts to prevent internal corrosion. Install internals and any shipped loose items from fabricators.

c.  Perform field stress relieving of any equipment as required including temporary burners and temperature monitoring equipment as necessary.

d.  Rough align all rotating equipment. Grout all equipment to the foundation. Make cold final alignment to the manufacturer's tolerances.

Page 43 of 55

HOVENSA
St. Croix, U.S.V.I.

Low Sulfur Gasoline Unit

Rev. 6
03/01/05

Appendix A
Scope Of Work

    e.  Install initial charge of all lubricants, connect oil mist, and connect any space heaters required for rotating equipment prior to commissioning.  Refer to Mechanical Completion checklist in Appendix X.

    f.  Check rotating machinery for correct direction of rotation and for freedom of moving parts before connecting driver.  Electrically connect and run-in driver for a minimum of four (4) hours before reconnecting to driven machine to make final cold alignment.  HOVENSA will operate motor for run-in.  Refer to Appendix X.

    g.  API 686 Vibration criteria will prevail for all mechanical rotating equipment, unless Engineering Standards are more restrictive.  Final acceptance requires fully coupled and operating run test of complete assemblies.

    h.  Provide maintenance to equipment as recommended by manufacturer from the time of arrival on Work Site until commissioning.  Refer to Appendix X.

    i.  Seal oil piping will be sized to the API or HOVENSA's Engineering Standards, per direction of HOVENSA.

    j.  HOVENSA will furnish and load catalyst.  Reactor vessel opening and closing will be by CONTRACTOR.

    k.  Open vessels including tray manways, install internals not completed in vendor shop if any, provide final inspection, and close vessels upon final acceptance by HOVENSA.

## 5.8  PIPING

### 5.8.1  CONTRACTOR will:

    a.  Furnish and install all IBSL process, utility, and sewer piping systems for the new LSG Unit including shop fabricated piping, valves, shoes, guides, supports, spring hangers, anchors, base ells, etc in accordance with P&IDs in Appendix F and Engineering Standards, 800 series.

    b.  Furnish and install safety showers and eyewash stations using potable water.

    c.  Provide all weld procedures, WPS's and PQR's to HOVENSA for approval prior to start of Work.  Provide all testing and certification for welders at time of hire to HOVENSA.

    d.  All temporary supports used during piping erection will be of sufficient strength as to prevent any undue stress or strain on equipment, instruments, or other piping components.  All temporary supports are to be removed when permanent supports are installed.  In no case will CONTRACTOR be allowed to utilize vessels, or other equipment connections as temporary supports.

HOVENSA                          Low Sulfur Gasoline Unit                          Rev. 6
St. Croix, U.S.V.I.                                                                03/01/05

Appendix A
Scope Of Work

6.4    To facilitate both Mechanical Completion and Commissioning planning and scheduling, the Work turnover boundaries will be determined during Engineering. Each line item in the respective Equipment list, Motor list, Instrument list, Piping Line list, etc., will include a reference (Turnover Number) to which system it is assigned. Assignment of Turnover Numbers is a requirement of issuing these documents for construction (IFC) and receiving the corresponding earned value credit.

7.0    COMMISSIONING

A commissioning team, under the direction and responsibility of Hovensa, shall be formed to Commission, Start-up, and Performance Test the work.

The commissioning team shall be responsible for the following activities:

- Commissioning
- Start – up
- Achievement of Stable operation
- Performance Acceptance Testing
- Interim Operation and Maintenance

The contractor shall provide services required to assist HOVENSA in the performance of the above activities as requested by Hovensa.

Activities associated with Pre-commissioning and Performance Acceptance Testing will be performed with the assistance of HOVENSA and are considered part of this Contractors Lump Sum Scope of Work. All other assistance (work) requested by Hovensa shall be performed Cost Reimbursable in accordance with the unit rates contained within this agreement.

Under the direction of Hovensa the areas of responsibility of the Commissioning Team are as follows:

a.    Develop commissioning and start-up plans, systems and procedures and coordinate the review and approval of such with HOVENSA's Project Team and appropriate Department management.

b.    Ensure that the commissioning and start-up plans, systems and procedures incorporate comprehensive consideration of safety, health and risk for personnel, the Facilities and the environment.

c.    Conduct orientation/review seminars with all pertinent team members to ensure a clear understanding of the responsibilities, procedures, and lines of communication to be used in executing commissioning and start-up activities.

d.    Pre-commission all equipment. This includes motor running tests to confirm direction before coupling driver to driven equipment, CONTRACTOR and

HOVENSA
St. Croix, U.S.V.I.

Low Sulfur Gasoline Unit

Rev. 6
03/01/05

Appendix A
Scope Of Work

HOVENSA witnessed run tests with equipment fully coupled to confirm vibration, bearing temperatures, motor stator temperatures, etc. CONTRACTOR to: conduct instrument checks for continuity and functional equipment operation, Tower spray tests and tray tests, on-Work Site final calibration of PSV's.

f.    Routinely (weekly and monthly) prepare and present necessary reports to HOVENSA during startup and early operations.

g.    Coordinate and monitor the day-to-day progress of the commissioning and start-up activities versus the adopted schedule and plans.

h.    Verify that safety and protection systems are in place, functionally operative and that all pre-commissioning test and checks have been successfully performed.

i.    Plan, witness, and verify performance acceptance testing.

8.0    EXHIBITS

1.    General Refinery Plot Plan

2.    Preliminary LSG Unit Arrangement Plan - Removed

3.    Preliminary KBR Process Flow Diagrams - Removed

4.    Preliminary KBR Equipment List - Removed

5.    EMRE / KBR Responsibility Matrix

6.    Work Site Laydown Areas

7.    EMRE / KBR Preliminary Major Equipment Datasheets - Removed

8.    Lifting Loads Permit Procedure #3582

<u>CERTIFICATE OF SERVICE</u>

        I, Beatriz Biscardi, am over the age of eighteen (18) years, not a party to this action, caused a true and correct copy of the foregoing Notice of Motion, dated June 4, 2008, Defendant's Memorandum of Law in Support of Their Motion to Dismiss the First Amended Complaint, dated June 4, 2008, Declaration of Patrick Picard, dated June 4, 2008, Declaration of Etienne Gory, dated June 3, 2008, and Declaration of Christopher Paparella, dated June 4, 2008, to be served on this 4th day of June, 2008, to the following:

> VIA ELECTRONIC FILING & FEDEX
> Gabriel Del Virginia
> Law Offices of Gabriel Del Virginia
> 641 Lexington Avenue, 21st floor
> New York, NY 10022
>
> VIA E-MAIL
> George T. Shipley
> Jonathan Smith
> Shipley Snell Montgomery LLP
> 4600 First City Tower
> 1001 Fannin
> Houston, TX 77002
>
> ATTORNEYS FOR PLAINTIFF HOVENSA
>
> I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 4, 2008
      New York, New York

                                  /s/ Beatriz Biscardi
                                     Beatriz Biscardi